SAMIR DEGER-SEN*
samir.deger-sen@lw.com
WILLIAM M. FRIEDMAN*
william.friedman@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Tel: 202.637.2200
Fax: 202.637.2201

AMANDA BARNETT (SBN 319046)
Amanda.Barnett@lw.com
JESSIE CAMMACK (SBN 329794)
Jessie.Cammack@lw.com
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Tel: 213.485.1234
Fax: 213.891.8763

AHILAN ARULANANTHAM
(SBN 237841)
aarulanantham@aclusocal.org
MICHAEL KAUFMAN
(SBN 254575)
mkaufman@aclusocal.org
JESSICA KARP BANSAL
(SBN 277347)
jbansal@aclusocal.org
MICHELLE (MINJU) CHO
(SBN 321939)
mcho@aclusocal.org
ACLU Foundation of Southern
California
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500

Attorneys for Plaintiffs-Petitioners
*Pro hac vice application forthcoming

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### EASTERN DIVISION

KELVIN HERNANDEZ ROMAN,
BEATRIZ ANDREA FORERO
CHAVEZ, MIGUEL AGUILAR
ESTRADA, on behalf of themselves and
all others similarly situated,

        Petitioners-Plaintiffs,

v.

CHAD F. WOLF, Acting Secretary, U.S.
Department of Homeland Security;
MATTHEW T. ALBENCE, Deputy
Director and Senior Official Performing
the Duties of the Director, U.S.
Immigration and Customs Enforcement;
DAVID MARIN, Director of the Los
Angeles Field Office, Enforcement and
Removal Operations, U.S. Immigration
and Customs Enforcement; and JAMES
JANECKA, Warden, Adelanto ICE
Processing Center,

        Respondents-Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 5:20-cv-00768

**ADELANTO COVID**

**PETITION FOR WRIT OF
HABEAS CORPUS AND CLASS
ACTION COMPLAINT FOR
INJUNCTIVE AND
DECLARATORY RELIEF**

**INTRODUCTION**

1.     Petitioners-Plaintiffs (Plaintiffs) are people held in civil immigration detention at the Adelanto ICE Processing Center ("Adelanto") in the midst of the current COVID-19 pandemic. The only effective means of preventing the spread of COVID 19 is social distancing—where people remain at least six feet apart from each other. But conditions at Adelanto render that impossible. People sleep on bunk beds in crowded cells or dormitories. They eat meals at packed tables, seated shoulder to shoulder. They use communal bathrooms. They have little or no access to hand sanitizer, gloves, or masks. The government's own medical subject matter experts have described this as a "tinderbox scenario." On behalf of themselves and a class of persons detained at Adelanto, Petitioners-Plaintiffs respectfully request an order directing Defendants to implement social distancing at Adelanto, including by releasing sufficient detainees to make social distancing possible.

2.     Dr. Robert Greifinger, a physician with thirty years of experience in medical care for detained populations, who has consulted for the Department of Homeland Security and formerly managed medical care for inmates in the custody of New York City and the New York State prison system, has concluded that "Release is the most important means of mitigating the spread of COVID-19 in Adelanto," because "[s]ocial distancing . . . will be impossible in Adelanto without significant downsizing." Dr. Todd Schneberk, an emergency medicine physician and assistant professor of clinical emergency medicine at the University of Southern California, agrees that "the only effective action to combat COVID-19 at Adelanto that is practically available at this time would be to implement social distancing" but "it would not be possible to achieve adequate social distancing if more than one person was housed in each cell" or "if bunks were within less than 8-10 feet of each other" as is the current practice.

3.     Given the population density inside Adelanto and the practical impossibility of achieving social distancing under current conditions, it is very

1   likely that hundreds of people inside Adelanto, as well as many of the staff who

2   work there, will contract COVID-19. If the disease progresses as it usually does,

3   one in five of them will require hospitalization, overwhelming regional medical

4   capacity. Dozens will likely perish if conditions at Adelanto remain the same.

5       4.    Over the past two weeks, this Court has ordered the immediate release

6   of at least two dozen individuals confined at Adelanto because of the enormous

7   risk to their health and safety, holding that "[u]nder the Due Process Clause, a civil

8   detainee cannot be subject to the current conditions of confinement at Adelanto,"

9   where there is "potential exposure . . . to a serious, communicable disease . . . [that

10  is] very likely to cause a serious illness." *Castillo* TRO at 9.[1] *See, e.g.*, *Castillo v.*

11

12      [1] *See, e.g., Castillo v. Barr* ("*Castillo* TRO"), No. CV 20-00605 TJH

13  (AFMx), 2020 WL 1502864, at *11 (C.D. Cal. Mar. 27, 2020) (ordering two
    detainees released); TRO and Order to Show Cause at 12, *Fraihat v. Wolf*

14  ("*Fraihat* TRO"), No. ED-CV2000590-TJH (C.D. Cal. Mar. 30, 2020) (ordering a
    detainee released); TRO and Order to Show Cause at 14, *Hernandez v. Wolf*

15  ("Hernandez TRO"), Case No. EDCV 20-00617 TJH (KSx), (C.D. Cal. Apr. 1,
    2020), ECF No. 17; TRO and Order to Show Cause at 2, *Sudney v. Wolf*, Case No.

