SAMIR DEGER-SEN*
samir.deger-sen@lw.com
WILLIAM M. FRIEDMAN*
william.friedman@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Tel: 202.637.2200
Fax: 202.637.2201

AMANDA BARNETT (SBN 319046)
amanda.barnett@lw.com
JESSIE CAMMACK (SBN 329794)
jessie.cammack@lw.com
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Tel: 213.485.1234
Fax: 213.891.8763

AHILAN ARULANANTHAM
(SBN 237841)
aarulanantham@aclusocal.org
MICHAEL KAUFMAN
(SBN 254575)
mkaufman@aclusocal.org
JESSICA KARP BANSAL
(SBN 277347)
jbansal@aclusocal.org
MICHELLE (MINJU) CHO
(SBN 321939)
mcho@aclusocal.org
ACLU Foundation of Southern
California
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500

Attorneys for Plaintiffs-Petitioners
*Pro hac vice application forthcoming

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELVIN HERNANDEZ ROMAN, BEATRIZ ANDREA FORERO CHAVEZ, MIGUEL AGUILAR ESTRADA, on behalf of themselves and all others similarly situated, <br><br> Petitioners-Plaintiffs, <br><br> v. <br><br> CHAD F. WOLF, Acting Secretary, U.S. Department of Homeland Security; MATTHEW T. ALBENCE, Deputy Director and Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement; DAVID MARIN, Director of the Los Angeles Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; and JAMES JANECKA, Warden, Adelanto ICE Processing Center, <br><br> Respondents-Defendants. | Case No. 5:20-cv-00768 <br><br> **ADELANTO COVID** <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EMERGENCY MOTION FOR PRELIMINARY INJUNCTION** |

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..................................................................................... 1

II. FACTS ...................................................................................................... 4

     A. COVID-19 Poses Grave Risk of Harm to Plaintiffs. ........................... 4

     B. Plaintiffs Face an Imminent and Substantial Risk of Contracting COVID-19 in Adelanto. ...................................................................... 6

     C. Adequate Social Distancing Is Impossible At Current Population Levels Within Adelanto .......................................................................... 8

III. LEGAL STANDARD ............................................................................. 11

IV. ARGUMENT ........................................................................................... 12

     A. Plaintiffs are Likely to Succeed on the Merits. ................................... 13

         1. Plaintiffs' Continued Detention at Adelanto Violates Their Fifth Amendment Right to Reasonable Safety in Government Custody. ................................................................. 13

         2. Remedies Short Of Social Distancing Are Inadequate To Protect Detainees Constitutional Rights ..................................... 15

     B. Plaintiffs Satisfy the Remaining Factors for Preliminary Injunction . 19

         1. Exposure to a Lethal Virus Which Lacks Any Vaccine, Treatment, or Cure Constitutes Irreparable Harm. ................... 19

         2. Public Interest and Balance of Equities Weigh Heavily in Plaintiffs' Favor. .......................................................................... 20

     C. A Comprehensive Response to the Constitutional Violations at Adelanto is Necessary. ...................................................................... 23

V. CONCLUSION ....................................................................................... 25

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ................................................................. 11

*Bogle v. Barr*,
   Case No. EDCV 20-00650 TJH (C.D. Cal. Apr. 3, 2020), ECF No. 12 .................. 3

*Brown v. Plata*,
   563 U.S. 493 (2011) ................................................................................ 13

*Castillo v. Barr*,
   Case No. 5:20-cv-00605-TJH (C.D. Cal. Apr. 7, 2020), ECF No. 37 ................... 23

*Castillo v. Barr*,
   Case No. CV2000605TJHAFMX, 2020 WL 1502864 (C.D. Cal. Mar.
   27, 2020) ........................................................................................*passim*

*DeGidio v. Pung*,
   920 F.2d 525 (8th Cir. 1990) ................................................................... 14

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
   489 U.S. 189 (1989) ................................................................................ 13

*Fraihat v. Wolf*,
   Case No. ED-CV2000590-TJH (C.D. Cal. Apr. 6, 2020), ECF No. 20 ................. 21

*Fraihat v. Wolf*,
   Case No. ED-CV2000590-TJH (C.D. Cal. Mar. 30, 2020) ........ 3, 12, 15, 18, 19, 20

*Gordon v. Cty. of Orange*,
   888 F.3d 1118 (9th Cir. 2018) ................................................................. 13

*Helling v. McKinney*,
   509 U.S. 25 (1993) ............................................................................. 2, 14

*Hernandez v. City of San Jose*,
   897 F.3d 1125 (9th Cir. 2018) ................................................................. 13

*Hernandez v. Cty. of Monterey*,
   305 F.R.D. 132 (N.D. Cal. 2015) ............................................................. 13

ii

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) .................................................................... 19, 20, 21

*Hernandez v. Wolf*,
  Case No. EDCV 20-00617 TJH (C.D. Cal. Apr. 1, 2020), ECF No. 17 ................... 3

*Hutto v. Finney*,
  437 U.S. 678 (1978).................................................................................. 14

*Lopez v. Heckler*,
  713 F.2d 1432 (9th Cir. 1983) ..................................................................... 20

*M.R. v. Dreyfus*,
  663 F.3d 1100 (9th Cir. 2011), *as amended by* 697 F.3d 706 (9th Cir
  2012) ................................................................................................... 19

*Munoz v. Wolf*,
  Case No. EDCV 20-00625 TJH (C.D. Cal. Apr. 2, 2020), ECF No. 14 ................... 3

*Nguyen v. Marin*,
  Case No. EDCV 20-00646 TJH (C.D. Cal. Apr. 3, 2020), ECF No. 10 ................... 3

*Ortuno v. Jennings*,
  Case No. 20-2064 MMC (N.D. Cal. Mar. 30, 2020), ECF No. 25 ........................ 21

*Padilla v. U.S. Immigration & Customs Enforcement*,
  Case No. 19-35565, 2020 WL 1482393 (9th Cir. Mar. 27, 2020) ........................ 19

*Perez Cruz v. Barr*,
  Case No. EDCV 20-00668 TJH (C.D. Cal. Apr. 3, 2020), ECF No. 8 ................... 3

*Pimentel v. Dreyfus*,
  670 F.3d 1096 (9th Cir. 2012) ..................................................................... 11

*Robles Rodriguez v. Wolf*,
  Case No. 5:20-CV-00527 (C.D. Cal. Apr. 3, 2020) ECF Nos. 35-39,
  42-43 ................................................................................................... 3

*Robles Rodriguez v. Wolf*,
  Case No. 5:20-cv-00627-TJH (C.D. Cal. Apr. 8, 2020), ECF No. 45 ................... 8

*Robles Rodriguez v. Wolf*,
  Case No. 5:20-cv-627-TJH-GJS, ECF No. 22 ............................................... 22

*Robles Rodriguez v. Wolf*,
  Case No. 5:20-cv-627-TJH-GJS, ECF No. 23-1 ............................................ 6

iii

*Robles Rodriguez v. Wolf*,
  Case No. 5:20-cv-627-TJH-GJS, ECF No. 28 ....................................... 21

*Robles Rodriguez v. Wolf*,
  Case No. 5:20-cv-627-TJH-GJS, ECF No. 45-1 .................................... 7, 8

*Savino v. Sousa*,
  Case No. 20-cv-10617-WGY (D. Mass. Apr. 8, 2020), ECF No. 64 ................ 3, 23

*Singh v. Barr*,
  Case No. EDCV 20-00653 TJH (C.D. Cal. Apr. 3, 2020), ECF No. 11 .................. 3

*Sudney v. Wolf*,
  Case No. EDCV 20-00626 TJH (C.D. Cal. Apr. 2, 2020), ECF No. 12 .................. 3

*Thaker v. Doll*,
  Case No. 20-cv-00480 (M.D. Pa. Mar. 31, 2020), ECF No. 47 ...................... 21, 22

*Thaker v. Doll*,
  Case No. 20-cv-00480 (M.D. Pa. Mar. 29, 2020), ECF No. 35 ........................... 21

*Thompson v. Tsoukaris*,
  Case No. 1:20-cv-01449-SDG (N.D. Ga. Apr. 3, 2020), ECF No. 4-20 ............... 11

