SAMIR DEGER-SEN*
samir.deger-sen@lw.com
WILLIAM M. FRIEDMAN*
william.friedman@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Tel: 202.637.2200
Fax: 202.637.2201

AMANDA BARNETT (SBN 319046)
amanda.barnett@lw.com
JESSIE CAMMACK (SBN 329794)
jessie.cammack@lw.com
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Tel: 213.485.1234
Fax: 213.891.8763

Attorneys for Plaintiffs-Petitioners
*Pro hac vice application forthcoming

AHILAN ARULANANTHAM
(SBN 237841)
aarulanantham@aclusocal.org
MICHAEL KAUFMAN
(SBN 254575)
mkaufman@aclusocal.org
JESSICA KARP BANSAL
(SBN 277347)
jbansal@aclusocal.org
MICHELLE (MINJU) CHO
(SBN 321939)
mcho@aclusocal.org
ACLU Foundation of Southern
California
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELVIN HERNANDEZ ROMAN, BEATRIZ ANDREA FORERO CHAVEZ, MIGUEL AGUILAR ESTRADA, on behalf of themselves and all others similarly situated,<br><br>        Petitioners-Plaintiffs,<br><br>v.<br><br>CHAD F. WOLF, Acting Secretary, U.S. Department of Homeland Security; MATTHEW T. ALBENCE, Deputy Director and Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement; DAVID MARIN, Director of the Los Angeles Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; and JAMES JANECKA, Warden, Adelanto ICE Processing Center,<br><br>        Respondents-Defendants. | Case No. 5:20-cv-00768<br><br>**ADELANTO COVID**<br><br>**DECLARATION OF ROBERT B. GREIFINGER, MD** |

# DECLARATION OF ROBERT B. GREIFINGER, MD

I, Robert B. Greifinger, declare as follows:

1.      I am a physician who has worked in health care for prisoners for more than 30 years. I have managed the medical care for inmates in the custody of New York City (Rikers Island) and the New York State prison system. I have authored more than 80 scholarly publications, many of which are about public health and communicable disease. I am the editor of Public Health Behind Bars: from Prisons to Communities, a book published by Springer (a second edition is due to be published in early 2021); and co-author of a scholarly paper on outbreak control in correctional facilities.[1]

2.      I have been an independent consultant on prison and jail health care since 1995. My clients have included the U.S. Department of Justice, Division of Civil Rights (for 23 years) and the U.S. Department of Homeland Security, Section for Civil Rights and Civil Liberties (for six years). I am familiar with immigration detention centers, having toured and evaluated the medical care in approximately 20 immigration detention centers, out of the several hundred correctional facilities I have visited during my career. I currently monitor the medical care in three large county jails for Federal Courts. My resume is attached as Exhibit A.

3.      COVID-19 is a coronavirus disease that has reached pandemic status. As of April 9, 2020, according to the World Health Organization, more than 1.43 million people have been diagnosed with COVID-19 around the world and 85,522 have died. In the United States, there are 395,030 confirmed cases and 12,740

---

[1] Parvez FM, Lobato MN, Greifinger RB. *Tuberculosis Control: Lessons for Outbreak Preparedness in Correctional Facilities*. Journal of Correctional Health Care OnlineFirst, published on May 12, 2010 as doi:10.1177/1078345810367593.

1

people have died.[2] These numbers are likely an underestimate, due to the lack of availability of testing.

4.     COVID-19 is a serious disease. Results range from no symptoms or mild ones, to respiratory failure and death. There is no vaccine to prevent COVID-19. There is no known cure or anti-viral treatment for COVID-19 at this time. The only way to mitigate COVID-19 is to use scrupulous hand hygiene and social distancing.

5.     COVID-19 spreads through droplets that can pass from person to person as well as by touching contaminated surfaces. Part of what is so pernicious about the virus is that it can remain on surfaces for days.

6.     People in the high-risk category for COVID-19, i.e., adults over 50 years old or those with underlying disease, are likely to suffer serious illness and death. According to preliminary data from China, 20% of people in high risk categories who contract COVID-19 have died.

7.     Those who do not die may have prolonged serious illness, for the most part requiring expensive hospital care, including ventilators that will likely be in very short supply.

8.     Even young, healthy people can get very sick or die from COVID-19.

9.     Those who become sick from COVID-19 now, when hospitals are already overburdened treating COVID-19 patients, are less likely to have access to necessary treatment.

10.    The Centers for Disease Control and Prevention (CDC) has identified underlying medical conditions that may increase the risk of serious COVID-19 for individuals of any age: blood disorders, chronic kidney or liver disease, compromised immune system, endocrine disorders, including diabetes, metabolic

---

[2] World Health Organization, Coronavirus disease 2019, Situation Report—80, *at* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200409-sitrep-80-covid-19.pdf?sfvrsn=1b685d64_2

disorders, heart and lung disease, neurological and neurologic and neurodevelopmental conditions, and current or recent pregnancy.