16  EDCV 20-00626 TJH (SHKx), (C.D. Cal. Apr. 2, 2020), ECF No. 12; TRO and
    Order to Show Cause at 2, *Munoz v. Wolf*, Case No. EDCV 20-00625 TJH

17  (SHKx), (C.D. Cal. Apr. 2, 2020), ECF No. 14; *Robles Rodriguez v. Wolf*, No.

18  5:20-CV-00527 (C.D. Cal. Apr. 3, 2020) ECF Nos. 35-39, 42-43 (granting
    temporary restraining orders on behalf of six Adelanto detainees); TRO and Order

19  to Show Cause at 2, *Perez Cruz v. Barr*, Case No. EDCV 20-00668 TJH, (C.D.

20  Cal. Apr. 3, 2020), ECF No. 8; TRO and Order to Show Cause at 2, *Singh v. Barr*,
    Case No. EDCV 20-00653 TJH, (C.D. Cal. Apr. 3, 2020), ECF No. 11; TRO and

21  Order to Show Cause at 2, *Nguyen v. Marin*, Case No. EDCV 20-00646 TJH,

22  (C.D. Cal. Apr. 3, 2020), ECF No. 10; TRO and Order to Show Cause at 2, *Bogle
    v. Barr*, Case No. EDCV 20-00650 TJH, (C.D. Cal. Apr. 3, 2020), ECF No. 12;

23  TRO and Order to Show Cause, *Eyere v. Wolf*, Case No. 5:20-cv-00700-TJH-

24  MAA (C.D. Cal. Apr. 9, 2020), ECF No. 17; TRO and Order to Show Cause,
    *Yanez Montoya v. Wolf*, Case No. 5:20-cv-00713 (TJH) (C.D. Cal. Apr. 10, 2020),

25  ECF No. 11; TRO and Order to Show Cause, *Hernandez Arevalo v. Wolf*, Case No.

26  5:20-cv-00712 (TJH) (C.D. Cal. Apr. 10, 2020), ECF No. 14; TRO and Order to
    Show Cause, *Zendejas Lopez v. Wolf*, Case No. 5:20-cv-00702 (TJH) (C.D. Cal.

27

28

*Barr,* TRO and Order to Show Cause ("*Castillo* TRO"), No. CV 20-605, Dkt. 32, at 9 (March 27, 2020). Those decisions implement a Constitutional command: the government cannot allow the people in its custody to suffer and die from infectious disease. The risk of harm from COVID-19 is "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

5.     The nature of the pandemic and ICE's response has put all Adelanto detainees at risk of COVID-19 infection. But the vast majority of them lack the resources to file individual lawsuits. Moreover, even if they could all somehow sue, piecemeal individualized litigation is too slow to meet the emergency at hand, too disorganized to ensure an orderly process of release, and too resource-intensive to be sustainable.

6.     Therefore, this class action is a superior mechanism to address this extraordinary crisis and resolve class members' urgent claims for relief. Plaintiffs propose, as one possible means of addressing this crisis, that this Court issue an injunction to implement a truncated system for considering Proposed Class Members' claims for release, similar to that in place for ICE detainees in the District of Massachusetts. *See Savino v. Sousa*, Mem. & Order at 7, 29, No. 20-cv-10617-WGY (D. Mass. Apr. 8, 2020), ECF No. 64 (emphasis added).[2] Such an approach would allow this Court to assess the individual circumstances of detainees at Adelanto, and craft appropriate conditions of release, as it has done in

Apr. 8, 2020), ECF No. 12; TRO and Order to Show Cause, *Moreno v. Wolf*, Case No. 5:20-cv-00718 (TJH) (C.D. Cal. Apr. 9, 2020), ECF No. 13.

[2] *Cf.* In re Expedited Detention Hearing Procedures Effective April 7, 2020, Miscellaneous General Order 20-12 (D. Alaska) (establishing expedited procedures for consideration motions for pretrial and presentence release based on COVID-19); Criminal Case Standing Order Re: Procedure for Review of Detention Orders in Light of Coronavirus Pandemic, M.J. Nat Cousins, Effective March 16, 2020 (N.D. Cal.) (establishing expedited procedure for any request to reopen a detention hearing on health grounds in light of COVID 19 pandemic).

the many individual habeas petitions it has granted. But it would also allow for a systematic and expeditious process where the vindication of any given detainee's constitutional rights does not turn on access to counsel, language and educational skills, or sheer luck.