*Torres v. Nielsen*,
  Case No. 18-cv-02602 (C.D. Cal), Dkt. No. 127-1 ................................. 7-8

*Unknown Parties v. Johnson*,
  Case No. CV-15-00250-TUC-DCB, 2016 WL 8188563 (D. Ariz.
  Nov. 18, 2016), *aff'd sub nom. Doe v. Kelly*, 878 F.3d 710 (9th Cir.
  2017) .......................................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................... 11

*Youngberg v. Romeo*,
  457 U.S. 307 (1982) ............................................................. 13

## REGULATIONS

Cal. Exec. Order N-36-20 (March 24, 2020), https://www.gov.ca.gov/wp-
  content/uploads/2020/03/3.24.20-EO-N-36-20.pdf; ................................. 1

## CONSTITUTIONAL PROVISIONS

Fifth Amendment .......................................................... 12, 14, 24

iv

Eighth Amendment ............................................................................... 13, 14

## **OTHER AUTHORITIES**

Alicia Lee, *These States Have Implemented Stay-At-Home Orders.
     Here's What That Means for You.*, CNN (Mar. 26, 2020),
     https://www.cnn.com/2020/03/23/us/coronavirus-which-states-stay-at-
     home-ordertrnd/index.html .......................................................... 18

CDCR announces plan to further protect staff and inmates from the
     spread of COVID-19 in state prisons, California Department of
     Corrections and Rehabilitation (Mar. 31, 2020),
     https://www.cdcr.ca.gov/news/2020/03/31/cdcr-announces-plan-to-
     further-protect-staff-and-inmates-from-the-spread-of-covid-19-in-
     state-prisons/ .................................................................................. 1

Chris Mooney, Brady Dennis and Sarah Kaplan, *Hundreds of young
     Americans have now been killed by the coronavirus, data shows*,
     Washington Post (Apr. 8, 2020),
     https://www.washingtonpost.com/health/2020/04/08/young-people-
     coronavirus-deaths/ ........................................................................ 5

Coronavirus 2019, San Bernardino County,
     http://wp.sbcounty.gov/dph/coronavirus (last visited Apr. 13, 2020) ................ 4, 12

Coronavirus Disease 2019 (COVID-19), Centers for Disease Control and
     Prevention, https://www.cdc.gov/coronavirus/2019-nCoV/index.html
     (last visited Apr. 13, 2020) ........................................................... 1

COVID-19, California Department of Public Health,
     https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/
     ncov2019.aspx (updated Apr. 13, 2020) ....................................... 4

Ctrs. for Disease Control, *5 Surprising Facts About High Blood Pressure*,
     https://www.cdc.gov/features/highbloodpressure/index.html (last
     visited Apr. 13, 2020) .................................................................... 5

Ctrs. for Disease Control and Prevention,
     https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-
     us.html (last visited Apr. 13, 2020) ........................................... 1, 4

*Health Coverage of Immigrants*, Kaiser Family Foundation (Mar. 18,
     2020), https://www.kff.org/disparities-policy/fact-sheet/health-
     coverage-of-immigrants/ ............................................................... 5

Jennifer Tolbert et al., *Key Facts about the Uninsured Population*, Kaiser
   Family Foundation (Dec. 13, 2019),
   https://www.kff.org/uninsured/issue-brief/key-facts-about-the-
   uninsured-population/ ................................................................................ 5

Jo Craven McGinty, *Why Doesn't Flu Tank Economy Like Covid-19?*,
   Wall Street Journal (Apr. 10, 2020),
   https://www.wsj.com/articles/why-doesnt-flu-tank-economy-like-
   covid-19-11586511000 .......................................................................... 19

March 16, 2020 Guidance, California Department of Public Health,
   https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-
   19/RetailFoodBeverageandOtherRelatedServiceVenues.aspx ............... 17

Melissa Davey, *What is a pandemic and does it change the approach to
   coronavirus?*, The Guardian (Mar. 14, 2020),
   https://www.theguardian.com/world/2020/mar/14/what-is-a-
   pandemic-coronavirus-covid-19 .............................................................. 4

Paige St. John, *California to release 3,500 inmates early as coronavirus
   spreads inside prisons*, L.A. Times (Mar. 31, 2020)
   https://www.latimes.com/california/story/2020-03-31/coronavirus-
   california-release-3500-inmates-prisons .................................................. 22

Sarah Mervosh et al., *Which States and Cities Have Told Residents to
   Stay at Home*, N.Y. Times (updated Apr. 7, 2020),
   https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-
   home-order.html ........................................................................................ 1

The President's Coronavirus Guidelines for America – 30 Days to Slow
   the Spread (Mar. 16, 2020), https://www.whitehouse.gov/wp-
   content/uploads/2020/03/03.16.20_coronavirus-
   guidance_8.5x11_315PM.pdf ................................................................... 8

*Recommendation Regarding the Use of Cloth Face Coverings, Especially
   in Areas of Significant Community-Based Transmission*, Centers for
   Disease Control and Prevention (last updated Apr. 3, 2020),
   https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-
   sick/cloth-face-cover.html ................................................................. 8, 17

*Responses to COVID-19 pandemic*, Prison Policy Initiative (Apr. 10,
   2020) (collecting instances where jails and prisons have released
   detainees due to COVID-19),
   https://www.prisonpolicy.org/virus/virusresponse.html#releases .... 11, 23

vi

U.S. Immigration and Customs Enforcement, *Confirmed Cases*, ICE
    Guidance on COVID-19 (last updated Apr. 13, 2020, 11:43 a.m.),
    https://www.ice.gov/coronavirus....................................................................2, 7, 20

# I.   INTRODUCTION

As this Court knows, the United States currently faces a health crisis unlike any it has encountered in over one hundred years. The COVID-19 pandemic has to date infected more than 500 thousand people in this country, and killed over twenty thousand.[1]

In the face of this unprecedented threat, the CDC has recommended that individuals maintain a distance of six feet at all times and use face coverings whenever in public places.[2] 95 percent of Americans—about 316 million people—have been ordered by their governors and mayors to stay at home to implement that guidance.[3] Prisons in California and across the country have taken drastic steps to reduce the detained population, recognizing the mortal danger posed by COVID-19 to those in close confinement.[4]

Yet, as the institutions of American life dramatically alter their existing practices, the United States Immigration and Customs Enforcement ("ICE") stands virtually alone in defying the medical and societal consensus. In filing after filing before this Court, the Government has maintained that it is not required to implement social distancing to prevent the spread of COVID-19 among civil detainees. It maintains it can keep immigrants in its custody safe just by improving sanitation protocols, testing and isolating individuals after they exhibit symptoms, and taking

---

[1] *See* Cases in U.S., Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Apr. 13, 2020).

[2] *See* Coronavirus Disease 2019 (COVID-19), How to Protect Yourself and Others, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Apr. 13, 2020).

[3] Sarah Mervosh, et al., *See Which States and Cities Have Told Residents to Stay at Home*, N.Y. Times (updated Apr. 7, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html.

[4] *See* Cal. Exec. Order N-36-20 (March 24, 2020), https://www.gov.ca.gov/wp-content/uploads/2020/03/3.24.20-EO-N-36-20.pdf; CDCR announces plan to further protect staff and inmates from the spread of COVID-19 in state prisons, California Department of Corrections and Rehabilitation (Mar. 31, 2020), https://www.cdcr.ca.gov/news/2020/03/31/cdcr-announces-plan-to-further-protect-staff-and-inmates-from-the-spread-of-covid-19-in-state-prisons/.

1    other measures short of what the CDC and governments at all levels have imposed on
2    everyone else.

3           This Court has already recognized that ICE's position is flawed, ruling that
4    "[u]nder the Due Process Clause, a civil detainee cannot be subject to the current
5    conditions of confinement at Adelanto." *Castillo v. Barr* ("*Castillo* TRO"), Case No.
6    CV 20-00605 TJH (AFMx), 2020 WL 1502864, at *5 (C.D. Cal. Mar. 27, 2020)
7    (citing *Helling v. McKinney*, 509 U.S. 25, 32 (1993)). Dr. Todd Schneberk, a board
8    certified emergency medicine physician and assistant professor of clinical emergency
9    medicine at the University of Southern California, has concurred, stating that "[f]rom
10   a public health perspective, the only effective action to combat COVID-19 at Adelanto
11   that is practically available at this time would be to implement social distancing."
12   Decl. of Dr. Todd Schneberk ("Schneberk Decl.") ¶ 39. And as Dr. Robert Greifinger,
13   a physician with thirty years of experience in medical care for detained populations,
14   has further explained, "[s]ocial distancing . . . will be impossible in Adelanto without
15   significant downsizing." Decl. of Dr. Robert B. Greifinger ("Greifinger Decl.") ¶ 25.
16   Accordingly, "[r]elease is the most important means of mitigating the spread of
17   COVID-19" at the facility. *Id.* ¶ 24; *see also id.* ¶¶ 26–27 (explaining why social
18   distancing is impossible under current conditions at Adelanto).