11.    Social distancing and hand hygiene are the only known ways to prevent the rapid spread of COVID-19. For that reason, public health officials have recommended extraordinary measures to combat the spread of COVID-19. Schools, courts, collegiate and professional sports, theater and other congregate settings have been closed as part of risk mitigation strategy.

12.    Jails and detention centers are congregate environments where the risk of infection and infectious spread are extraordinarily high.

13.    There are increasingly reports of COVID-19 infections in correctional and detention sites around the country. Once COVID-19 is introduced into these facilities, it spreads like wildfire. In mid-March the jail at Rikers Island in New York City had not had a single confirmed COVID-19 case. Rikers now has a rate of infection that is far higher than the infection rates of the most infected regions of the world. By April 5, 273 inmates, 321 correction staff and 53 health workers tested positive for COVID-19; four correction staff members and one inmate have died and multiple inmates have been hospitalized.[3] The Chief Medical Officer of Rikers has described a "public health disaster unfolding before our eyes." In his view, following CDC guidelines has not been enough to stem the crisis: "infections in our jails are growing quickly despite these efforts."[4]

14.    Like the explosive growth at Rikers, the Cook County Jail went from two confirmed COVID-19 cases on March 23 to 134 cases in a matter of one

---

[3] A Rikers inmate has died of complications from the virus, New York Times, April 5, 2020, *available at* https://www.nytimes.com/2020/04/05/nyregion/coronavirus-new-york-update.html#link-3236f5ee.

[4] Ross MacDonald (@RossMacDonaldMD), Twitter (Aug. 30, 2020, 8:03 PM), https://twitter.com/rossmacdonaldmd/status/1244822686280437765?s=12 ("I can assure you we were following the CDC guidelines before they were issued.").

week.[5] As of April 7, 234 detainees and 78 staff members had tested positive and one inmate had died.[6] In one facility for which I work for the federal court as a medical monitor, there have been 15 test-positive staff members, and six test-positive health care staff, several test-positive inmates and multiple other tests pending results.

15.     Like these jails, Adelanto is an enclosed environment. People live in close quarters and cannot achieve the "social distancing" needed to effectively prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without disinfection between use. Food preparation and food service is communal, with little opportunity for surface disinfection.

16.     Staff at Adelanto arrive and leave on a shift basis; there is little to no ability to adequately screen staff for new, asymptomatic infection.

17.     In the face of these challenges, ICE has failed to adequately respond to the COVID-19 pandemic. I have reviewed the March 6, 2020 interim guidance sheet[7] produced by ICE Health Services Corps, the body that oversees ICE detention facilities' medical care, the March 27, 2020 ICE Memorandum to Detention Wardens and Superintendents on Coronavirus Disease 2019 (COVID 19), and ICE's COVID-19 guidance on its website.[8] These protocols are wholly

---

[5] Sam Kelley, *134 Inmates at Cook County Jail Confirmed Positive for COVID-19*, Chicago Sun Times, Mar. 30, 2020, available at https://chicago.suntimes.com/coronavirus/2020/3/29/21199171/cook-county-jail-coronavirus-positive-134-cases-covid-19.

[6] Jason Meisner and Megan Crepeau, *Sheriff defends attempts to curb coronavirus at Cook County Jail as judge mulls lawsuit seeking releases*, Chicago Tribune, April 7, 2020, *available at* http://www.chicagotribune.com/coronavirus/ct-coronavirus-dart-jail-lawsuit-hearing-20200407-xplp23bx6janxbce4mvwuc633u-story.html.

[7] ICE Health Service Corps, *Interim Reference Sheet on 2019-Novel Coronavirus (COVID-19)* (Mar. 6, 2020), https://www.aila.org/infonet/ice-interim-reference-sheet-coronavirus.

[8] U.S. Immigration and Customs Enforcement, *ICE Guidance on COVID-19*, ICE.GOV (last updated April 9, 2020), https://www.ice.gov/covid19.

insufficient to adequately face the crisis at hand. These are just some of the key ways in which they fail:

a.  Although detainees are instructed on the importance of social distancing, social distancing of six feet, as recommended by the CDC, is impossible in ICE facilities, especially in light of the common practice of facility lockdowns.

b.  There is no protocol for testing of asymptomatic detainees or staff and other individuals who enter the detention facility.

c.  The ICE protocol does not follow the measures in the CDC guidelines for long term care facilities. Specifically, it does not ensure access to hand sanitizer nor does it provide masks for individuals with a cough.

d.  The ICE protocol does not provide guidance on how to deal with surge capacity, which will almost certainly be necessary as the number of cases in the detention facility increase and the number of healthy staff to treat detained people decreases.