7.      This Court is not alone in acting decisively in the face of this enormous public health threat. Around the country, courts, government officials, and prison systems are increasingly recognizing that release from detention is the only way to protect incarcerated people from COVID-19. On March 24, a panel of the Ninth Circuit *sua sponte* ordered the immediate release from civil detention of an immigrant who is in removal proceedings, holding that release was necessary "[i]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers." *Xochihua-Jaimes v. Barr*, No. 18-71460, 2020 WL 1429877, at *1 (9th Cir. Mar. 24, 2020). Most courts have reached the same conclusion. *See, e.g., Coronel v. Decker*, 20-cv-2472, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) (ordering immediate release of four petitioners with chronic medical conditions on due process grounds); *People ex rel. Stoughton on behalf of Little et al. v. Brann*, Index No. 260154/2020 (Bronx Sup. Ct. Mar. 25, 2020) (ordering immediate release of 106 petitioners held at Rikers on a non-criminal technical parole violation who are older or have underlying medical conditions).[3]

---

[3] *See also Basank v. Decker*, No. 1:20-cv-02518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) (same, for ten petitioners); *Jovel v. Decker,* 20 Civ. 308 (GBD) (SN), 2020 WL 1467397 (S.D.N.Y. Mar. 26, 2020) (ordering release of petitioner with unspecified medical problems within eight days unless bond hearing provided); *see also In re Extradition of Alejandro Toledo Manrique*, Case No. 19-mj-71055-MAG-1 (TSH), 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (ordering the release of a 74-year old detainee after rejecting "the government's suggestion that [the plaintiff] should wait until there is a confirmed outbreak of COVID-19 in [the facility] before seeking release" as "impractical [because b]y then it may be too late"); *United States v. Perez*, 19 Cr. 297 (PAE), 2020 WL

1    8.    This Court should order Defendants to comply with the Fifth

2   Amendment by mandating social distancing at Adelanto, including by releasing a

3   sufficient number of detainees to make that social distancing possible.

4                      **JURISDICTION AND VENUE**

5    9.    Jurisdiction is proper and relief is available pursuant to 28 U.S.C.

6   § 1331 (federal question), 28 U.S.C. § 1346 (original jurisdiction), 5 U.S.C. § 702

7   (waiver of sovereign immunity), 28 U.S.C. § 2241 (habeas corpus jurisdiction),

8   and Article I, Section 9, clause 2 of the United States Constitution (the Suspension

9   Clause). This Court has the power in equity to issue declaratory and injunctive

10   relief for violations of the Constitution by federal officials. *See Ex Parte Young*,

11   209 U.S. 123 (1907); *Philadelphia Co. v. Stimson*, 223 U.S. 605, 620 (1912)

12   (applying *Ex Parte Young* principle to federal government officials); 5 U.S.C.

13

14   1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (ordering release of detainee with serious
     lung disease and other significant health problems); *United States v. Fellela*, No.
15   3:19-cr-79, 2020 U.S. Dist. LEXIS 49198, at *1 (D. Conn. Mar. 20, 2020)
16   (ordering release of diabetic criminal defendant awaiting sentencing, even though
     there had been no confirmed COVID-19 cases in the facility and despite
17   government's steps to prevent the spread of coronavirus); *United States v.*
18   *Stephens*, 15-cr-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020)
     (releasing pretrial detainee in light of "the unprecedented and extraordinarily
19   dangerous nature of the COVID-19 pandemic"); *State v. Ferguson*, Order, No.
20   2019-270536-FH (Mich. Ct. App. Mar. 23, 2020) (ordering defendant's immediate
     release on bond due to "the public health factors arising out of the present public
21   health emergency"); *In re Request to Commute or Suspend County Jail Sentences*,
22   Dkt. No. 084230 (N.J. Mar. 22, 2020) (court consent order, creating immediate
     presumption of release for every person serving a county jail sentence based on
23   COVID-19).
24        Additional cases ordering release of civil immigration detainees include
25   *Malam v. Adduci*, No. 20 Civ. 10829, 2020 WL 1672662 (E.D. Mich. Apr. 5,
     2020), *as amended* (Apr. 6, 2020); *Ali v. Dep't of Homeland Sec.*, No. 20 Civ. 140,
26   2020 WL 1666074 (S.D. Tex. Apr. 2, 2020); *Hernandez v. Decker*, No. 20 Civ.
27   1589, 2020 WL 1547459 (S.D.N.Y. Mar. 31, 2020); *Thakker v. Doll*, No. 20 Civ.
     480 (M.D. Pa. Mar. 31, 2020); and *Jimenez v. Wolf*, No. 18 Civ. 10225, (D. Mass.
28   Mar. 25, 2020).

§ 702.

10.     Venue is proper in the Central District of California under 28 U.S.C. § 1391, because at least one federal Defendant resides in this District, the Individual Plaintiffs are imprisoned in this District, and a substantial part of the events giving rise to the claims in this action took place in this District. Venue is also proper under 28 U.S.C. § 2243 because the immediate custodians of all the Individual Plaintiffs reside in this District.