19          This Court's system-wide intervention is urgently needed. Just one week ago,
20   there was only one confirmed case of COVID-19 in the entire ICE detention system.
21   Today, ICE has announced there are confirmed cases at over two dozen facilities.[5]
22   COVID-19 is assuredly coming to Adelanto. And "[i]f authorities wait until an
23   outbreak occurs to release detainees, it will be far too late. . . The outbreak will spread
24   like wildfire among detainees who are trapped in the facility in concentrated
25   numbers." Schneberk Decl. ¶ 45.

26

27   [5] *See* U.S. Immigration and Customs Enforcement, *Confirmed Cases*, ICE Guidance
     on COVID-19 (last updated Apr. 13, 2020, 11:43 a.m.),
28   https://www.ice.gov/coronavirus (click on "Confirmed Cases").

1    Understanding this imminent danger, this Court has ordered the immediate
2    release of at least two dozen individuals and placed them under appropriate conditions
3    of confinement outside of Adelanto.[6] That individualized relief has safeguarded those
4    detainees' fundamental rights and may have even saved their lives.

5    Many more individual claims are likely to follow. But individualized habeas
6    relief for the over 1,300 detainees at Adelanto will be an enormous tax on this Court's
7    resources, will likely take too long and would, at best, result in constitutional rights
8    turning on the happenstance of whether a detainee has access to a lawyer, or on their
9    language skills and education level. That is fundamentally unfair. The appropriate
10   remedy for the system-wide crisis at Adelanto is not a flood of individual habeas
11   petitions, but system-wide relief for *all* those whose rights are being violated.

12   Plaintiffs thus propose that this Court issue an injunction to implement a
13   truncated system for considering Proposed Class Members' claims for relief, similar
14   to the one now utilized for ICE detainees in the District of Massachusetts. *See Savino*
15   *v. Sousa*, Mem. & Order at 28, 29, Case No. 20-cv-10617-WGY (D. Mass. Apr. 8,

---

[6] *Castillo v. Barr* ("*Castillo* TRO"), Case No. CV 20-00605 TJH (AFMx), 2020 WL 1502864, at *11 (C.D. Cal. Mar. 27, 2020) (ordering two detainees released); TRO and Order to Show Cause at 12, *Fraihat v. Wolf* ("*Fraihat* TRO"), Case No. ED-CV2000590-TJH (C.D. Cal. Mar. 30, 2020) (ordering a detainee released); TRO and Order to Show Cause at 14, *Hernandez v. Wolf* ("Hernandez TRO"), Case No. EDCV 20-00617 TJH (KSx), (C.D. Cal. Apr. 1, 2020), ECF No. 17; TRO and Order to Show Cause at 2, *Sudney v. Wolf*, Case No. EDCV 20-00626 TJH (SHKx), (C.D. Cal. Apr. 2, 2020), ECF No. 12; TRO and Order to Show Cause at 2, *Munoz v. Wolf*, Case No. EDCV 20-00625 TJH (SHKx), (C.D. Cal. Apr. 2, 2020), ECF No. 14; *Robles Rodriguez*, Case No. 5:20-CV-00527 (C.D. Cal. Apr. 3, 2020) ECF Nos. 35-39, 42-43 (granting temporary restraining orders on behalf of six Adelanto detainees); TRO and Order to Show Cause at 2, *Perez Cruz v. Barr*, Case No. EDCV 20-00668 TJH, (C.D. Cal. Apr. 3, 2020), ECF No. 8; TRO and Order to Show Cause at 2, *Singh v. Barr*, Case No. EDCV 20-00653 TJH, (C.D. Cal. Apr. 3, 2020), ECF No. 11; TRO and Order to Show Cause at 2, *Nguyen v. Marin*, Case No. EDCV 20-00646 TJH, (C.D. Cal. Apr. 3, 2020), ECF No. 10; TRO and Order to Show Cause at 2, *Bogle v. Barr*, Case No. EDCV 20-00650 TJH, (C.D. Cal. Apr. 3, 2020), ECF No. 12; TRO and Order to Show Cause, *Eyere v. Wolf*, Case No. 5:20-cv-00700-TJH-MAA (C.D. Cal. Apr. 9, 2020), ECF No. 17; TRO and Order to Show Cause, *Yanez Montoya v. Wolf*, Case No. 5:20-cv-00713 (TJH) (C.D. Cal. Apr. 10, 2020), ECF No. 11; TRO and Order to Show Cause, *Hernandez Arevalo v. Wolf*, Case No. 5:20-cv-00712 (TJH) (C.D. Cal. Apr. 10, 2020), ECF No. 14; TRO and Order to Show Cause, *Zendejas Lopez v. Wolf*, Case No. 5:20-cv-00702 (TJH) (C.D. Cal. Apr. 8, 2020), ECF No. 12; TRO and Order to Show Cause, *Moreno v. Wolf*, Case No. 5:20-cv-00718 (TJH) (C.D. Cal. Apr. 9, 2020), ECF No. 13.

3

2020), ECF No. 64. Such an approach would allow this Court to assess the individual circumstances of detainees at Adelanto, and craft appropriate conditions of release, as it has done in the habeas petitions it has already granted. But it would also allow for a systematic and expeditious process that fairly adjudicates and vindicates the rights of all those who need relief.

Alternatively, the Court could establish a different system for class-wide relief, or otherwise mandate that ICE implement the social distancing measures necessary to protect the vulnerable individuals within its care. What is critical is that the systemic crisis at Adelanto is addressed at the systemic level. For many of the detainees currently trapped at the facility, the Government's refusal to act will be a death sentence. It is this Court's profound responsibility to intervene. Both the Constitution and common decency demand nothing less.

## II.    FACTS

### A.    COVID-19 Poses Grave Risk of Harm to Plaintiffs.

COVID-19 is a deadly pandemic. In the United States alone, there are 554,849 cases and 21,942 confirmed deaths,[7] and in California more than 22,348 cases and 687 confirmed deaths.[8] In San Bernardino County, COVID-19 diagnoses have increased exponentially with no end in sight. This Court noted on March 27, 2020 that the number of confirmed cases in San Bernardino County has "tripled over the past five days." *Castillo* TRO at *5. As of April 13, 2020, there are 977 identified COVID-19 cases in San Bernardino County, and 31 deaths—over 500% more cases since the Court's observation in *Castillo*.[9]

---

[7] *See* Cases in U.S., Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Apr. 13, 2020).

[8] *See* COVID-19, California Department of Public Health, https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx (updated Apr. 13, 2020).

[9] Coronavirus 2019, San Bernardino County, http://wp.sbcounty.gov/dph/coronavirus/ (last visited Apr. 13, 2020).

Nearly every adult appears to be at risk of infection.[10] Although certain characteristics such as advanced age or underlying health conditions exacerbate the risk of death or serious illness from COVID-19, early CDC data shows nearly 40% of COVID-19 patients hospitalized in the U.S. have been between the ages of 18 and 54. Schneberk Decl. ¶¶ 14, 16. In New York, approximately *one-third* of the patients between the ages of 30 and 39 who died from COVID-19 did not appear to have any risk factors, Schneberk Decl. ¶ 17, and physicians treating COVID-19 have noted the "randomness" with regard to which young people are unable to survive contraction of the illness.[11]

Moreover, many individuals have risk factors that have not been diagnosed. For example, the CDC has stated that about 11 million adults in the U.S. have high blood pressure but do not know it.[12] Under-diagnosis of risk factors is particularly likely among Plaintiffs and other detainees at Adelanto, who are part of a population that often lacks adequate access to healthcare. Among the nonelderly population, 23% of lawfully present immigrants and more than four in ten (45%) undocumented immigrants were uninsured as of March 2020, compared to less than one in ten (9%) citizens,[13] and the lack of health insurance often results in a failure to identify chronic diseases or other health conditions.[14] *See also* Schneberk Decl. ¶ 15 (noting that

---

[10] *See* Melissa Davey, *What is a pandemic and does it change the approach to coronavirus?*, The Guardian (Mar. 14, 2020), https://www.theguardian.com/world/2020/mar/14/what-is-a-pandemic-coronavirus-covid-19.