e.  There is no guidance on when to test detained people. There need to be daily updates from ICE leadership to medical staff disseminating criteria for testing in this rapidly changing environment. Epidemiologists working in conjunction with local and Federal COVID-19 responders must be part of the decision-making process guiding this daily protocol.

f.  There are no clear criteria for hospital transfer. As clinical staff have no experience with this disease, ICE should develop rational clinical criteria for transfer to an acute care hospital. established guidelines for when transfer to a hospital is appropriate.

g.  The ICE protocol relies on isolation for detainees with possible exposure to COVID-19, but isolation is not a proper solution for people without symptoms or confirmed disease. Detainees who are

isolated are monitored less frequently. If they develop COVID-19 symptoms, or their symptoms escalate, they may not be able to get the medical attention they desperately need in a timely fashion. It also makes it more likely that these detained people will attempt suicide or self-harm, giving rise to more medical problems in the midst of a pandemic. Isolation also increases the amount of physical contact between staff and detained people—in the form of increased handcuffing, escorting individuals to and from the showers, and increased use of force due to the increased psychological stress of isolation. My expert opinion is that the use of isolation or lockdown is not a medically appropriate method for abating the substantial risks of COVID-19.

18.    I have also reviewed the declarations of Gabriel Valdez of March 31, 2020 and April 7, 2020, filed in *Robles v. Wolfe*, Case No. 20-cv-00627 (C.D. Cal) at Dkt. 45-1, which describe steps that have been taken at the Adelanto ICE Processing Center ("Adelanto") to address the COVID-19 outbreak. I incorporate by reference my declaration submitted on March 31, 2020 in *Robles v. Wolfe*, which describes how the March 31 Valdez Declaration demonstrates ICE's failure to adequately comprehend and respond to the COVID-19 pandemic at Adelanto. *See* Exhibit B.

19.    The April 7 Valdez Declaration continues to demonstrate ICE's failure to adequately respond to the COVID-19 pandemic at Adelanto.

20.    The primary significant change described in the April 7 Valdez Declaration is that it states new arrivals are now quarantined for 14 days to monitor for the onset of any symptoms related to COVID-19. This step was long overdue, since community transmission of COVID-19 is now widespread and nearly every person who has arrived at Adelanto within the past several weeks will have had close contact to someone with COVID-19. However, it is woefully insufficient.

6

21.     In particular, the quarantine procedures outlined in the Valdez Declaration, which consist of cohorting new detainees, do not comply with best practice. The CDC identifies "cohorting" as a suboptimal practice of group quarantining. Where cohorting can be an effective mitigation strategy in the absence of sufficient space for medical isolation, it requires adequate space for appropriate groupings. For instance, confirmed cases should not be in the same cohort as suspected cases or case contacts; those who had contact with an infected person ten days ago should not be in the same cohort as someone who had contact with an infected person two days ago. In order to provide the appropriate level of monitoring, Adelanto would need significantly more space and staff, but the April 7 Valdez Declaration gives no indication those changes have been made.

22.     Moreover, staff at Adelanto continue to go back and forth between work and the outside world, where community transmission of COVID-19 is prevalent. As a result, Adelanto *will* be hit by COVID-19.

23.     The April 7 Valdez Declaration also states for the first time that detainees are "encouraged" to "exercise social distancing protocols within their housing units and while participating in outdoor recreation" and notes that occupancy limits have been temporarily reduced in certain, limited areas. However, the Valdez Declaration fails to recognize the obvious: social distancing is impossible when people sleep in small, multi-person rooms and live under conditions that necessarily subject them to close proximity with others multiple times throughout the day.

24.     Most significantly, ICE continues to fail to appreciate the importance of releasing detainees to limit the risk for the individuals released, for those who remain detained, and for the general public. Release is the most important means of mitigating the spread of COVID-19 in Adelanto. This would be true even if the conditions inside the facility were impeccable.

25.     Adelanto's "capacity" is not an appropriate marker for its ability to

house people safely during the COVID-19 pandemic. This is because its capacity does not take into account the need for social distancing in mitigating the COVID-19 pandemic. Social distancing of six feet, as recommended by the CDC, will be impossible in Adelanto without significant downsizing. This is especially true in light of the common practice of facility lockdowns.

26.     In my professional opinion, it is not possible to achieve adequate social distancing—that is, more than six feet between detainees—if more than one person is held in a cell, or if bunks in a dormitory are placed within less than 8-10 feet of each other. Six feet of distance must also be maintained when detainees are eating, showering, using common areas and generally at all times.

27.     Mitigating the spread of COVID-19 also requires that common areas are regularly cleaned and disinfected and that eating and bathroom areas are disinfected between each use.