## PARTIES

*Plaintiffs*

11.     Kelvin Hernandez Roman is a 31-year-old citizen of El Salvador. In 2012, an asylum officer found that he had a credible fear of returning to El Salvador. An immigration judge eventually administratively closed his removal proceedings in an exercise of prosecutorial discretion. He was subsequently transferred to ICE following an arrest in July 2019 for which no charges were filed, and has been detained in Adelanto ever since. He suffers from asthma and has been prescribed an inhaler.

12.     Beatriz Forero Chavez is a 31-year-old citizen of Colombia who fled to the United States in 2019 to seek asylum. She was detained upon her arrival at Los Angeles International Airport. An asylum officer found that she has a credible fear of returning to Colombia. Beatriz has been detained in Adelanto since September 2019.

13.     Miguel Aguilar Estrada is a 52-year-old citizen of Mexico. He has been diagnosed with diabetes and hypertension. He has lived in the United States for more than 30 years. He was arrested by ICE outside of his home in front of his two minor children for being "present in the United States without being admitted or paroled." He has been detained in Adelanto since December 2019.

*Defendants*

14.     Defendant Chad F. Wolf is the Acting Secretary for DHS. In this capacity, he has responsibility for the administration of immigration laws pursuant to 8 U.S.C. § 1103(a), has authority over ICE and its field offices, and has authority to order the release of Plaintiffs. At all times relevant to this Complaint, Defendant Wolf was acting within the scope and course of his position as the Acting Secretary for DHS. Defendant Wolf is sued in his official capacity.

15.     Defendant Matthew T. Albence is the Deputy Director and Senior Official Performing the Duties of the Director of ICE. Defendant Albence is responsible for ICE's policies, practices, and procedures, including those relating to the detention of immigrants. Defendant Albence is a legal custodian of Plaintiffs. At all times relevant to this Complaint, Defendant Albence was acting within the scope and course of his position as an ICE official. He is sued in his official capacity.

16.     Defendant David Marin is the Director for the Los Angeles Field Office of Enforcement and Removal Operations ("ERO") within ICE, a federal law enforcement agency within the Department of Homeland Security ("DHS"). ERO is a division of ICE that manages and oversees the immigration detention system. In his capacity as Field Office Director for ERO, Defendant Marin exercises control over and is a custodian of immigration detainees held at Adelanto, including all Plaintiffs in this case. At all times relevant to this Complaint, Defendant Marin was acting within the scope and course of his employment with ICE. He is sued in his official capacity.

17.     Defendant James Janecka is Warden of Adelanto in San Bernardino County, where all Plaintiffs are detained. Defendant Janecka is the immediate, physical custodian of Plaintiffs. He is named in his official capacity.

# FACTUAL ALLEGATIONS

## A.     COVID-19 Poses a Significant Risk of Illness or Death.

18.     COVID-19 is a disease caused by a coronavirus that has reached pandemic status.

19.     As of April 13, 2020, it has killed almost 22,000 people in the United States. In the Los Angeles metropolitan area, there are 9,420 confirmed cases and 320 known deaths. In San Bernardino County, where Adelanto is located, the number of confirmed cases is doubling every five days.

20.     Patients who develop COVID-19 can develop complications at an alarming pace. Patients can show the first symptoms of infection within two days of exposure, and their condition can seriously deteriorate in five days or less.

21.     People who contract severe cases of COVID-19 need intensive medical support, requiring highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians.

22.     The extensive degree of support that COVID-19 patients need can quickly exceed local health care resources. When healthcare systems are overwhelmed, doctors and public health authorities are inevitably left to allocate scarce resources regarding who receives care.

23.     There is no known cure or FDA-approved treatment for COVID-19 at this time. The only way to protect people from grave illness and death is to prevent them from being infected with the coronavirus at the outset. Thus, the only known means of minimizing the risk of infection is social distancing—*i.e.*, staying at least 6 feet from others at all times—coupled with rigorous sanitization practices.

**B.      Everyone Detained at Adelanto Is Vulnerable to Harm from COVID-19.**

24.      Every adult faces grave risks of harm from COVID-19, not just those deemed particularly vulnerable. The CDC has reported that up to 20% of coronavirus hospitalizations in the United States were of people under 44. And the WHO has reported that, globally, 10–15% of adults under 50 who contract COVID-19 suffer moderate to severe cases.

25.      Some young people who become seriously ill or die from COVID-19 have pre-existing medical conditions, but many do not. For example, in New York, 36 percent of people between 30 and 39 who died from the virus had no pre-existing conditions.[4]

26.      Doctors and scientists do not yet know why some otherwise healthy young people are so susceptible to COVID-19. Some evidence suggests that exposure to larger viral loads—such as occurs with close, in-person interaction in enclosed spaces, at short distances—may lead to more serious infection.[5]

27.      Preliminary data show that Black and Hispanic people are twice as likely to die of the virus as white people.[6] The Adelanto detainees are significantly more Black and Hispanic than the general American population.