[11] Chris Mooney, Brady Dennis and Sarah Kaplan, *Hundreds of young Americans have now been killed by the coronavirus, data shows*, Washington Post (Apr. 8, 2020), https://www.washingtonpost.com/health/2020/04/08/young-people-coronavirus-deaths/.

[12] Centers for Disease Control, *5 Surprising Facts About High Blood Pressure*, https://www.cdc.gov/features/highbloodpressure/index.html (last visited Apr. 13, 2020).

[13] *Health Coverage of Immigrants*, Kaiser Family Foundation (Mar. 18, 2020), https://www.kff.org/disparities-policy/fact-sheet/health-coverage-of-immigrants/.

[14] Jennifer Tolbert et al., *Key Facts about the Uninsured Population*, Kaiser Family Foundation (Dec. 13, 2019), https://www.kff.org/uninsured/issue-brief/key-facts-about-the-uninsured-population/.

individuals without consistent access to healthcare may not be aware of pre-existing conditions that render them high-risk for COVID-19).

There is no vaccine, antiviral treatment, or cure for COVID-19. The disease is believed to spread through "droplets" that can be transmitted during close interpersonal contact of about six feet as well as through touching surfaces contaminated by respiratory droplets produced by a sick person. *See* Greifinger Decl. ¶ 5; Schneberk Decl. ¶¶ 7–8. And evidence shows individuals infected with COVID-19 can transmit it to others even if they have no symptoms. Schneberk Decl. ¶ 9.

Because of its highly contagious nature, the only known effective measure to reduce the risk of injury or death from COVID-19 is to prevent people from being infected in the first place. Greifinger Decl. ¶ 4. In the absence of a comprehensive testing regime, "social distancing," or maintaining six feet of separation at all times from other people, is the *only* effective means of stopping the spread of the disease in the long run. Greifinger Decl. ¶ 4; Schneberk Decl. ¶ 39.

**B.   Plaintiffs Face an Imminent and Substantial Risk of Contracting COVID-19 in Adelanto.**

Dr. Greifinger explains that "[j]ails and detention centers are congregate environments where the risk of infection and infectious spread is extraordinarily high." Greifinger Decl. ¶ 12. At Adelanto, as in other similar environments, there is a heightened risk of infection due to the lack of adequate hygiene and the inability of detainees to practice social distancing. *Id.* ¶¶ 13–15; *see also* Schneberk Decl. ¶ 38 ("Because of the structure and conditions at Adelanto, detainees face a dramatically reduced ability to protect themselves by social distancing than they would in the community, and therefore face a significantly higher risk of being exposed to and infected by contagious diseases like COVID-19.").

Defendants' own medical subject matter experts have recognized that conditions like those present currently at Adelanto amount to a "tinderbox scenario" for the rapid spread of COVID-19. *See* Letter from Drs. Scott A. Allen & Josiah Rich

6

to Rep. Bennie Thompson, et al. (Mar. 19, 2020), https://www.documentcloud.org/ documents/6816336-032020-Letter-From-Drs-Allen-Rich-to-Congress-Re.html# document/p4/a557238; *see also* Schneberk Decl. ¶¶ 23–35; Greifinger Decl. ¶¶ 2–17.

Similar conditions have led to disastrous results in other congregate facilities. In three weeks across March and April, the jail at Rikers Island in New York jumped from no cases among inmates to 273 cases, a higher rate of infection than in the most infected places in the world; four corrections staff members and one inmate have died. Suppl. Greifinger Decl. ¶ 13. The Cook County Jail has likewise seen an alarming rise in cases: the Jail went from two confirmed inmate cases on March 23, 2020, to 234 confirmed inmate cases on April 7, 2020; one inmate has died. *Id* ¶ 14. As of April 13, 2020, there were at least 72 confirmed cases among detainees in ICE custody, including twelve at the Otay Mesa Detention Center in San Diego.[15]

Dr. Greifinger details the numerous ways in which ICE's response to the pandemic has been "wholly inadequate." Greifinger Decl. ¶¶ 17–24. The descriptions of Plaintiffs and individuals recently released from Adelanto confirm ICE's utter failure to protect those who are detained there. Despite the crowded, communal facilities, detainees have no access to masks. *See* Decl. of Paola Rayon Vite ("Rayon Vite Decl.") ¶ 13; Decl. of Luis Lopez Salgado ("Lopez Salgado Decl.") ¶ 20; Decl. of Charleston Edward Dacoff ("Dacoff Decl.") ¶ 28; Decl. of Ruth Calvillo ("Calvillo Decl.") ¶ 20.[16] Hand sanitizer dispensers are empty. Calvillo Decl. ¶ 22. Guards and

---

[15] U.S. Immigration and Customs Enforcement, *Confirmed Cases*, ICE Guidance on COVID-19 (last updated Apr. 13, 2020, 11:43 a.m.), https://www.ice.gov/coronavirus (click on "Confirmed Cases").

[16] ICE has placed severe restrictions on attorneys' ability to access their clients at Adelanto, including limitations on in-person visits unless attorneys bring their own personal protective equipment, which is obviously in very short supply. *See* Motion for TRO at 10-17, *Torres v. Nielsen*, Case No. 18-cv-02602 (C.D. Cal), Dkt. No. 127-1 (describing current limitations on attorney-client communication at Adelanto and seeking emergency relief to ensure detainees maintain basic access to counsel during the COVID-19 pandemic); Decl. of Gabriel Valdez ("Valdez Decl.") ¶ 26 *Robles Rodriguez v. Wolf*, Case No. 5:20-cv-00627-TJH-GJS (C.D. Cal. Apr. 7, 2020), ECF No. 45-1. In addition, ICE provides no effective way for attorneys to conduct confidential calls with clients detained at Adelanto. *See* Mot. for TRO at 10-

7

medical staff generally do not wear masks, though they frequently stand in close proximity to detained individuals. *See* Calvillo Decl. ¶¶ 13, 20–21; Lopez Salgado Decl. ¶ 19; Rayon Vite Decl. ¶ 13; *see also* Schneberk Decl. ¶ 29. Staff arrive and leave on a shift basis, and new detainees continue to arrive at the facility, but there is no attempt to test staff or detainees for asymptomatic infection. Schneberk Decl. ¶ 29; Greifinger Decl. ¶ 22; Dacoff Decl. ¶ 32; *see also* Gov't Response to Order to Show Cause ("*Robles Rodriguez* Gov't Response") at 8–9, Att. 1, Decl. of Gabriel Valdez ("Valdez Decl.") ¶ 14, *Robles Rodriguez v. Wolf*, Case No. 5:20-cv-627-TJH-GJS (C.D. Cal. Apr. 8, 2020, ECF No. 45-1. Even detainees who are experiencing symptoms of COVID-19, such as fever and cough, are not tested. Decl. of Jose Hernandez Velasquez ("Hernandez Velasquez Decl.") ¶ 18; *accord* Rayon Vite Decl. ¶¶ 18–19; Dacoff Decl. ¶ 32.

### C.   Adequate Social Distancing Is Impossible At Current Population Levels Within Adelanto

Although the CDC now recommends wearing face coverings as an "additional" measure,[17] staying away from others remains the "cornerstone" of the agency's recommendations.[18] As Drs. Greifinger and Schneberk explain, social distancing is crucial to mitigating the spread of COVID-19. Greifinger Decl. ¶ 11; Schneberk Decl. ¶ 39. If detainees are unable to maintain an appropriate distance from one another or

---

17, *Torres v. Nielson*, Case No. 18-cv-02602 (C.D. Cal. Mar. 26, 2020), ECF No. 127-1. As a result, and because of the urgency of the situation, in lieu of declarations from Plaintiffs-Petitioners themselves, the attorneys representing Plaintiff-Petitioners in their administrative removal proceedings have provided declarations describing the facts of their cases. A temporary restraining order requiring that the government take steps to improve access to counsel at Adelanto was granted on April 11, 2020. *Torres v. Nielson*, Case No. 18-cv-02602 (C.D. Cal), Dkt. No. 144.