28.     Release of immigration detainees would reduce the burden on Adelanto's limited health care infrastructure, as it lessens the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time. Release also reduces the burden on regional hospitals and health centers, which will otherwise bear the brunt of having to treat these individuals when infected, thus reducing the number of hospital beds and equipment available for the general population.

//

//

//

//

//

//

//

//

//

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this <u>10th</u> day of April, 2020 in New York City, New York.

ROBERT B. GREIFINGER, M.D.

# EXHIBIT A

# ROBERT B. GREIFINGER, M.D.

380 Riverside Drive, Apt 4F                                                (646) 559-5279
New York, New York 10025                                          bob@rgreifinger.com

Physician consultant with extensive experience in development and management of complex community and institutional health care programs. Demonstrated strength in leadership, program development, negotiation, communication, operations and the bridging of clinical and public policy interests. Teacher of health and criminal justice.

## SUMMARY OF EXPERIENCE

MEDICAL MANAGEMENT AND QUALITY IMPROVEMENT SERVICES        1995-Present

Consultant on the design, management, operations, quality improvement, and utilization management for correctional health care systems.

- Recent clients include (among others) the U.S. Department of Justice Civil Rights Division, monitoring multiple correctional systems and the U.S. Department of Homeland Security Office of Civil Rights and Civil Liberties. Federal court monitor for the Metropolitan Detention Center, Albuquerque, New Mexico, Orleans Parish Sheriff's Office, New Orleans, Louisiana, and Miami-Dade Corrections and Rehabilitation Department.

- National Commission on Correctional Health Care. Principal Investigator for an NIJ funded project to make recommendations to Congress on identifying public health opportunities in soon-to-be-released inmates.

- Associate Editor, Puisis M (ed), Clinical Practice in Correctional Medicine, Second Edition, St. Louis. Mosby 2006.

- Editor, Greifinger, RB (ed), Public Health Behind Bars: From Prisons to Communities, New York. Springer 2007.

- John Jay College of Criminal Justice. Professor (adjunct) of Health and Criminal Justice and Distinguished Research Fellow 2005 – 2016.

- Co-Editor, International Journal of Prison Health 2010 – 2016.


NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES              1989 - 1995

Operating budget of $1.4 Billion. Responsible for inmate safety, program, and security. Sixty-nine facilities housing over 68,000 inmates with 30,000 employees.

Deputy Commissioner/Chief Medical Officer, 1989 - 1995

- Operating budget of $140 million; health services staff of 1,100. Accountable for inmate health services and public health. Directed major initiatives in policy and program development, quality and utilization management.

- Developed and implemented comprehensive program for HIV prevention, surveillance, education, and treatment in nation's largest AIDS medical practice.

- Managed the rapid implementation of an infection control program responding to a major outbreak of multidrug-resistant tuberculosis. Helped bring the nation's tuberculosis epidemic to public attention.

- Developed $360 million five-year capital plan for inmate health services. Opened the first of five regional medical units for multispecialty ambulatory and long-term care.

- Implemented a centralized and regional pharmacy system, improving quality, service and cost management.

## ROBERT B. GREIFINGER, M.D.

MONTEFIORE MEDICAL CENTER, Bronx, NY                          1985 - 1989

A major academic medical center with 8,000 employees and annual revenue of $500 million.

Vice President, Health Care Systems, 1986 - 1989

Director, Alternative Delivery Systems, 1985 - 1986

Operating budget of $60 million with 1,100 employees.  Managed a multi-specialty group, a home health agency, and prison health programs.

- Negotiated contracts, including bundled service, risk capitation, fee-for-service arrangements, and major service contracts.  Developed a high technology home care joint venture.

- Taught epidemiology and health care organization at Albert Einstein College of Medicine.  Lectured nationally on health care delivery and managed care.

- Conceived and collaborated in development of a consortium of six academic medical centers, leading to a metropolitan area-wide, joint venture HMO.  Organized a network of physicians to contract with HMO's preparing for cost-containment.


WESTCHESTER COMMUNITY HEALTH PLAN, White Plains, NY              1980 - 1985

Independent, not-for-profit, staff-model HMO, acquired by Kaiser-Permanente in 1985.  Operating revenue $17 million with 200 employees and 27,000 members.

Vice President and Medical Director

Chief medical officer and COO.  Managed the delivery of comprehensive medical services.  Accountable to the Board of Directors for quality assurance and utilization management. Practiced pediatrics.

- Accomplished turnaround with automated utilization management, improved service, sound personnel management principles, and quality management programs.

- Implemented performance based compensation program.

COMMUNITY HEALTH PLAN OF SUFFOLK, INC.                          1977 - 1980

Community based, not-for-profit, staff model HMO, with enrollment of 18,000.

Medical Director

- Developed and operated clinical services.  Accountable for quality of care.  Practiced clinical pediatrics, and taught community health and medical ethics at SUNY Stony Brook School of Medicine.