28.      Adelanto also likely includes a disproportionate number of people at

---

[4] *See* Chris Mooney, et. al., *Hundreds of young Americans have now been killed by the coronavirus, data shows*, Washington Post, April 8, 2020, available at https://www.washingtonpost.com/health/2020/04/08/young-people-coronavirus-deaths/.

[5] *See* Joshua Rabinowitz and Caroline Bartman, *These Coronavirus Exposures Might be the Most Dangerous*, New York Times, April 1, 2020, available at https://www.nytimes.com/2020/04/01/opinion/coronavirus-viral-dose.html.

[6] *See* NYC Health, *Age adjusted rate of fatal lab confirmed COVID-19 cases per 100,000 by race/ethnicity group*, April 6, 2020, at https://www1.nyc.gov/assets/doh/downloads/pdf/imm/covid-19-deaths-race-ethnicity-04082020-1.pdf?referringSource=articleShare

heightened risk for other reasons. The United States Centers for Disease Control and Prevention (CDC) and other experts have identified several particularly vulnerable groups, including older adults, people who are immunocompromised, and people with a variety of pre-existing medical conditions of any age, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis), diabetes, asthma, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, pregnancy (current or recent), and obesity.

29.    A large percentage of the individuals at Adelanto likely have these medical conditions because they are disproportionately indigent with little or no access to high-quality healthcare. In many cases, these individuals may not even be aware that they have relevant pre-existing conditions. Many class members likely have undiagnosed risk factors for COVID-19.

30.    For people in the highest risk populations, the fatality rate of COVID-19 is about 15 percent.

**C.    Conditions at Adelanto Create a Massive Risk of COVID-19 Infection.**

31.    The conditions at ICE's Adelanto Detention Center present an extreme risk to those imprisoned there (as well as others working there).

32.    COVID-19 infects people who come into contact with respiratory droplets that contain the coronavirus, such as those produced when an infected person coughs, sneezes, or otherwise breathes on any surface. Such droplets can spread between people at a distance of up to six feet. The virus can also survive for long periods on inanimate surfaces.

33.    Therefore, enclosed group environments, like cruise ships, nursing homes, and prisons, have become the sites for the most severe outbreaks of COVID-19. The largest-known cluster of U.S. infections is a jail in Chicago,

where 306 inmates and 126 staff members (a majority of whom were working as correctional deputies) have tested positive. Two inmates there have died from COVID-19.

34.     In response to this and other outbreaks, multiple jurisdictions, including Los Angeles, CA, Chicago, IL, Harris County, TX, New York City, and the entire states of New Jersey and Iowa have released thousands of people from criminal custody, acknowledging the grave threat that an outbreak in jails and detention centers pose.

35.     Adelanto is a similarly dangerous enclosed environment. People imprisoned there live in close quarters—far closer than six feet—and subject to security measures that make social distancing impossible. These are ideal incubation conditions for the rapid spread of COVID-19.

36.     Adelanto imprisons people in two separate buildings (East and West). In Adelanto West, people are detained in 16 housing units consisting of 18 cells each. Each cell houses approximately 4 to 8 detainees. Bunk beds are placed approximately 2.5 to 3 feet apart.

37.     Each housing unit includes a common area with approximately 10–12 tables, and four stools around each table. Detainees are responsible for cleaning tables and stools themselves, but cleaning supplies are often unavailable.

38.     In Adelanto East, people are detained in two open bay housing modules containing 7 dormitories, or "pods." Each pod is divided into four quadrants, with 12 sets of double bunks each, and houses up to 96 detainees.

39.     Adelanto also includes a Special Management Unit (SMU). The SMU contains 32 cells and houses up to 64 individuals assigned to administrative or disciplinary segregation.

40.     Detainees in Adelanto share toilets, sinks, and showers with others in their cells and pods, without disinfection after each use. The showers are consistently dirty and infrequently sanitized. Up to 72 people share one showering

area and the showers are typically crowded with people. Showers are placed so closely together that water commonly sprays from one shower stall into the next.

41.     Food preparation and service is communal, with little opportunity for disinfection. Detainees are responsible for cleaning the eating areas, but they lack proper supplies. Cleaning is done with a bucket of water and a dirty rag, which is reused again and again.

42.     Staff members, including medical staff, generally do not wear masks or other personal protective equipment (PPE). Staff arrive and leave on a shift basis. There is limited ability to adequately screen staff for new, asymptomatic infection.

43.     At Adelanto, detainees have not been provided with hand sanitizer, gloves, or masks—nor have they been instructed about the need for social distancing. But in any event, social distancing is not possible in Adelanto under current conditions.

44.     Staff members are not monitoring detainees' temperatures or otherwise systemically testing for COVID-19. Nor are they regularly testing guards for COVID-19, unless they are symptomatic.