[17] *Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission*, Centers for Disease Control and Prevention (updated Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.

[18] *Id.*; *see also* The President's Coronavirus Guidelines for America – 30 Days to Slow the Spread (Mar. 16, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.

staff, they face a dire risk of COVID-19 transmission, including from individuals who are pre- or asymptomatic. *See* Schneberk Decl. ¶ 9; Greifinger Decl. ¶ 5.

Nonetheless, the Government has expressed in numerous filings before this Court that it has no intention of engaging in meaningful social distancing at Adelanto, dismissing such practices as "idealized safety precaution[s]."[19] But even if the Government were motivated to try to implement some form of social distancing, the physical footprint of the Adelanto facility is simply not compatible with keeping 1,300 detainees and numerous staff members six feet apart at all times. This is so for several reasons.

*First*, the number of detainees housed in each sleeping area at Adelanto makes social distancing impossible. In Adelanto West, detainees are forced to sleep in cells that house between four and eight people in a space that is as small as eight by ten feet. Schneberk Decl. ¶ 26; Dacoff Decl. ¶ 7; Decl. of Jose Robles Rodriguez ("Robles Rodriguez Decl.") ¶ 7; *accord* Hernandez Velasquez Decl. ¶ 6. Bunk beds are placed approximately 2.5 to 3 feet apart. Dacoff Decl. ¶ 7. Dormitories are constituted of 18 cells each, containing up to 72 people. Dacoff Decl. ¶ 11; Decl. of Jessica Bansal ("Bansal Decl."), Ex. A at 2; *id.* Ex. B at 22. Detainees in Adelanto East are clustered in pod quadrants, which hold up to 96 detainees in 12 sets of double bunks. Schneberk Decl. ¶ 27; Bansal Decl., Ex. A at 2; *id.* Ex. B at 22; *see* Rayon Vite Decl. ¶ 7. But, as Plaintiffs' medical experts explain, "it would not be possible to achieve adequate social distancing if more than one person slept in each bunk, [or] if bunks were within less than 8–10 feet of each other (to maintain at least a 6 foot distance even as people are getting in and out of the bunks)." Schneberk Decl. ¶ 27; *see also* Greifinger Decl. ¶ 26. In both Dr. Greifinger and Dr. Schneberk's professional opinions, it is not possible to achieve social distancing if more than one person is housed in each cell. Schneberk Decl. ¶ 26; Greifinger Decl. ¶¶ 23, 26 ("[S]ocial distancing is impossible when people sleep in small, multi-person rooms and live under conditions that

[19] *Robles Rodriguez* Gov't Response at 16.

1    necessarily subject them to close proximity with others multiple times throughout the

2    day.").

3        *Second*, detainees share toilets, sinks, and showers with others in their

4    dormitories and pods. Schneberk Decl. ¶ 28; Rayon Vite Decl. ¶¶ 9–11; Lopez

5    Salgado Decl. ¶¶ 11–14; Dacoff Decl. ¶¶ 8, 13; Robles Rodriguez Decl. ¶¶ 9–11. Up

6    to 72 people share one showering area. Dacoff Decl. ¶ 13; Robles Rodriguez Decl. ¶

7    10. Showers are typically crowded with people and placed so closely together that,

8    when standing in one shower stall, "you could reach out your hand and press the button

9    for the shower adjacent to yours," Dacoff Decl. ¶¶ 14; 18. Again, in the opinions of

10   Plaintiffs' medical experts, it is not possible "to achieve adequate social distancing

11   and hygiene in communal bathroom[s]" unless "people [are] at least six feet apart at

12   all times" and the "facilities [are] thoroughly disinfected after each use"—which is

13   impossible if 72 people are confined to single shower area. Schneberk Decl. ¶ 28; *see*

14   *also* Greifinger Decl. ¶ 26

15       *Third*, detainees congregate every day in pods and dining areas, with as little as

16   a few inches between them. *See* Schneberk Decl. ¶ 28; Hernandez Velasquez Decl. ¶

17   9. Food preparation and service is communal, with six to ten people eating at the same

18   table. Robles Rodriguez Decl. ¶ 11; *see also* Dacoff Decl. ¶¶ 19–21. Detainees are

19   responsible for cleaning the dining areas, but in Adelanto West, "the only thing we

20   [are] given to clean [is] a dirty towel and a bucket of dirty water," which is used again

21   and again. Robles Rodriguez Decl. ¶ 11; *see also* Dacoff Decl. ¶ 20. In Adelanto East,

22   detainees only have access to cleaning supplies during mealtimes: "So either we [can]

23   eat, or we [can] clean." Rayon Vite Decl. ¶ 11. But even if Adelanto's grossly

24   inadequate sanitation were improved, current population levels preclude keeping each

25   detainee anything near six feet apart from each other during communal mealtimes.

26       Plaintiffs' medical experts therefore conclude that release of detainees is crucial

27   to limit the risk of infection "for the individuals released, for those who remain

28   detained, and for the general public." Greifinger Decl. ¶ 24. As Dr. Greifinger

explains, "this would be true even if the conditions inside the facility were impeccable." *Id.*; *see also* Schneberk Decl. ¶ 38 ("Because of the structure and conditions at Adelanto, detainees face a dramatically reduced ability to protect themselves by social distancing than they would in the community").

That is precisely why multiple jurisdictions, including Los Angeles, CA, Detroit, MI, Travis County, TX, New York City, and the entire states of New Jersey and Iowa have released thousands of people from *criminal* custody, acknowledging the grave threat that an outbreak in jails and detention centers poses.[20] Other public officials have likewise called for the release of eligible individuals from detention. The former Acting Director of ICE, John Sandweg, has advocated releasing individuals to combat the spread of COVID-19 in detention centers, and has stated "ICE has the operational capacity to quickly and drastically reduce the population of civil immigration detainees." Motion for TRO Ex. 19, Sandweg Decl. ¶ 9, *Thompson v. Tsoukaris*, Case No. 1:20-cv-01449-SDG (N.D. Ga. Apr. 3, 2020), ECF No. 4-20.

## III.  LEGAL STANDARD

Plaintiffs are entitled to a preliminary injunction if they show: (1) a likelihood of success on the merits; (2) they are likely to suffer irreparable harm in the absence of relief; (3) the balance of equities tips in their favor; and, (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit employs a sliding scale approach, under which a stronger showing of one element may offset a weaker showing of another. *See Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012). Thus, a preliminary injunction may issue where "serious questions going to the merits [are] raised and the balance of hardships tips sharply in [plaintiffs'] favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (internal quotation marks omitted). To succeed under the "serious question" test, plaintiffs must show that they are likely to suffer irreparable injury and

---

[20] *See Responses to COVID-19 pandemic*, Prison Policy Initiative (Apr. 10, 2020) (collecting instances where jails and prisons have released detainees due to COVID-19), https://www.prisonpolicy.org/virus/virusresponse.html#releases.

that an injunction is in the public's interest. *Id.* at 1132.

## IV.  ARGUMENT

In multiple orders over the past two weeks, this Court has recognized that "[u]nder the Due Process Clause, a civil detainee cannot be subject to the current conditions of confinement at Adelanto." *Castillo* TRO at *5. Those conditions include "sleeping rooms housing four or six detainees with shared sinks, toilets and showers," potentially infected guards who "regularly rotate through the various holding areas several times a day" without donning protective equipment, and "meal times" where detainees "line up together, sometimes only inches apart, in the cafeteria." *Castillo* TRO at *2; *see also* TRO and Order to Show Cause ("*Fraihat* TRO"), *Fraihat v. Wolf*, Case No. ED-CV2000590-TJH, at *4-*5 (C.D. Cal. Mar. 30, 2020). The unconstitutional nature of these conditions does not turn on who is seeking relief; rather, this Court has made clear that *everyone* currently trapped inside Adelanto is subject to an ongoing violation of their Fifth Amendment rights.