MONTEFIORE MEDICAL CENTER, Bronx, NY                          1976 - 1977

Residency Program in Social Medicine, Deputy Director, 1976-1977

Unique clinical training program focused on community health and change agentry.  Developed curriculum and supervised 40 residents in internal medicine, pediatrics and family medicine.

UNITED STATES PUBLIC HEALTH SERVICE                          1972 - 1974

Commissioned officer in the National Health Service Corps.  Functioned as medical director and family physician in a federally funded neighborhood health center in Rock Island, Illinois.  Honorable Discharge.

# ROBERT B. GREIFINGER, M.D.

## FACULTY APPOINTMENTS

1976 - 2002
　　　Assistant Professor of Epidemiology and Social Medicine, Albert Einstein College of Medicine

2005 - 2016
　　　Professor (adjunct) of Health and Criminal Justice and Distinguished Research Fellow, John Jay
　　　　　College of Criminal Justice

## NATIONAL COMMITTEE FOR QUALITY ASSURANCE

Worked with NCQA since its inception in 1980. Began training surveyors in 1989, and continued as
faculty for NCQA sponsored educational sessions.  Served for six years as a charter member of the
Review Oversight (accreditation) Committee. Served on the Reconsideration (appeals) Committee for six
years.  Surveyed dozens of managed care organizations, and reviewed several hundred quality
management programs.

## OTHER PROFESSIONAL ACTIVITIES

| | |
|---|---|
| 2012 – present | Member, Board of Directors, Prison Legal Services, New York |
| 2012 – present | Member, Board of Directors, National Health Law Program |
| 2011 – 2015 | Member, Board of Directors, Academic Consortium of Criminal Justice Health |
| 2010 - 2016 | Co-editor, International Journal of Prisoner Health |
| 2009 | Recipient, B. Jaye Anno Award for Lifetime Achievement in Communication |
| 2007-2015 | Member, National Advisory Group on Academic Correctional Health Care |
| 2007 | Recipient, Armond Start Award, Society of Correctional Physicians |
| 2005 - 2011 | Member, Advisory Board to the Prisoner Reentry Institute, John Jay College |
| 2002 - present | Member, Editorial Board, Journal of Correctional Health Care |
| 2002 - present | Peer reviewer for multiple journals, including Journal of Correctional Health Care, International Journal of Prison Health, Journal of Urban Health, Journal of Public Health Policy, Annals of Internal Medicine, American Journal of Public Health, Health Affairs, and American Journal of Drug and Alcohol Abuse. |
| 2001 - 2003 | Member, Advisory Board to CDC on Prevention of Viral Hepatitis in Correctional Facilities |
| 1999 - 2003 | Member, Advisory Board to CDC on Prevention and Control of Tuberculosis in Jails |
| 1997 - 2003 | Member, Reconsideration Committee, NCQA |
| 1997 - 2001 | Moderator, Optimal Management of HIV in Correctional Systems, World Health Communications |
| 1997 - 2000 | Member, Reproductive Health Guidelines Task Force, CDC |
| 1993 - 1995 | Co-chair, AIDS Clinical Trial Community Advisory Board, Albany Medical Center |
| 1992 - Present | Society of Correctional Physicians |
| 1991 - 1997 | Member, Review Oversight (accreditation) Committee, NCQA |

## ROBERT B. GREIFINGER, M.D.

1983 - 1985  Executive Committee, Medical Directors' Division, Group Health Association of
       America (Secretary, 1984-1985)

### EDUCATION

University of Pennsylvania, College of Arts and Sciences, Philadelphia; B.A., 1967 (Amer. Civilization)

University of Maryland, School of Medicine, Baltimore; M.D., 1971

Residency Program in Social Medicine (Pediatrics), Montefiore Medical Center, Bronx, NY; 1971-1972,
  1974-1976, Chief Resident 1975-1976

### CERTIFICATION

Diplomate, National Board of Medical Examiners, 1971

Diplomate, American Board of Pediatrics, 1976

Fellow, American Academy of Pediatrics, 1977

Fellow, American College of Physician Executives, 1983

Fellow, American College of Correctional Physicians (formerly Society of Correctional Physicians), 2000

License:  New York, Pennsylvania (inactive)

# ROBERT B. GREIFINGER, M.D.

Updated February 2018

## PUBLICATIONS

Greifinger RB, A Summer Program in Life Sciences.  Journal of Medical Education 1970; 45: 620-622.

Greifinger RB, Sidel VW, American Medicine - Charity Begins at Home.  Environment 1977; 18(4): 7-18.

Greifinger RB, An Encounter With the System.  The New Physician 1977; 26(9): 36-37.

Greifinger RB, Sidel VW, Career Opportunities in Medicine.  In Tice's(eds) Practice of Medicine. Hagerstown: Harper & Row 1977; 1(12): 1-49.