45.     Experts confirm that Adelanto contravenes all medical and public health directives for COVID-19 risk mitigation.

46.     Dr. Robert Greifinger, a correctional health expert with over three decades of prisoner health care experience, attests that the crowded conditions at immigration detention centers like Adelanto make the most vital preventive measure, social distancing, impossible. Dr. Todd Schneberk, an emergency medicine physician and professor of clinical emergency medicine with experience conducting and supervising multiple physical and psychological evaluations of detainees at Adelanto, explains that detainees in Adelanto "face a dramatically reduced ability to protect themselves by social distancing than they would in the community, and therefore face a significantly higher risk of being exposed to and

1    infected by contagious infected diseases like COVID-19."

2        47.    These experts predict that it is inevitable that COVID-19 will reach

3    Adelanto, if it has not already.

4        48.    The spread of COVID-19 has already been confirmed in other ICE

5    facilities: as of April 13, 2020, 72 detainees and nineteen ICE detention center

6    employees had tested positive for the virus. This does not include any third-party

7    contractors that work at ICE facilities who have tested positive for COVID-19, as

8    ICE takes the position that it is not required to publicly report those numbers.

9        49.    Moreover, an internal ICE COVID-19 report states that, as of March

10   19, 2020, ICE's Health Services Corps had isolated nine detainees and it was

11   monitoring 24 more in ten different ICE facilities, and 1,444 officials with ICE and

12   DHS were in precautionary self-quarantine.

13       50.    Defendants have acknowledged the risk (albeit inadequately) in

14   memos issued on March 15, and April 4, 2020. However, the protocols they have

15   announced are inadequate.

16       51.    After reviewing the COVID-19 protocols announced by ICE, Dr.

17   Greifinger concluded that the guidance is impractical and does not reflect the

18   reality of the overcrowded conditions in immigration detention. In particular,

19   although ICE "encourage[s]" detainees "to exercise social distancing protocols,"

20   ICE "fails to recognize the obvious: social distancing is impossible when people

21   sleep in small, multi-person rooms and live under conditions that necessarily

22   subject them to close proximity with others multiple times throughout the day."

23       52.    Tellingly, the ICE guidance acknowledges that the options to

24   safeguard vulnerable detainees "depend on available space." Adelanto simply does

25   not have that space, and therefore is incapable of protecting Plaintiffs and other

26   detainees from the risks of COVID-19 under current population levels.

27       53.    Detainees at Adelanto are not generally tested for COVID-19.

28   Accordingly, it is impossible to conclude that COVID-19 has not already entered

1  Adelanto.

2      **D.**    **A Significant Population Reduction Is Required to Ensure**

3              **Reasonably Safety for Individuals at Adelanto.**

4      54.    Social distancing is required to prevent the widespread transmission

5  of COVID-19.

6      55.    To achieve social distancing at Adelanto, the detainee population must

7  be significantly reduced.

8      56.    Dr. Greifinger has concluded that "Release is the most important

9  means of mitigating the spread of COVID-19 in Adelanto. This would be true even

10  if the conditions inside the facility were impeccable."

11      57.    Dr. Schneberk concurs, "Congregate settings such as Adelanto are

12  nearly impossible to protect in scenarios such as this one, and it will be very

13  difficult irrespective of the amount of sanitation and hygiene practices employed,

14  to prevent spread in such a confined densely populated space" as Adelanto. For

15  that reason, Dr. Schneberk recommends that "[f]rom a public health perspective,

16  the only effective action to combat COVID-19 at Adelanto that is practically

17  available at this time would be to implement social distancing to prevent the risk to

18  detainees and staff at the facility."

19      58.    In both doctors' professional opinions, it is not possible to achieve

20  social distancing if more than one person is housed in each cell, or if beds in dorms

21  are placed within less than 8–10 feet of each other.  Nor can anyone share a bunk

22  bed with another person under social distancing.

23      59.    The government's own medical subject matter experts have also

24  called for ICE to release detainees to protect them. Nearly two months ago, Dr.

25  Scott Allen and Dr. Josiah Rich, medical experts to DHS, warned the agency about

26  the danger to detainees of rapid spread of COVID-19 in immigration detention

27  facilities.

28      60.    In a whistleblower letter to Congress, Dr. Allen and Dr. Rich

recommended that "[m]inimally, DHS should consider releasing all detainees in high risk medical groups such as older people and those with chronic diseases." They concluded that "acting immediately will save lives not of only those detained, but also detention staff and their families, and the community-at-large."

61.    Other public officials have likewise called for the release of eligible individuals from detention. The former Acting Director of ICE, John Sandweg, has stated that "ICE can, and must, reduce the risk [COVID-19] poses to so many people, and the most effective way to do so is to drastically reduce the number of people it is currently holding."

## LEGAL FRAMEWORK

### A. Immigrant Detainees are Entitled to Constitutional Due Process Protections Against Exposure to Infectious Disease.

62.    Whenever the government detains or incarcerates someone, it has an affirmative duty to provide conditions of reasonable health and safety. As the Supreme Court has explained, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). As a result, the government must provide those in its custody with "food, clothing, shelter, medical care, and reasonable safety." *Id*. at 200.