The conditions within Adelanto remain fundamentally unchanged despite this Court's orders. And Plaintiffs here are in even greater danger today than the dozens of detainees this Court has already released because the spread of COVID-19 in the area—from which facility staff commute daily—has dramatically increased in recent days. As of April 13, 2020, there are 977 identified COVID-19 cases in San Bernardino County, and 31 deaths, compared with fewer than 100 identified cases on March 27, the day *Castillo* was decided.[21] All Class members are entitled to—and desperately require—relief for the same reasons as the individuals this Court has already released. This Court should grant the preliminary injunction and order system-wide relief.

---

[21] Coronavirus 2019, San Bernardino County, http://wp.sbcounty.gov/dph/coronavirus/ (last visited Apr. 13, 2020).

**A.      Plaintiffs are Likely to Succeed on the Merits.**

**1.      Plaintiffs' Continued Detention at Adelanto Violates Their Fifth Amendment Right to Reasonable Safety in Government Custody.**

Individuals confined by the government have a right to health and safety. *See Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982). "The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989).

Thus, a plaintiff establishes "a due process violation" if the Government "placed them in danger," and "acted with deliberate indifference to a known or obvious danger in subjecting them to that danger." *Hernandez v. City of San Jose*, 897 F.3d 1125, 1137 (9th Cir. 2018) (internal quotations, citations, and alterations omitted). A plaintiff need not show that the relevant government officials are "subjectively aware that their [actions are] unreasonable," only that "a reasonable official in the circumstances would have appreciated the high degree of risk involved." *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1123, 1125 (9th Cir. 2018). This standard requires "something akin to reckless disregard." *Id.* at 1125. In systemic cases, such as this, deliberate indifference can be shown by evidence of "systematic or gross deficiencies in staffing, facilities, equipment, or procedures." *Hernandez v. Cty. of Monterey*, 305 F.R.D. 132, 152–53, 155 n. 138 (N.D. Cal. 2015) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)). The key question in such cases is whether systemic deficiencies "taken as a whole" subject people to a "substantial risk of serious harm." *See Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011).

Furthermore, it is well-settled that a detainee's constitutional protections extend to "future harm," including a "condition of confinement that is sure or very likely to

13

cause serious illness and needless suffering the next week or month or year." *Helling*, 509 U.S. at 33. Constitutional violations therefore can arise from "the exposure of inmates to a serious, communicable disease" even if "the complaining inmate shows no serious current symptoms" and "even though the possible infection might not affect all of those exposed." *Id.*; *see also Castillo* TRO at *4; *Hutto v. Finney*, 437 U.S. 678, 682–83, 687 (1978) (risk of exposing inmates to communicable diseases such as hepatitis and venereal disease violates the Eighth Amendment); *DeGidio v. Pung*, 920 F.2d 525, 526, 533 (8th Cir. 1990) (inadequate screening and control procedures in response to tuberculosis outbreak violated the Eighth Amendment).[22]

Here, as this Court has already recognized, COVID-19 poses a substantial risk of serious harm to Plaintiffs, and Defendants' response to that imminent risk constitutes reckless disregard for their safety. As this Court explained in its *Castillo* TRO order, "[t]he law is clear":

> [T]he Government cannot put a civil detainee into a dangerous situation, especially where that dangerous situation was created by the Government. The Due Process Clause of the Fifth Amendment prohibits the Government from exposing an individual to a danger which he would not have otherwise faced. A civil detainee's constitutional rights are violated if a condition of his confinement places him at substantial risk of suffering serious harm, such as the harm caused by a pandemic.

*Castillo* TRO at *3 (internal citations omitted). After carefully surveying the conditions at Adelanto, this Court held that "[u]nder the Due Process Clause, a civil detainee cannot be subject to the current conditions of confinement at [the facility]." *Id.* at *5. Relying on this holding, this Court has subsequently granted release to at

---

[22] The above discussion relies in part on Eighth Amendment case law. But, because civil detention is governed by the Fifth Amendment rather than the Eighth, even conditions short of "deliberate indifference" could be unconstitutional in the immigration context. *Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004). A condition of confinement violates the Fifth Amendment "if it imposes some harm to the detainee that significantly exceeds or is independent of the inherent discomforts of confinement and is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective." *Unknown Parties v. Johnson*, Case No. CV-15-00250-TUC-DCB, 2016 WL 8188563, at *5 (D. Ariz. Nov. 18, 2016), *aff'd sub nom. Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017). The conditions described here easily meet that standard.

14

least two dozen more detained individuals—recognizing the *continuing* inadequacy of the conditions of confinement at Adelanto.

In its TRO orders, this Court noted at least four specific conditions that made detainees at Adelanto vulnerable to COVID-19: (1) detainees were not kept "at least 6 feet apart from others at all times"; (2) they lived in "sleeping rooms housing four or six detainees with shared sinks, toilets and showers"; (3) they had "meal times" where they "line[d] up together, sometimes only inches apart, in the cafeteria"; and (4) and they were forced to interact with potentially infected guards who "regularly rotate through the various holding areas several times a day" without protective equipment. *Castillo* TRO at *5, *2; *Fraihat* TRO at *11, *4–5. *None* of these conditions have been remedied, and *every* detainee at Adelanto is subject to them. *See supra* Pt. II.C. Since, as this Court has already found, "a civil detainee cannot be subject to the current conditions of confinement at Adelanto," the Government's continued detention of the proposed class is necessarily unlawful.

### 2. Remedies Short Of Social Distancing Are Inadequate To Protect Detainees' Constitutional Rights

This Court has already recognized the fundamental importance of social distancing in its prior orders. As it has explained, and as Plaintiffs' experts confirm, the "coronavirus is spread between people who are in close contact—within about 6 feet—with one another through respiratory droplets produced when an infected person coughs or sneezes." *Castillo* TRO at *2. These "droplets can land in the mouths or noses, or can be inhaled into the lungs, of people who are within about 6 feet of the infected person." *Id.*

Yet, as this Court also found, and as the evidence Plaintiffs' present again confirms, the detainees at Adelanto "are *not* kept at least 6 feet apart from others at all times." *Id.* at *5 (emphasis added). To the contrary, they are placed in "dormitory-type sleeping rooms housing four or six detainees with shared sinks, toilets and showers," and are "forced to touch surfaces touched by other detainees." *Id.* at *2, *5.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"At meal times—three times a day—the 60 to 70 detainees in each holding area line up together, sometimes only inches apart, in the cafeteria." *Id.* at \*2. Accordingly, *all* detainees at Adelanto are "suffering from a condition of confinement that takes away . . . their ability to socially distance," *id.* at \*5, and thus protect themselves from COVID-19. *See* Greifinger Decl. ¶ 23 (explaining why ICE's strategy of "encouraging" social distancing and reducing occupancy limits in some Adelanto locations is meaningless when sleeping and living facilities are shared); *see also* Schneberk Decl. ¶¶ 26–29, 36 (explaining why social distancing, "essential" to slowing the spread of the virus, is impossible under current conditions at Adelanto).

Despite this Court's recognition that social distancing of six feet is essential to mitigate the serious risk of COVID-19, the Government in its recent filings makes clear that it has *no intention* of seriously engaging in social distancing practices at Adelanto. The Government asserts only that "[d]etainees are encouraged to exercise social distancing protocols within their housing units" and "reminded to practice social distancing" in their "group movements" without explaining *how* they could possibly do so when housed in cramped rooms with six or seven other individuals. *See* Valdez Decl. ¶ 30; Greifinger Decl. ¶ 23 ("[T]he Valdez Declaration fails to recognize the obvious: social distancing is impossible when people sleep in small, multi-person rooms and live under conditions that necessarily subject them to close proximity with others multiple times throughout the day.").

Indeed, the most telling thing about the Government's response is its continued assertion that it is *not required* to address the "three specific conditions at the Adelanto facility" it acknowledges this Court has *already* "deemed unacceptable risks: (i) going within six feet of others; (ii) touching surfaces touched by other detainees, and (iii) the rotation of guards and staff at Adelanto" without protective equipment. *Robles Rodriguez* Gov't Response at 16. In asserting that these measures are not required, the Government concedes that, despite making paper changes, it is doing nothing to actually remedy the constitutional harms this Court has already identified.