Greifinger RB, Grossman RL, Toward a Language of Health.  Health Values 1977; 1(5): 207-209.

Grossman RL, Greifinger RB, Encouraging Continued Growth in the Elderly.  In Carnevali DL & Patrick M (eds), Nursing Management for the Elderly. Philadelphia: Lippincott 1979: 543-552.

Greifinger RB, Jonas S, Ambulatory Care.  In Jonas S (ed), Health Care Delivery in the United States (second edition). New York: Springer 1980: 126-168.

Greifinger RB, Toward a New Direction in Health Screening.  In Health Promotion: Who Needs It? Washington: Medical Directors Division, Group Health Association of America 1981: 61-67.

Greifinger RB, Sidel VW, American Medicine.  In Lee, Brown & Red (eds), The Nation's Health.  San Francisco: Boyd & Fraser 1981: 122-134.

Greifinger RB, Bluestone MS, Building Physician Alliances for Cost-Containment.  Health Care Management Review 1986: 63-72.

Greifinger RB, An Ethical Model for Improving the Patient-Physician Relationship.  Chicago: Inquiry 1988: 25(4): 467-468.

Glaser J, DeCorato DR, Greifinger RB, Measles Antibody Status of HIV-Infected Prison Inmates. Journal of Acquired Immunodeficiency Syndrome 1991; 4(5): 540-541.

Ryan C, Levy ME, Greifinger RB, et al, HIV Prevention in the U.S. Correctional System, 1991.  MMWR 1992; 41(22): 389-397.

Greifinger RB, Keefus C, Grabau J, et al, Transmission of Multidrug- resistant Tuberculosis Among Immunocompromised Persons in a Correctional System.  MMWR 1992; 41(26): 509-511.

Greifinger RB, Tuberculosis Behind Bars, in Bruce C Vladeck ed, The Tuberculosis Revival:  Individual Rights and Societal Obligations In a Time of AIDS.  New York: United Hospital Fund 1992: 59-65.

Bastadjian S, Greifinger RB, Glaser JB. Clinical characteristics of male homosexual/bisexual HIV-infected inmates. J AIDS 1992;5:744-5.

Glaser JB, Greifinger R. Measles antibodies in HIV-infected adults. J Infect Dis. 1992 Mar;165(3):589.

Glaser J, Greifinger RB, Correctional Health Care:  A Public Health Opportunity.  Annals of Internal Medicine 1993; 118(2): 139-145.

Greifinger RB, Glaser JG and Heywood NJ, Tuberculosis In Prison:  Balancing Justice and Public Health, Journal of Law, Medicine and Ethics 1993; 21 (3-4):332-341.

# ROBERT B. GREIFINGER, M.D.

Valway SE, Greifinger RB, Papania M et al, Multidrug Resistant Tuberculosis in the New York State Prison System, 1990-1991, Journal of Infectious Disease 1994; 170(1):151-156.

Wolfe P, Greifinger RB, Prisoners in Service of Public Health: Focus New York State.  New York Health Sciences Journal 1994 1(1):35-43.

Valway SE, Richards S, Kovacovich J, Greifinger RB et al, Outbreak of Multidrug-Resistant Tuberculosis in a New York State Prison, 1991.  American Journal of Epidemiology 1994 July 15; 140(2):113-22.

Smith HE, Smith LD, Menon A and Greifinger RB, Management of HIV/AIDS in Forensic Settings, in Cournos F(ed), <u>AIDS and People with Severe Mental Illness: A Handbook for Mental Health Professionals</u>. New Haven: Yale Press 1996.

Greifinger RB, La Plus Ca Change . . . ., Public Health Reports 1996 July/August; 111(4):328-9.

Greifinger RB, TB and HIV, Health and Hygiene 1997;18,20-22.

Greifinger RB, Horn M, "Quality Improvement Through Care Management," chapter in Puisis M (ed), <u>Clinical Practice in Correctional Medicine</u>, St. Louis: Mosby 1998.

Greifinger RB, Glaser JM, "Desmoteric Medicine and the Public's Health," chapter in Puisis M (ed), <u>Clinical Practice in Correctional Medicine</u>, St. Louis: Mosby 1998.

Greifinger RB, Commentary: Is It Politic to Limit Our Compassion? Journal of Law, Medicine & Ethics, 27(1999):213-16.

Greifinger RB, Glaser JG and Heywood NJ, "Tuberculosis In Prison:  Balancing Justice and Public Health," chapter in Stern V (ed), <u>Sentenced to die? The problem of TB in prisons in Eastern Europe and Central Asia</u>, London: International Centre for Prison Studies, 1999.

Greifinger RB (Principal Investigator).  National Commission on Correctional Healthcare.  The Health Status of Soon-to-be-Released Inmates, a Report to Congress.  August 2002. http://www.ncchc.org/pubs_stbr.html.