63.    The Constitution requires that "inmates be furnished with the basic human needs, one of which is 'reasonable safety.'" *Helling*, 509 U.S. at 33 (quoting *DeShaney*, 489 U.S. at 200). The Supreme Court has explicitly recognized that the risk of contracting a communicable disease may constitute such an "unsafe, life-threatening condition" that threatens "reasonable safety." *Id.* Accordingly, "[i]t would be odd to deny an injunction to inmates who plainly

1    proved an unsafe, life-threatening condition in their prison on the ground that

2    nothing yet had happened to them." *Id.*[7]

3

4    **B. Defendants Are Violating Plaintiffs' Constitutional Due Process Rights.**

5        64.    The conditions described above violate Plaintiffs' due process rights.

6    Keeping Plaintiffs detained in such close proximity to one another places them at

7    serious risk of being infected with COVID-19.

8        65.    Given the ample evidence supporting the need for social distancing to

9    adequately respond to the COVID-19 pandemic, Defendants' failure to decrease

10   the facility's population and implement adequate distancing constitutes deliberate

11   indifference to this critical safety concern. Defendants are aware of and have

12   recklessly disregarded the serious risk that COVID-19 poses to Plaintiffs, as their

13   own medical experts' statements and the actions of various other jurisdictions

14   illustrate.

15       66.    A significant reduction in the population of Adelanto is the only

16   means to ensure compliance with Plaintiffs' due process rights, because the facility

17   is too densely populated to permit social distancing.

18       67.    Plaintiffs do not seek release free of any supervision. ICE has a range

19   of highly effective tools at its disposal to ensure that individuals report for court

20   hearings and other appointments (once they become possible given the pandemic).

21   ───────────────

22   [7] Moreover, because civil detention is governed by the Fifth Amendment rather
     than the Eighth, even conditions short of "deliberate indifference" could be

23   unconstitutional in the immigration context. *Jones*, 393 F.3d at 934. A condition of
     confinement violates the Fifth Amendment "if it imposes some harm to the

24   detainee that significantly exceeds or is independent of the inherent discomforts of
     confinement and is not reasonably related to a legitimate governmental objective or

25   is excessive in relation to the legitimate governmental objective." *Unknown Parties*

26   *v. Johnson*, No. CV-15-00250-TUC-DCB, 2016 WL 8188563, at *5 (D. Ariz. Nov.
     18, 2016), *aff'd sub nom. Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017). The

27   conditions described here easily meet that standard.

28

1   For example, ICE's conditional supervision program, called ISAP (Intensive

2   Supervision Appearance Program), relies on the use of electronic ankle monitors,

3   biometric voice recognition software, unannounced home visits, employer

4   verification, and in-person reporting to supervise participants. A government-

5   contracted evaluation of this program reported a 99% attendance rate at all

6   immigration court hearings and a 95% attendance rate at final hearings.

### C. The Court Has Authority to Order a Reduction in Detainee Population to Allow for Social Distancing, and Such Relief Is Necessary Here.

68.     Courts have broad power to fashion equitable remedies to address constitutional violations in carceral institutions. *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978).  "When necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population," *Brown v. Plata*, 563 U.S. 493, 511 (2011).

69.     "The scope of a district court's equitable powers" in this regard "is broad, for breadth and flexibility are inherent in equitable remedies." *Hutto*, 437 U.S., at 687, n. 9. Thus, even where "[t]he inquiry involves uncertain predictions regarding the effects of population reductions, as well as difficult determinations regarding the capacity of prison officials to provide adequate care at various population levels," federal courts "have substantial flexibility [in] making these judgments" and crafting an appropriate remedy. *Plata*, 563 U.S. at 538.

70.     Federal courts have repeatedly ordered the release of detained persons when necessary to remedy unconstitutional conditions caused by overcrowding. *See, e.g.*, *Plata*, 563 U.S. 493; *Duran v. Elrod*, 713 F.2d 292, 297–98 (7th Cir. 1983), *cert. denied*, 465 U.S. 1108 (1984) (concluding that court did not exceed its authority in directing release of low-bond pretrial detainees as necessary to reach a population cap); *Mobile Cty. Jail Inmates v. Purvis*, 581 F. Supp. 222, 224–25 (S.D. Ala. 1984) (concluding that district court properly exercised remedial powers

1   to order a prison's population reduced to alleviate unconstitutional conditions, and

2   noting other cases); *Inmates of the Allegheny Cty. Jail v. Wecht*, 565 F. Supp.

3   1278, 1297 (W.D. Pa. 1983) (order to reduce overcrowding "is within our power to

4   correct the constitutional violations"); *Brenneman v. Madigan*, 343 F. Supp. 128,

5   139 (N.D. Cal. 1972) ("If the state cannot obtain the resources to detain persons . .