16

Instead, in breathtaking defiance of this Court's findings, the Government simply belittles those dangers—likening them to the risks associated with going to "the grocery store." *Id*. This analogy is as obtuse as it is inhumane. In fact, State-wide guidance discourages all but essential trips to the grocery store and requires that grocery stores "ensure social distancing of six feet per person" and "[l]imit[] the number of customers at any given time as necessary to reduce outdoor/indoor crowding."[23] And while individuals can wear protective equipment and take steps to limit their distance from others for the 30 minutes per week they may spend in a grocery store, the Defendants *force* Adelanto detainees to *live* in overcrowded dormitories without any protective equipment for 24 hours a day, 7 days a week. The Government's false comparison underscores just how much it underestimates the devastating threat posed by COVID-19—and how little it intends to do to stop it at Adelanto. *Cf.* Greifinger Decl. ¶ 13 ("In mid-March the jail at Rikers Island in New York City had not had a single confirmed COVID-19 case. Rikers now has a rate of infection that is far higher than the infection rates of the most infected regions of the world.").

Indeed, it is simply extraordinary that ICE has not yet taken the minimal step of requiring its guards—who rotate in and out of the facility on a daily basis—to wear face coverings during their interactions with detainees, even as the CDC now recommends such coverings for *all* Americans when they leave their home.[24] Nothing could better illustrate how little regard the Government continues to have for the lives of those detained inside Adelanto.

Instead of addressing the areas it acknowledges this Court has already found

---

[23] *See* March 16, 2020 Guidance, California Department of Public Health, https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/RetailFoodBeverageandOtherRelatedServiceVenues.aspx.

[24] *Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission*, Centers for Disease Control and Prevention (updated Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.

unacceptable at Adelanto, the Government continues to stress that increased sanitation is adequate to prevent the spread of COVID-19 at the facility (while simultaneously maintaining it is not required to do even that limited amount). But this Court has recognized that sanitation measures alone are woefully insufficient to stop the spread of COVID-19.[25] *See Castillo* TRO at *5; *Fraihat* TRO at *11; *see also* Schneberk Decl. ¶ 42 (Plaintiffs' medical expert opining that at Adelanto "it will be very difficult irrespective of the amount of sanitation and hygiene practices employed, to prevent spread in such a confined densely populated space"). If such measures were remotely adequate, government officials across the country would not have made the painful but necessary decision to close high-density settings of all sorts—schools, workplaces, government buildings, and cultural institutions. Nor would people throughout California and all over the nation be advised to stay home for all but the most essential purposes.[26]

The Government has also confirmed, once again, that it has no intention of testing guards or detainees unless they are symptomatic (and has no intention of testing guards at all). *See Robles Rodriguez* Gov't Response at 10; Valdez Decl. ¶ 27. That underscores the degree to which ICE protocols are dramatically behind the curve. As this Court has explained, "[t]he science is well established – infected, asymptomatic carriers of the coronavirus are highly contagious." *Castillo* TRO at *5. Individuals may be infected and spreading the virus to others for days or even weeks while exhibiting mild symptoms or none at all. Awaiting the development of symptoms before acting is a recipe for an outbreak—which is virtually guaranteed if Defendants maintain their defiance of basic epidemiological consensus. *See also*

---

[25] Declarations from current and former Adelanto detainees also make clear that the Government has *not* significantly increased sanitation at Adelanto in any meaningful way. *See supra* Pt.II.C.

[26] Alicia Lee, *These States Have Implemented Stay-At-Home Orders. Here's What That Means for You.*, CNN (updated Apr. 7, 2020), https://www.cnn.com/2020/03/23/us/coronavirus-which-states-stay-at-home-ordertrnd/index.html.

Schneberk Decl. ¶ 11 (explaining that due to lack of testing actual cases are "without a doubt much, much higher" than confirmed cases).

### B.   Plaintiffs Satisfy the Remaining Factors for Preliminary Injunction

#### 1.   Exposure to a Lethal Virus Which Lacks Any Vaccine, Treatment, or Cure Constitutes Irreparable Harm.

As this Court explained in *Castillo* and *Fraihat*, "[i]t is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Castillo* TRO at *6 (citing *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017)); *Fraihat* TRO at *11 (citing same). That alone satisfies this factor.

Moreover, the Ninth Circuit recently recognized that the dangerous and unsafe conditions of detention that Plaintiffs face also constitute irreparable harm supporting injunctive relief. *Padilla v. U.S. Immigration & Customs Enforcement*, Case No. 19-35565, 2020 WL 1482393, at *9 (9th Cir. Mar. 27, 2020) (recognizing that "substandard physical conditions, [and] low standards of medical care" in immigration detention constitute irreparable harm justifying injunctive relief). And the Ninth Circuit has also recognized that there is irreparable harm where government actions threaten to worsen an individual's health. *See M.R. v. Dreyfus*, 663 F.3d 1100, 1111 (9th Cir. 2011), *as amended by* 697 F.3d 706 (9th Cir 2012).

Each of these reasons supports immediate relief here. The fatality rate for people infected with COVID-19 is estimated to be more than thirty times higher than the seasonal flu.[27] For those who survive, infection can permanently damage the lungs and other major organs. *See* Schneberk  Decl. ¶ 22. Once COVID-19 is introduced into a congregate environment like a detention center, it spreads "like wildfire." Greifinger Decl. ¶ 13; Schneberk Decl. ¶ 42. And the risk is getting closer: as of April 13, ICE had confirmed detainees in 21 different detention facilities have tested

---

[27] Jo Craven McGinty, *Why Doesn't Flu Tank Economy Like Covid-19?*, Wall Street Journal, (Apr. 10, 2020), https://www.wsj.com/articles/why-doesnt-flu-tank-economy-like-covid-19-11586511000.

positive for COVID-19, including twelve confirmed detainee cases at Otay Mesa Detention Center in San Diego—up from just one on April 4.[28] For these reasons, experts have concluded that "[e]ach day we wait to act increases the danger of serious illness or death due to COVID-19 for not only detainees and staff at Adelanto, but for millions of southern Californians." Schneberk Decl. ¶ 43; *see* Greifinger Decl. ¶¶ 19, 23. There is no serious dispute the irreparable harm factor is satisfied.

## 2. Public Interest and Balance of Equities Weigh Heavily in Plaintiffs' Favor.

Here, as in the cases where this Court has already granted relief, "[t]he balance of the equities tip sharply in favor" of Plaintiffs. *Castillo* TRO at *6; *Fraihat* TRO at *11. While Plaintiffs "face[] irreparable harm to their constitutional rights and health," "there is no harm to the Government when a court prevents the Government from engaging in unlawful practices." *Castillo* TRO at *6; *Fraihat* TRO at *11. Indeed, "[f]aced with . . . preventable human suffering, [the Ninth Circuit] ha[s] little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." *Hernandez*, 872 F.3d at 996 (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)).

Moreover, it is in both the *Defendants'* and the broader public interest to reduce the threat of an imminent COVID-19 outbreak at Adelanto. ICE has an interest in preventing any potential spread of COVID-19 in its detention facility, which may then affect guards, visitors, attorneys, and others who may potentially interact with detainees. And an outbreak of COVID-19 at Adelanto would doubtless put significant pressure on or exceed the capacity of local health infrastructure. Greifinger Decl. ¶ 14; *see* Schneberk Decl. ¶ 26. As this Court succinctly explained:

> The public has a critical interest in preventing the further spread of the coronavirus. An outbreak at Adelanto would, further, endanger all of us

---

[28] U.S. Immigration and Customs Enforcement, *Confirmed Cases*, ICE Guidance on COVID-19 (last updated Apr. 13, 2020, 11:43 a.m.), https://www.ice.gov/coronavirus (click on "Confirmed Cases").

– Adelanto detainees, Adelanto employees, residents of San Bernardino County, residents of the State of California, and our nation as a whole.

*Castillo* TRO at *6. Thus, the implementation of measures to permit adequate social distancing would not only impose minimal harm to the government, it would also reduce the health and economic burden on the local community and health infrastructure at large. Schneberk Decl. ¶¶ 42, 48; Greifinger Decl. ¶ 14; Decl. of Jonathan Luis Golob in Supp. of Emergency Ex Parte Appl. for TRO ¶ 11, *Robles Rodriguez*, Case No. 5:20-cv-627-TJH-GJS (Mar. 30, 2020), ECF No. 18; *see also Hernandez*, 872 F.3d at 996 ("[T]he general public's interest in the efficient allocation of the government's fiscal resources favors granting [relief].").