Kraut JR, Haddix AC, Carande-Kulis V and Greifinger RB, Cost-effectiveness of Routine Screening for Sexually Transmitted Diseases among inmates in United States Prisons and Jails.  National Commission on Correctional Healthcare.  The Health Status of Soon-to-be-Released Inmates, a Report to Congress.  August 2002. http://www.ncchc.org/stbr/Volume2/Report5_Kraut.pdf.

Hornung CA, Greifinger RB, and Gadre S, A Projection Model of the Prevalence of Selected Chronic Diseases in the Inmate Population. National Commission on Correctional Healthcare.  The Health Status of Soon-to-be-Released Inmates, a Report to Congress. August 2002. http://www.ncchc.org/stbr/Volume2/Report3_Hornung.pdf.

Hornung CA, Anno BJ, Greifinger RB, and Gadre S, Health Care for Soon-to-be-Released Inmates: A Survey of State Prison Systems," National Commission on Correctional Healthcare.  The Health Status of Soon-to-be-Released Inmates, a Report to Congress. August 2002. http://www.ncchc.org/stbr/Volume2/Report1_Hornung.pdf.

Patterson RF & Greifinger RB, Insiders as Outsiders:  Race, Gender and Cultural Considerations Affecting Health Outcome After Release to the Community, Journal of Correctional Health Care 10:3 2003; 399-436.

Howell E & Greifinger RB, What is Known about the Cost-Effectiveness of Health Services for Returning Inmates? Journal of Correctional Health Care 10:3 2003; 437-455.

Kraut JR, Haddix AC, Carande-Kulis V & Greifinger RB, Cost-effectiveness of Routine Screening for Sexually Transmitted Diseases among inmates in United States Prisons and Jails, J Urban Health:

# ROBERT B. GREIFINGER, M.D.

Bulletin of the New York Academy of Medicine 2004: 81(3):453-471. (Finalist, Charles C. Shepard Science Award)

Greifinger RB. Health Status in U.S. and Russian Prisons: More in Common, Less in Contrast. Journal of Public Health Policy 2005 26:60-68. http://www.palgrave-journals.com/cgi-taf/DynaPage.taf?file=/jphp/journal/v26/n1/full/3200003a.html&filetype=pdf

Greifinger RB. Health Care Quality Through Care Management, M. Puisis (ed). Clinical Practice in Correctional Medicine, Second Edition. St. Louis. Mosby 2006: pp. 510-519.

Greifinger RB. Pocket Guide Series on tuberculosis, HIV, MRSA, sexually transmitted disease, viral hepatitis and management of outbreaks. See http://www.achsa.org/displaycommon.cfm?an=1&subarticlenbr=23

Greifinger RB. Inmates are Public Health Sentinels. Washington University Journal of Law and Policy. Volume 22 (2006) 253-64.

Greifinger RB. Disabled Prisoners and "Reasonable Accommodation." Journal of Criminal Justice Ethics. Winter Spring 2006: 2, 53-55.

Mellow J, Greifinger RB. Successful Reentry: The Perspective of Private Health Care Providers. Journal of Urban Health. November 2006 doi:10.1007/s11524-006-9131-9.

Mellow J, Greifinger RB. The Evolving Standard of Decency: Post-Release Planning? Journal of Correctional Health Care January 2008 14(1):21-30.

Williams B, Greifinger RB. Elder Care in Jails and Prisons: Are We Prepared? Journal of Correctional Health Care January 2008 14(1):4-5.

Greifinger RB (editor). Public Health Behind Bars: From Prisons to Communities. Springer. New York 2007.

Greifinger RB. Thirty Years Since Estelle v. Gamble: Looking Forward Not Wayward. Greifinger, RB (ed). Public Health Behind Bars: From Prisons to Communities. Springer. New York 2007.

Patterson RF, Greifinger RB. Treatment of Mental Illness in Correctional Settings. Greifinger, RB (ed). Public Health Behind Bars: From Prisons to Communities. Springer. New York 2007.

MacDonald M, Greifinger RB. and Kane D. Use of electro-muscular disruption devices behind bars: Progress or regress. Editorial',International Journal of Prisoner Health,4:4,169 — 171. 2009.

Hoge SK, Greifinger RB, Lundquist T, Mellow J. Mental Health Performance Measurement in Corrections. International Journal of Offender Therapy and Criminology, 53:6 634-47, 2009. Abstract accessed January 12, 2010 at http://www.ncjrs.gov/App/Publications/abstract.aspx?ID=251100.

Williams BA, Lindquist K . . . Greifinger RB et al. Caregiving Behind Bars: Correctional Officer Reports of Disability in Geriatric Prisoners. J Am Geriatr Soc 57:1286–1292, 2009.