6   . in accordance with minimum constitutional standards, then the state simply will

7   not be permitted to detain such persons."); *see also Unknown Parties v. Nielsen*,

8   CV-15-00250-TUC-DCB, 2020 WL 813774, *1 (D. Az. Feb. 19, 2020) (ordering

9   that DHS release from custody detainees to whom it did not provide a bed, shower,

10   nutritious food, and screening by a medical professional within 48 hours of

11   booking).

12

13                              **CLASS ALLEGATIONS**

14        71.    Petitioners bring this action pursuant to Rule 23(b)(2) of the Federal

15   Rules of Civil Procedure on behalf of themselves and a class of similarly situated

16   individuals.

17        72.    Petitioners seek to represent a class of all individuals detained in civil

18   immigration detention at Adelanto.

19        73.    The proposed class satisfies the requirements of Federal Rule of Civil

20   Procedure 23(a)(1) because it is so numerous that joinder of all members is

21   impracticable. Upon information and belief, there are approximately 1,300 people

22   currently detained at Adelanto.

23        74.    Joinder is also impracticable because class members are detained and

24   largely unrepresented, limiting their ability to bring individual litigation.

25        75.    The proposed class meets the commonality requirements of Federal

26   Rule of Civil Procedure 23(a)(2). Whether current conditions at Adelanto,

27   including the failure to implement social distancing in the face of the COVID-19

28   pandemic, comply with the Fifth Amendment presents common questions of fact

1    and law.

2         76.    The proposed class meets the typicality requirements of Federal Rule

3    of Civil Procedure 23(a)(3) because Petitioner's claims are typical of the claims of

4    their class. Petitioners are currently detained at Adelanto and are exposed to the

5    current conditions of detention.

6         77.    The proposed class meets the adequacy requirements of Federal Rule

7    of Civil Procedure 23(a)(4). Named Plaintiffs have the requisite personal interest in

8    the outcome of this action and have no interests adverse to the interests of the

9    proposed class.

10        78.    Additionally, the proposed class is represented by pro bono counsel

11   from the American Civil Liberties Union of Southern California and Latham &

12   Watkins LLP. Petitioners' counsel have extensive experience litigating class action

13   lawsuits and other complex cases in federal court, including civil rights lawsuits on

14   behalf of detained immigrants.

15        79.    The members of the class are readily ascertainable through

16   Defendants' records.

17        80.    Finally, the proposed class satisfies Federal Rule of Civil Procedure

18   23(b)(2). Defendants have acted on grounds generally applicable to the class by

19   detaining class members without social distancing in the face of the COVID-19

20   pandemic. Thus, final injunctive and declaratory relief is appropriate for the class

21   as a whole.

22

23                              **CLAIM FOR RELIEF**

24   **Violation of the Fifth Amendment Right to Substantive Due Process**

25            **(Right to Reasonable Safety in Government Custody)**

26

27        81.    Plaintiffs repeat and incorporate by reference all allegations above as

28   though set forth fully herein.

82.   The Fifth Amendment requires the federal government to maintain conditions of reasonable health and safety for people in its custody. The government violates that requirement when it fails to provide for their basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety.

83.   The federal government also violates the Fifth Amendment when it subjects anyone in its custody to cruel treatment, and when it subjects civil detainees to conditions of confinement that amount to punishment.

84.   By detaining Plaintiffs at Adelanto during the global COVID-19 pandemic without implementing social distancing, Defendants are failing to ensure Plaintiffs' reasonable safety, exposing them to a risk of infection from COVID-19 and thus violating their rights under the Fifth Amendment.

85.   For these reasons, Defendants' failure to implement social distancing violates Plaintiffs' right to reasonable safety in government custody, rendering Defendants' ongoing detention of Plaintiffs in violation of the Due Process Clause.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully ask this Court to take jurisdiction over this actual controversy and:

a. Certify this Petition as a Class Action and appoint named Petitioners as class representatives and the undersigned counsel as class counsel;

b. Declare that conditions of confinement for all individuals held at the Adelanto Detention Facility are currently unconstitutional under the Fifth Amendment because they do not permit social distancing as necessary to minimize the risk of infection with COVID-19;

c. Issue a Writ of Habeas Corpus on the ground that Plaintiffs' continued detention violates the Due Process Clause and order Defendants to release a sufficient number of class members to reduce the population of the Facility to a level that permits adequate social distancing;

d.  In the alternative, issue injunctive relief ordering Defendants to immediately institute social distancing and maintain six feet between all Adelanto detainees at all times, including by reducing the population of the Facility to a level that permits adequate social distancing;

e.  Award Plaintiffs their costs and reasonable attorneys' fees in this action under the Equal Access to Justice Act, as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and on any other basis justified under law; and,

f.  Grant any other and further relief that this Court deems just and appropriate.

Respectfully submitted,

Dated:  April 13, 2020

/s/ Amanda Barnett
AMANDA BARNETT
Counsel for Plaintiffs-Petitioners