The Government's purported interest in public safety does not remotely justify subjecting detainees at Adelanto to life-threatening illness. Although the Government has protested that it should not be required to "shutter" Adelanto, *see* TRO Opp. at 19, *Robles Rodriguez*, Case No. 5:20-cv-627-TJH-GJS (Mar. 31, 2020), ECF No. 28, an order from this Court mandating appropriate social distancing would not require shuttering the facility or even releasing all detainees. Rather, Defendants would need only release—under appropriately tailored conditions of supervision—a sufficient number of detainees to ensure that effective social distancing can be maintained at the facility.

There is no reason to believe that such an approach would pose any danger to the public. While the Government in its filings appears to be taking the position that *every* detainee presents such a danger to the community, or is such a flight risk, that it is worth risking a major, life-threatening outbreak at the facility to maintain their detention, that position is patently absurd.[29] As this Court has recognized, "the risk that Petitioners, here, will flee, given the current global pandemic, is very low . . . ."

---

[29] *See, e.g.*, *Robles Rodriguez* Gov't Response at 1–2; Gov't Response to Order to Show Cause, *Fraihat v. Wolf*, Case No. ED CV 20-cv-590 TJH (KSx) (C.D. Cal. Apr. 6, 2020), ECF No. 20; Resp'ts' Resp. and Opp. To Pet. For Writ of Habeas Corpus and Mot. for TRO or Prelim. Inj., *Thaker v. Doll*, Case No. 20-cv-00480 (M.D. Pa. Mar. 29, 2020), ECF No. 35; Resp'ts' Opp. To Mot. for TRO at 1, *Ortuno v. Jennings*, Case No. 20-2064 MMC (N.D. Cal. Mar. 30, 2020), ECF No. 25.

*Castillo* TRO at \*5.

Furthermore, ICE has a range of highly effective tools at its disposal to ensure that individuals report for court hearings and other appointments, including conditions of supervision. *See* Compl. at ¶ 67; Mem. & Order Granting TRO at 22, *Thaker v. Doll*, Case No. 20-cv-00480 (M.D. Pa. Mar. 31, 2020), ECF No. 47 (noting "that ICE has a plethora of means *other than* physical detention at their disposal by which they may monitor civil detainees and ensure that they are present at removal proceedings, including remote monitoring and remote check-ins"). For example, ICE's conditional supervision program, called ISAP (Intensive Supervision Appearance Program), "relies on the use of electronic ankle monitors, biometric voice recognition software, unannounced home visits, employer verification, and in-person reporting to supervise participants."[30] Compl. ¶ 67 at 19. That program is so effective that a "government-contracted evaluation of this program reported a 99% attendance rate at all immigration court hearings." *Id.* It is therefore perfectly possible for ICE to remedy the on-going violation of Plaintiffs' rights—and all those of the Proposed Class—by selectively releasing certain detainees under appropriate conditions of confinement, in order to facilitate adequate social distancing at the facility.

Moreover, as this Court has repeatedly stressed, the individuals in question here are *civil* detainees who have already served the sentences required by a criminal conviction, if any. *See Castillo* TRO at \*5. If they were U.S. citizens, they would *already* be free from any kind of state supervision, deemed rehabilitated and no further risk to the public. The notion that their different immigration status transforms them into such a public danger that they categorically cannot be released—even under careful supervision and even during a life-threatening pandemic—is simply baseless.

---

[30] The Intensive Supervision Appearance Program, or ISAP, "relies on the use of electronic ankle monitors, biometric voice recognition software, unannounced home visits, employer verification, and in-person reporting to supervise participants." Lorenzen-Strait Decl. ¶ 15, *Robles Rodriguez*, Case No. 5:20-cv-627-TJH-GJS (Mar. 30, 2020), ECF No. 22.

Indeed, in prisons across the country, *thousands* of individuals who are still serving the terms of their incarceration have been released, as governments recognize that the need to mitigate the spread of COVID-19 in many instances outweighs the state interest in continued detention.[31] The fact that by contrast hardly any civil immigration detainees have been voluntarily released anywhere in the country plainly reflects a political judgment rather than a public safety one. It is precisely at such times, when a government's political priorities may encourage it to ignore the rights of society's most marginalized and powerless, that the judiciary's vital role in safeguarding our system of constitutional rights is at its most profound.

**C.     A Comprehensive Response to the Constitutional Violations at Adelanto is Necessary.**

The only way for the Adelanto detainees to have equal access to potentially life-saving relief is a class-wide remedy. This Court has already stated that, "[u]nless an Adelanto habeas case is filed as a class action, each case shall be limited to a single petitioner." *Castillo v. Barr*, Minute Order, Case No. 5:20-cv-00605-TJH (C.D. Cal. Apr. 7, 2020), ECF No. 37. Should the Court deny Plaintiffs' motion for provisional class certification, dozens, perhaps hundreds of individual Adelanto detainees will likely file claims for relief depending on their access to lawyers. The result will be vastly under-inclusive and likely unfair. *All* of the Proposed Class Members are at grave risk of COVID-19 infection under their current conditions of confinement, regardless of whether their circumstances permit them to file individual claims.

Last week a district court in Massachusetts certified a class of civil detainees held at two detention centers in Bristol County, Massachusetts, recognizing that a systemic remedy was necessary "*in order to protect everyone* [in the facility] from the

---

[31] *See Responses to COVID-19 pandemic*, Prison Policy Initiative (Apr. 10, 2020) (collecting instances where jails and prisons have released detainees due to COVID-19), https://www.prisonpolicy.org/virus/virusresponse.html#releases; *see, e.g.*, Paige St. John, *California to release 3,500 inmates early as coronavirus spreads inside prisons*, L.A. Times (Mar. 31, 2020) https://www.latimes.com/california/story/2020-03-31/coronavirus-california-release-3500-inmates-prisons (describing California's plan to accelerate release for thousands of state prison inmates).

impending threat of mass contagion." *See Savino v. Sousa*, Mem. & Order at 7, 23, 29, Case No. 20-cv-10617-WGY (D. Mass. Apr. 8, 2020), ECF No. 64 (emphasis added). That court issued an order requiring a reduction of the population of those detention centers on an expedited, individualized basis. *Id.* at 28.

Plaintiffs propose that this Court adopt a similar procedure here, as set forth in the Proposed Order. Such an approach would largely track the procedure that this Court has already adopted in providing relief on an individualized basis, allowing this Court to assess the individual circumstances of detainees at Adelanto, and craft appropriate conditions of release, as it has done in the dozens of habeas petitions it has granted. But it would also allow for a systematic and expeditious process where the vindication of any given detainee's constitutional rights does not turn on access to counsel, language and educational skills, or sheer luck. It would also reduce the intense burden on the Court's resources that comes with claim-by-claim adjudication. And it would allow claims for relief to be processed fast enough that there is a chance social distancing could be established at Adelanto *before* a serious outbreak has occurred. Of course, nothing in Plaintiffs' Proposed Order bars Defendants from implementing an alternative plan to rapidly reduce the population to a level where they could implement social distancing at the facility.

ICE, however, has steadfastly refused to implement such a system to date—leaving no doubt that this Court's intervention is desperately needed. If this Court does not act, it is clear nothing will change at Adelanto. Instead, the Government will defend each individual habeas action by pointing to the same strategies—like sanitation, hand-washing and temperature checks—that this Court has already found inadequate time and again. While this Court's case-by-case attention has provided vital relief for many endangered detainees, only system-wide relief can prevent the tragedy the Government is courting.

This Court should grant the preliminary injunction, adopt Plaintiffs' proposal for considering release requests on an expedited basis, and keep that system in place

1   until the Government takes the necessary steps to cease the ongoing system-wide Fifth
2   Amendment violation at Adelanto.

3   **V.      CONCLUSION**

4          This Court should grant Plaintiffs' motion for a preliminary injunction, and
5   grant the relief requested in Plaintiffs' Complaint.

6                                                    Respectfully submitted,

7
8   Dated:  April 13, 2020              */s/ Amanda Barnett*
                                         AMANDA BARNETT
9                                        Counsel for Plaintiffs