Baillargeon J, Williams B . . . Greifinger RB, et al. Parole Revocation among Prison Inmates with Psychiatric and Substance Use Disorders. Psychiatric Services 60:11: 1516-21, 2009.

Parvez FM, Lobato MN, Greifinger RB. Tuberculosis Control: Lessons for Outbreak Preparedness in Correctional Facilities. Journal of Correctional Health Care OnlineFirst, published on May 12, 2010 as doi:10.1177/1078345810367593.

Stern MF, Greifinger RB, Mellow J. Patient Safety: Moving the Bar in Prison Health Care Standards. Am J Public Health. Nov 2010; 100: 2103 - 2110.

Blair P, Greifinger R, Stone TH, & Somers S. Increasing Access to Health Insurance Coverage for Pre-trial Detainees and Individuals Transitioning from Correctional Facilities Under the Patient

# ROBERT B. GREIFINGER, M.D.

Protection and Affordable Care Act.  American Bar Association.  Accessed on March 23, 2011 at http://www.cochs.org/files/ABA/aba_final.pdf

Williams BA, Sudore RL, Greifinger R, Morrison RS. Balancing Punishment and Compassion for Seriously Ill Prisoners.  Ann Int Med 2011; 155:122-126.

Weilandt C, Greifinger RB , Hariga F. HIV in Prison: New Situation and Risk Assessment Toolkit. Int. J. Prisoner Health 2011; 7(2/3):17-22.

Williams, B., Stern, M., Mellow, J., Safer, M., Greifinger, RB. Aging in correctional custody: Setting a policy agenda for older prisoner health. Am J Public Health. Published online ahead of print June 14, 2012: e1–e7. doi:10.2105/AJPH.2012.300704.

Greifinger, RB.  Independent review of clinical health services for prisoners. Int. J. Prisoner Health 2012; 8(3/4):141-150.

Greifinger RB. Facing the facts, Int J Prisoner Health, Vol. 8 (3/4) (editorial).

Greifinger, RB. The Acid Bath of Cynicism.  Correctional Law Reporter June/July 2013: 3, 14, 16.

Ahalt C, Trestman RL, Rich JD, Greifinger RB, Williams BA. Paying the price: the pressing need for quality, cost and outcomes data to improve correctional healthcare for older prisoners. J Am Geriatr Soc 61:2013–2019, 2013.

Williams BA, Ahalt C, Greifinger RB.  The older prisoner and complex medical care.  Chapter in WHO guide Prisons and Health.  WHO Copenhagen. 2014: 165-170.

Rich JD, Chandler R . .. . Greifinger RB et al. How health care reform can transform the health of criminal justice-involved individuals. Health Affairs 33, No. 3(2014: -

Allen SA, Greifinger RB. Asserting Control: A Cautionary Tale. International Journal of Prisoner Health 11:3, 2015.

Junod V, Wolff H, Scholten W, Novet B, Greifinger R, Dickson C & Simon O.  Methadone versus torture: The perspective of the European Court of Human Rights. Heroin Addict Relat Clin Probl. Heroin Addict Relat Clin Probl 2018; 20(1): 31-36.

Pont J, Enggist S, Stover H, Williams B, Greifinger R, Wolff H. Prison Health Care Governance: Guaranteeing Clinical Independence. Published online ahead of print February 22, 2018.

## ABSTRACTS & RESEARCH PRESENTATIONS

Mikl J, Kelley K, Smith P, Greifinger RB, Morse D, Survival Among New York State Prison Inmates With AIDS.  Florence:  Seventh International Conference on AIDS 1991 (poster session).

Sherman M, Coles B, Buehler J, Greifinger RB, Smith P, The HIV Epidemic in Inmates.  Atlanta: Centers for Disease Control. 1991

Mikl J, Kelley K, Smith P, Greifinger RB, Morse D, Survival Among New York State Prison Inmates With AIDS, American Public Health Association. 1991 (poster session)

Mikl J, Smith P, Greifinger RB, Forte A, Foster J, Morse D, HIV Seroprevalence of Male Inmates Entering the New York State Correctional System.  American Public Health Association. 1991 (poster session)

Valway SE, Richards S, Kovacovich J, Greifinger R, Crawford J, Dooley SW. Transmission of Multidrug-resistant Tuberculosis in a New York State Prison, 1991. Abstract No 15-15, In: World Congress on TB Program and Abstracts, Washington, D.C., November, 1992.

ROBERT B. GREIFINGER, M.D.

Mikl J, Smith PF, Greifinger RB, HIV Seroprevalence Among New York State Prison Entrants.  Ninth International Conference on AIDS 1993 (Poster Session)

Hornung CA, Greifinger RB, McKinney WP. Projected Prevalence of Diabetes Mellitus in the Incarcerated Population. J Gen Int Med 14 (Supplement 2):40, April 1999.