1   SAMIR DEGER-SEN*
    samir.deger-sen@lw.com
2   WILLIAM M. FRIEDMAN*
    william.friedman@lw.com
3   LATHAM & WATKINS LLP
    555 Eleventh Street, NW
4   Suite 1000
    Washington, D.C. 20004-1304
5   Tel: 202.637.2200
    Fax: 202.637.2201
6
    AMANDA BARNETT (SBN 319046)
7   amanda.barnett@lw.com
    JESSIE CAMMACK (SBN 329794)
8   jessie.cammack@lw.com
    LATHAM & WATKINS LLP
9   355 South Grand Avenue, Suite 100
    Los Angeles, California 90071-1560
10  Tel: 213.485.1234
    Fax: 213.891.8763
11

AHILAN ARULANANTHAM
(SBN 237841)
aarulanantham@aclusocal.org
MICHAEL KAUFMAN
(SBN 254575)
mkaufman@aclusocal.org
JESSICA KARP BANSAL
(SBN 277347)
jbansal@aclusocal.org
MICHELLE (MINJU) CHO
(SBN 321939)
mcho@aclusocal.org
ACLU Foundation of Southern
California
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500

12  Attorneys for Plaintiffs-Petitioners
    *Pro hac vice application forthcoming

13

## UNITED STATES DISTRICT COURT
14  ## CENTRAL DISTRICT OF CALIFORNIA

15

16  KELVIN HERNANDEZ ROMAN,
    BEATRIZ ANDREA FORERO
    CHAVEZ, MIGUEL AGUILAR
17  ESTRADA, on behalf of themselves and
    all others similarly situated,
18
            Petitioners-Plaintiffs,
19
20  v.

    CHAD F. WOLF, Acting Secretary, U.S.
21  Department of Homeland Security;
    MATTHEW T. ALBENCE, Deputy
22  Director and Senior Official Performing
    the Duties of the Director, U.S.
23  Immigration and Customs Enforcement;
    DAVID MARIN, Director of the Los
24  Angeles Field Office, Enforcement and
    Removal Operations, U.S. Immigration
25  and Customs Enforcement; and JAMES
    JANECKA, Warden, Adelanto ICE
26  Processing Center,

27          Respondents-Defendants.

28

)   Case No. 5:20-cv-00768
)
)   **ADELANTO COVID**
)
)   **DECLARATION OF JESSICA
)   KARP BANSAL**
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**DECLARATION OF JESSICA KARP BANSAL**

I, Jessica Karp Bansal, hereby declare:

1.      I submit this declaration in support of Petitioners'-Plaintiffs' motion for a preliminary injunction.

2.      I am over the age of 18 and competent to make this declaration.

3.      I am a Senior Staff Attorney with the American Civil Liberties Union of Southern California and one of the counsel of record for Petitioners'-Plaintiffs.

4.      I certify that the attached exhibits are true and correct copies of the following:

| Exhibit | Document |
|---------|----------|
| A | DHS Office of Inspector General, Management Alert—Issues Requiring Action at the Adelanto ICE Process Center in Adelanto, California, Sept. 27, 2018, *available at* https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-86-Sep18.pdf |
| B | The California Department of Justice's Review of Immigration Detention in California, Feb. 2019, *available at* https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/immigration-detention-2019.pdf. |

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed this 13th day of April, 2020 in Los Angeles, California.

/s/Jessica Karp Bansal

JESSICA KARP BANSAL

1

# EXHIBIT A

**OFFICE OF INSPECTOR GENERAL**

# Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California

Homeland Security

**September 27, 2018**

OIG-18-86



# DHS OIG HIGHLIGHTS

### *Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California*

## September 27, 2018

# Why We Did This Alert

This Alert is part of an ongoing review to inspect U.S. Immigration and Customs Enforcement (ICE) detention facilities. We conducted an unannounced visit to the Adelanto ICE Processing Center and, using ICE's 2011 *Performance-Based National Detention Standards*, we identified serious violations that are important to inform ICE of immediately.

# What We Recommend

We recommend that ICE conduct a full review of the Adelanto ICE Processing Center and the GEO Group's management of the center immediately to ensure compliance with ICE's 2011 *Performance-Based National Detention Standards*. As part of this assessment, ICE must ensure compliance with the standards addressing personal housekeeping requirements, segregation, and medical care.

**For Further Information:**
Contact our Office of Public Affairs at (202) 981-6000, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov

# What We Found

During our May 2018 unannounced inspection of the Adelanto ICE Processing Center in Adelanto, California, we identified a number of serious issues that violate ICE's 2011 *Performance-Based National Detention Standards* and pose significant health and safety risks at the facility. Specifically, we are concerned about the following:

- Nooses in Detainee Cells
- Improper and Overly Restrictive Segregation
- Untimely and Inadequate Detainee Medical Care

ICE must ensure the Adelanto Center complies with detention standards to establish an environment that protects the safety, rights, and health of detainees. Mitigation and resolution of these issues require ICE's immediate attention and increased engagement with the center and its operations.

# ICE Response

ICE concurred with the recommendation and is implementing corrective actions to ensure the Adelanto ICE Processing Center meets required detention standards. ICE reported that it will complete a full inspection of the Adelanto facility and a Special Assessment Review to ensure concerns identified in this report are fully inspected and addressed. We consider the one recommendation resolved and open.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

September 27, 2018

MEMORANDUM FOR:     Ronald D. Vitiello
                    Senior Official Performing the Duties of Director
                    U.S. Immigration and Customs Enforcement

FROM:               John V. Kelly
                    Senior Official Performing the Duties of the Inspector
                    General

SUBJECT:            *Management Alert – Issues Requiring Action at the
                    Adelanto ICE Processing Center in Adelanto, California*

For your action is our final report, *Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California.* We incorporated the formal comments provided by your office.

The report contains one recommendation aimed at improving compliance with these U.S. Immigration and Customs Enforcement (ICE) detention standards and to strengthen its oversight of the Adelanto ICE Processing Center. Your office concurred with the one recommendation.

Based on information provided in your response to the draft report, we consider recommendation 1 open and resolved. Once your office has fully implemented the recommendation, please submit a formal closeout letter to us within 30 days so that we may close the recommendation. The memorandum should be accompanied by evidence of completion of agreed-upon corrective actions. Please send your response or closure request to OIGInspectionsFollowup@oig.dhs.gov.

Consistent with our responsibility under the *Inspector General Act*, we will provide copies of our report to congressional committees with oversight and appropriation responsibility over the Department of Homeland Security. We will post the report on our website for public dissemination.

Please call me with any questions, or your staff may contact Jennifer L. Costello, Chief Operating Officer, or John D. Shiffer, Chief Inspector, at (202) 981-6000.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Background

The Adelanto ICE Processing Center, owned and operated by the GEO Group, Inc., houses up to 1,940 U.S. Immigration and Customs Enforcement (ICE) detainees through an Intergovernmental Service Agreement.[1] Based on this agreement, the Adelanto Center must comply with ICE's 2011 *Performance-Based National Detention Standards*, as revised in December 2016. These detention standards establish requirements for areas such as:

- environmental health and safety: e.g., cleanliness, sanitation, security, admission into facilities, classification, detainee searches, segregation[2] (Special Management Units), and disciplinary system;
- detainee care: e.g., food service, medical care, and personal hygiene;
- activities: e.g., religious practices, telephone access, and visitation; and
- grievance system.

In May 2018, we visited the Adelanto ICE Processing Center as part of our latest round of unannounced spot inspections. At the time, 307 contract guards oversaw 1,659 detainees housed in different facilities around the center. On the west side of the center, detainees resided in 16 housing units consisting of 18 cells each that can hold approximately 4 to 8 detainees per cell. On the east side of the center, detainees resided in 2 open bay housing modules with 7 dormitories and an average of 94 detainees per dormitory. While at the center, we identified serious issues relating to safety, detainee rights, and medical care that require ICE's immediate attention. These issues not only constitute violations of ICE detention standards but also represent significant threats to the safety, rights, and health of detainees.

### Nooses Made from Braided Bed Sheets Present Ongoing Safety and Security Risks

ICE standards[3] prohibit detainees from hanging or draping objects from their beds, fixtures, or other furniture. However, in about 15 of the approximately 20 male detainee cells we visited within 4 housing units on the west side, we observed braided bedsheets, referred to as "nooses" by center staff and

---

[1] The Intergovernmental Service Agreement (IGSA) was established between the City of Adelanto and ICE.
[2] Segregation is the process of separating certain detainees from the general population for administrative, disciplinary, or protective reasons.
[3] ICE, *Performance-Based National Detention Standards, 2011,* Section 5.8.V.C, Voluntary Work Program, Expected Practices, Personal Housekeeping Required (Revised Dec. 2016). The pertinent part of this standard requires detainees to maintain their immediate living areas in a neat and orderly manner by making their bunk beds daily; stacking loose papers; keeping the floor free of debris and dividers free of clutter; and refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures, or other furniture.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

detainees, hanging from vents (see figure 1). The contract guard escorting us during our visit removed the first noose found in a detainee cell, but stopped after realizing many cells we visited had nooses hanging from the vents. We also heard the guard telling some detainees to take the sheets down.

During our interviews, detainees provided a range of reasons for braiding and hanging bedsheets in the cells. One detainee told us, "I've seen a few attempted suicides using the braided sheets by the vents and then the guards laugh at them and call them 'suicide failures' once they are back from medical." Four detainees told us the braided sheets can be easily unfurled to temporarily create privacy within the cell, specifically the bathroom area or individual bunk area. Two detainees reported tying the braided sheets from one bedpost to another to serve as a clothesline.

 

**Figure 1**. Nooses hanging from vents in detainee cells observed by the Office of Inspector General (OIG) at the Adelanto Center on May 1, 2018.
*Source*: OIG

ICE has not taken seriously the recurring problem of detainees hanging bedsheet nooses at the Adelanto Center; this deficiency violates ICE standards. According to the guard escorting us, the nooses are a daily issue and very widespread. When we asked two contract guards who oversaw the housing units why they did not remove the bed sheets, they echoed it was not a high priority. In March 2018, an ICE contractor who conducts daily center checks noted that detainees were hanging bedsheets in their cells and began sending a weekly deficiency report to ICE for action. According to a senior ICE official, however, local ICE management at Adelanto does not believe it is necessary or a priority to address the braided sheets issue.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

ICE must prioritize addressing the issue of sheets hanging in detainee cells, as
they represent the potential to assist suicide acts. In March 2017, a 32-year-
old male died at an area hospital after being found hanging from his bedsheets
in an Adelanto cell. In the months after this suicide, ICE compliance reports
documented at least three suicide attempts by hanging at Adelanto, two of
which specifically used bedsheets. Media reports based on 911 call logs
indicate at least four other suicide attempts at the center from December 2016
to July 2017.[4] In total, these reports represent at least seven suicide attempts
at the Adelanto Center from December 2016 to October 2017. Nationwide, self-
inflicted strangulation accounts for 4 of the 20 detainee deaths reported
between October 2016 to July 2018, according to ICE news releases. The most
recent ICE detainee death, on July 10, 2018, at the Stewart Detention Facility
in Georgia, again highlights the current need to prioritize this issue, as ICE
preliminarily attributed that death to self-inflicted strangulation. ICE's lack of
response to address this matter at the Adelanto Center shows a disregard for
detainee health and safety.

**Inappropriate Segregation Restricts Detainee Rights**

Detainees may be separated from the center's general population because they
committed a serious prohibited act or rule violation (disciplinary segregation)[5]
or to protect themselves, others and property, for medical reasons, and for
secure and orderly facility operations (administrative segregation). ICE
standards[6] obligate the Adelanto Center to meet numerous requirements for
segregation, including:

- preventing the commingling of detainees in administrative and
  disciplinary segregation;
- placing detainees in disciplinary segregation only after they are found to
  have committed a prohibited act and only when alternative dispositions
  may inadequately regulate the detainee's behavior;
- avoiding the use of restraints on detainees;

---

[4] Paloma Esquivel, *'We don't feel OK here': Detainee deaths, suicide attempts and hunger strikes
plague California immigration facility*, LOS ANGELES TIMES (Aug. 8, 2017),
http://www.latimes.com/local/lanow/la-me-ln-adelanto-detention-20170808-story.html.
[5] A prohibited act or rule violation must be classified at a "greatest" (e.g., killing, rioting,
assault), "high" (e.g., fighting, drug possession, bribery), or "high-moderate" (e.g., theft, refusal
to obey staff or officer orders, gambling) level as defined in ICE standards.
[6] ICE, *Performance-Based National Detention Standards, 2011,* Section 2.12, Special
Management Units (Revised Dec. 2016). "This detention standard protects detainees, staff,
contractors, volunteers and the community from harm by segregating certain detainees from
the general population in Special Management Units with an Administrative Segregation
section for detainees segregated for administrative reasons and a Disciplinary Segregation
section for detainees segregated for disciplinary reasons."



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

- providing communications assistance to detainees in segregation who cannot speak English or who may be blind or deaf; and,
- providing regular access to supervisory, management, program, and health care staff.

Nonetheless, our review of disciplinary segregation revealed multiple violations of ICE detention standards. These violations pose a significant threat to maintaining detainee rights and ensuring their mental and physical well-being.

<u>Detainees Are Placed in Disciplinary Segregation Prematurely and Inappropriately</u>

During our visit to the Adelanto Center, there were 14 detainees in disciplinary segregation. Through our file review, we found that the Adelanto Center inappropriately placed all 14 detainees in disciplinary segregation before they were found guilty of a prohibited act or rule violation. We also identified one detainee who requested placement in administrative segregation but was inappropriately held in disciplinary segregation for more than a week.

ICE standards state that a detainee shall be placed in disciplinary segregation only after a disciplinary hearing panel finds the detainee guilty of a prohibited act or rule violation and the disciplinary panel chair completes a written order for segregation. Yet, based on file reviews and interviews with GEO Group staff, the Adelanto Center places detainees in disciplinary segregation prior to a guilty finding and a written order for segregation. GEO Group staff indicated it is the center's practice to place all detainees directly in disciplinary segregation after an alleged incident to prevent further issues with the detainee. We reviewed files for the 14 detainees in disciplinary segregation and only found disciplinary panel decisions for 7 of the detainees. File reviews indicated that this segregation placement is also done before the disciplinary panel assesses a penalty for the violation and the detainee has the opportunity to appeal, thereby violating the detainee's right to due process.

This premature placement in disciplinary segregation may further restrict detainee rights by imposing additional sanctions not included in the disciplinary panel's decision or orders. In the seven cases where we found a disciplinary panel decision in the detainee file, the sanctions imposed went beyond the penalties listed in the disciplinary panel decision. For example, through interviews and observations, we learned that these detainees lost the ability to purchase or keep commissary items in their cells while in disciplinary segregation, but the disciplinary panel's decisions did not include this penalty. Further, according to center staff, all detainees in disciplinary segregation lose contact visits with family. However, neither the disciplinary segregation orders



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

for the 14 detainees nor the center handbook's description of rule violation
penalties listed loss of contact visits with family as an available penalty.

Our file review also revealed that a disabled detainee who had requested to be
placed in administrative segregation, was instead placed in disciplinary
segregation. This violates two aspects of the Special Management Units
standard: one requiring a guilty finding before disciplinary segregation, and
another prohibiting commingling detainees in administrative and disciplinary
segregation. The center initially placed the detainee in disciplinary segregation
due to an unrelated behavioral problem in administrative segregation at the
time of transfer but inappropriately held him there for 9 days until we raised
the issue to the center's Medical Health Services Administrator. Based on our
file review, in those 9 days, the detainee never left his wheelchair to sleep in a
bed or brush his teeth. During our visit, we saw that the bedding and toiletries
were still in the bag from his arrival. We also observed medical staff just
looking in his cell and stamping his medical visitation sheet rather than
evaluating the detainee, as required by ICE standards. After our notification,
the Medical Health Administrator moved the detainee from segregation to
medical for observation.

Detainees in Disciplinary Segregation Are Improperly Handcuffed and Shackled

According to ICE standards, placement in disciplinary segregation alone does
not constitute a valid basis for using restraints (i.e., handcuffs and shackles)
on detainees. However, in disciplinary segregation, we observed GEO Group
contract guards moving six detainees in physical restraints, including
handcuffs and shackles. The GEO Group segregation supervisor and guards
said they place all detainees held in disciplinary segregation in restraints when
outside their cells. The center reported using restraints for security reasons,
though according to ICE standards, restraints should only be used if necessary
as a precaution against escape during transfer, when directed by the medical
officer for medical reasons, or to prevent self-injury, injury to others, or serious
property damage. Physically restraining all disciplinary segregation detainees
whenever they are outside their cells does not comport with ICE standards and
gives the appearance of criminal, rather than civil, custody.

Detainees in Disciplinary Segregation Lack Communication Assistance

ICE standards require facilities to provide communication assistance to
detainees in segregation with disabilities or who are limited in their English
proficiency. During our visit, we encountered a blind, limited English proficient
detainee in disciplinary segregation but found the center had no auxiliary aids
or translated materials for the detainee to read or understand documents he
was given. In addition, file reviews of the 14 detainees in disciplinary



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

segregation at the time of our visit revealed that none of the segregation orders
or information provided to detainees while in segregation was translated or
otherwise communicated to ensure the detainee's understanding. Without
proper communication assistance, ICE cannot ensure that detainees placed in
disciplinary segregation understand the reasoning for their segregation and are
aware of their rights.

## Failure to Provide Timely and Adequate Medical Care for Detainees Increases Health Risks

ICE has not ensured that Adelanto Center general population and segregated
detainees receive appropriate and necessary medical and dental care, as
required by ICE standards.[7] We observed medical staff performing limited
checks on detainees in disciplinary segregation, which do not effectively ensure
detainee well-being. Based on interviews with detainees and medical staff and a
review of independent reports, we concluded that detainees do not have timely
access to proper medical care. Also, our detainee interviews and review of
medical records revealed that detainees are placed on waitlists for months and,
sometimes, years to receive basic dental care, resulting in tooth loss and
unnecessary extractions in some cases.

<u>Medical Oversight in Disciplinary Segregation Is Ineffective in Ensuring
Detainee Well-Being</u>

Although ICE standards require face-to-face medical assessments of all
detainees in segregation at least once daily to ensure their welfare, we observed
Adelanto Center medical providers, including nurses, physicians, and mental
health providers, conducting cursory walk-throughs of disciplinary segregation.
For example, we observed two doctors walking through disciplinary segregation
and stamping their name on the detainee records, which hang outside each
detainee's cell, indicating that they visited with the detainee. However, we
observed them doing so without having any contact with 10 of the 14 detainees
in disciplinary segregation. For the four detainees a doctor did speak with, the
doctor asked if the detainee was "ok" in English, not necessarily a language the
detainee understood. We confirmed with guards that these four detainees were
non-English speakers, and the doctor left without any acknowledgment or
response from the detainee. Although ICE's detainee death review of the March
2017 suicide at Adelanto previously identified similar issues with medical
oversight of detainees in segregation, our spot inspection of the center
confirmed these issues persist.

---

[7] ICE, *Performance-Based National Detention Standards, 2011*, Section 4.3, Medical Care
(Revised Dec. 2016). "This detention standard ensures that detainees have access to
appropriate and necessary medical, dental and mental health care, including emergency
services."



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

---

Medical Care for Detainees Is Delayed and Inadequate

From November 2017 to April 2018, detainees filed 80 medical grievances (about 34 percent of all grievances filed) with the center for not receiving urgent care, not being seen for months for persistent health conditions, and not receiving prescribed medication. Four of the 13 detainees we interviewed reported waiting weeks and months to see a doctor. They also reported that their appointments were sometimes canceled with no explanation, and that they were then placed back on the waiting list for a future appointment. In 2017, the medical unit conducted a quality improvement investigation and identified 60 to 80 clinic appointments that were canceled because contract guards were not available to take detainees from their cells to their appointments.

Detainee statements also corroborated a 2017 outside medical review that reported wait times to see a provider for both acute illness/injury and chronic care needs are often excessively long. Further, ICE's detainee death reviews for three Adelanto Center detainees who have died since fiscal year 2015 also cited medical care deficiencies related to providing necessary and adequate care in a timely manner. ICE must take these continuing violations seriously and address them immediately.

Dental Providers Do Not Provide Basic Dental Care

ICE standards expect detention facilities to provide dental care, including checkups, cleanings, and procedures, after an individual has been in detention for 6 months. The Adelanto Center, however, does not include time spent at other ICE facilities when calculating the 6 months, and only adds detainees requesting dental cleanings to a waitlist for dental care after they have been at the Adelanto Center for more than 6 months. Records indicated and center staff corroborated that the center was waiting for detainees to leave rather than providing cleanings. Further, the Adelanto Center has only two dentists on staff to provide care for up to 1,940 detainees. According to center logs, no detainees received cleanings for almost 4 years. Dental cleanings began shortly before our visit due to findings from an external medical review.

Our review of all requests for fillings since 2014 also found that although the center's two dentists identified cavities and placed detainees on a waitlist for fillings, no detainees have received fillings in the last 4 years. One detainee we interviewed reported having multiple teeth fall out while waiting more than 2 years for cavities to be filled. When we asked one of the dentists why fillings were not performed, he said he barely has time to do cleanings and screening, so as a result he does not do fillings. He offered extractions over other types of



dental care; we corroborated this information through detainee interviews. In our interviews with detainees, one reported having to wait 8 months for an extraction and another reported having the wrong tooth pulled. We reviewed the detainee dental records for tooth extraction and corroborated the detainee statements.

During our interviews, a center dentist stated that he only provides "palliative care" and does not have time to complete cleanings or fillings. The dentist dismissed the necessity of fillings if patients commit to brushing and flossing. Floss is only available through detainee commissary accounts, but the dentist suggested detainees could use string from their socks to floss if they were dedicated to dental hygiene.

## Conclusion

ICE must ensure the Adelanto Center complies with detention standards to establish an environment that protects the safety, rights, and health of detainees. Although this form of civil custody should be non-punitive, some of the center conditions and detainee treatment we identified during our visit and outlined in this management alert are similar to those one may see in criminal custody. Mitigation and resolution of these issues require ICE's immediate attention and increased engagement with the center and its operations.

## Recommendation

**Recommendation 1**: We recommend that ICE conduct a full review of the Adelanto ICE Processing Center and the GEO Group's management of the center immediately to ensure compliance with ICE's 2011 *Performance-Based National Detention Standards*. As part of this assessment, ICE must review and ensure compliance with those standards addressing:

1. Personal housekeeping requirements, associated with hanging bedsheets
2. Segregation
3. Medical Care

## Management Comments and OIG Analysis

ICE concurred with the one report recommendation. Appendix A contains a copy of ICE's management comments in their entirety. We also received technical comments from ICE, and we incorporated those comments in the report where appropriate. We consider this recommendation to be resolved and open. A summary of ICE's response and our analysis follows.



**ICE Response to Recommendation 1:** ICE concurred with this recommendation. ICE reported that it has scheduled a contractor to inspect the Adelanto ICE Processing Center, beginning October 10, 2018. The inspection is intended to gauge compliance with the 2011 PBNDS [*Performance-Based National Detention Standards*]. In addition, ICE Office of Enforcement and Removal Operations (ERO) has implemented a Special Assessment Review in response to this Management Alert. The Special Assessment Review is an additional detention facility review to target emergent concerns like those identified by the OIG. Additionally, ERO and the ICE Health Services Corps will meet to discuss an ongoing plan for providing technical assistance, monitoring, and oversight to ensure corrective actions are completed. ICE anticipates these actions to be completed by January 31, 2019.

**OIG Analysis:** We consider these actions responsive to this recommendation, which is resolved and open. We will close this recommendation when we receive sufficient evidence that ICE has completed both the full inspection of Adelanto and a Special Assessment Review that will cover the areas of concern identified in this report. Once we receive documentation that these two inspections have been completed and ICE's plan to address these reports, we will close this recommendation.

# Scope and Methodology

We visited the Adelanto ICE Processing Center as part of our larger effort to inspect ICE detention facilities. We used ICE's 2011 *Performance-Based National Detention Standards* to conduct our inspection, as these are the standards under which the center reported currently operating. These standards, which were developed in coordination with component stakeholders, prescribe the expected outcomes of each standard and the expected practices required to achieve them. ICE detention standards were also designed to improve safety, security, and conditions of confinement for detainees.

During our inspection, we interviewed the following ICE staff members: ICE Supervisory Detention and Deportation Officer, ICE Assistant Field Office Director, Detention Management and Compliance Officer, and medical oversight staff at the Adelanto ICE Processing Center. We interviewed employees of the GEO Group, including the Warden, Assistant Warden, Grievance Coordinator, Classification Officer, Segregation Supervisor, Health Services Administrator, and medical providers. We also interviewed detainees held in the general population and segregation. We reviewed documentation from previous ICE inspections, center documents, detainee records, and documentation of grievances.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

As part of our inspection we toured the following areas of the center:

- General medical unit for detainees
- Kitchens
- Special Management Unit (segregation)
- Modular housing units, including individual cells
- Center intake
- Control room

We reviewed disciplinary and administrative segregation files, as well as medical files and records for detainee care, including dental logs for patients awaiting care.

We conducted this review from May 2018 to July 2018 under the authority of the *Inspector General Act 1978*, as amended, and in accordance with the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency. Major contributors to this report are: John D. Shiffer, Chief Inspector; Stephanie Christian, Lead Inspector; Michael Rich, Lead Inspector; Ryan Nelson, Senior Inspector; and LaDana Crowell, Independent Reference Reviewer.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

# Appendix A
# ICE Response to the Draft Management Alert

*Office of the Chief Financial Officer*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration
and Customs
Enforcement**

September 17, 2018

MEMORANDUM FOR:   John V. Kelly
                  Senior Official Performing the Duties of the Inspector
                  General

FROM:             Nathalie Asher   *Nathalie R. Asher*
                  (A) Executive Associate Director
                  Enforcement and Removal Operations

SUBJECT:          Management Response to OIG Draft Report: "Management
                  Alert - Issues Requiring Attention at the Adelanto ICE
                  Processing Center in Adelanto, California"
                  (Project No. 17-123-ISP-ICE MA-Adelanto)

Thank you for the opportunity to review and comment on this draft report. U.S.
Immigration and Customs Enforcement (ICE) appreciates the work of the Office of
Inspector General (OIG) in planning and conducting its review and issuing this report.

In its prior work, the OIG has acknowledged that treatment and care of detainees can be
challenging. The OIG has reported on ICE's collaboration with stakeholders for more
than a decade to improve the safety, security, and conditions of confinement of
detainees. The OIG reported that ICE's Office of Professional Responsibility (OPR)
implemented a thorough inspection methodology and recognized the persistent efforts of
ICE's Office of Enforcement and Removal Operations (ERO) on-site detention
monitoring personnel.

ICE is committed to continually enhancing civil detention operations to promote a safe
and secure environment for both administrative detainees and staff. ICE utilizes a
layered approach to monitor detention conditions at facilities, with processes in place to
implement corrective actions in instances where non-compliance to ICE detention
standards is found. ICE maintains a rigorous and multi-faceted inspection schedule for
its detention facilities. ICE's detention operations are governed by national detention
standards and are overseen by field office personnel, inspections by OPR, and other
programmatic oversight and inspections by ERO. ICE works on a daily basis with the
ERO field offices, the OPR Office of Detention Oversight, and the DHS Office for Civil

www.ice.gov



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Rights and Civil Liberties to ensure that facilities comply with ICE detention standards or take the necessary corrective action to address problems and concerns.

The safety, rights, and health of detainees in ICE's care are paramount. ICE is concerned by the OIG's findings. However, the OIG's draft report lacks important context on some issues. For example, when a disciplinary infraction occurs, it may be necessary to remove the detainee from the general population while the matter is investigated to ensure the safety and security of the facility. During the investigation, the detainee is placed under administrative segregation protocols, which are less restrictive than the disciplinary protocols described. Additionally, ICE maintains a robust program to provide meaningful access to limited English proficient individuals. Current language resources include translation and interpretation through both government run and contract language lines. ICE will evaluate whether additional services may be required.

ICE concurs with OIG's single recommendation in the draft report. Attached is ICE's response to the recommendation. ICE provided technical comments under separate cover.

Again, thank you for the opportunity to review and comment on this draft report. Please feel free to contact us if you have any questions. We look forward to working with you again in the future.

Attachment

2



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Attachment:  Management Response to Recommendation
Contained in 17-123-ISP-ICE MA-Adelanto**

The OIG recommended that ICE:

**Recommendation 1:**  Conduct a full review of the Adelanto ICE Processing Center and the GEO Group's management of the center immediately to ensure compliance with ICE's 2011 *Performance-Based National Detention Standards* [PBNDS]. As part of this assessment, ICE must review and ensure compliance with those standards addressing:
1.  Personal housekeeping requirements, associated with hanging bedsheets
2.  Segregation
3.  Medical Care

**Response:**  Concur.  ICE ERO's contracted inspection firm is scheduled to inspect the Adelanto ICE Processing Center, beginning October 10, 2018.  The inspection is intended to gauge compliance with the 2011 PBNDS.  In addition, ICE ERO has implemented a Special Assessment Review (SAR) in response to this Management Alert. The SAR is an additional detention facility review to target emergent concerns like those identified by the OIG.  Additionally, ERO and the ICE Health Services Corps will meet to discuss an ongoing plan for providing technical assistance, monitoring, and oversight to ensure corrective actions are completed.

Estimated Completion Date:  January 31, 2019.

3



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Appendix B**
**Report Distribution**

**Department of Homeland Security**

Secretary
Deputy Secretary
Chief of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Assistant Secretary for Office of Policy
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
Director, ICE
ICE Component Liaison

**Office of Management and Budget**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

**Congress**

Congressional Oversight and Appropriations Committees

## Additional Information and Copies

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

> Department of Homeland Security
> Office of Inspector General, Mail Stop 0305
> Attention: Hotline
> 245 Murray Drive, SW
> Washington, DC 20528-0305

# EXHIBIT B

The California Department of Justice's Review of

# Immigration Detention in California

February 2019



Xavier Becerra

California Attorney General

The California Department of Justice's
Review of

# Immigration Detention in California

February 2019

Xavier Becerra
California Attorney General

# Background and Overview

California is one of the first states to examine the daily operations of detention facilities housing civil immigration detainees.  After public reports of distressing conditions and several deaths in detention facilities surfaced with little to no transparency, the California Legislature enacted Assembly Bill 103 (AB 103) in June 2017.  Under AB 103's 10-year mandate, the California Department of Justice is charged with reviewing and reporting back to the Legislature, the Governor, and the public about the conditions of confinement, including how those conditions impact due process, and the circumstances around apprehension and transfer of detainees in public and privately operated locked detention facilities housing immigration detainees in California.

In preparation of this report, the California Department of Justice (Cal DOJ) consulted with dozens of experts, visited all ten public and private detention facilities in California, and engaged in comprehensive reviews of three of the ten facilities, including the juvenile detention facility housing children in immigration proceedings.  This review allows California to understand issues related to health, welfare, and other conditions in immigration facilities in the state—including local publicly operated facilities. The report is intended to provide transparency to the public regarding those conditions.  It includes a written summary of findings that detail the difficulties immigration detainees face while in detention such as significant restrictions on liberty, language barriers, limited access to medical and mental health care, minimal contact with family and friends, and numerous barriers to securing legal representation or the evidence and other support they need.

This initial report is the first important step towards ensuring that civil immigration detainees are afforded critical health, safety, and due process protections through their conditions of confinement in California.

# Immigration Detention Facility Report Team

## Xavier Becerra
### Attorney General

| | |
|---|---|
| **Daniel Torres** | Special Assistant to the Attorney General |
| **Angela Sierra** | Chief Assistant Attorney General |
| **Michael Newman** | Senior Assistant Attorney General |
| **Susan Slager** | Supervising Deputy Attorney General |
| **Randie C. Chance, Ph.D.** | Director, Department of Justice Research Center |
| **Elizabeth Duenas** | Special Agent, Division of Law Enforcement |
| **Domonique C. Alcaraz** | Deputy Attorney General |
| **Marisol León** | Deputy Attorney General |
| **Julia Harumi Mass** | Deputy Attorney General |
| **Vilma Palma-Solana** | Deputy Attorney General |
| **Jasleen Singh** | Deputy Attorney General |
| **Katyria Serrano** | Associate Governmental Program Analyst |
| **Tiffany Jantz, Ph.D.** | Research Associate, Department of Justice Research Center |

# Table of Contents

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Glossary of Terms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .v

I.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

II.   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

      1.   Immigration and Nationality Act Provisions Authorizing Civil Detention. . . . . . . . . . . . . . . .3

      2.   Applicable Detention Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

III.  Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

      1.   Review of Publicly Available Information and Input from Stakeholders . . . . . . . . . . . . . . .10

      2.   Consultation with Experts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

      3.   Preliminary Site Visits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

      4.   Comprehensive Reviews . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

IV.   Demographics of the Immigration Detainee Population in California . . . . . . . . . . . . . . . . . . . . .13

V.    Overview and Brief Description of Seven out of the Ten Facilities Housing
      Immigration Detainees in California . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

      1.   Adelanto ICE Processing Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

      2.   Imperial Regional Detention Facility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

      3.   James A. Musick Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

      4.   Mesa Verde ICE Processing Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

      5.   Otay Mesa Detention Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

      6.   Rio Cosumnes Correctional Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

      7.   Yuba County Jail. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

VI.   Comprehensive Facility Review:  Yolo County Juvenile Detention Facility. . . . . . . . . . . . . . . . .37

      1.   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

      2.   Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

      3.   Summary of Key Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

      4.   Apprehension and Transfer of Detainees to Yolo. . . . . . . . . . . . . . . . . . . . . . . . . . .40

      5.  Conditions of Confinement at Yolo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

      6. Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

      7. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

VII. Comprehensive Facility Review:  Theo Lacy Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

  1. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

  2. Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

  3. Summary of Key Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

  4. Apprehension and Transfer of Detainees to Theo Lacy . . . . . . . . . . . . . . . . . . . . . . . . . . 71

  5. Conditions of Confinement at Theo Lacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

  6. Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

  7. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

VIII. Comprehensive Facility Review:  West County Detention Facility . . . . . . . . . . . . . . . . . . . . . . . . 99

  1. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

  2. Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

  3. Summary of Key Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

  4. Apprehension and Transfer of Detainees to West County . . . . . . . . . . . . . . . . . . . . . . . . 103

  5. Conditions of Confinement at West County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

  6. Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

  7. Effect of West County's Termination of the ICE Contract . . . . . . . . . . . . . . . . . . . . . . . . 119

  8. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

IX. Summary of Key Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

  1. Individuals in Immigration Detention: From Asylum Seekers to
     Long Time Permanent Residents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

  2. Conditions of Confinement Fail to Address the Unique Characteristics
     of Immigration Detention Population . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

  3. Due Process: The Challenges of Accessing Legal Services, Counsel, and
     Other Support for Immigration Cases While Detained . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

X. Conclusion and Next Steps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

List of Figures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

List of Tables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

# Executive Summary

More immigrants are being held in detention facilities than ever before in American history.  In Fiscal Year (FY) 2017, U.S. Immigration and Customs Enforcement (ICE) reported that a total of 323,591 individuals were booked into ICE custody to begin a new detention stay, with an average daily population of 38,106 amongst all its detention facilities.[1]  In FY 2018, the number increased by 22.5 percent for a total of 396,448 individuals booked into ICE custody.[2]  During the last three years, locked public and private detention facilities in California housed more than 74,000 immigration detainees, including youth, from over 150 countries.  Although children, women, and men all comprise the immigration detainee population, the most typical profile for detainees housed in California is that of a 25- to 34-year-old male from either Mexico, India, Guatemala, Honduras, or El Salvador, who spends an average of 51 days at any given facility.  While this is the most common profile in California, through our review, we also encountered immigrants as young as 13 and as old as 95, from Armenia, China, France, Germany, Ghana, Haiti, Ireland, Israel, Italy, Japan, Nigeria, Russia, Spain, South Africa, Syria, Thailand, and the United Kingdom, with lengths of stay at a single facility as long as 1,500 days (over 4 years).

Immigration detainees in California come into ICE custody in three main ways.  They may have been: (1) apprehended by or presented themselves to Customs and Border Protection (CBP) at the border, (2) arrested by ICE in the interior of the country after being in the United States with or without permission for some amount of time, or (3) taken into custody by ICE at the time of their release from local, state, or federal criminal custody.  Some of these individuals are detained because they are found to pose a risk of flight or danger to the community.  Others are detained because they cannot afford to pay the bond amount ordered, or because they are statutorily ineligible for bond as arriving aliens— including those seeking asylum—or due to certain past criminal convictions.  The end result is the confinement of many immigrants in highly restrictive settings without any specific finding that they pose a risk of flight or danger to the community.

The federal government detains civil immigration detainees in public and private facilities throughout the United States, including locked public and private detention facilities in California.  While the public and private facilities control their day-to-day operations, the federal government decides who is detained and in which detention facility.  Through AB 103, the California Legislature directed the Attorney General to review these facilities to provide greater transparency about the conditions of confinement, including how those conditions impact due process, and the circumstances surrounding

---

[1]  U.S. Immigration and Customs Enforcement, Fiscal Year 2018 ICE Enforcement and Removal Operations Report p. 8 <https://www.ice.gov/doclib/about/offices/ero/pdf/eroFY2018Report.pdf> [as of Jan. 23, 2019]; U.S. Immigration and Customs Enforcement, Dept. of Homeland Security, Budget Overview Fiscal Year 2019 Congressional Justification p. 5 <https://www.dhs.gov/sites/default/files/publications/U.S.%20Immigration%20and%20Customs%20Enforcement.pdf> [as of Jan. 23, 2019].

[2]  Id.

apprehension as well as transfers to detention facilities in California.  Without these reviews, the publicly available information regarding the treatment of immigration detainees in California is cursory and inconsistent.

For this initial report, Cal DOJ conducted one-day visits at all ten facilities that housed immigration detainees when AB 103 was signed into law:[3]

1. **Adelanto ICE Processing Center (Adelanto)**, a private facility operated by the GEO Group, Inc. through a subcontract with the City of Adelanto;

2. **Imperial Regional Detention Facility (Imperial),** a private facility operated by Management Training Corporation (MTC) through a subcontract with the City of Holtville;

3. **James A. Musick Facility (James Musick)**, a county jail operated by the Orange County Sheriff's Department;

4. **Mesa Verde ICE Processing Facility (Mesa Verde)**, a private facility operated by the GEO Group, Inc. through a subcontract with the City of McFarland *(in December 2018 the City communicated its intent to terminate its contract with ICE effective March 2019)*;

5. **Otay Mesa Detention Center (Otay Mesa)**, a private facility operated by CoreCivic (formerly Corrections Corporation of America) that contracts directly with the federal government;

6. **Rio Cosumnes Correctional Center (Rio Cosumnes)**, a county jail operated by the Sacramento County Sheriff's Department *(contract with ICE terminated by the County in June 2018)*;

7. **Theo Lacy Facility (Theo Lacy),** a county jail operated by the Orange County Sheriff's Department;

8. **West County Detention Facility (West County)**, a county jail operated by the Contra Costa County Office of the Sheriff *(contract with ICE terminated by the Sheriff in July 2018)*;

9. **Yolo County Juvenile Detention Facility (Yolo)**, a county juvenile facility operated by the Yolo County Probation Department; and

10. **Yuba County Jail (Yuba)**, a county jail operated by the Yuba County Sheriff's Department.

This report focuses on overall observations from one-day visits to the ten detention facilities and comprehensive reviews of three publicly operated facilities: (1) Yolo, (2) Theo Lacy, and (3) West County. The review faced some challenges.  For example, the private facilities initially objected to our visits; the federal government unsuccessfully challenged AB 103's validity in a legal action; access to each facility varied depending on ICE's level of involvement during each one-day visit; and at West County, some personnel did not agree to be interviewed and ICE transferred detainees out days before our team's visit.

---

[3] Pursuant to Senate Bill 29 (SB 29), codified as Civil Code section 1670.9, effective January 1, 2018, no city, county, or local law enforcement agency in California may "enter into a contract with the federal government or any federal agency or a private corporation, to house or detain in a locked detention facility noncitizens for purposes of civil immigration custody."  Those government entities that have existing contracts to provide custody to civil immigration detainees may not increase the maximum number of beds for the detention of noncitizens for civil immigration detention.



This report is divided into three main sections.  The first section provides background on how and why immigrants—whether arriving at a port of entry or having lived in the United States for decades—enter the immigration detention system; the limited constitutional protections afforded to them during detention; and the standards of confinement that govern detention facilities in California.  The second section provides a brief overview of seven detention facilities, including detainee demographics, housing conditions, and prevalent issues identified at each facility.  The third section provides detailed findings from the comprehensive reviews of the remaining three detention facilities: (1) Yolo, a county facility housing immigrant children ages 13 to 17; (2) Theo Lacy, a county jail housing adult male immigration detainees; and (3) West County, a county jail that held male and female adult immigration detainees, with a focus on allegations of mistreatment of female immigration detainees in 2017.  The information presented in each comprehensive review differs based on the unique aspects of each facility, operational differences, and the different populations they serve.  Beyond providing insight to the public regarding the conditions of confinement faced by immigration detainees throughout California, the comprehensive facility reviews highlight the unique needs and challenges faced by immigrant children, women, and men housed at these facilities.  Cal DOJ communicated its key findings to each of the three comprehensively reviewed facilities and the facilities may wish to respond once the report is published.

Our review found that the detainee experience varies drastically within and across facilities.  Common issues among a number of facilities, however, are the following:

- **Restrictions on Liberty:**  Immigration detainees in California, whether housed in jails or private facilities, have extremely limited freedom of movement.  Some detainees may be confined to cells for 22 hours a day, while others in dormitory-style housing have greater ability to move about their housing units.  Facilities' use of force and search policies, and harsh disciplinary practices also affect detainee liberty, sometimes resulting in restrictions that are unnecessarily severe in relation to detainees' backgrounds and the purpose of their confinement, or imposing a chilling effect on immigration detainees' perception of their freedom of movement.

- **Language Barriers:**  For a vast number of individuals held in immigration custody in California, English is not their primary language.  While some orientation material and postings may be available in English and Spanish, and many facilities do employ Spanish-speaking staff, no facility has staff who are able to communicate in all the languages spoken by immigration detainees.  Lack of bilingual staff and failure to access alternative language services hinder both the staff's ability to convey facility rules to detainees, and detainees' ability to understand those rules.  This can lead to discipline or treatment by staff that appears arbitrary and abusive, and prevents facilities from meeting detainees' legitimate needs.  It also compromises confidentiality because detainees must rely on other detainees to communicate with staff.

- **Issues with Access to Medical and Mental Health Care:**  While medical and mental health care vary across facilities, common issues we found include medical record accuracy and accessibility, nurses practicing outside their legal scope of practice, superficial medical examinations,

delayed or inadequate medical care, inadequate mental health staffing and services, and unsafe suicide watch and disciplinary isolation (solitary confinement) practices.

- **Obstacles to Contacting Family and Other Support Systems:**  Detainees' ability to stay in contact with family and friends is difficult while in detention.  Many of the detention facilities housing immigrants in California are located far from city centers, with limited access by public transportation.  None of the adult county jail facilities permit contact visits (without a glass barrier between the visitor and the detainee) with family or friends.  Contact via telephone is limited by the facility's scheduled times for phone calls, the high cost of making calls, and technical barriers.

- **Barriers to Adequate Representation:**  Individuals in immigration proceedings do not have a right to appointed counsel.  Detainees face several challenges to obtaining counsel or adequately representing themselves.  Not all detention facilities in California offer consistent legal orientation programs, and when detainees are able to contact pro bono counsel numbers provided by facilities, many organizations are unable to take on new clients.  Further, many facilities do not facilitate confidential legal phone calls for detainees who have or are seeking counsel or advice.  Legal materials provided to detainees are difficult to access, are rarely offered in languages other than English and Spanish, and may be out of date.

These challenges are exacerbated by federal detention standards, which are designed for criminal incarceration.  Those standards fail to meet the unique needs of individuals in immigration detention, such as their lack of government-funded counsel, unique mental health issues, and significant language and cultural barriers.  Cal DOJ will continue to bring transparency to the issue of immigration detention through these reports.

# Glossary of Terms

| | |
|---|---|
| AB 103 | California Assembly Bill 103 |
| ACA | American Correctional Association |
| BSCC | Board of State and Community Corrections |
| Cal DOJ | California Department of Justice |
| CBP | U.S. Customs and Border Protection |
| Research Center | California Department of Justice Research Center |
| DHS | U.S. Department of Homeland Security |
| OIG | Department of Homeland Security's Office of the Inspector General |
| ERO | ICE Enforcement and Removal Operations |
| HHS | U.S. Department of Health and Human Services |
| ICE | U.S. Immigration and Customs Enforcement |
| DIGSA | Dedicated intergovernmental service agreement |
| IGSA | Intergovernmental service agreement |
| IHSC | ICE Health Services Corps |
| INA | Immigration and Nationality Act |
| LVN | Licensed vocational nurse |
| NDS | National Detention Standards (2000) |
| ODO | ICE Office of Detention Oversight |
| ORR | HHS Office of Refugee Resettlement |
| PBNDS | Performance-Based National Detention Standards (2008 and 2011) |
| PREA | Prison Rape Elimination Act |
| SB 29 | California Senate Bill 29 |
| SMU | Special Management Unit |
| TVPRA | Trafficking Victims Protection Reauthorization Act |
| USCIS | U.S. Citizenship and Immigration Services |
| US DOJ | U.S. Department of Justice |
| USMS | U.S. Marshals Service |

# Introduction

California Assembly Bill 103 (AB 103), codified as Government Code section 12532 and signed into law by then Governor Edmund G. Brown Jr., on June 27, 2017, requires the California Attorney General to conduct reviews of county, local, and private locked detention facilities in which noncitizens are housed or detained on behalf of the federal Office of Refugee Resettlement (ORR) and the United States Immigration and Customs Enforcement (ICE) for purposes of civil immigration proceedings in California.  The mandate runs for ten years, through July 1, 2027.

While AB 103 provides the Attorney General with discretion to determine the order and number of facilities to be reviewed, it specifically requires that the review of each facility include a review of: (1) conditions of confinement; (2) the standard of care and due process provided to detainees at the facility; and (3) the circumstances surrounding apprehension and transfer of detainees to the facility. AB 103 does not impose any substantive requirements on county, local, or private detention facilities in California.  Instead, it contemplates increased transparency regarding the conditions in and opera-tion of detention facilities across the State.  Under the law, the Attorney General is required to provide the Legislature and the Governor with a comprehensive report outlining the findings of the reviews by March 1, 2019.

The California Legislature enacted AB 103 in reaction to growing concerns regarding conditions in facilities within California that house noncitizens for purposes of civil immigration proceedings.  Some of these conditions—including improper and overly restrictive segregation, substandard healthcare, and lack of access to counsel—have been documented by the federal government and nongovernmental organizations,[4] and have also been the subject of research studies and widespread media coverage.

ICE's Office of Detention Oversight (ODO) and the Nakamoto Group, Inc. (a private company with which ICE contracts), perform inspections of conditions of confinement at ICE detention facilities.  But in June 2018, the Department of Homeland Security's (DHS) Office of the Inspector General (OIG) issued a report finding that these two types of inspections and subsequent monitoring have produced neither sustained compliance with the federal government's own national detention standards nor systemic improvements in detention facilities across the country.[5]  The report identified several problems with

---

[4] Office of Inspector General, Dept. of Homeland Security, Management Alert—Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California (Sep. 27, 2018) <https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-86-Sep18.pdf> [as of Jan. 23, 2019]; Office of Inspector General, Dept. of Homeland Security, Management Alert on Issues Requiring Immediate Action on Theo Lacy Facility in Orange, California (Mar. 6, 2017) <https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-mga-030617.pdf> [as of Jan. 23, 2019]; Human Rights Watch, Code Red: The Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention (Jun. 20, 2018) <https://www.hrw.org/report/2018/06/20/code-red/fatal-consequences-dangerously-substandard-medical-care-immigration> [as of Jan. 23, 2019]; California Coalition for Universal Representation, California's Due Process Crisis: Access to Legal Counsel for Detained Immigrants (June 2016) <http://www.publiccounsel.org/tools/assets/files/0783.pdf> [as of Jan. 23, 2019].

[5] Office of Inspector General, Dept. of Homeland Security, ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements p. 4 (Jun. 26, 2018) <https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf> [as of Jan. 23, 2019].

the two types of inspections, including that the Nakamoto Group inspections are significantly limited and the ODO inspections are not frequent enough.[6]   The report also found that there is inadequate follow-up to the ODO and the Nakamoto Group inspections, and therefore ICE fails to correct the identified deficiencies.[7]   A January 2019 OIG report further found that "ICE does not adequately hold detention facility contractors accountable for not meeting performance standards."[8]

AB 103 sets out a framework for the people of the State of California, through their Attorney General, to understand the conditions in which many California residents or their family members are confined. This transparency is critical to our State's understanding of the welfare of every person in California— including those who are detained—regardless of immigration status.

---

[6]  Id. at pp. 4-13.

[7]  Id. at p. 11.

[8]  Office of Inspector General, Dept. of Homeland Security, ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards (Jan. 29, 2019) <https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf> [as of Feb. 5, 2019].



# Background

## 1. Immigration and Nationality Act Provisions Authorizing Civil Detention

### A. Detention of Noncitizens in Removal Proceedings

The Immigration and Nationality Act (INA) grants the U.S. Attorney General authority to arrest and detain noncitizens pending a decision on whether they may be ordered removed from the United States.[9]  This authority applies to individuals who came to the United States without authorization, visitors whose visas have expired, and longtime lawful permanent residents whom the federal government asserts are subject to removal.  In FY 2018, ICE reports that approximately 25% of all ICE administrative arrests were "at-large" arrests made in the community.[10]  ICE has discretion to release individuals facing removal charges upon payment of bond or other forms of supervised release, except for noncitizens that meet statutory requirements for mandatory detention, including past criminal convictions.[11]  Absent mandatory detention, detainees can seek a lower bond amount through a bond redetermination hearing before an immigration judge.  In bond redetermination hearings, the burden is on the noncitizen to establish "that he or she does not present a danger to persons or property, is not a threat to the national security, and does not pose a risk of flight."[12]  In most of the country,[13] in both the immigration and criminal justice contexts, inability to pay whatever bond has been ordered is a common reason people remain in detention even after they have been found to present no risk of danger to the community.  In a 2017 court decision, the U.S. Court of Appeals for the Ninth Circuit held that due process requires the immigration court to consider a noncitizen's financial resources and alternative forms of release to ensure that ability to pay is not used to justify ongoing detention where doing so does not serve the federal government's interest in securing an immigration court respondent's presence in court.[14]

---

[9]  8 U.S.C. § 1226 [detention on warrant issued by Attorney General].

[10]  U.S. Immigration and Customs Enforcement, Fiscal Year 2018 ICE Enforcement and Removal Operations Report p. 2, 5-6 <https://www.ice.gov/doclib/about/offices/ero/pdf/eroFY2018Report.pdf> [as of Jan. 23, 2019].

[11] See 8 U.S.C. § 1226(c).  The "mandatory detention" provision imposes no obligations on state and local law enforcement to hold non-citizens in custody, comply with requests by ICE for advance of their release, or transfer them to ICE following their release from custody.

[12]  *In re Guerra* (2006) 24 I. & N. Dec. 37, p. 38 (BIA).

[13] The California Money Bail Reform Act, which takes effect on October 1, 2019, establishes a new system for determining a criminal defendant's pre-trial custody status based on an assessment of risk to public safety and probability of missing a court date rather than their ability to pay cash bail. Sen. Bill No. 10 (2017-2018 Reg. Sess.) Ch. 244.

[14] *Hernandez v. Sessions* (9th Cir. 2017) 872 F.3d 976 [affirming preliminary injunction requiring new bond hearings due to previous failure to consider financial circumstances and alternative forms of release].

Mandatory detention applies to noncitizens—including lawful permanent residents—who have been convicted of a crime of moral turpitude or aggravated felony, as defined by federal law.[15] As a result of the 1996 Illegal Immigration Reform and Immigrant Responsibility Act, hundreds of criminal offenses subject noncitizens to mandatory detention, and can lead to those individuals spending months or even years in immigration detention.[16] Individual detainees have successfully challenged their prolonged detentions on due process grounds.[17]

## B.  Detention of Asylum Seekers

Noncitizens arriving at our nation's ports of entry or encountered at the border are considered applicants for admission and can generally be turned away if CBP finds them inadmissible.  However, applicants for admission who indicate an intention to apply for asylum or state a fear of persecution if returned to their home countries must be referred for an interview with an asylum officer from the U.S. Citizenship and Immigration Services (USCIS).[18]  Once they pass a credible fear interview, such individuals can—in the discretion of the U.S. Attorney General—be paroled into the United States or held in detention pending their asylum proceedings.  There is no right to parole for applicants for admission who have been determined to have a credible fear of persecution, but the U.S. District Court for the District of Columbia issued an injunction in July 2018 requiring the federal government to follow its own rules regarding parole.  This decision was in response to the plaintiffs' showing that rates of parole for asylum seekers had drastically declined and the administration was not making case-by-case determinations to deny parole as required by ICE's 2009 Parole Directive.[19]

## C. Detention Following Issuance of Removal Order

The INA authorizes ICE to hold noncitizens in detention after an order has been issued for their removal.[20]  The INA provides ICE 90 days to effectuate the removal, although sometimes ICE is unable to meet that deadline.  In these instances, the Supreme Court has held that detainees cannot be indefinitely detained.[21]  If a noncitizen is not removed within six months of a removal order becoming final and shows that there is good reason to believe removal is not reasonably foreseeable, the federal government must rebut that showing or release the individual from detention.[22]

---

[15] 8 U.S.C. § 1226(c).

[16] See 8 U.S.C. § 1101(a)(43) [listing aggravated felonies]; *Hernandez v. U.S. Atty. Gen.* (11th Cir. 2008) 513 F.3d 1336 ["simple battery" offense that included intentional physical contact of a "provoking nature" constituted an aggravated felony]; *Gibson v. Holder* (9th Cir. 2011) 450 Fed.Appx. 672 [generic threat offense constitutes an aggravated felony].

[17] See e.g. *Tijani v. Willis* (9th Cir. 2005) 430 F.3d 1241 [granting habeas to detainee who was imprisoned for two years and eight months pursuant to mandatory detention].  Litigation challenging the application of 8 U.S.C. § 1226(c) to deny detainees the opportunity to seek release on bond for more than six months has been ongoing since 2007.  (See *Jennings v. Rodriguez* (2018) __ U.S. __, 138 S.Ct. 830, 838, 851 [reversing Court of Appeals' statutory construction limiting § 1226(c) to six months and remanding for consideration of constitutional claims].)

[18] 8 U.S.C. § 1225(b) [requiring referral to asylum officer for noncitizens stating fear of persecution or intention to apply for asylum and requiring mandatory detention unless and until a finding of credible fear is made]; 8 U.S.C. § 1182(d)(5)(A) [allowing U.S. Attorney General to grant parole to applicants for admission on a case-by-case basis for urgent humanitarian reasons or significant public benefit].

[19] *Damus v. Nielsen* (D.D.C. 2017) 313 F.Supp.3d 317.

[20] 8 U.S.C. § 1231(a)(2).

[21] *Zadvydas v. Davis* (2001) 553 U.S. 678, 699.

[22] Id. at 701.

 

## D. Detention of Unaccompanied Immigrant Children

While ICE is the custodian of adult noncitizens who are detained pending their removal or asylum proceedings or following an order of deportation, Congress has charged the U.S. Department of Health and Human Services (HHS) with the care and custody of children that are present in the United States without lawful immigration status.[23]   The HHS Office of Refugee Resettlement (ORR) is authorized to house unaccompanied immigrant children in locked detention facilities only when there has been a determination that the child poses a danger to self or others, or has been charged with having committed a criminal offense.  ORR must review the propriety of secure placement at least every month.[24]  In addition, under a long-standing settlement agreement concerning the federal government's detention of noncitizen children, children housed in locked detention facilities have a right to a hearing before an immigration judge to challenge their placement in such restrictive conditions.[25]  The Yolo County Juvenile Detention Facility is the only secure, locked detention facility for unaccompanied immigrant children in California and is one of two such facilities nationwide.

# 2. Applicable Detention Standards

Each facility housing immigration detainees is subject to certain detention standards depending on its contract with ICE or ORR and whether it houses children or a county jail population (Table 1).  Not all these standards have an inspection or enforcement scheme.

## A. Constitutional Standards

When the government takes a person into custody, it must provide for the person's "basic human needs—e.g. food, clothing, shelter, medical care, and reasonable safety."[26]  For criminal prisoners, conditions of confinement must meet contemporary standards of decency in order to avoid the Eighth Amendment's prohibition on cruel and unusual punishment.[27]  Individuals held in custody before trial on criminal charges, cannot be subjected to punishment at all.[28]  Their confinement is governed by the constitution's Due Process Clause, which requires that restrictions on liberty not be "excessive in relation to" their purpose.[29]  The Ninth Circuit Court of Appeal, which encompasses California, has ruled that civil detainees are entitled to more considerate treatment than both convicted prisoners and individuals held in custody pending trial on criminal charges.[30]

---

[23] 8 U.S.C. § 1232(b)(1); 6 U.S.C. § 279(g).

[24] 8 U.S.C. § 1232(c)(2)(A).

[25] *Flores v. Sessions* (9th Cir. 2017) 862 F.3d 863.

[26] *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.* (1989) 489 U.S. 189, 199-200.

[27] *Trop v. Dulles* (1958) 356 U.S. 86 [plurality opinion].

[28] See *Youngberg v. Romeo* (1982) 457 U.S. 307, 322.

[29] *Bell v. Wolfish* (1979) 441 U.S. 520, 538.

[30] *Jones v. Blanas* (9th Cir. 2004) 393 F.3d 918, 931-32, but see *Matherly v. Andrews* (4th Cir. 2017) 859 F.3d 264, 276 [declining to follow *Jones*].

**Table 1. Applicable Detention Standards by Immigration Detention Facility**

| Detention Facility | Constitutional | Lyons Settlement | TVPRA & Flores | 2000 NDS | 2008 PBNDS | 2011 PBNDS | PREA Standards | State & Local Health Laws | CA Detention Standards |
|---|---|---|---|---|---|---|---|---|---|
| Adelanto | ● | | | | | ● | ● | ● | |
| Imperial | ● | | | | | ● | ● | ● | |
| James Musick | ● | | | | ● | | ● | ● | ● |
| Mesa Verde | ● | ● | | | | | ● | ● | |
| Otay Mesa | ● | | | | | ● | ● | | |
| Rio Cosumnes | ● | ● | | ● | | | ● | ● | ● |
| Theo Lacy | ● | | | | ● | | ● | ● | ● |
| West County | ● | ● | | ● | | | ● | ● | ● |
| Yolo | ● | | ● | | | | ● | ● | ● |
| Yuba | ● | ● | | | | ● | ● | ● | ● |

Note. ● denotes applicable detention standard.

In addition, immigration detainees have a constitutional right to due process in their removal and other immigration proceedings—including the right to an attorney at their own expense and the right to a full and fair hearing.[31]  Due to a court injunction, the federal government is required to provide legal representation to immigration detainees in California, Arizona, and Washington who have serious mental disabilities and are unable to adequately represent themselves in their immigration proceedings.[32]  Otherwise, immigration detainees must pay for their own attorneys or find pro bono representation.  Where conditions of confinement interfere with detainees' ability to retain counsel or represent themselves, those conditions may infringe on detainees' due process rights.[33]

### (i)  *Lyon* Settlement and Access to Legal Calls

Four California detention facilities housing immigration detainees are covered by the 2016 settlement reached in *Lyon v. United States Immigration and Customs Enforcement,* (N.D. Cal 2016), No. 3:13-cv-05878.  This class action, brought on behalf of detainees at the four facilities under the jurisdiction of ICE's San Francisco Field Office, alleged that limited opportunities for communication with attorneys and others from whom detainees needed information and

---

[31] See *Rios-Berrios* (9th Cir. 1985) 776 F.2d 859, 862; *Oshodi v. Holder* (9th Cir. 2013) 729 F.3d 883, 889.

[32] See *Franco-Gonzalez v. Holder* (C.D. Cal. May 3, 2013, No. 10-2211-DMG (DTBx)) 2013 WL 8116823.

[33] See *Lyon v. U.S. Immigration and Customs Enforcement* (N.D. Cal. 2016) 171 F.Supp. 961 [denying ICE's motion for summary judgment where plaintiffs presented evidence that obstacles to telephone access impacted detainees' ability to retain and speak confidentially with counsel and obtain evidence for their immigration cases].

evidence violated detainees' rights to access to counsel and due process in their immigration hearings.  As a result of the *Lyon* settlement, the facilities are required to provide phone booths in housing units for additional privacy, expanded options for free, direct, and unmonitored calls to attorneys and government agencies, and prompt access to a phone room for other legal calls upon request, among other requirements, to immigration detainees housed at Mesa Verde, Rio Cosumnes, West County, and Yuba.

## B. National Standards

### (i)  Three Sets of National Detention Standards for Adult Facilities

ICE uses three sets of detention standards to govern conditions in locked facilities housing adult immigration detainees.  The standards for a given facility are determined by considerations such as the facility's size, type, staffing, actual or potential costs of executing physical and operational changes, and the year ICE and the operating entity entered into an agreement.[34]

The National Detention Standards (NDS), issued in 2000 by the Immigration and Naturalization Service (ICE's predecessor agency), most frequently apply to county or city jails that contract with ICE.  The NDS contains 39 standards addressing issues such as food service, issuance and exchange of clothing, custody classification, sexual abuse and assault prevention and training, disciplinary system, healthcare, telephone access, recreation, religious practices, communication between ICE staff and detainees, and access to legal material.  ICE issued the 2008 Performance-Based National Detention Standards (PBNDS) to enhance safety, security, and conditions of confinement.  The 2011 PBNDS were designed to improve healthcare services, implement stronger protections against sexual assault, increase access to legal services and religious opportunities, improve communication for detainees with limited English proficiency, improve the complaint process, and increase recreation and visitation opportunities.  In December 2016, ICE revised the 2011 PBNDS to adopt the Prison Rape Elimination Act of 2003 (PREA) standards (discussed below); enhance disability accommodations and communication assistance; and change disciplinary, medical, and suicide prevention standards.  Some facilities adopted these revisions.  ICE deems some NDS and PBNDS standards as priority standards based on what ICE designates as critically important, including those related to health, safety, and security.

Both the NDS and the PBNDS were modeled on American Correctional Association (ACA) standards, which are based on criminal case law and set forth minimum requirements for criminal detention facilities.  Thus, they do not necessarily address the particular circumstances and needs of civil immigration detainees.  Unlike pretrial criminal detainees, civil immigration detainees have no right to government-funded counsel and often have to represent themselves in complex immigration proceedings.  But the 2011 PBNDS Telephone Access standard (section 5.6) limits free and direct calls to a very small list of advocates and organizations that is inadequate to meet the needs of detainees who may have to represent themselves.  The Visitation (section 5.7) and Access to

---

[34] ICE Detention Standards <https://www.ice.gov/factsheets/facilities-pbnds> [as of Jan. 22, 2019].

Legal Research Material (section 6.3) standards similarly fail to address the particular needs of immigration detainees and their counsel—who, unlike criminal public defenders, may practice far away from remote detention facilities.  The Recreation Standard (section 5.4) requires only one hour of recreation a day, even for detainees in the lowest possible security level, which may include individuals who have no criminal history and could be granted much more freedom without posing any risk to safety or order in the facility.

A June 2018 report issued by OIG found that ICE's inspection scheme and subsequent monitoring have not led to sustained compliance with national detention standards or systemic improvements in detention facilities across the country.[35]

### (ii)  Standards Relating to Responses to Sexual Assault (PREA)

In 2003, the federal government enacted PREA to protect against, and ensure prompt investigation of and response to, sexual assault.  The U.S. Department of Justice (US DOJ) promulgated PREA standards in 2012, and DHS promulgated its own PREA standards in 2014.[36]  Facilities housing county jail and juvenile populations and U.S. Marshals Service (USMS) detainees are subject to the US DOJ PREA standards.  Facilities that only house adult immigration detainees are subject to the DHS PREA standards.[37] Each of these PREA standards include requirements related to designation of a PREA coordinator; staff training; development of policies and procedures to ensure that detainees have multiple ways to report sexual abuse, retaliation for reporting sexual abuse, or staff neglect; development of investigation protocols; assurance of effective disciplinary sanctions for staff misconduct, neglect, or violations; detainee access to medical and mental health assessments; and audits every three years.

### (iii)  Standards for Youth Facilities

Standards applicable to the detention of immigrant youth are governed in large part by the Trafficking Victims Protection Reauthorization Act (TVPRA) and the *Flores v. Reno,* No. 85-cv-4544 (C.D. Cal. Jan. 17, 1997) *(Flores)* settlement.  The TVPRA requires that HHS take responsibility for the care and custody of immigrant children upon apprehension.  HHS discharges this responsibility through ORR.  Under the *Flores* settlement, the federal government must: (1) release children from immigration detention without unnecessary delay; (2) place children in the "least restrictive" and licensed setting appropriate to their age and any special needs; and (3) implement standards relating to the care and treatment of children in immigration detention.[38]

---

[35] See note 5.

[36] National Standards To Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37106 (June 20, 2012); Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities, 79 Fed. Reg. 13100 (Mar. 7, 2014).

[37] U.S. Immigration and Customs Enforcement, Dept. of Homeland Security, Progress in Implementing 2011 PBNDS Standards and DHS PREA Requirements at Detention Facilities (Jan. 17, 2017) <https://www.dhs.gov/sites/default/files/publications/ICE%20-%20Progress%20in%20Implementing%202011%20PBNDS%20Standards.pdf> [as of Jan. 23, 2019].

[38] On September 7, 2018, DHS and HHS proposed regulations that would limit some of the protections afforded to immigrant children in the Flores settlement agreement.



The cooperative agreement between ORR and Yolo County for the housing and care of immigrant children must be executed in accordance with State residential care licensing requirements, the *Flores* settlement agreement, pertinent federal laws and regulations, and ORR policies and procedures. Pursuant to the *Flores* settlement, Yolo is required to provide youth under its care with proper physical care and maintenance, healthcare, individualized needs assessments, educational services, recreation and leisure time, at least one individual counseling session per week, bi-weekly group counseling sessions, acculturation and adaptation services, visitation and contact with family, services designed to identify relatives in the United States and abroad, and legal services information, among other services.

Yolo is also required to follow the US DOJ PREA standards.[39]

## C. State Standards

### (i)  State and Local Health Standards
Public and private detention facilities in California are subject to both state and local health standards and are evaluated by local health officials.[40]

### (ii)  California Detention Standards
Facilities in California that house a county jail or juvenile population are subject to the State's detention standards.  Those standards are found in the Penal Code (i.e., § 4000, et seq.), the Welfare and Institutions Code section 207, et seq., (applicable to juvenile facilities) and Titles 15 and 24 of the California Code of Regulations (applicable to adult and juvenile facilities).  The Board of State & Community Corrections (BSCC) established the Title 15 and 24 minimum detention and building standards, which address health and safety, access to healthcare, personnel training, suicide prevention, grievances, administrative and disciplinary segregation, mail, library services, security, recreation, treatment of confined individuals, and the types and availability of visitation, among others.[41]  The BSCC conducts biennial inspections to assess compliance with Title 15 and 24 standards, and works with facilities that do not meet the standards.

The State detention standards apply to: James Musick, Rio Cosumnes, Theo Lacy, West County, Yolo, and Yuba.[42]

---

[39] Standards To Prevent, Detect, and Respond to Sexual Abuse and Sexual Harassment Involving Unaccompanied Children, 79 Fed.Reg. 77768 (Dec. 24, 2014) [HHS' PREA standards only apply to non-secure facilities. HHS instructed secure facilities, such as Yolo, to follow the US DOJ PREA standards because juvenile facilities were already subject to those standards].

[40] Health & Saf. Code, § 101045.

[41] Pen. Code, §§ 6029, 6030; Welf. & Inst. Code, §§ 209, 885; Cal. Code Regs., tit. 15, § 1000, et seq.

[42] Pen. Code, § 6031.4.

# ||| Methodology

AB 103, as codified in Government Code section 12532, provides the Attorney General with discretion to determine the order and number of facilities to be reviewed at any given time during its 10-year mandate. At the time AB 103 was signed into law, ten locked detention facilities housed immigration detainees in California—six public and four private.  Cal DOJ reviewed publicly available information about the facilities, requested additional information from the facilities, and conducted one-day visits to each of the facilities. Cal DOJ also consulted with experts and stakeholders to identify issues of concern and possible approaches to the review process.  Cal DOJ's extensive research, stakeholder meetings, one-day site visits, communications with facilities, and local decisions to terminate contracts helped inform the selection of the three facilities discussed in detail in this report: (1) Yolo; (2) West County; and (3) Theo Lacy.

## 1. Review of Publicly Available Information and Input from Stakeholders

In June and July 2017, Cal DOJ conducted an extensive review of publicly available information regarding each of the ten facilities, including DHS-issued reports, reports by nongovernmental organizations, media articles, and documentation found in the ICE Freedom of Information Act (FOIA) library, to gain an understanding of the facilities' operations, and particularly with respect to AB 103's mandated focus areas: (1) conditions of confinement; (2) the impact conditions of confinement have on detainee's due process rights; and (3) circumstances around their apprehension and transfer to the facility.

In August and September 2017, Cal DOJ held two stakeholder meetings in northern and southern California, attended by immigration attorneys, advocates, volunteers, and former detainees, who shared their personal observations and experiences with the ten facilities.

The Department of Justice Research Center ("Research Center") within Cal DOJ also developed an online attorney survey tool to assess detainees' access to due process at all ten facilities.  From the limited population of attorneys that represent detained immigrants, forty-three attorneys from across California, with clients at all ten detention facilities, completed the survey.  Participants were asked questions pertaining to their past and current experiences regarding their and their clients' experience with legal visitations, telephone calls, and materials at immigration detention facilities in California. Participants rated their experiences on a scale from 1 (very easy) to 10 (very difficult) for both past and current clients.  For facilities currently operating, scores were averaged between ratings given for past and current experiences to produce one average rating per facility.  For attorneys who had reported experiences for both current and past clients at a given facility, their current and past client responses were averaged to produce one average rating per participant.

## 2. Consultation with Experts

Cal DOJ consulted with over two dozen immigration law, correctional, and immigration detention experts across the United States, and eventually retained two correctional experts (Thomas Faust and Dr. Dora Schriro), one medical expert (Dr. Marc Stern), one mental health expert (Dr. Andrea Weisman), and one social science expert (Dr. Emily Ryo).  The correctional experts, medical expert, and mental health expert evaluated the three comprehensive review facilities in accordance with best practices and in consultation with applicable ICE national detention standards (NDS, PBNDS 2008, PBNDS 2011), California's Title 15, and industry standards, including standards promulgated by the ACA, National Commission on Correctional Health Care, Juvenile Detention Alternatives Initiative, and PREA.  These experts provided invaluable feedback as Cal DOJ developed and implemented our review methodology, sharing key analyses in accordance with applicable standards and best practices that informed the report's findings.

## 3. Preliminary Site Visits

In November 2017, Cal DOJ contacted all ten facilities, requesting one-day site visits and a preliminary set of background documents.  All four private facilities denied Cal DOJ's initial site visit requests and rejected the request for documents.  The Cal DOJ review team and at least one expert[43] completed one-day site visits and received preliminary documents from all six of the public facilities by February 2018.

On March 6, 2018, the federal government filed *United States v. California*, No. 2:18-cv-00490-JAM-KJN (E.D.Cal.), a lawsuit seeking to invalidate AB 103 and aspects of two other laws passed by the State legislature.  On July 5, 2018, U.S. District Judge John A. Mendez denied the federal government's motion to enjoin AB 103 during the pendency of the litigation, and on July 9, 2018, dismissed most of the federal government's lawsuit, including all claims with respect to AB 103.[44]  In September and November 2018, the Cal DOJ was provided access to the four private facilities through one-day site visits.

The one-day site visits included a tour of the facility and, when permitted, short informal group or individual discussions with detainees to evaluate all AB 103 focus areas.  The team conducted these informal discussions with over 300 detainees in English and Spanish, and at Imperial, also in Punjabi. Additionally, in response to Cal DOJ's initial document requests, each facility provided a facility roster that generally reflected gender, length of stay, and country of origin for detainees held at the facility. The Research Center compiled the demographic data provided by each facility and developed infographics and charts found throughout this report.

---

[43] Dr. Dora Schriro accompanied the Cal DOJ to the Adelanto, James Musick, Mesa Verde, Rio Cosumnes, Theo Lacy, West County, Yolo, and Yuba. Thomas Faust accompanied the team to Imperial, Mesa Verde, and Otay Mesa.  Robert Lang accompanied the team to James Musick and Theo Lacy.

[44] The case is currently on appeal in the 9th Circuit. *United States v. State of California,* No. 18-16496 (9th Cir.).

# 4. Comprehensive Reviews

Cal DOJ's review process targeted AB 103's three focus areas.  To evaluate conditions of confinement, Cal DOJ reviewed detainee housing, daily schedule and programming, food, hygiene, visitation, access to telephones and mail, language access, grievances, discipline, and access to medical and mental health care.  To evaluate due process at the facility, Cal DOJ reviewed detainee access to legal materials, and ability to communicate with or retain legal representation.  Finally, to evaluate circumstances surrounding apprehension and transfer, Cal DOJ reviewed information relating to detainees' place of apprehension, and reasons and process for transfers to the facilities.

Cal DOJ reviewed documentation from the three facilities, including policies and procedures, staff and training records, facility logs, operations schedules, and other documents.[45]  Cal DOJ also conducted comprehensive multiday follow-up site visits to the three facilities, accompanied by retained experts, as appropriate.  These follow-up site visits included tours and interviews with facility personnel, detainees, and, when applicable, county jail populations.

Cal DOJ conducted over 110 detainee interviews to evaluate all AB 103 focus areas.  Interviews were conducted in English and Spanish, as appropriate, and at Theo Lacy we also conducted interviews in Punjabi, and used a telephone interpreter service to conduct interviews in Armenian, Cambodian, Haitian Creole, Korean, Russian, and Somali.  Our team particularly relied on detainee interviews with regard to the AB 103 focus area of detainees' apprehension and transfer.  Of note, detainees at all three facilities expressed fear of retaliation for speaking with Cal DOJ, and at least one detainee ended an interview abruptly, citing discomfort.  Such fear of retaliation—whether anchored in previous experiences or perceptions—likely impacted detainees' willingness to participate in the review process.

More details about the methodology used at each of the three comprehensively reviewed facilities is found in those respective sections of the report. The report focuses on themes Cal DOJ identified from multiple sources during this first year of review.  Our methodology will further develop as we continue to review immigration detention facilities.

---

[45]   Each facility maintains records differently, which will be reflected in different sections of this report.



# IV Demographics of the Immigration Detainee Population in California

At the time AB 103 went into effect there were ten detention facilities housing immigration detainees in California (Fig. 1).

## Figure 1. Map of Immigration Detention Facilities in California



**Key**

🔵 **County-Operated**

**James A. Musick Facility**
Irvine
Capacity: 958 Combined with Theo Lacy

**Theo Lacy Facility**
Orange
Capacity: 958 combined with James A. Musick

**Yolo Juvenile Detention Facility**
Woodland
Capacity: 24

**Yuba County Jail**
Marysville
Capacity: 220

🔴 **Inactive**

**Rio Cosumnes Correctional Center**
Elk Grove
ICE Contract ended June 2018

**West County Detention Facility**
Richmond
ICE Contract ended July 2018

🟡 **Privately-Operated**

**Adelanto ICE Processing Center**
Adelanto
Capacity: 1,940

**Imperial Regional Detention Facility**
Calexico
Capacity: 704

**Mesa Verde ICE Processing Center**
Bakersfield
Capacity: 400

**Otay Mesa Detention Center**
San Diego
Capacity: 896

🟢 **ICE ERO Field Office**

**San Diego-Imperial**
Otay Mesa, Imperial

**Los Angeles**
Adelanto, James A.Musick, Theo Lacy

**San Francisco**
Mesa Verde, Yuba

Each adult facility belongs to one of three ICE Enforcement and Removal Operations (ERO) Field Offices in California noted in Figure 1: (1) the San Francisco Field Office oversees Mesa Verde and Yuba, and oversaw Rio Cosumnes and West County; (2) the Los Angeles Field Office oversees Adelanto, James Musick, and Theo Lacy; and (3) the San Diego Field Office oversees Imperial and Otay Mesa.

The following figures reflect detainees' country of origin, gender, age, and length of stay data provided by each facility.[46]  Each facility maintains detainee data differently and, thus, not all facilities provided all data points.  The date span covered by the data provided varied between facilities, though most facilities provided information for detainees housed from July 2015 to Fall 2018 (Table 2).[47]

### Table 2. Date Span of Data Provided by Facility

| Facility | Earliest Intake | Latest Departure | Data Description |
|---|---|---|---|
| Adelanto | Jun-2017 | Oct-2018 | Detainees from June 2017 intake to October 2018 departure |
| Imperial | Jul-2015 | Nov-2018 | Detainees from July 2015 intake to November 2018 departure |
| James Musick | Apr-2012 | Sep-2018 | Detainees from July 2015 departure to September 2018 departure |
| Mesa Verde | Sep-2015 | Oct-2018 | Detainees from June 2017 departure to October 2018 departure |
| Otay Mesa | Feb-2015 | Oct-2018 | Detainees from October 2015 departure to October 2018 departure |
| Rio Cosumnes | Nov-2013 | Jun-2018 | Detainees from July 2015 departure to June 2018 departure |
| Theo Lacy | Jul-2015 | Oct-2018 | Detainees from July 2015 intake to October 2018 departure |
| West County | Jul-2015 | Aug-2018 | Detainees from July 2015 intake to August 2018 departure |
| Yolo | Jul-2015 | Sep-2018 | Detainees from July 2015 intake to September 2018 departure |
| Yuba | Jul-2015 | Sep-2018 | Detainees from July 2015 intake to September 2018 departure |

Note. Earliest Intake = Month and year of earliest intake; Latest Departure = Month and year of latest departure;

Data Description = Detainees included in data set

---

[46] Otay Mesa and Rio Cosumnes did not provide gender.  Rio Cosumnes did not provide country of origin.

[47] Some detainees arrived at the facilities before these dates but were housed at the facilities as of these dates.  The Adelanto and Mesa Verde Facilities provided data on detainees from July 2015 after the present report drafting had commenced, which did not allow for enough time to conduct additional data cleaning and analysis.  As such, the present report only includes the data covered by the date ranges provided in Table 2.

**Detainees' Country of Origin**

In the years for which data was analyzed (Table 2), 74,822 immigration detainees who came from over 150 countries were housed in the ten locked detention facilities in California (Table 3).

### Table 3. Immigration Detainees' Regions and Countries of Origin

| Region | Number of Detainees | Percentage | Countries |
|---|---|---|---|
| Africa | 2,261 | 3.02% | Algeria, Angola, Benin, Burkina Faso, Cameroon, Chad, Comoros, Congo, Cote D'Ivoire, Egypt, Eritrea, Ethiopia, Gabon, Gambia, Ghana, Guinea, Kenya, Liberia, Libya, Mali, Mauritania, Morocco, Mozambique, Niger, Nigerria, Senegal, Sierra Leone, Somalia, South Africa, Sudan, Tanzania, Togo, Tunisia, Uganda, Zimbabwe |
| Asia | | | |
| Central Asia | 364 | 0.49% | Kazakhstan, Kyrgyzstan, Russia, Tajikistan, Turkmenistan, Uzbekistan |
| East and Southeast Asia | 3,175 | 4.24% | Burma, Cambodia, China, Hong Kong, Indonesia, Japan, Laos, Macau, Malaysia, Mongolia, North Korea, Philippines, Singapore, South Korea, Taiwan, Thailand, Vietnam |
| Middle East | 1,208 | 1.61% | Armenia, Azerbaijan, Georgia, Iran, Iraq, Israel, Jordan, Kuwait, Lebanon, Saudi Arabia, Syria, Turkey, Yemen |
| South Asia | 10,684 | 14.28% | Afghanistan, Bangladesh, British Indian Ocean Territory, India, Nepal, Pakistan, Sri Lanka |
| Australia/ Oceania | 179 | 0.24% | Australia, Cook Islands, Coral Sea Islands, Fiji, Guam, Kiribati, Midway Islands, Nauru, New Zealand, Samoa, Tonga |
| Europe | 590 | 0.79% | Albania, Austria, Belarus, Belgium, Bulgaria, Cyprus, Czech, Republic, Denmark, England, Estonia, France, Germany, Gibraltar, Greece, Hungary, Ireland, Italy, Liechtenstein, Macedonia,Moldova, Montenegro, Netherlands, Norway, Poland, Portugal, Romania, San Marino, Scotland, Serbia, Spain, Switzerland, Ukraine, United Kingdom, Yugoslavia |
| North America | | | |
| Central America & Caribbean | 15,559 | 20.79% | Antigua & Barbuda, Barbados, Belize, Cayman Islands, Costa Rica, Cuba, Dominican Republic, El Salvador, Guadeloupe, Guatemala, Haiti, Honduras, Jamaica, Nicaragua, Panama, Saint Martin, Trinidad and Tobago |
| Mexico | 28,944 | 38.68% | Mexico |
| Others | 125 | 0.17% | Canada, Saint Pierre and Miquelon |
| South America | 984 | 1.32% | Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, Guyana, Paraguay, Peru, South Georgia and South Sandwich Islands, Suriname, Uruguay, Venezuela |
| Other/Not Listed | 10,749 | 14.37% | |
| TOTAL | 74,822 | 100.00% | |

Detainees primarily came from 10 countries (Table 4).[48]

**Table 4. Ten Most-Represented Countries of Origin for All Facilities**

| Country | No. of Detainees | Percentage |
|---|---|---|
| Mexico | 28,944 | 38.68% |
| India | 9,118 | 12.19% |
| Guatemala | 5,023 | 6.71% |
| Honduras | 3,814 | 5.10% |
| El Salvador | 3,500 | 4.68% |
| China | 2,575 | 3.44% |
| Haiti | 2,371 | 3.17% |
| Nepal | 728 | 0.97% |
| Armenia | 644 | 0.86% |
| Cameroon | 631 | 0.84% |
| Other Countries | 14,471 | 19.34% |
| Not Provided | 3,003 | 4.01% |
| TOTAL | 74,822 | 100.00% |

Most detainees in all facilities reporting are male (Table 5).  The facilities did not provide data regarding their LGBTQ populations, if any.

**Table 5. Detainees' Gender by Facility**

| Facility | Female | Female (%) | Male | Male(%) | Not Reported |
|---|---|---|---|---|---|
| Adelanto*[49] | 1,106 | 11% | 8,894 | 89% | |
| Imperial | 1,327 | 9% | 13,690 | 91% | |
| James Musick | 841 | 18% | 3,764 | 82% | |
| Mesa Verde* | 476 | 10% | 4,238 | 90% | |
| Otay Mesa | | | | | 22,243 |
| Rio Cosumnes | | | | | 3,003 |
| Theo Lacy | | | 5,837 | 100% | |
| West County | 1,044 | 19% | 4,327 | 81% | 2 |
| Yolo | | | 244 | 100% | |
| Yuba | 272 | 7% | 3,514 | 93% | |
| TOTAL | 5,066 | | 44,508 | | 25,248 |

---

[48] Rio Cosumnes did not provide data on country of origin or citizenship.

[49] The asterisk (*) reflects the fact that information from Adelanto and Mesa Verde began in June 2017.

As indicated in Table 6, the average detainee across facilities is 33 years of age, with the largest represented age group being 25-34 years of age.

**Table 6. Detainees' Age in Years by Facility**

| Facility | Average Age | Avg. Female | Avg.Male | Youngest | Oldest |
|---|---|---|---|---|---|
| Adelanto* | 32 | 33 | 32 | 18 | 75 |
| Imperial | 30 | 32 | 30 | 18 | 74 |
| James Musick | Not Reported | | | | |
| Mesa Verde* | 36 | 35 | 36 | 18 | 76 |
| Otay Mesa | Not Reported | | | | |
| Rio Cosumnes | Not Reported | | | | |
| Theo Lacy | 34 | NA | 34 | 18 | 79 |
| West County | 34 | 35 | 34 | 18 | 95 |
| Yolo | 16 | NA | 16 | 13 | 18 |
| Yuba | 36 | 35 | 36 | 18 | 81 |
| All Facilities | 33 | 34 | 32 | 13 | 95 |

Note. Age was the duration from the detainee's birthdate to the date of their intake at a detention facility. Imperial provided age, reported in Table 6, but no birthdate.

**Length of Stay**[50]

In the years covered, the average detainee across facilities was held at a single facility approximately 51.8 days (Table 7; Fig. 2), although if they were transferred between ICE facilities their overall ICE detention could have been longer.  Table 7 shows the average length of stay in days by facility.

---

[50] Length of stay was calculated for cases in which both arrival and departure were provided and not equivalent.  Approximately 2,000 observations had no release date and were removed from length of stay analysis.  The same individual could be represented multiple times in length of stay analysis if they had more than one stay separated by at least one day.  There were a number of "overlapping stays."  Overlapping stays were defined as the same person departing on one day and arriving again on the same day in a different observation.  There were approximately 27,000 overlapping stays.  These overlapping stays were combined within the same person and treated as a single, uninterrupted stay.  There were approximately 25,000 observations in which a person arrived and departed in the same day.  Those observations were removed from length of stay analysis except in cases of overlapping stays.  Finally, there were approximately 7,700 suspected duplicate length of stay data points across the facilities with an identical arrival and departure date for the same person.  Suspected duplicates were removed from length of stay analysis.

**Table 7. Length of Stay by Facility**

| Facility | Average | Median | Min-Max | Stand. Dev.[51] | Count[52] |
|---|---|---|---|---|---|
| Adelanto* | 59.73 | 42 | 1 – 472 | 60.42 | 8,562 |
| Imperial | 45.45 | 19 | 1 – 880 | 70.09 | 14,940 |
| James Musick | 80.70 | 35 | 1 – 1,500 | 116.05 | 4,521 |
| Mesa Verde* | 38.50 | 3 | 1 – 866 | 80.85 | 4,356 |
| Otay Mesa | 40.71 | 5 | 1 – 1,055 | 82.10 | 21,533 |
| Rio Cosumnes | 51.04 | 18 | 1 - 854 | 80.67 | 3,068 |
| Theo Lacy | 107.32 | 54 | 1 – 1,002 | 126.35 | 5,390 |
| West County | 34.84 | 5 | 1 – 749 | 70.76 | 5,101 |
| Yolo | 76.75 | 58 | 1 – 419 | 67.68 | 235 |
| Yuba | 46.93 | 7 | 1 – 926 | 90.85 | 3,730 |
| All Facilities | 51.87 | 19 | 1 – 1,500 | 86.07 | 71,436 |

**Figure 2. Length of Stay for All Facilities: Number of Stays at Single Facility in 60-Day Increments**



---

[51] The standard deviation for a data set provides context for averages.  A low standard deviation indicates that the data points tend to be close to the mean of the set, while a high standard deviation indicates that the data points are spread out over a wider range of values.

[52] Count is the total number of stays used to calculate the average, median, and standard deviation.  In the event that the same person was detained multiple times, each stay is counted separately.  Lengths of stay under one day were not included in the count or calculation of the mean, median, and standard deviation for the length of stay.

Figure 3 shows the percentage of detainees who stayed at each facility for 0-7 days, 7-30 days, 30-60 days and more than 90 days.

**Figure 3. Length of Stay by Facility: Percentage of Detainees by Length of Stay (in Days) in a Single Facility**



# V Overview and Brief Description of Seven of the Ten Facilities Housing Immigration Detainees in California

In California, ICE contracts with adult locked detention facilities through intergovernmental service agreements (IGSA), if a local government entity is involved, or directly with CoreCivic in the case of Otay Mesa. The public facilities have IGSAs with ICE; three of the private facilities (Adelanto, Imperial and Mesa Verde) operate through subcontracts with local cities where the city has an IGSA with ICE but is not involved in the facility operations. Each agreement specifies the ICE national standards (NDS, 2008 PBNDS or 2011 PBNDS) that apply to the facility. The agreements also establish maximum detainee bed capacity (Fig. 4) and the amount ICE will pay, usually through a daily bed rate per detainee. For the four private facilities, "ICE is contractually required to purchase a certain or specific number of detention beds per month regardless of whether the bed is occupied."[53]

**Figure 4. Total Bed Capacity by Facility**



**Figure 5. Percentage of Immigration Detention Bed Capacity in California by Owner Type**





---

[53] U.S. Immigration and Customs Enforcement, Dept. of Homeland Security, Budget Overview Fiscal Year 2019 Congressional Justification p. 111 <https://www.dhs.gov/sites/default/files/publications/U.S.%20Immigration%20and%20Customs%20Enforcement.pdf> [as of Feb. 21, 2019].

As indicated in Figure 5, private facilities currently have 77 percent of the total bed capacity for immigration detainees in California.

The following sections provide basic overviews of the seven facilities for which Cal DOJ conducted one-day visits and did not conduct a comprehensive review for this report.  Although Cal DOJ received a number of allegations about these facilities through detainee interviews and stakeholder reports, those allegations are not discussed here, but will inform future comprehensive reviews.

# 1. Adelanto ICE Processing Center

The Adelanto ICE Processing Center (Adelanto), located in the city of Adelanto, is owned and operated by a private operator, the GEO Group, Inc. (GEO Group), through a subcontract with the City of Adelanto (Table 8).  The City entered into an IGSA with ICE on May 13, 2011, for 1,300 beds.  On July 1, 2015, GEO finished expansion of Adelanto, allowing for the housing of female detainees, and making Adelanto the second largest immigration detention center in the United States with the capacity to house a maximum of 1,940 immigration detainees.  ICE reports that it pays $113.51 per bed per day for a guaranteed minimum of 1,455 beds, and $43.77 for additional beds.[54]  The 2011 PBNDS apply to Adelanto.

**Table 8. Adelanto Key Data Points**

| Facility: | Adelanto |
|---|---|
| Operator: | Geo Group, Inc. |
| Housing Detainees Since: | May 2011 |
| Bed Capacity: | 1,940 |
| Daily Bed Rate: | $113.51 for up to 1,455 beds; $43.77 for additional beds |
| Type(s) of Detainees: | Male and Female Adults |
| June 2017 Intake to October 2018 Departure | |
| No. of Countries of Origin: | 108 |
| No. of Detainees: | 10,000 |
| Average Age: | 32 years old |
| Average Length of Stay: | 60 days |
| Longest Detainee Stay: | 472 days |

Cal DOJ conducted a one-day visit at Adelanto in September 2018.  At the time of our visit, the facility housed 240 female detainees and 1,527 male detainees.  One of the female detainees was identified as pregnant.  Prior to the one-day visit, Cal DOJ requested a comprehensive two-week site visit and the

---

54 U.S. Immigration and Customs Enforcement, Dept. of Homeland Security, Budget Overview Fiscal Year 2019 Congressional Justification p. 112 <https://www.dhs.gov/sites/default/files/publications/U.S.%20Immigration%20and%20Customs%20Enforcement.pdf> [as of Jan. 23, 2019].

opportunity to speak with facility staff and detainees.  Instead, ICE provided our team with a limited tour and did not permit us to speak with detainees or facility staff informally, or to conduct formal detainee or staff interviews.

The facility consists of two separate buildings (East and West), each with detainee housing units that house female and male detainees of all security classification levels—low, medium, and high.  Female detainees are housed in the East building of the facility, and male detainees are housed in both the East and West buildings.  Within the East and West buildings, detainees are housed in a variety of housing configurations depending on their security classification.  Barracks are divided into four quadrants, two downstairs and two upstairs, with 12 sets of double-bunks each to house up to 96 detainees; cells can house between two to eight detainees.  Since February 2016, GEO has contracted with Correct Care Solutions for medical and mental health care.  Attorneys who responded to our survey report having the most difficult time obtaining client files from Adelanto than any other facility.

Between June 2017 intake and October 2018 departure dates, Adelanto housed a total of 10,000 detainees from over 100 countries of origin.  Detainees held at Adelanto came primarily from Latin America countries of origin (Table 9).

**Table 9. Most-Represented Countries of Origin at Adelanto**

| Country | Count | Percentage |
|---|---|---|
| Mexico | 3,508 | 35.08% |
| India | 2,216 | 22.16% |
| Guatemala | 1,034 | 10.34% |
| Honduras | 727 | 7.27% |
| El Salvador | 589 | 5.89% |
| China | 239 | 2.39% |
| Nepal | 174 | 1.74% |
| Cuba | 113 | 1.13% |
| Cameroon | 98 | 0.98% |
| All Other Countries | 1,302 | 13.02% |
| TOTAL | 10,000 | 100.00% |

From June 2017 through October 24, 2018, detainees' average length of stay was 60 days.  However, during that period, at least one detainee was housed at Adelanto for 472 days.

In its most recent inspection in 2014, ICE's ODO reviewed Adelanto with respect to 2011 PBNDS standards and found it compliant with 11 out of 17 standards.  ODO found 26 deficiencies in the remaining six standards, nine of which related to priority components.  Those deficiencies were in the areas of Food Service, Funds and Personal Property, Grievance System, Law Libraries and Legal Material, Sexual Abuse and Assault Prevention and Intervention, and Telephone Access.

On December 19, 2017, a class action lawsuit was filed against GEO Group in the Central District of California alleging systematic and unlawful wage theft, unjust enrichment, and forced labor at Adelanto.[55]  On May 25, 2018, another class action lawsuit was filed in the Central District of California against GEO Group, the City of Adelanto, and several GEO Group employees, in their individual capacity, stemming from alleged mistreatment of Adelanto detainees who engaged in a hunger strike on June 12, 2017, to protest the conditions of their confinement.[56]

On June 18, 2018, Cal DOJ hosted a stakeholder meeting in Los Angeles to gather additional information about Adelanto.  During the meeting, nongovernmental organizations, legal service providers, and former detainees shared personal observations, experiences, and concerns about the facility.  Amongst the most pressing concerns identified were inadequate medical and mental health care; lack of access to legal counsel; and issues with the disciplinary process and disciplinary segregation.

On September 27, 2018, OIG released a report entitled *Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California.*  The OIG report identified additional violations of the 2011 PBNDS and significant health and safety risks at Adelanto.  Specifically, OIG expressed concern about nooses that it discovered in detainee cells, improper and overly restrictive segregation practices, and untimely and inadequate detainee medical care.  During federal FY 2017, three detainee deaths and six unsuccessful suicide attempts occurred at Adelanto.[57]

# 2. Imperial Regional Detention Facility

The Imperial Regional Detention Facility (Imperial), located in Calexico, is owned by the City of Holtville and operated by the Management and Training Corporation (MTC) (Table 10).  Imperial opened in 2014 pursuant to a dedicated intergovernmental service agreement (DIGSA) under the oversight of ERO's Field Office Director in San Diego that is set to expire in September 2019.  ICE reports that it pays $142.60 per bed per day for a guaranteed minimum of 640 beds, and $96.43 for any additional beds.[59]  The facility has a maximum bed capacity of 704.  The 2011 PBNDS apply to this facility.

Cal DOJ conducted a one-day visit of Imperial in November 2018.  At the time of our visit, the facility housed 64 female and 591 male immigration detainees.[60]  Two of the female detainees were identified

---

[55] *Novoa v. The GEO Group, Inc.,* (C.D. Cal., Aug. 22, 2018, No. 17-2514-JGB-(SHKx)) 2018 WL 4057814.

[56] *Rivera Martinez v. The GEO Group, Inc.,* (C.D. Cal., No. 5:18-cv-01125).

[57] Office of Inspector General, Dept. of Homeland Security, Management Alert—Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California (Sep. 27, 2018) < https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-86-Sep18.pdf> [as of Jan. 23, 2019].

[58] Based on the Research Center's calculations, but during our visit the facility staff told us it was 95 days.

[59] U.S. Immigration and Customs Enforcement, Dept. of Homeland Security, Budget Overview Fiscal Year 2019 Congressional Justification p. 112 <https://www.dhs.gov/sites/default/files/publications/U.S.%20Immigration%20and%20Customs%20Enforcement.pdf> [as of Jan. 23, 2019].

[60] The facility reported that two of the detainees at Imperial are transgender. The review team spoke to one detainee who is a transgender woman being housed with male detainees.

**Table 10. Imperial Key Data Points**

| Facility: | Imperial |
|---|---|
| Operator: | Management & Training Corp. (MTC) |
| Housing Detainees Since: | 2014 |
| Bed Capacity: | 704 |
| Daily Bed Rate: | $142.60 for up to 640 beds; $96.43 for additional beds |
| Type(s) of Detainees: | Male and Female Adults |
| June 2017 Intake to November 2018 Departure | |
| No. of Countries of Origin: | 94 |
| No. of Detainees: | 15,017 |
| Average Age: | 30 years old |
| Average Length of Stay: | 45 days[58] |
| Longest Detainee Stay: | 880 days |

as pregnant.  Imperial staff noted that 73 percent of immigration detainees at Imperial were apprehended at the U.S.-Mexico border, and that approximately 80 percent are asylum seekers.  Cal DOJ staff was provided with a very thorough tour of Imperial, and was able to informally speak to both female and male immigration detainees during our visit.  Detainees raised fewer concerns regarding Imperial staff, food, and access to recreation than at any other facility our staff visited.

**Figure 6. Photo of Imperial Regional Detention Facility**



Imperial houses both female and male detainees of all security classification levels—low, medium, and high.  Detainees are housed in open dorm style housing units, within which four detainees are assigned to what was referred to as a "cube."  All housing units are connected to an enclosed outdoor

recreation yard that detainees have access to throughout the day.  Cal DOJ staff observed detainees using mobile speakers while in the recreation yards through which they could play different types of music.  The facility also offers a variety of classes provided by volunteers, including typing, ESL, health and wellness, parenting, anger management, beauty basics, crochet, cake decorating classes, Zumba, and INEA (Instituto Nacional para la Educación de los Adultos) classes which Imperial staff explained function to obtain the Mexican equivalent to a GED.  MTC provides medical care at the facility.

From July 2015 intake to November 2018 departure dates, Imperial housed a total of 15,017 detainees from 94 countries of origin.  A large proportion of detainees held at Imperial came from India (Table 11). During this time, detainees' average length of stay was 45 days.  However, at least one detainee was housed at Imperial for 880 days.

**Table 11. Most-Represented Countries of Origin at Imperial**

| Country | Count | Percentage |
|---|---|---|
| India | 5,977 | 39.80% |
| Honduras | 1,568 | 10.44% |
| Haiti | 1,487 | 9.90% |
| Guatemala | 1,323 | 8.81% |
| Mexico | 1,122 | 7.47% |
| China | 924 | 6.15% |
| El Salvador | 714 | 4.75% |
| Armenia | 412 | 2.74% |
| Brazil | 144 | 0.96% |
| All Other Countries | 1,346 | 8.96% |
| TOTAL | 15,017 | 100.00% |

In its December 2015 Compliance Inspection Report, ODO reported that it reviewed the facility with respect to the 2011 PBNDS Standards and found Imperial compliant with 12 out of 16 standards. ODO found five deficiencies in the remaining four standards, related to staff-detainee communication, food service, telephone access, and the grievance system.  Problems reported by nongovernmental organizations include:  inadequate access to legal assistance and inadequate medical care.

# 3. James A. Musick Facility

The James A. Musick Facility (James Musick), is a minimum-security facility owned by Orange County and operated by the Orange County Sheriff's Department (Table 12).  James Musick first housed ICE detainees in 2010, when Orange County executed an IGSA with ICE for both James Musick and the Theo Lacy Facility.  The agreement is set to expire in 2020.  ICE pays Orange County $118 per bed per day for up to 958 total detainee beds at both facilities.  Five to six hundred detainees are usually held at Theo Lacy leaving 200-300 to be housed at James Musick.  The 2008 PBNDS apply to this facility.

**Table 12. James Musick Key Data Points**

| Facility: | James Musick |
|---|---|
| Operator: | Orange County Sheriff's Dept. |
| Housing Detainees Since: | 2010 |
| Bed Capacity: | Varies (combined total of 958 with Theo Lacy) |
| Daily Bed Rate: | $118 |
| Type(s) of Detainees: | Male and Female Adults |
| July 2015 Departure to September 2018 Departure | |
| No. of Countries of Origin: | 78 |
| No. of Detainees: | 4,605 |
| Average Age: | Not Reported |
| Average Length of Stay: | 81 days |
| Longest Detainee Stay: | 1,500 days |

Cal DOJ conducted a one-day visit of the facility in December 2017.  At the time of our visit, James Musick housed 101 female detainees and 243 male detainees.  The facility houses pregnant detainees only through the second trimester, after which they are returned to ICE for transfer or release.  During our visit, the Orange County Sheriff's Department facilitated a tour and permitted our staff to informally speak with female and male detainees.

James Musick houses female and male detainees classified as low security.  Detainees are housed in barrack-style housing units, with 60 bunk beds on the left and right side of a control room within each housing unit.  James Musick houses its county jail population in separate housing units.  According to facility representatives, James Musick does not offer educational programming to immigration detainees.  Medical care at the facility is provided by the Orange County Health Care Agency.  Out of the currently active detention facilities, attorneys who responded to our survey report having less difficulty visiting their clients detained at James Musick than any other facility.

From July 2015 to September 2018, James Musick housed a total of 4,605 detainees from 78 different countries of origin (Table 13).

**Table 13. Most-Represented Countries of Origin at James Musick**

| Country | Count | Percentage |
|---|---|---|
| Mexico | 2,080 | 45.17% |
| Guatemala | 400 | 8.69% |
| El Salvador | 392 | 8.51% |
| India | 342 | 7.43% |
| China | 202 | 4.39% |
| Honduras | 190 | 4.13% |
| Haiti | 166 | 3.60% |
| Nepal | 108 | 2.35% |
| Ghana | 64 | 1.39% |
| All Other Countries | 661 | 14.35% |
| TOTAL | 4,605 | 100.00% |

During that time, detainees' average length of stay was 81 days.  However, one detainee was housed at James Musick for 1,500 days (over four years).

In 2015, Orange County Grand Jury findings of inadequate surveillance equipment across Orange County jails prompted the Orange County Sheriff's Department to secure over $10 million in funding to install 1,500-2,000 cameras throughout its jails by 2020.

In 2016, ODO reviewed James Musick with respect to 2008 PBNDS standards and found it compliant with eight out of sixteen standards.  ODO found eight deficiencies in the remaining eight standards, one of which related to a priority component.  Those deficiencies were in the areas of Classification System, Funds and Personal Property, Staff-Detainee Communication, Use of Force and Restraints, Telephone Access, Visitation, Grievance System, and Law Libraries and Legal Material.  The Orange County Grand Jury and nongovernmental organizations have also reported on other problems at James Musick, including:  inadequate medical and mental health care; inadequate access to unmonitored calls to courts or legal representatives; and denial of access to important documents, medical records, and other evidence taken from detainees upon being booked into custody.

# 4. Mesa Verde ICE Processing Facility

The Mesa Verde ICE Processing Facility (Mesa Verde), located in Bakersfield, is owned and operated by GEO Group through a subcontract with the City of McFarland (Table 14).  McFarland entered into an IGSA with ICE on January 27, 2015.  ICE reports that it pays $119.95 per bed per day for a guaranteed minimum of 320 beds, and $94.95 for any additional beds.[61]  The facility has a maximum bed capacity of 400 (approximately 300 male and 100 female).  The 2011 PBNDS apply to this facility.

**Table 14. Mesa Verde Key Data Points**

| Facility: | Mesa Verde |
|---|---|
| Operator: | Geo Group, Inc. |
| Housing Detainees Since: | January 2015 |
| Bed Capacity: | 400 detainees |
| Daily Bed Rate: | $119.95 for up to 320 beds; $94.95 for additional beds |
| Type(s) of Detainees: | Male and Female Adults |
| **June 2017 Departure to October 2018 Departure** | |
| No. of Countries of Origin: | 77 |
| No. of Detainees: | 4,714 |
| Average Age: | 36 years old |
| Average Length of Stay: | 39 days |
| Longest Detainee Stay: | 866 days |

On December 19, 2018, the City of McFarland announced its decision to end its IGSA with ICE, and the termination of its subcontract with the GEO Group, with both contract terminations effective in March 2019.[62]  Pursuant to SB 29 (Civil Code section 1670.9),[63] no public entity may enter into a contract with ICE to continue the detention of noncitizens at Mesa Verde.  As of the date of this report, it is unclear whether Mesa Verde will remain open, and what will happen to detainees housed therein.

Cal DOJ conducted a one-day visit of Mesa Verde in September 2018.  At the time of our visit, the facility housed 89 female detainees and 278 male detainees.  The facility reported that it does not house pregnant detainees.  During our visit, ICE facilitated a limited tour of the facility and did not permit us to speak with detainees.

---

[61] U.S. Immigration and Customs Enforcement, Dept. of Homeland Security, Budget Overview Fiscal Year 2019 Congressional Justification, p. 112 <https://www.dhs.gov/sites/default/files/publications/U.S.%20Immigration%20and%20Customs%20Enforcement.pdf> [as of Jan. 23, 2019].

[62] Goss, *What it means for Kern County if Mesa Verde closes*, Bakersfieldnow.com <https://bakersfieldnow.com/news/local/what-it-means-for-kern-county-if-mesa-verde-closes> [as of Jan. 29, 2019].

[63] SB 29 prohibits cities, counties, and local law enforcement agencies from entering into new contracts, or expanding their contracts, with the federal government to house or detain noncitizens in locked detention facilities for the purposes of civil immigration detention.  It also prohibits cities, counties, and public agencies from conveying land or issuing permits to private corporations, contractors, or vendors for the purpose of housing or detaining noncitizens in civil immigration custody, unless they provide notice and solicit public comment.  Effectively, local governments may not facilitate new immigration detention facilities pursuant to IGSAs in California.

Mesa Verde can house female and male detainees of all security classification levels—low, medium, and high security.  Detainees are housed in one of four barrack-style housing units, each of which has 50 double bunk beds to accommodate 100 detainees.  At the time of Cal DOJ's visit, it appeared that the only programming available to detainees was an intermittent art therapy class offered by a volunteer organization.  Medical care at Mesa Verde is provided by the GEO Group.  Attorneys report that it is easier to contact clients by phone and mail at Mesa Verde than any other facility.

From June 2017 to October 2018, the facility has housed a total of 4,714 detainees from 77 countries of origin.  Detainees held at Mesa Verde came primarily from Latin America countries of origin (Table 15).

**Table 15. Most-Represented Countries of Origin at Mesa Verde**

| Country | Count | Percentage |
|---|---|---|
| Mexico | 3,619 | 76.77% |
| El Salvador | 236 | 5.01% |
| Guatemala | 200 | 4.24% |
| Honduras | 190 | 4.03% |
| India | 77 | 1.63% |
| China | 54 | 1.15% |
| Armenia | 19 | 0.40% |
| Cameroon | 19 | 0.40% |
| Cuba | 18 | 0.38% |
| All Other Countries | 282 | 5.98% |
| TOTAL | 4,714 | 100.00% |

Since June 2017, detainees' average length of stay at Mesa Verde has been 39 days.  However, at least one detainee was housed at the facility for 866 days.

Prior to the opening of Mesa Verde, a coalition of immigrants' rights advocates and legal service providers voiced concerns with opening a detention facility in the San Joaquin Valley, where the potential for contracting valley fever could pose health risks for detainees with high risk factors.  Mesa Verde medical staff informed Cal DOJ during its one-day visit that the facility does not house HIV-positive detainees because of the risk for valley fever in the region.

Mesa Verde is one of four detention facilities housing immigration detainees covered by the class action settlement reached in *Lyon v. United States Immigration and Customs Enforcement.*  As a result of this settlement, Mesa Verde is required to provide phone booths in housing units for additional privacy; expanded options for free, direct, and unmonitored calls to attorneys and government agencies; and prompt access to a phone room for other legal calls upon request, among other requirements.

In its most recent inspection in 2016, ODO reviewed Mesa Verde with respect to 2011 PBNDS standards and found it compliant with four of sixteen standards.  ODO found 43 deficiencies in the remaining 12 standards, 19 of which were priority components.  ODO found 25 deficiencies with respect to Security, including in the areas of Sexual Abuse and Assault Prevention and Intervention, Special Management Units, Staff-Detainee Communication, and Use of Force and Restraints.  ODO also found deficiencies in the areas of Food Service, Medical Care, Telephone Access, Detainee Handbook, Grievance System, and Law Libraries and Legal Material.  In a 2016 audit of Mesa Verde's compliance with PREA standards, DHS found that it met all applicable standards and exceeded requirements in two standards.  In 2017, nongovernmental organizations reported that detainees at Mesa Verde have inadequate access to legal counsel and inadequate information regarding how to obtain unmonitored calls to courts or legal representatives.

# 5. Otay Mesa Detention Center

The Otay Mesa Detention Facility (Otay Mesa) is located in San Diego and is owned and operated by a private contractor, CoreCivic (Table 16).  In 2015, CoreCivic transitioned operations from the 1,154-bed San Diego Correctional Facility, which was subject to a ground lease with the County of San Diego, to the CoreCivic-owned and then-newly constructed Otay Mesa.  CoreCivic contracts directly with ICE and the contract runs through June 2020.  Otay Mesa was designed to house 1,482 ICE and USMS detainees,[64] but the facility reports it is currently adding 512 additional beds for USMS detainees.  ICE reports

### Table 16. Otay Mesa Key Data Points

| Facility: | Otay Mesa |
|---|---|
| Operator: | CoreCivic |
| Housing Detainees Since: | 2015 |
| Bed Capacity: | 896 but may exceed capacity |
| Daily Bed Rate: | $2,746,406.04 flat monthly rate for up to 600 beds; $138.29 for additional beds |
| Type(s) of Detainees: | Male and Female Adults |
| **October 2015 Departure to October 2018 Departure** | |
| No. of Countries of Origin: | 112 |
| No. of Detainees: | 22,243 |
| Average Age: | Not Reported |
| Average Length of Stay: | 41 days |
| Longest Detainee Stay: | 1,055 days |

---

[64] USMS detainees are individuals who have been charged with federal offenses and are held in USMS custody pending the outcome of their case.

that it pays Otay Mesa a $2,746,406.04 flat monthly rate for a guaranteed minimum of 600 beds, and $138.29 for additional beds.  Although the bed capacity for ICE detainees is 896, ICE reports that in FY 2017, the average daily ICE population was 1,028.[65]  The 2011 PBNDS apply to this facility.

Cal DOJ conducted a one-day visit of Otay Mesa in November 2018.  At the time of our visit, the facility housed 140 female and 776 male immigration detainees, of which a total of four were identified as trans-gender by the facility.[66]  Otay Mesa houses pregnant detainees, but did not release the exact number of pregnant detainees housed at the time at the facility.  Cal DOJ was provided with a limited tour of Otay Mesa facilitated by ICE, and was permitted to speak only informally to male immigration detainees during the visit.

The facility houses both female and male immigration detainees of all security classification levels—low, medium, and high.  Detainees are housed in cells or dorm style 128-person housing units, depending on their security classification.  Housing units with cells have 64 double bunk cells in each.  All housing units are connected to an enclosed outdoor recreation yard.  Tour facilitators reported that Otay Mesa provides housing unit-based programming, including parenting and ESL classes.

Otay Mesa reports that it does not comingle its USMS detainees with immigration detainees.  The new USMS housing units are being built where a soccer field previously provided outdoor recreational space.  Therefore, future recreation for detainees will be limited to either the smaller recreation yards connected to housing units or the facility's indoor gym.  Medical and mental health care are provided by ICE Health Services Corps (IHSC).  Tour facilitators also noted that Otay Mesa is one of two ICE facilities focused on serving immigration detainees with acute mental health needs; the other facility is located in Florida.

From October 2015 to October 2018, Otay Mesa housed a total of 22,243 detainees from 112 countries of origin (Table 17).

In the same timeframe, detainees' average length of stay was 41 days.  However, at least one detainee was housed at Otay Mesa for 1,055 days.

In its April 2015 Compliance Inspection Report of the former San Diego Correctional Detention Facility, ODO reported that it reviewed 16 of the 2011 PBNDS Standards and found the facility compliant with 14 of those standards.  ODO found the two deficiencies in Admission and Release, and Funds and Property.  It does not appear that ODO has conducted a compliance inspection of the new Otay Mesa facility since it opened in the latter part of 2015.  Since then, nongovernmental organizations have reported problems at Otay Mesa, including issues with medical and mental health care; the detainee death review process; and allegations of sexual assault, neglect, and harassment.  On May 31, 2017, a

---

[65] U.S. Immigration and Customs Enforcement, Dept. of Homeland Security, Budget Overview Fiscal Year 2019 Congressional Justification p. 112 <https://www.dhs.gov/sites/default/files/publications/U.S.%20Immigration%20and%20Customs%20Enforcement.pdf> [as of Jan. 23, 2019].

[66] The facility reported that four of the detainees at Otay Mesa are transgender but did not disclose whether transgender detainees are housed consistent with their gender identity or the gender they were assigned at birth.

**Table 17. Most-Represented Countries of Origin at Otay Mesa**

| Country | Count | Percentage |
|---------|-------|------------|
| Mexico | 9,513 | 42.77% |
| Guatemala | 1,131 | 5.08% |
| China | 980 | 4.41% |
| El Salvador | 710 | 3.19% |
| Honduras | 638 | 2.87% |
| Haiti | 456 | 2.05% |
| Ghana | 310 | 1.39% |
| India | 287 | 1.29% |
| Cameroon | 260 | 1.17% |
| All Other Countries | 7,958 | 35.78% |
| TOTAL | 22,243 | 100.00% |

class action lawsuit was filed in the Southern District of California against CoreCivic, alleging labor and employment law violations resulting from the low pay received by detainees who work at the facility.[67] Allegations of understaffing have also been raised as recent as April 2018.[68]

**Figure 7. Photo of Otay Mesa Detention Facility**



---

[67] *Owino v. CoreCivic, Inc.,* (S.D. Cal, May 14, 2018, No. 17-cv-01112-JLS-(NLS)) 2018 WL 2193644.

[68] *Estate of Gerardo Cruz-Sanchez et al. v. United States of America et al.,* (S.D. Cal, May 14, 2018, No. 17-cv-569-BEN-NLS) 2018 WL 2193415 [Court permitted requested discovery related to understaffing concerns].

# 6. Rio Cosumnes Correctional Center

The Rio Cosumnes Correctional Center (Rio Cosumnes), located in Elk Grove, is owned by Sacramento County and operated by the Sacramento County Sheriff's Department (Table 18).  From July 1, 2013, to June 30, 2018, Rio Cosumnes housed male immigration detainees through an IGSA between ICE and the Sacramento County Sheriff's Department.  The Sacramento County Board of Supervisors authorized the IGSA on June 18, 2013.  During the contract's period of performance, ICE paid the facility $100 per bed per day, for a maximum of 165 immigration detainees.  The 2000 NDS applied to this facility.

**Table 18. Rio Cosumnes Key Data Points**

| Facility: | Rio Cosumnes |
|---|---|
| Operator: | Sacramento County Sheriff's Dept. |
| Housing Detainees Since: | July 2013 |
| Bed Capacity: | 165 detainees |
| Daily Bed Rate: | $100 |
| Type(s) of Detainees: | Male Adults |
| July 2015 Departure to June 2018 Departure | |
| No. of Countries of Origin: | Not Reported |
| No. of Detainees: | 3,003 |
| Average Age: | Not Reported |
| Average Length of Stay: | 51 days |
| Longest Detainee Stay: | 854 days |

Cal DOJ conducted a one-day visit of Rio Cosumnes in February 2018.  At the time of our visit, the facility was housing 149 male detainees.

On June 5, 2018, the Sacramento Board of Supervisors voted to end Rio Cosumnes's contract with ICE.  Prior to the vote, the Sacramento County Sheriff's Department and ICE had sought to amend the IGSA to extend it indefinitely.  During the meeting to reject this extension, Supervisor Phil Serna cited distressing conditions of confinement for individuals who may have never faced criminal charges.

By June 25, 2018, all detainees previously housed at Rio Cosumnes had reportedly been transferred to other detention facilities in Northern California pending immigration proceedings, to Denver, Colorado, or Honolulu, Hawaii.  Stakeholders reported that most detainees had resided in California prior to being detained at Rio Cosumnes, with the largest numbers hailing from Alameda, Contra Costa, Los Angeles, Marin, Sacramento, San Joaquin, Santa Clara, San Francisco, and Stanislaus counties.

While the IGSA was in place, Rio Cosumnes housed male detainees of all security classifications—low, medium, and high security.  Detainees were housed in a variety of housing configurations depending

on their security classification, and the county jail population lived in separate housing units.  Medical care was provided by the County of Sacramento, and mental health services were provided by the University of California's Jail Psychiatric Services Program.

Between July 2015 and June 2018, Rio Cosumnes housed a total of 3,003 detainees from a wide variety of countries of origin.  During that time period, the average length of stay for detainees housed at Rio Cosumnes was 51 days.  However, at least one detainee was housed at Rio Cosumnes for 854 days.

In 2015, ODO reviewed Rio Cosumnes with respect to the 2000 PBNDS standards and found it compliant with one out of sixteen standards.  ODO found a total of 49 deficiencies in the remaining 15 standards.  Those deficiencies were in the areas of Access to Legal Materials, Admission and Release, Contraband, Detainee Classification System, Detainee Grievance Procedures, Detainee Handbook, Environmental Health and Safety, Food Service, Funds and Personal Property, Medical Care, Special Management Unit—Administrative Segregation, Special Management Unit—Disciplinary Segregation, Staff-Detainee Communication, Telephone Access, and Use of Force.  The 2016-2017 Sacramento Grand Jury reported that Rio Cosumnes suffered from staffing shortages and nongovernmental organizations reported on excessive use of isolation and solitary confinement; inadequate mental health care; and denial of rights under the American with Disabilities Act (ADA).  Rio Cosumnes was one of four detention facilities covered by the 2016 settlement reached in *Lyon v. United States Immigration and Customs Enforcement*.

# 7.  Yuba County Jail

Yuba County Jail (Yuba), located in Marysville and owned by Yuba County, is operated by the Yuba County Sheriff's Department through an IGSA between Yuba County and ICE (Table 19).  The Yuba County Board of Supervisors, on behalf of Yuba County, entered into the contract on November 18, 2008.  ICE pays the County $97.39 per bed per day, and Yuba can house a maximum of 220 immigration detainees.  ICE and Yuba County amended their IGSA's period of performance on January 11, 2018.  The amendment extends the agreement indefinitely, from December 14, 2018, until December 14, 2099, but may be terminated by either party with 60 days' written notice.  The 2011 PBNDS apply to Yuba.

Cal DOJ conducted a one-day visit to Yuba in February 2018.  The facility houses both female and male immigration detainees of all security classification levels—low, medium, and high security.  Detainees are housed in barrack-style housing or in cells, depending on their security classification.  Yuba also houses a county jail population; the county jail's male population wears orange and male immigration detainees wear red.  The county jail's female population and female immigration detainees wear two different shades of green.  At the time of our visit, Yuba housed 13 female detainees and 169 male detainees, and both male and female detainees were commingled with the county jail population in housing units.  Immigration detainees reported having access to Alcoholics Anonymous, GED instruction, and parenting classes as part of their programming.  Attorneys responding to our survey reported that obtaining files, making copies, and receiving legal documents from Yuba is easier than at any other facility.

**Table 19. Yuba Key Data Points**

| Facility: | Yuba County Jail |
|---|---|
| Operator: | Yuba County Sheriff's Dept. |
| Housing Detainees Since: | November 2008 |
| Bed Capacity: | 220 detainees |
| Daily Bed Rate: | $97.39 |
| Type(s) of Detainees: | Male and Female Adults |
| **July 2015 Intake to September 2018 Departure** | |
| No. of Countries of Origin: | 17 |
| No. of Detainees: | 3,786 |
| Average Age: | 36 years old |
| Average Length of Stay: | 47 days |
| Longest Detainee Stay: | 926 days |

Since September 1, 2017, medical and mental health services at Yuba have been provided by a private medical company, California Forensic Medical Group (CFMG).  The contract with CFMG is supposed to provide Yuba with full-time, around the clock medical staff, and a recent BSCC grant in the amount of $20 million will allow Yuba to improve its medical facilities and programs.

From July 2015 intake to September 2018 departure dates, Yuba has housed approximately 3,786 immigration detainees from many different countries of origin (Table 20).

**Table 20. Most-Represented Countries of Origin at Yuba**

| Country | Count | Percentage |
|---|---|---|
| Mexico | 2,130 | 56.26% |
| Guam | 87 | 2.30% |
| Cameroon | 66 | 1.74% |
| San Marino | 47 | 1.24% |
| Canada | 32 | 0.85% |
| South Africa | 28 | 0.74% |
| Philippines | 26 | 0.69% |
| Spain | 26 | 0.69% |
| Switzerland | 25 | 0.66% |
| All Other Countries | 1,319 | 34.84% |
| TOTAL | 3,786 | 100.00% |

During that same time, detainees' average length of stay at Yuba was 47 days.  However, at least one detainee was housed at Yuba for 926 days.

As a result of a class action civil rights case brought in federal district court in 1976, the Yuba County Jail has been operating under a consent decree that specifies certain required conditions of confinement.[69] In 2013, the Yuba County Counsel's Office filed a motion to have the Consent Decree terminated, but the motion was denied due to the court's determination that Yuba County failed "to demonstrate that there are no ongoing constitutional violations, that the relief ordered exceeds what is necessary to correct an ongoing constitutional violation, or both."[70]  On August 23, 2018, the parties to the action, *Hedrick v. Grant*, (E.D. Cal No. 2:76-CV-00162-EFB), reached an agreement on an Amended Consent Decree.  Pursuant to this Amended Consent Decree, Yuba County has agreed, among other things, to improve Yuba's medical and mental health care; provide more access to exercise, recreation, and out-of-cell time; and update its policies and practices relating to the Americans with Disabilities Act.  Yuba is also one of the four Northern California detention facilities covered by the 2016 class action settlement reached in *Lyon v. United States Immigration and Customs Enforcement.*

In its 2017-2018 Yuba County Jail Report, the Yuba County Grand Jury reported that the jail is operating effectively "while serving the needs of the inmates and the public."  In its most recent inspection report, ODO concluded that Yuba complied with nine standards and found 14 deficiencies, three of which were "priority components," in the remaining seven standards.  Problems reported by ODO and nongovernmental organizations include: inadequate medical care; inadequate telephone access and access to legal materials; and inadequate measures taken to implement applicable sexual abuse and assault prevention and intervention standards.

---

[69] *Hedrick v. Grant* (E.D. Cal., Nov. 2, 1978) [Consent Decree] ECF No. 163-1 at 60-109.

[70] *Hedrick v. Grant* (E.D. Cal., April 2, 2013) ECF No. 135. [affd. mem. (9th Cir. April 19, 2016) 648 Fed.Appx. 715, 716].

# VI Comprehensive Facility Review: Yolo County Juvenile Detention Facility

## 1. Background

The Yolo County Juvenile Detention Facility (Yolo) is located in Woodland, California, and is operated by the Yolo County Juvenile Probation Department for the detention of juvenile offenders in the county (Table 21).  Yolo also houses immigration detainees through a December 2008 cooperative agreement between ORR and Yolo County.  Yolo is a secure setting and is utilized by ORR, the federal agency responsible for the care and custody of unaccompanied immigrant children, to house youths who have been identified as being a danger to themselves or to the community, or a flight risk.  ORR pays Yolo County approximately $5.7 million per fiscal year to house a maximum of 24 immigration detainees who are generally between the ages of 13 and 17.[71]  Despite calls to end its agreement with ORR due to concerns over detention officer safety, in April 2018, the Yolo County Board of Supervisors voted to continue housing ORR youth.  In May 2018, the federal government agreed to provide additional funding to increase staffing at Yolo.  Yolo is one of two locked juvenile immigration facilities in the United States, and the only such facility operating in California.

**Table 21. Yolo Key Data Points**

| | |
|---|---|
| **Facility:** | Yolo |
| **Operator:** | Yolo County Juvenile Probation Department |
| **Housing Detainees Since:** | 2008 |
| **Bed Capacity:** | 24 detainees |
| **Type(s) of Detainees:** | Male and Female 13-17 years old |
| **July 2015 Intake to September 2018 Departure** | |
| **No. of Countries of Origin:** | 8 |
| **No. of Detainees:** | 244 |
| **Average Age:** | 16 |
| **Average Length of Stay:** | 77 days |
| **Longest Detainee Stay:** | 419 days |

Once a youth enters ORR custody, ORR conducts an assessment to determine where a youth should be placed.  Shelters, group homes, or foster care placements are the least restrictive environments in which an ORR youth may be housed.  Staff-secure settings are designed to provide closer supervision

---

[71] Yolo County Probation Department, *Office of Refugee and Resettlement (ORR) Update* (June 26, 2018) <https://yoloagenda.yolocounty.org/docs/2018/BOS/20180626_1904/7254%5FTerm%20Sheet%2C%20rev%2E%2005%2E22%2E18%2Epdf> [as of Jan. 23, 2019].

than shelters, and youth who have issues in less restrictive settings are placed here.  Secure settings, such as Yolo, in which youth are housed in locked cells, are the most restrictive form of ORR housing, and are utilized for those youth who have exhibited issues in less restrictive settings, or otherwise pose a danger to themselves or others.  Residential treatment centers are used to house ORR youth requiring short-term mental health care.  ORR is required to house youth pursuant to the standards set forth in the TVPRA and the *Flores* settlement agreement.  The TVPRA and *Flores* require placement of youth in the least restrictive setting in the best interests of the child; review of placement in a secure setting on a monthly basis, at minimum; access to counsel; and minimization of unnecessary delay in releasing youth to their parents or other qualified sponsor.[72]

Cal DOJ conducted a four-day visit of the facility in August 2018.  Yolo County staff were cooperative and forthright throughout the review period.  At the time of our visit, the facility housed 19 detainees.

From July 2015 intake to September 2018 departure dates, the facility housed a total of 244 male detainees, from the countries of origin listed in Table 22.

### Table 22. Most-Represented Countries of Origin at Yolo

| Country | Count | Percentage |
|---|---|---|
| Honduras | 85 | 34.84% |
| Mexico | 80 | 32.79% |
| El Salvador | 50 | 20.49% |
| Guatemala | 24 | 9.84% |
| Nicaragua | 2 | 0.82% |
| China | 1 | 0.41% |
| Nigeria | 1 | 0.41% |
| Yemen | 1 | 0.41% |
| TOTAL | 244 | 100.00% |

Detainees' average length of stay in the same timeframe was 77 days.  However, some detainees were housed much longer, with the longest being 419 days.

For the purposes of this report, "ORR youth" refers to those youths housed at Yolo pursuant to the agreement with ORR, whereas "County youth" refers to youths housed at the facility under the custody of the Yolo County Probation Department.

---

[72] 8 U.S.C. § 1232; *Flores v. Reno* (C.D.Cal. Jan. 17, 1997, No. CV 85-4544-RJK(Px)).

# 2. Methodology

Cal DOJ conducted an initial visit to Yolo on December 7, 2017.  Personnel from Cal DOJ, a correctional expert, a medical expert, and a mental health expert then conducted a comprehensive site visit of Yolo on August 7-10, 2018.  The comprehensive visit consisted of a facility tour; observation of educational classes, non-school programming, recreation, one night-shift change, meal time, and staff meetings; and interviews with detention staff, ORR staff, healthcare staff, volunteers, individuals responsible for programming, training, and transportation, and all detainees housed at the facility at the time.

Cal DOJ reviewed detainee files maintained by Yolo, including medical records and incident reports; relevant facility policies and procedures regarding intake, orientation, programming, access to legal counsel, use of force, and sexual assault, among others; and some video footage.

Cal DOJ held an in-person debrief with Yolo's management staff at the close of its comprehensive visit on August 10, 2018.  Cal DOJ held a follow-up call with Yolo on January 10, 2019, during which the facility shared positive steps it had taken in response to our preliminary feedback.

All detainee interviews were conducted in Spanish, which was the primary language of all but one youth, whose primary language was indigenous to Guatemala; Spanish was his secondary language.

# 3. Summary of Key Findings

Most of the 19 ORR youth housed at Yolo at the time of our visit were from Central America (Table 23).

**Table 23. Detainee Interviewees' Countries of Origin at Yolo**

| Country of Origin | Number of Detainees |
|---|---|
| El Salvador | 6 |
| Honduras | 8 |
| Guatemala | 4 |
| Mexico | 1 |

Most of the youth were apprehended and came into ORR custody because they crossed the U.S.-Mexico border while fleeing from trauma and abuse they reported suffering in their home countries. Youth are generally transferred by ORR to Yolo from less secure ORR facilities.

As a secure facility, Yolo maintains a restrictive environment for immigrant youth, whereby youth often spend 22 hours per day indoors.  At the time of our visit, some ORR youth were housed with County youth.  Based on our record review, we concluded that some degree of physical force or the deployment of chemical agents are commonly utilized as a method of control by detention officers on immigration detainees.  At least nine youth reported attempting to commit suicide or cutting themselves since entering Yolo.  Cal DOJ personnel and our mental health expert observed that ORR youth at Yolo appeared traumatized by their experiences both prior to and during detention, but Yolo does not adequately address their mental health needs.  There are issues with access to medical care—some licensed vocational nurses (LVNs) are practicing outside their licensed scope of practice, and the medical request system is underutilized.  Youth primarily keep in touch with their family via limited phone calls and rarely receive in-person visits.  At the time of our visit, Yolo did not engage in interdisciplinary staff meetings, which hindered the facility's ability to provide adequate services and to appropriately manage ORR youth.

When an ORR youth arrives at Yolo, they go through an intake process which includes a general orientation to the facility, a preliminary medical exam, and a suicide risk screening.  With regard to their due process rights at the facility, youth are advised of their right to request a bond hearing and meet with counsel soon after the initial intake and orientation process.  While youth reported meeting with a representative from Legal Services for Children, which provides a legal orientation program and conducts legal screenings at Yolo in Spanish, many youths are aged 14- to 17-years-old and reported a lack of understanding of why they were housed at Yolo and the status of their immigration cases.

Following Cal DOJ's visit, Yolo reported the implementation of significant measures that address some of our findings.  First, with additional funding it received from ORR, Yolo hired more detention staff, a third mental health clinician, and a bilingual psychologist.  Second, it added staff trainings on cultural competency, youth trauma, and non-violent crisis intervention, among others.  Third, it implemented weekly multidisciplinary team meetings to coordinate care, needs, and services for each ORR youth.  And, fourth, Yolo is working with its medical and mental health contractor to address other issues Cal DOJ identified.

# 4. Apprehension and Transfer of Detainees to Yolo

## A. Findings Regarding Detainees' Apprehension and Transfer to Yolo

Based upon our review of files maintained by Yolo and interviews with the youth, we concluded that most of the detainees at Yolo are apprehended by the federal government and come into ORR custody after crossing the U.S.-Mexico border.  None were identified as having been separated from their parents.  One youth our team interviewed reported that he was separated from siblings.  One youth had been in the United States for some time before he was apprehended due to a juvenile offense.  Another youth reported that he had been released to his family after ORR detention but was re-apprehended and placed at Yolo following a family dispute.

The majority of ORR youth enter Yolo because they have been reassigned, or "stepped up,"[73] from less secure settings.  Two youths arrived as lateral transfers from another secure setting.  ORR youth are usually transferred (or stepped up) to Yolo because of fights with other youth or staff, disclosure of criminal history or gang affiliation, other outbursts of violence, or self-injurious behavior displayed at the previous facility.  In September 2018, a lawsuit filed on behalf of a later-certified class of plaintiffs alleged that ORR places youth in overly restrictive settings in violation of the TVPRA and *Flores*.[74]

In December 2017, 22 youths were released from ORR custody, seven of whom were housed at Yolo, because immigration courts found that the federal government failed to substantiate claims of gang affiliation or other changed circumstances at the time of apprehension.[75]

## B. Findings Regarding Transfer from Yolo

ORR youth are transferred out of Yolo under four conditions: repatriation to home country; family reunification; step-down to a less secure facility; or transfer to ICE custody at an adult immigration detention center.

### (i)  Repatriation

ORR youth may be returned to their country of nationality or last place of residence if a judge orders them to be removed or grants a request for voluntary departure.  During our visit one ORR youth reported he was waiting to be repatriated.

### (ii)  Family or Sponsor Reunification

Some ORR youth are released from Yolo through reunification with a family member or other sponsor located in the United States.  If a youth does not have family in the United States or does not have a repatriation option, Legal Services for Children will help the youth seek permission to remain in the United States.  ORR may eventually place the youth in long-term foster care.

Yolo personnel reported that reunification has recently become more difficult due to an April 2018 Memorandum of Agreement between ORR and ICE establishing that prior to releasing a youth to a sponsor, ORR must provide some of the sponsor's biographical data to ICE, including name, address, date of birth, identification documents, and fingerprints.[76]  ORR staff at Yolo reported

---

[73] "Stepped up" refers to youth in ORR custody being transferred from a less secure to a more secure setting.

[74] *Lucas R. v. Azar* (C.D.Cal. June 29, 2018, No. 18-cv-05741) 2018 WL 3209193.

[75] Magagnini, *More than 20 undocumented teens ordered released after feds fail to prove gang affiliation,* SacBee (Dec. 20, 2017), <https://www.sacbee.com/news/local/article190918089.html> [as of Jan. 23, 2019]; In November 2017, a federal District Court issued a preliminary injunction requiring hearings for a class of plaintiffs who had been previously determined to not pose a danger or be a flight risk, but then later apprehended on the basis of gang affiliation. (*Saravia v. Sessions* (N.D. Cal. 2017) 280 F.Supp.3d 1168, 1205 [affd. sub nom. (9th Cir. 2018) 905 F.3d 1137].

[76] Hager, *Young Migrants: Victims of Gangs or Members of Them?*, New York Times (March 1, 218), <https://www.nytimes.com/2018/05/01/us/immigration-minors-children.html> [as of Jan. 23, 2019]; Memorandum of Agreement Among The Office of Refugee Resettlement of the U.S. Department of Health and Human Services and U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection of the U.S. Department of Homeland Security Regarding Consultation and Information Sharing in Unaccompanied Alien Children Matters (April 13, 2018) <https://www.texasmonthly.com/wp-content/uploads/2018/06/Read-the-Memo-of-Agreement.pdf> [as of Jan. 23, 2019].

that potential sponsors are now less likely to share their information with the facility. In fact, between late July to late November 2018, ICE arrested 170 potential sponsors of unaccompanied minors in ORR custody based on background checks conducted by ICE for ORR.[77]

Some youth have challenged the length of their ORR detentions through litigation. For example, in November 2018, a lawsuit was filed on behalf of a youth housed at Yolo who had been detained by ORR for 11 months at the time of the lawsuit, despite his mother having submitted a reunification request.[78] Plaintiffs in *Lucas R. v. Azar*, filed in September 2018, also alleged unnecessarily prolonged detention in violation of *Flores*.[79] In 2017, ORR did not release a 14-year old Honduran youth from Yolo until almost three months after he was granted asylum.[80]

### (iii) Step-Down

ORR youth may be transferred to a less secure facility at the discretion of ORR. This process is called a "step down." In order to be eligible for step down, a youth must be free of any Significant Incident Report (SIR)[81] for at least 30 days. Some youth reported that they purposely ask to stay in their cells during scheduled free time so they can avoid getting SIRs and more quickly be eligible for step down. In accordance with ORR policy, Yolo must review each ORR youths' security classification every 30 days.

### (iv) Transfer to Adult Immigration Detention Centers

While Yolo attempts to find placement for each ORR youth who comes into their custody, youths who are not placed before their 18th birthday are transferred to adult immigration detention facilities. Three youths whom Cal DOJ interviewed have turned 18 since our comprehensive visit. One youth was placed at Mesa Verde and two at Yuba.[82]

---

[77] Sands, *ICE arrested 170 potential sponsors of unaccompanied migrant children,* CNN (Dec. 10, 2018) <https://www.cnn.com/2018/12/10/politics/ice-potential-sponsors-arrests/index.html> [as of Jan. 23, 2019].

[78] Ternus-Bellamy, *Lawsuit seeks release of refugee minor held at Yolo County's juvenile hall,* Davis Enterprise (Nov. 13, 2018) <https://www.davisenterprise.com/local-news/lawsuit-seeks-release-of-refugee-minor-held-at-yolo-countys-juvenile-hall/> [as of Jan. 23, 2019] (The complaint also alleged that the youth had been unlawfully separated from his family and was being held under false allegations of gang affiliation).

[79] *Lucas R. v. Azar* (C.D.Cal. June 29, 2018, No. 18-cv-05741) 2018 WL 3209193.

[80] Ternus-Bellamy, *14-year-old Honduran refugee placed in Yolo County foster care,* Davis Enterprise (March 14, 2017) <https://www.davisenterprise.com/local-news/county-government/14-year-old-honduran-refugee-placed-in-yolo-county-foster-care/> [as of Jan. 23, 2019].

[81] Significant Incident Reports are records created to document each instance of youth misbehavior.

[82] Cal DOJ searched the online ICE Detainee Locator using the youths' A-numbers. On November 16, 2018, Cal DOJ found one youth's name listed at Mesa Verde ICE Processing Center. This youth had two birthdates—about two months apart from each other—listed in his records, and he was transferred according to the earlier birthdate. If the youth's actual birthdate was the latter date, he was moved to an adult detention facility as a minor.



# 5. Conditions of Confinement at Yolo

ORR youth processed into Yolo often arrive with histories of trauma and face significant cultural challenges while in detention.  A youth reported that his younger brother was killed shortly after the youth decided to flee the violent environment of his home country.  Another youth reported that his sister and girlfriend were raped and killed just ten days before he left his home country.  Three of the youth have children of their own.  One of these teenage parents had been in ORR custody for two years as of the date of our visit and reported that he had been unable to obtain information about his daughter.

*My Central America, my Raza, my people*
*are valuable, my beloved Central America*
*does not compare with anything else…*

*I ask God to take care of you*
*every day, and that*
*he gives you the strength to push forward,*
*that he gives you protection.*
*that he gives you thy daily bread*
*and that he gives you peace and tranquility*
*in every one of your homes*
*every day whether it be night or day*
*and to my fellow Salvadorians I*
*want to tell you that I love you immensely,*
*and I appreciate you a lot, because*
*you are worth a lot more than*
*a diamond, I want to tell you*
*that it does not matter what comes your*
*way or in your path, and always continue*
*pushing forward, these are the last*
*words of this night poet*
*a juvenile prisoner who makes*
*a daily effort so that my prayers,*
*that I make to my God*
*and the ones he always listens to. And with*
*this phrase I say farewell.*

*Mi Centro América, Mi raza, mi gente es*
*valiosa, mi [C]entro [A]mérica querida no se*
*compara con cualquier otra cosa…*

*le pido al señor q me*
*los cuide todos los días, q les*
*de fuerza para seguir adelante, q*
*les de protección.*
*q les de el pan de cada día y*
*q les de paz y tranquilidad*
*a cada uno de sus hogares*
*cada día sea noche o medio día*
*y a mi gente salvadoreña les*
*quiero decir q los amo mucho, y*
*q las aprecio bastante, por q*
*ustedes valen muchísimo más q*
*un diamante, les quiero decir*
*q no importa lo q se les ponga*
*en el camino, q siempre sigan*
*adelante, estas son mis ultimas*
*palabras de este poeta nocturno*
*de un preso juvenil q cada*
*día lucha por q las oraciones, q*
*a mi señor le hago el siempre*
*me las escucha. Y con esta*
*frase me despido diciéndoles.*

*The youth who wrote the poem excerpted above reported that he writes poems to help cope with his sadness and grief.*[83]

---

[83] This poem is reprinted with consent.

Youth expressed frustration with being confined.  One youth stated, "Ya me quiero ir a donde sea que no sea aquí," which translates to *"I want to leave wherever, as long as it's not here."*  Several youths reported problems sleeping.  Mental health staff reported that youth demonstrate issues with anger management, impulse control, and control over anxiety.  According to interviews our team conducted, as well as a review of detainee mental health records, at least four youths had fresh cuts on their arms at the time of the comprehensive visit, and others reported prior attempts to commit suicide.[84]

Additionally, fights between ORR youth take place about once a week.  One youth reported, "*[f]ighting is the only thing that distracts me when I am bored."*

Below is discussion of Cal DOJ's findings regarding conditions of confinement at Yolo.

## A. General Conditions

### (i)  Staffing
Unlike adult detention facilities, where detainees primarily interact with detention staff, ORR youth at Yolo engage with both detention officers and ORR staff, as well as teachers provided by Yolo County, on a consistent, almost daily basis.

Detention officers are responsible for supervising youth at all times, responding to grievances, executing suicide watch orders, and serving food.  Most detention officers who work with ORR youth are bilingual in Spanish and English.

At the time of our visit, three ORR case managers were responsible for acting as a liaison between youth and ORR, managing youths' immigration cases, finding sponsors, and contacting youths' family members.  Case managers speak Spanish, meet with the youth on their caseload at least once a week, attend weekly meetings with clinicians, and attend monthly meetings with the ORR Federal Field Specialist.  ORR mental health clinicians meets with each youth for approximately one hour each week, and on an as-needed basis.

### (ii)  Housing
Yolo has three housing pods within one building.  Each pod is a direct-supervision style two-tiered unit, and consists of mostly double-occupancy cells, for a total capacity of 30 youth per pod.  Within each pod is the day room, where youth have meals, attend programs, and watch TV during free time; two classrooms; a medical exam room; and showers.  Toilets and sinks are located within each cell.  Except for small windows near the ceiling in the day rooms and a small slit window in each cell, the pods lack natural sunlight.  At the time of the comprehensive visit, one pod housed only County youth; one housed only ORR youth; and one housed a mixed

---

[84] Youth may use metal objects they find in the recreation yard and take back to their cells or tie a bedsheet or blanket around their neck.



population.  Youth are able to keep drawings, books, and religious texts in their cells.  Several youths expressed the wish that they could keep a pencil and notebook in their cells.  Youth are able to exchange clothes about three times each week; socks and underwear are exchanged daily. Youth reported feeling uncomfortable with receiving previously used underwear and socks.

Depictions of the cells and housing pods are illustrated in Figures 8, 9, and 10.

**Figure 8. Photo of Housing Pod**          **Figure 9. Photo of Day Room**

   

**Figure 10. Photo of Housing Cell**



Pictured below are other areas of Yolo: the recreation yard (Fig. 11), which is spacious for the size of the facility; the library (Fig. 12); and the game rooms (Fig. 13).  At the time of the comprehensive visit, the second classroom in each housing pod was being converted to a "game room," pictured below, and will contain activities such as air hockey, foosball, and ping pong tables.

**Figure 11. Photo of Outdoor Recreation Yard**     **Figure 12. Photo of Library**

 

**Figure 13. Photo of Game Room**



**(iii)   Classification**

Once youth arrive at Yolo, facility staff administers a needs and risk assessment to identify each youth's custody classification level, risk, and needs for facility housing purposes.  But neither this risk assessment tool, nor known behaviors at previous ORR facilities resulted in housing or care decisions that effectively protected the youth at Yolo.  For example, one youth reported that another youth taught him how to cut himself at a previous ORR facility.  The two youths started fighting and were then transferred to Yolo.  Yolo housed these two youths in the same pod,

despite their history.  During the week of the comprehensive site visit, these two youths were in another fight with each other.

Based on our observations, Yolo's ability to identify and manage youth with gang affiliation or history of disruption may be limited.  During the week of our comprehensive visit to Yolo, a youth who claimed to be a member of a gang was threatened and verbally assaulted by several other youths whose families had reportedly been targeted by the gang.  Despite being aware of this issue, the facility did not reassign the youth to a different housing pod, nor did it otherwise address the other youths' behavior until Cal DOJ staff raised concerns over the assaulted youth's placement.

**(iv) Free Time, Exercise, and Programming**

Yolo has several periods of scheduled recreation, free time, and programming.  Free time is at least three hours per day, but activities are limited to the day room.  During free time, youth can make phone calls, play video games, attend programming, or stay in their cells.  Youth may go outside for an hour of "large muscle exercise" during school, and participate in one hour of outdoor recreation in the recreation yard or indoor gymnasium (Fig. 14) on weekdays, where they can play soccer or basketball.  On most days, the youth are indoors for 22 hours.  One youth commented, "*It's funny because we're so used to being inside that when they take us out, the sun bothers our eyes.*"

**Figure 14. Photo of Indoor Gym**                **Figure 15. Photo of Classroom**




ORR youth are required to attend school for five hours each day (Fig. 15), and may voluntarily attend non-school programming offered by the facility.  Education at Yolo is provided by the Yolo County Office of Education, which operates a fully accredited school—Dan Jacobs School—on-site at the facility.  Each ORR youth completes an initial assessment that tests his reading, writing, and mathematics skills, and is then placed on an individualized learning program, with curricula tailored to student's skill levels.  No matter a youth's grade level, the student attends school in the same

classroom as other youth at various grade levels.  Thus, education levels in one classroom may range from students who cannot read to those who are taking GED classes.  Often times, a teacher will be teaching a particular lesson at the front of the classroom to some students while para-educators circle the classroom to assist other students with completing various worksheets.  There is no set curriculum for any education level, and although self-paced learning can be an effective tool in classrooms with students of varied education levels, the quality and substance of classroom time for youth at Yolo can be quite disparate for each youth and by pod placement.

Yolo has relatively robust programming offerings for both ORR and County youth.  Current program offerings include church services, therapeutic counseling, yoga classes, guitar classes, an arts course, and activities facilitated by volunteer groups.[85]  Yolo management expressed that they are open-minded and proactive about offering additional programs, especially those that are oriented around sports and games.

**(v)  Food**

Food served to Yolo youth is prepared at the main Yolo County Jail's kitchen facility.  Yolo's food plan operates on a five-week cycle.  Youth are served a hot breakfast and dinner; a sack lunch; and a snack each evening.  Volunteers and teachers often bring in snacks for the youth.  Requests for special or medical diets are approved by medical staff.

ORR youth had several complaints about the food served; they reported finding hairs in the food and receiving rotten fruit.  One youth commented that the food *"was the worst thing about being in the facility."*  Personnel interviewed across function areas are aware of ORR youths' complaints about food.

Although youth strongly dislike the food, our medical expert found that the food is nutritionally adequate, and youths' body mass index (BMI) indicate they are well-nourished.[86]

**(vi)  Non-Legal Visitation and Telephone Calls**

ORR youth may have contact visits with non-attorney visitors; however, it is very rare that ORR youths' families are able to visit because most youths' families reside far from Yolo or fear visiting because of their own immigration status.  One officer who had been at the facility for two years was aware of only one ORR youth whose family visited him.  One youth reported being able to speak to his family by videoconference.

---

[85] For example, Yolo Interfaith Immigration Network (YIIN) brings in board games, card games, and arts and craft materials, and has facilitated a theater arts class. Holy Rosary volunteers facilitate church services and other activities such as origami, conversations with Spanish-speaking youth, and holiday meals.

[86] This conclusion is based on our medical expert's weighing and assessing nine youths.



Youth can make calls during free time to the numbers they have specifically added to their call list.  ORR deposits a money to youths' accounts every Wednesday, and youths must budget their call time accordingly.  Each call is limited to 10 minutes, but youths may make as many calls as they would like within their allotted budget.  This usually means they are only able to make international calls one to two times per week.

**(vii)  Sexual Harassment and Abuse**

The facility reported that all facility staff and volunteers undergo an online PREA orientation.  All detained youth are required to watch a PREA video upon arrival at Yolo, which is also provided in Spanish.  Youths also review a sheet about "good touch, bad touch," which informs youth that they are not allowed to touch other youth in inappropriate ways, nor are officers or other youth allowed to touch them in inappropriate ways.

From January to June 2018, the facility recorded 15 written PREA-related reports.  According to Yolo, on most occasions, youth reportedly called the PREA hotline because they were bored.  Other incidents involved allegations against other youth, including two reports of exposure of private parts that were substantiated.  During the comprehensive visit, Cal DOJ only identified one youth that had called the PREA hotline.  Multiple youth reported that detention officers knocked the youth down because the youth failed to follow instructions while he was on suicide watch wearing only a smock.  On one of these occasions, one of the detention officers reportedly touched the youth's buttocks.  The youth involved called the PREA hotline but reported dissatisfaction with the lack of response.  The facility, however, reported that each PREA report triggers extensive documentation and interviews.  Cal DOJ was unable to verify details of the incident.

## B. Staff and Detainee Relations: Communication, Behavioral Management, Use of Force

Statements made during facility personnel and youth interviews indicate tension between staff and detainees.  For example, detention and clinical staff reported that working with ORR youth is challenging.  Personnel stated that they find that ORR youth are guarded and distrusting of staff, and especially detention officers, as many youths have experienced violence perpetrated by the government and law enforcement in their home countries.  One youth reported that he could not name a single officer with whom he felt comfortable talking.  As of the time of our visit, detention officers did not receive a cultural competence training to aid in understanding and managing immigration detainees, nor did they receive training on trauma-informed practices to effectively respond to the trauma many immigrant youth have experienced prior to being housed at Yolo.[87]

The relationship between detention staff and ORR youth is further impacted by a variety of factors, including lack of facility-wide interdisciplinary communication, language barriers, and use of force as a common method of control.  These factors, and more, are discussed next.

---

[87] Trauma-informed practices recognize the emotional trauma that an individual—as a victim or witness to actual or perceived threat of death or bodily violation—may have experienced prior to detention.  These operational approaches avoid interaction that may cause further trauma.  For example, trauma-informed practices would seek to avoid routine banging on doors, yelling, strip searching detainees, performing cell extractions, and enforcing segregation, because these actions might remind detainees of past traumatic events.

### (i)  Communication among Facility Staff

Facility staff that interact with ORR youth in different areas reported lack of regular communication about the youth.  Detention staff reported that they are only apprised of incidents that occurred with youth on the previous staff shift, but are unaware of how the status of youths' immigration cases or mental health may impact their behavior in the housing units.  ORR clinicians reported that they do not always have complete or accurate information about incidents occurring in the housing units, which could be beneficial in their counseling sessions with the ORR youth.  Teachers, who spend at least five hours each day with ORR youth, also reported that they do not receive sufficient information, and therefore cannot anticipate how a youth's emotions may manifest in the classroom.  This lack of communication negatively impacts staff's ability to manage and respond to youth.

At the time of our visit, ORR clinicians and case managers held weekly meetings to discuss each ORR youth's behavioral issues and clinical status and as applicable, court hearings, reunification status, step-down eligibility, and voluntary departure.  However, detention and teaching staff did not attend these meetings.

The facility now reports that it holds weekly multi-disciplinary staff meetings attended by staff from mental health, education, ORR, and detention.

### (ii)  Language Access

Most youth housed at Yolo over the past three years were from Central America, where Spanish is the primary language.  ORR clinicians, case managers, and ORR teachers were all bilingual in Spanish.  Most detention officers were fluent in, or know some Spanish.  However, ORR youth still reported that language is a barrier in communicating with some security staff,[88] and accessing television or radio, which is usually played in English.  Cal DOJ observed a lack of Spanish-language reading material available in the facility library.

In the recent past, Yolo staff reported that the facility housed at least one youth who spoke Arabic and one youth who spoke an East-Asian language.  Detention officers reported using iPads to communicate with these youths.  The use of iPads to translate assumes that youth are literate; additionally, it was unclear how effective iPads can be to communicate all necessary information to a youth.

### (iii)  Staff Shortages

At the time of our visit, Yolo had recently established a 1:4 detention officer-to-ORR-youth ratio but lacked the staffing to implement that policy.[89]  Detention officers often found themselves working 16-18 hour shifts as a result of mandatory overtime.  This practice raised security concerns for officers and ORR youth.  The facility reported that recent additional funding from ORR allowed

---

[88] Many supervisor-level staff do not speak Spanish.

[89] This low ratio was established by a May 2018 Yolo County-ORR Term Sheet. The previous ratio was 8:1.

Yolo to hire more full-time detention officers to meet the 1:4 ratio, and mandatory overtime was rarely utilized as of January 2019.

Additionally, Yolo has only one assigned transportation officer, who is responsible for facilitating transport for medical visits, court appearances, and custody transfer purposes on a 1:1 officer- to-youth ratio.  The ratio contravenes best practice, which is to have two officers for each transport; this, coupled with the fact that the transportation officer is not bilingual raised security concerns for transport.

### (iv)  Managing Youth Behavior

#### (1)  Behavioral Management System

Yolo utilizes a unique Behavioral Management System.  Under this system, there are three tiers of behavior which, in descending order, are Gold, Silver, and Purple.  Detention officers assign each youth points throughout the day;[90] the number of points a youth receives on any given day determines their behavioral tier for the following day.  Youths are given a t-shirt every morning of the color that corresponds with their behavioral tier for the day: yellow for Gold, grey for Silver, purple for Purple.  Points are forfeited if a youth misbehaves.[91]

Each tier begets certain privileges throughout the day.  For example, Gold youth can play X-Box; Silver and Gold can get chips as a snack and play in the game room, and have later bed times.  Some youth like the system, while others do not.  The system can be a significant point of contention between detainees and detention staff, as a youth's tier may change day to day.[92]

#### (2)  Discipline

To impose discipline, detention staff are required to follow a protocol.  If a youth is misbehaving, an officer first gives the youth a verbal warning.  After repeated warnings, the misbehavior becomes a "level 2" violation, and the youth is subject to the disciplinary process, which includes a hearing and an assignment of formal discipline.  All incidents of youth misbehavior, no matter how minor, are recorded as a Significant Incident Report (SIR) which impacts the youth's ability to be stepped down to a less secure facility.

---

[90] Points may be assigned for the following: attending meals in the day room; attending school; no contraband found in rooms during room inspection; no write ups the previous day.

[91] Two youths reported that they've had to forfeit a point for giving away their food at meal time.  Cal DOJ was unable to verify this allegation.

[92] During the comprehensive visit, personnel from Cal DOJ observed three youths refuse to return to their cells after breakfast because they disputed being designated as Purple for the day.  Detention officers brought out the written record of the previous day's point breakdown to discuss with youth.  While there were three to four detention officers in the housing unit at the time, when the youth disputed their designation officers began streaming into the housing unit, with three to four detention officers surrounding each youth during the discussions.  Our correctional expert, who was present at the time, concluded that this approach escalated the situation.

Discipline may come in the form of forfeiture of a point within the Behavioral Management System, further counseling, deprivation of benefits, or room confinement.  Time spent in room confinement is at the discretion of the supervising detention officer, but generally may not exceed four consecutive hours per Yolo facility policy.[93]  Facility staff reports that they usually allow youth to leave their cells well before four hours, but several youth report that they have been subject to a full or almost full four-hour room confinement multiple times.

A youth may also be deprived of certain benefits or necessities for misbehavior.  For example, a detention officer reported that toilet paper may be withheld if the youth uses toilet paper to obstruct view of their cell; soap may be withheld if the youth uses soap to cover windows or make the cell floor slippery, and toilet water may be shut off if a youth throws items into the toilet to flood the toilet on purpose.  Youth reported that detention officers have also taken away youths' personal effects, including notebooks, books, and pictures, as a form of punishment.

If a youth misbehaves during school, the teacher may give the youth a 15-minute "time out," ask staff to counsel the youth, redirect the youth's attention, or place the youth on a "modified program" where the youth will sit outside the classroom and complete work on their own.

### (3)  Staff and Detainee Altercations and Criminal Charge Against Detainee

As detailed further in *Section (v) Use of Force,* below, physical altercations between staff and detainees occur.  One such altercation resulted in one detention officer pressing charges for assault against a youth.

Legal Services for Children has reported abuse to California's Child Protective Services in the past when an altercation has occurred between a detention officer and a youth.  A case investigator will visit the facility to speak with the affected youth.  Case managers reported that no such abuse reports had occurred recently.

### (v)  Use of Force

*"Los tumban."*  This was the most common answer provided when youth were interviewed about staff discipline they have experienced or observed at the facility.[94]  The phrase translates to "they knock them down," referring to detention staff "take downs"—knocking youth down and handcuffing them if a youth refuses to follow instructions, is perceived as a threat to other youth or an officer, and in some cases, if they attempt to commit suicide.

---

[93] Also see Welf. & Inst. Code, § 208.3 [Four hours of room confinement can exacerbate or worsen youth's behavior. If room confinement must extend beyond four hours, statutory obligations trigger additional approval and documentation requirements.].

[94] One youth experienced such an incident the day Cal DOJ interviewed him.



Use of force incidents are those incidents that involve a detention officer using some degree of physical force, including physical restraints such as handcuffs and pepper spray, upon a detainee. Cal DOJ reviewed incident reports for incidents that occurred between July 2017 and June 2018.  Between January 2018 and the time of our visit in August, there were a total of 27 occasions on which one or more of the 19 youths in custody at the time of our visit was subjected to a form of force.[95]

"Take downs" of youth detainees are the primary means of controlling youth.  Per facility policy, the threshold to use force is quite limited, as use of force must be "reasonable and appropriate," and only used in defense of a threat of imminent harm.[96]  Pepper spray may only be used if there is a "credible threat of violence coupled with a present ability to cause injury."[97]  Use of force can never be applied as an offensive or retaliatory means of control.  However, our correctional expert's review of 11 surveillance videos involving incidents with the 19 ORR youth who were at Yolo at the time of our visit revealed four interactions where a detention officer used force in excess of what facility policy allows.  In one incident, an officer offensively tackled a youth who was sitting on a day room table.  While the SIR stated that the use of force was prompted by the youth attempting to rise from the table with clenched fists, the surveillance video available of the incident does not clearly show the youth doing so.

Although detention officers attend monthly trainings on de-escalation tactics, the crux of detention officers' initial 120-hour training is a 16-hour Crisis Prevention Intervention (CPI) training, which focuses almost exclusively on physical interventions ("taking someone down"), and not on de-escalation.[98]  Our mental health expert noted that generally, facilities that use these control- based strategies have a larger number of instances of use of force.  Yolo reports, however, that since our comprehensive site visit, the facility implemented new training focused on de-escalation tactics.

One youth reported that he had been "taken down" multiple times[99] for not following the rules since he arrived at the facility less than two months prior to our visit.  The youth reported that he was once taken down for covering his window; the officer hit him with a shield.  Similarly, if detention staff instructs the youth to "cover" – throw themselves on the floor – and the youth does not obey, four or five officers may aggregate around the youth to force him to go to his room.[100]

---

[95] Cal DOJ reviewed SIRs and Incident Critiques (IC), which are reports generated to review detention staff conduct during a use of force.

[96] Yolo County Juvenile Detention Facility, Policy & Procedure Manual (April 16, 2016) Use of Force Article 5, Section 1357, p. 70.

[97] Yolo County Juvenile Detention Facility, Policy & Procedure Manual (April 16, 2016) Use of Force Article 5, Section 1357, p. 70.

[98] Specifically, CPI focuses 85% on physical intervention and 15% on de-escalation.

[99] Cal DOJ was only able to verify one of these take downs.

[100] An explanation of the "Cover" command is included in orientation materials.

Although Cal DOJ was not able to verify his claims, another youth reported that he had been handcuffed five times since he entered the facility just over two months prior, once because he threw his food.  He also reported being taken down about four times.

According to detention officers, pepper spray use is permitted as a last resort when previous attempts to de-escalate a situation involving a youth are not successful.  However, many youths spoke of detention officers threatening to use pepper spray if their behavior did not improve.

> *One afternoon, youth were sitting in the day room.  Two youth started arguing and a detention officer instructed them to disengage.  Youth 1 then threw a sandal at Youth 2 and the detention officer yelled "Cover."  Youth 2 then threw Jumbling Tower game pieces, and both youth refused to get on the floor.  When three detention officers attempted to get Youth 1 in cover position, he refused and threw punches.  Officers used two bursts of pepper spray on Youth 1's face, handcuffed him, and put him in a cell.  The youth complained of ear pain but the nurse did not offer an assessment until an hour later, which the youth declined.*

Detention facilities typically have a policy and procedure in place to follow up on a use of force incident. At Yolo, a debriefing occurs after each use of force event with all involved detention officers in attendance.  During this meeting, supervisors and detention officers review video, if video footage exists, and discuss what was done properly and what could be improved.  Clinicians and case managers do not attend these meetings.

In addition to a debriefing, medical staff is alerted when a use of force incident takes place.  A licensed vocational nurse (LVN) checks up on a youth who has been subject to a use of force, and assesses whether they need medical care, which may take place on-site or off-site at a hospital.

At the time of the comprehensive visit, Yolo did not have written policies and procedures in place to address when a potential or planned use of force incident should be video recorded, did not monitor or track detention officers that are involved in use of force incidents, and did not screen SIRs and detainee grievances for allegations of staff misconduct.  Thus, the facility was unable to methodically identify staff who may have repeated use of force incidents.  Yolo reports that since our visit, it started tracking these incidents, including time, date, location, officer names, youth names, and youth motivation for an incident.

**(vi)  Perception of Disparate Treatment between County and ORR Youth**
ORR youth housed in the same pod with County youth complained of disparate treatment by detention officers.  For example, ORR youth reported that County youth are able to leave their

cells later than ORR youth and may play video games when a similarly situated ORR youth cannot. Five of the nine ORR youth interviewed for the purposes of assessing mental health care reported that the detention officers were more lenient with County youth than with ORR youth.  One youth reported that when County youth use racial slurs to refer to ORR youth, detention officers do not address the conduct.  While Cal DOJ was unable to verify ORR youths' claims of disparate treatment, and there was no evidence of differences in access to programs or recreation, youth have a strong perception of bias in their treatment.  Further, some detention officers expressed that they felt ORR youth are not held as accountable as County youth.  Thus, at least some detention officers approach working with ORR youth differently than County youth.

**(vii)  Grievances**

Yolo's system for filing grievances lacks confidentiality and formality.  Grievance forms are provided in Spanish and English, but are not readily available in the housing pods.  Rather, youth must proactively ask for a grievance form from detention officers.  Detention officers and clinicians may, and regularly do, assist youths in filling out a grievance, therefore undermining confidentiality of grievances.  Completed grievance forms may be filed into a box in the housing pods (Fig. 16), and are reportedly collected at least once a day.

**Figure 16. Photo of Grievance Boxes**



Once a youth has a filed a grievance, a detention officer reviews the grievance with the "shift lead," the detention officer supervising the housing unit at the time, then verbally communicates the outcome to the youth.  If the youth is not satisfied, the grievance will be forwarded up the

chain of command to the Superintendent.  If a grievance is filed against a detention officer, review begins with a different detention officer and then follows the same chain of command.  Detention staff reports that grievances are usually resolved at the detention officer or supervisor level.

Youth express little confidence in the grievance process.  Youth consistently complained of not getting responses to filed grievances.  Although we were unable to independently confirm such an incident, youth reported seeing detention officers tear and throw away grievance forms.

## C. Healthcare

Medical care at Yolo is provided via a contract with the California Forensic Medical Group (CFMG). Yolo provides primary medical and mental healthcare on-site (Fig. 17).  Specialty care, including dental and vision care, are handled off-site.

**Figure 17. Photo of Medical Exam Room**



At Yolo, a physical assessment is done by a physician or nurse practitioner within 48 hours of a youth's arrival at the facility.  At the 96-hour mark, the youth undergoes a health appraisal which includes questions about family medical history and HIV, a TB test, and a PREA exam.  An initial dental exam takes place within 70-90 days.  To access medical care, ORR youth may submit a written medical request form, called a "gold slip," or request immediate assistance for more urgent needs.

When youth are transported to off-site medical facilities, youth are handcuffed and subjected to leg restraints and a soft seat-belt type restraint.

In order to evaluate the medical and dental care at the facility, our medical expert met with the Program Manager (PM)[101] and Assistant PM at the facility; toured relevant parts of the building

---

[101] The Program Manager, known in other detention or correctional operations as the Health Services Administrator, is the highest health care administrator onsite and is generally responsible for the entire health care program.



used by ORR youth, including housing pods, medical units, intake area, showers, and toilets; observed medical administration; interviewed the physician, nurse practitioner, nurses, detention officers, and nine ORR youth; and reviewed the medical reports of the nine youth he interviewed.  When any of these activities generated questions, our medical expert interviewed or re-interviewed the relevant authority.  Cal DOJ personnel also inquired about medical care during our interviews with ORR youth.

For the purposes of this section, "healthcare clinician" refers to a physician, nurse practitioner, or physician assistant.  Registered Nurses (RNs) and Licensed Vocational Nurses (LVNs) have different scopes of practice as authorized by statute.  For the purposes of this report, the most significant difference in their scopes of practice is that RNs may perform nursing assessments (observing signs and symptoms of illness, reactions to treatment, general physical condition) and arrive at basic nursing diagnoses (such as fever, stomach pains, etc.).  While LVNs may take patients' vital signs, they may not perform comprehensive nursing assessments nor make nursing diagnoses, and RNs may not delegate these functions to an LVN.  Both RNs and LVNs may administer medications under the supervision of a physician or surgeon.[102]

Yolo reported that it elevated the majority of the findings below to its healthcare contractor.

### (i)  Failure to Thoroughly Examine or Follow-Up on Patient Symptoms

Our medical expert did not render an overall finding regarding the quality of decision-making and care provided by healthcare clinicians, RNs and LVNs at Yolo, partly because we found the youth in detention to be in good general health and there was therefore not a high frequency of use of health services.  However, some specific cases he reviewed raised concerns about the quality of care at Yolo.

In two cases, healthcare clinicians or RNs failed to thoroughly investigate and rule out serious health conditions when symptoms of serious health conditions were presented.  For example, one patient saw an RN for testicular pain.  The RN contacted a practitioner who ordered ibuprofen and a protective cup.  However, based on the information provided in the record, there was not nearly enough data to exclude a more serious problem, like testicular torsion, which would have required immediate surgery to prevent loss of the testicle.  In three other cases, healthcare clinicians and RNs alike failed to follow up on serious injuries, thoroughly investigate the extent of an injury, or provide appropriate corrective care, which has resulted in harm to at least some youth.

### (ii)  Dental Care

Provision of medically necessary dental care is a component of minimally adequate health care in the detention setting.  Dental care at Yolo is provided by off-site community dentists.  Given the very small number of dental cases reviewed, our medical expert was unable to draw any conclusions

---

[102]  Bus. & Prof. Code, § 2725 et seq. and § 2859 et seq.

about the overall quality of dental care.  However, one case was particularly concerning.  One youth was seen for a probable "tooth eruption" and referred "urgently" to the dentist.  There was no definite note from a dental visit, although there were some notes referencing the visit and indicating that the patient needed further treatment.  There was no evidence that any note was reviewed by the youth's healthcare clinician, and as of the dates of the comprehensive visit to Yolo, no further dental treatment had been provided.  The quality of care, documentation, and almost three-week delay from the time of the urgent referral until the dental visit in this single case is concerning.  Based on other interviews, delays in accessing dental care are not unusual at Yolo.  The causes appear to be multi-factorial, including transportation and community dentists' scheduling limitations.  Yolo should more closely monitor access to dental care and correct delays for the youth in their custody.

**(iii) Medical and Detention Staff Practices Outside Legal Scope**

At the time of the comprehensive visit, our medical expert observed LVNs conducting evaluations outside the scope of LVN practice.  For example, an LVN's decision, after examining a patient who had experienced a physical altercation in the housing unit, that the practitioner does not need to be contacted, is a de facto nursing evaluation and a de facto nursing care plan.  Such practices require the expertise, at a minimum, of an RN, if not a healthcare clinician.[103]

Detention officers are trained in first aid, and can therefore recognize some obvious emergencies and provide temporizing care until the arrival of emergency personnel.  Detention officers should not be expected to provide health care judgments or treatment.  Only on rare occasions, such as a facility riot or earthquake, might detention staff be forced to relay a medical order.

However, at Yolo, detention officers may evaluate health complaints and in some instances, may have countermanded 1-on-1 suicide watch orders issued by healthcare staff.[104]  As a general practice, when a youth approaches a detention officer with a health issue, the officer decides whether to contact the nurse or instruct the youth to fill out a gold slip.  Detention officers also issue certain over-the-counter medications.  While it is unclear to what extent the officers guide the youth's decision on whether to take a medication, which medication to take, and how much to take and when, detention officers do engage in these activities because it is expected of them.  While officers may be doing this with a genuine desire to be helpful, the decisions they are making are nursing or medical triage decisions, and due to the officers' lack of appropriate health care training, education, and licensure the practice puts patients at risk of harm.  In its worst light, this could be viewed as practicing nursing or medicine without a license.

Yolo reports that it elevated this matter to the healthcare contractor with regard to LVNs, and will be following up with training for detention officers.

---

[103] Whether or not the care provided by LVNs in individual cases is safe care is not relevant to this discussion – the *practice* is unsafe.

[104] In one recent case, there was resistance or refusal to executing a 1-on-1 order, and CFMG executives did not immediately escalate the issue to the facility superintendent.  Our interviews with staff indicated that this incident nearly resulted in serious harm.  Detention staff did not verify this report.



**(iv)  Medical Request System is Inefficient or Inadequate**

ORR youths request non-urgent episodic care by submitting a written request known as a gold slip.  According to medical staff, the boxes in each housing pod where gold slips may be filed are checked every morning and evening.  The facility attempts to see each youth who has filed a gold slip within 24 hours.

ORR youths complained that their gold slips are ignored, but our medical expert's review of medical records, observations, and interviews with staff and youth does not support that allegation.  Nevertheless, it is evident that the system does not work in a confidential manner, or at least not in a manner that gives confidence to the youth being served.  Our medical expert believes the gold slip system's challenges arise from several factors:  youths' lack of faith in the reliability of the system; youths' limited health literacy, including lack of experience trying to access a health care system on their own; possible illiteracy in their own language; behavioral problems; mental health problems; and history of psychological trauma.

**(v)  Refusal of Medicine**

Due to the small sample size and our limited observation of medication administration, Cal DOJ is unable to offer reliable opinions about the quality of the facility's medication administration system.

However, the facility's policy regarding medication refusals is problematic.  Per current policy, a healthcare clinician should be notified if a patient has refused medicine three consecutive times; ORR should be notified each time a youth refuses a psychotropic medication.  The three-dose-notification policy fails to account for the risk conferred from single missed doses – i.e. medications for HIV, antibiotics, or anticoagulants – or intermittent missed doses, which may have the same deleterious effect of consecutive missing.  For example, one youth was started on penicillin for a dental infection.  He refused two non-consecutive doses, increasing the risk of developing a resistant infection.  However, there is no evidence that an RN or healthcare clinician counseled him, nor that a practitioner was notified.

There is also evidence to suggest that even the three-dose-notification policy is not followed.  Another youth missed three consecutive doses of a psychotropic medication beginning on or around July 2018, but at the time of our visit almost two weeks later, there was no evidence of notification of a practitioner or of any remedial steps taken.

**(vi)  Referrals and Off-Site Medical Care**

When a youth needs off-site medical care, including hospitalization, blood work, imaging, and dental care, Yolo faces several issues.  There are times when nurses do not have enough information about a patient to acquire preapproval for a service, especially blood work and imaging. This results in re-booking appointments.  Some providers do not want to treat youth in handcuffs or accept payment through Yolo's reimbursement system.  Meanwhile, some off-site care is challenging because of transportation needs that Yolo is unable to facilitate.

### (vii)  Healthcare Management and Training

At the time of Cal DOJ's visit, a new Program Manager (PM)  had been appointed to Yolo after two years of the position being unfilled; a new Assistant PM had also been recently appointed to Yolo after the previous one had departed.  Both the PM and Assistant PM joined Yolo with no correctional management experience, and were tasked with overseeing both the Yolo Juvenile Detention Facility and the main Yolo County adult jail.  Learning their new jobs, attaining new skills in correctional health care management, and catching up on years of backlog, requires tremendous support from CFMG.  That support was not evident during our visit.  As a result, several healthcare management functions were not getting done or were being done deficiently: at least some staff were following an outdated CFMG policy manual and had not been directed to adhere to an updated version; PM and Assistant PM did not spend enough time at the Yolo facility; management meetings focused on existing problems, rather than proactive planning; and the Charge Nurse at the Yolo facility was not part of the central correctional health management team, yet is responsible for day-to-day operations there.

### (viii)  Key Performance Indicators

Health care managers must monitor key operations and review policies and procedures on a regular basis.  Such a program is known as "Continuous Quality Improvement" ("CQI") and such measurements are known as "key performance indicators" ("KPI").  The benefits of a CQI program include determination of whether written policies and procedures are being followed and result in their intended effects,[105] evaluation of the efficacy of any implemented interventions, and provision of a peer review process.  KPIs may be measured under a CQI program and should be used to detect dangerous conditions, in order to use that information to make repairs to systems, with the ultimate goal of preventing adverse events.

The CQI program and KPI measurements at Yolo are inadequate.  Health care managers monitor a few parameters, such as average daily population and number of youth on suicide watch each month, but these parameters do not measure quality and safety of health care, and therefore are insufficient to detect serious deviations from safe operating conditions.  The few quality and safety-related KPIs are measured when requested by CFMG corporate supervisors, whereby one KPI is requested each month, which is insufficient to ensure safe care.  KPIs are sometimes measured in response to an adverse event, which means it is too late for preventing adverse events.  In the absence of a CQI program, Yolo is in danger of maintaining practices that compromise minimally adequate medical and mental health care for ORR youth housed at Yolo.

### (ix)  Medical Encounters Lack Privacy and Confidentiality

The routine practices of CFMG staff providing medical services to ORR and County youth at Yolo do not protect patient privacy.  For example, the facility physician meets with youth with the

---

[105]  For example, in determining the effectiveness of group counseling sessions, clinical staff might give youth surveys both before and after a set number of sessions.



exam room door open.  More significantly, detention officers are always present during post-use of force or physical altercation evaluations.  This latter practice is particularly concerning in carceral settings, because nurses should be able to ask about abuse after an incident, out of the earshot of an officer, to identify potential staff abuse.

Yolo's language interpretation practices also compromise confidentiality of medical care.  Medical request slips are often filled out by detention officers, requiring youth to share sensitive information with non-medical staff.  Additionally, few members of the healthcare staff speak Spanish, and instead of using a telephonic interpretation service, detention officers are consistently used as interpreters for clinical encounters.  Oral communications regarding urgent or emergent episodic care needs are also transmitted via a detention officer.  Patients must be able to communicate with their health care providers.  When a medical staff member is not fluent in the patient's language, barring an emergency, another health care provider or certified interpreter, via telephone or otherwise, should interpret to preserve patient privacy and confidentiality.

Yolo reports that it elevated this concern to the healthcare contractor.

### (x)  Electronic Health Records System

CorrEMR, the Electronic Health Record system in use at Yolo, is the platform used to enter clinical information into the patient's record.  However, retrieval of that information appears to be challenging because a user cannot easily follow the "story" of care for a specific problem, especially if the care involved professionals from different disciplines – nurses, healthcare clinician, mental health clinician – or involved external, often scanned, documents.  One specific problem with scanned documents is that they are sometimes erroneously filed based on the date scanned, rather than the date of care.  This interferes with healthcare staff's ability to view a patient's full medical history, chronologically.

### (xi)  Intake

A key component of carceral health care is evaluation upon admission into a new facility to detect any urgent needs.  Then, various medical, mental health, substance abuse, and dental examinations are conducted by healthcare personnel over the next several hours or days to address issues identified during the screening, and screen for and address other issues.

At Yolo, elements of healthcare evaluations are performed by detention officers, LVNs, RNs, and healthcare clinicians.  We were unable to identify clear written policies regarding necessary evaluations to be completed at intake.  When questioned, staff provided inconsistent information about which elements of the medical evaluation must be performed, when, and by whom.  It is unclear whether practitioners are notified immediately when an underlying medical problem is identified at intake,[106] or whether evaluations are reviewed by higher-level professionals.  For

---

[106]  Due to the poor usability of the electronic health record (EHR) in use at the facility, it is possible that these documents and their appropriate review and action, were in fact present and appropriate, but could not be easily identified by our expert.

example, there was a lack of evidence indicating whether screenings administered by a detention officer are reviewed by a nurse, or initial screenings administered by an LVN but which require assessments that should be reviewed by an RN or healthcare clinician.

## D. Mental Health Care

Mental health services for ORR youth are provided in part by Yolo's contract with CFMG and in part by ORR mental health clinicians.  ORR clinicians appear highly dedicated and empathic individuals who are committed to providing the best care they can.  The CFMG contract provides for one psychiatrist and one clinical intern.  Mental health staff provide one-on-one counseling as well as voluntary group therapy sessions each week.[107]  For the reasons discussed below, mental health staff are not equipped to respond to youth who suffer from acute psychiatric issues.

In order to evaluate the mental health care at the facility, our mental health expert toured relevant parts of the facilities used by ORR youth, including housing pods and medical units; interviewed the lead behavioral health clinician provided by CFMG, ORR Clinical Services Supervisor, and ORR clinicians, detention officers, and nine ORR youth; and reviewed the medical records of six ORR youth. Cal DOJ personnel also inquired about mental health care during their interviews with ORR youth.

Our mental health expert found that Yolo's mental health program is performing below national standards in a number of areas.  The following are particular areas of concern.

### (i)  Inadequate Services to Provide for ORR Youths' Mental Health Needs

Yolo purportedly evaluates the youth's mental health needs by using a tool called the Ohio Youth Assessment System.[108]  This system matches mental health service intensity to the youth's risk level.  However, while Yolo staff consistently use this instrument for County youth, it is not clear if it is used for ORR youth.  Indeed, all ORR youth, regardless of mental health need, receive the same intensity of services.

Clinicians face the challenge of building therapeutic relationships with ORR youth in a setting that does not contemplate the opportunity for long-term therapy.  An ORR youth may be transferred out of the facility or released from ORR custody at any time.  Given this reality, mental health clinicians mostly assist ORR youth with coping with experiences and incidents that arise at the facility—including altercations with other youth or officers—rather than facilitate therapy for ORR youths' deep-rooted trauma.  Some CFMG mental health staff, in particular, appear to employ a rote and insufficiently detailed nature of inquiry.  Multiple youths reported to Cal DOJ they are only asked the three "Million Dollar Questions": (1) Did you eat?; (2) Did you sleep?; (3) Do you feel well?"

---

[107]  Group therapy are "socialization groups," where clinicians and ORR youth discuss such issues as working together, team building, mindfulness and relaxation; or Cognitive Behavioral Therapy groups that focus on lifestyle changes, anger management, emotional regulation and peer relations.

[108]  Latessa et. al., (2009) The Ohio Youth Assessment System Final Report.



Case managers develop Individual Service Plans (ISPs) for youth, which should be written, indi-
vidualized, and crafted by all staff function areas.  ISPs articulate goals and the objectives that
serve as the incremental steps toward achieving the goal.  But the mental health files of ORR
youth indicate rote plans with nearly identical language that does not describe goals and inter-
ventions specific to the individual youth.  The ISP development process is not collaborative, and
does not involve input from a multidisciplinary team.

Yolo reports that additional funding provided by ORR enabled the facility to hire more mental
health staff.

**(ii)  Overuse of Psychotropic Medications**
After Cal DOJ's comprehensive site visit, Yolo's healthcare staff reviewed 47 mental health
records of ORR youth and determined that 43 of those youth had arrived with previously pre-
scribed psychiatric medications, and at least two others were either restarted or first prescribed
psychiatric medications at Yolo.  This is an extremely high level of psychiatric medication use in a
detention facility, as our mental health expert noted that a typical rate is approximately 40%.  It
is also concerning that from the subset of youth we interviewed for the purpose of evaluating
mental health services, they were all receiving psychotropic medications but none was aware of
what the medication was, or why they were receiving it.  This lack of knowledge or consent to
take psychotropic medication was a subject of a lawsuit filed in September 2018 which alleged
that a class of plaintiffs – one of whom was housed at Yolo at the time of Cal DOJ's visit – were
denied due process when ORR allowed the administration of psychotropic medication without
youths' knowledge or consent.[109]

The facility reported that as of January 2019, CFMG implemented a practice of speaking with
the youth when there is an addition, change, or discontinuation to their medications.

**(iii)  Responses to Self-Harming Behavior**
Yolo places youth on "protective watch" or "suicide watch" depending on the severity of their
self-injurious behavior.  Protective watch calls for 5-minute checks; suicide watch requires constant
line-of-sight supervision.  However, Yolo does not properly execute suicide watch because staff
reported that whether a youth has been put on protective or suicide watch, they are subject to
five minute checks.  There is no separate housing for suicidal or constant watch.  Only a mental
health clinician can lower or remove a youth from a protective or suicide watch.

During interviews, several youths reported that they are suicidal or are inclined to hurt themselves.
Some showed signs of cutting; other youths reported hearing youth in neighboring cells hit
themselves against the wall.  One youth reported trying to strangle himself with blankets.

---

[109]  *Lucas R. v. Azar* (C.D.Cal. June 29, 2018, No. 18-cv-05741) 2018 WL 3209193.

> *During Cal DOJ's visit, a Detention Officer reported that one youth attempted to hang himself with a shirt.  Staff went in to talk with him and brought him out of the cell.  One staff member informed Cal DOJ that the youth acted out just to get staff to pay attention to him.*

During an interview, another youth stated, "voy a dejar de tratar de matarme cuando salga de aquí"—"*I will stop trying to kill myself when I get out of here.*"

In one case, Cal DOJ uncovered that a youth had been cutting himself, but had not been placed on protective watch.  Only after Cal DOJ alerted facility staff was the youth put on protective watch.

**(iv) Intake**

A prompt mental health assessment is critical for the youth arriving at Yolo.  Many ORR youths are placed at Yolo because they have been deemed to be a risk to themselves or others.  Those who arrive from other facilities generally come with some records regarding their medical and mental health status, and are known from the outset to be struggling with mental health issues.  Although a mental health assessment is administered within 48 hours of a youth's arrival at Yolo, a minimally adequate mental health assessment at intake should take place within 2-4 hours of admission.[110]

At Yolo, detention officers are instructed to notify mental health staff if the intake process reveals any reason to believe that the youth is a potential suicide risk.[111]  However, detention officers are not trained to perform the clinical observation required to trigger this notification.  Our mental health expert could not identify any policy regarding conveyance of mental health concerns flagged at intake to appropriate mental health staff.  Yolo reports that it will follow-up with the facility's healthcare contractor regarding additional training for detention officers conducting intake assessments.

# 6. Due Process

Cal DOJ assessed how conditions of confinement at Yolo impacted the due process rights of detainees by reviewing detainees' access to information regarding legal representation, detainees' ability to communicate with attorneys, and attorneys' ability to communicate and visit their clients at Yolo.

---

[110] National standards require the use of a validated screening tool to do this, such as the MAYSI-2, which is intended to promote quick and early identification of youth who have mental health problems. Administration of the tool within 48 hours does not provide the kind of quick feedback necessary to make immediate clinical decisions.

[111] This would trigger placing the youth on precautionary status, which requires five-minute checks.

 

## A. Intake and Orientation

The intake process at Yolo includes a general orientation to the facility, including a PREA orientation, a preliminary medical exam, and a suicide risk screening.  Per facility policy, within 24 hours, a case manager gathers more comprehensive information about the youth's personal history.  The case manager also reviews facility operations with the youth, which includes information about housing assignment, grievance procedures, right to contact the consulate of their home country, school and non-school programs, and process for accessing phones and accounts.  The case manager does not provide legal assistance, but does provide the youth with a legal resource guide and reviews the guide with the youth, explaining that if the youth does not already have a lawyer, they may attend the legal Know Your Rights program and legal screenings facilitated by Legal Services for Children (LSC).  Case Managers also review the *Flores* bond hearing notice with youth, explaining that they have a right to a hearing in front of an immigration judge.[112]

Most youth reported that they did receive orientation materials when they first arrived at the facility. Despite case managers' assurances about the efficacy of the intake and orientation process, it appears that much information is lost on youth, as several youths reported that they did not under-stand the materials, nor why there were placed at Yolo.

## B. Access to Legal Services and Representation

Yolo does not have a law library or legal materials available for youth to read for themselves. However, information about bond hearings and legal representation is shared with youth during the intake process.  As described above, all youth are advised of their right to request a bond hearing and the option to consult with LSC on other legal questions when they are first processed into the facility.

LSC provides the legal orientation program at Yolo for both County and ORR youth, conducts legal screenings for youth, and may take on youth as clients on a pro bono basis.  LSC visits Yolo at least once a week.  Although some youth were unaware whether they are formally represented, many youths reported that they have met with at least an LSC social worker, and many reported having met with an attorney during their time at Yolo.

Per facility policy, attorneys have around-the-clock access to the facility, meaning they can meet with their clients at any time, and on any day of the week.  However, in Cal DOJ's survey, at least one attorney reported difficulty setting up timely calls with their clients, even for urgent matters.

---

[112] Youth may respond yes or no to understanding *Flores*, to requesting a bond hearing, and to reviewing information about *Flores* with an LSC representative.

# 7. Conclusion

Yolo faces the difficult task of caring for youth who have likely faced extreme trauma.  On the whole, staff across all function areas appear well-intentioned in doing their jobs, and the facility is actively searching for ways to positively engage youth.  However, the restrictive environment, an overarching lack of staff training, frequent use of force, issues with access to medical care, and inadequate provision of mental health care hinder the facility's ability to appropriately meet the needs of ORR youth.

# VII Comprehensive Facility Review: Theo Lacy Facility

## 1. Background

The Theo Lacy Facility (Theo Lacy), built in 1960, is located in Orange and is operated by the Orange County Sheriff's Department (Table 24).  Orange County entered into an IGSA with ICE in 2010 to house immigration detainees at both Theo Lacy and James Musick.  The contract was extended in 2015 to be effective until 2020.  ICE pays Orange County $118 per bed per day, and Theo Lacy holds between 500 and 600 immigration detainees out of the 958 combined total detainees that may be housed at Theo Lacy and James Musick facilities.  The 2008 PBNDS apply to this facility.  According to Theo Lacy staff, Orange County has sought to comply with these standards by adopting 2008 PBNDS requirements into its own policies and procedures.

**Table 24. Theo Lacy Key Data Points**

| | |
|---|---|
| Facility: | Theo Lacy |
| Operator: | Orange County Sheriff's Dept. |
| Housing Detainees Since: | 2010 |
| Bed Capacity: | Varies (combined total of 958 with James Musick) |
| Type(s) of Detainees: | Male Adults |
| July 2015 Intake to October 2018 Departure | |
| No. of Countries of Origin: | 77 |
| No. of Detainees: | 5,837 |
| Average Age: | 34 years old |
| Average Length of Stay: | 107 days |
| Longest Detainee Stay: | 1,002 |

In February 2017, ICE's ODO reviewed Theo Lacy for compliance with applicable detention standards. ODO reviewed the facility's compliance with 16 standards and found it compliant with 10 standards. ODO found 12 deficiencies in the remaining six standards, two of which were repeat deficiencies. ODO found deficiencies in the following areas: Environmental Health and Safety, Classification System, Special Management Units, Use of Force and Restraints, Telephone Access, and Visitation.  This was an improvement over ODO's 2013 review in which ODO found 20 deficiencies concentrated in 11 of the 18 standards reviewed.[113]

---

[113]  The Nakamoto Group was scheduled to conduct an additional inspection in October 2018.

On March 6, 2017, OIG issued a "Management Alert on Issues Requiring Immediate Action" at Theo
Lacy.  This report noted concerns in the following areas:

- Food handling, specifically failure to monitor food spoilage and regular serving of spoiled meat;

- Unsatisfactory conditions such as moldy shower stalls, refuse in cells, and inoperable phones;
  failure to track grievances to ensure resolution and opportunities for appeal; and

- Additional concerns related to custody, including violations of the PBNDS regarding the use of
  disciplinary and administrative segregation.

These reports, as well as information received directly by Cal DOJ and media reports concerning con-
ditions at Theo Lacy and the Orange County Jail system generally informed our decision to conduct a
comprehensive review of Theo Lacy.

In October 2018, Cal DOJ conducted a multiday comprehensive visit to Theo Lacy.  Orange County
Counsel, the County's Health Care Agency, and the Sheriff's Department were very cooperative with
Cal DOJ's review of the facility.

# 2. Methodology

Following a request for records and a one-day visit on December 14, 2017, Cal DOJ conducted a
comprehensive site visit of Theo Lacy on October 9-12 and 29-30, 2018.  Personnel from Cal DOJ and
three contracted experts in the areas of corrections, medical services, and mental health toured Theo
Lacy, observed operations, interviewed a variety of facility personnel, and interviewed 91 detainees.

Our tour included the housing areas where detainees are held, law library computer terminals, guard
stations, outdoor recreation areas, medical and mental health services, intake loop, kitchen and pantry,
dining hall, visiting areas, and chapel.  The review team interviewed command staff; individuals re-
sponsible for the ICE detention program, classification, grievances, and PREA compliance; and housing
sergeants and deputies assigned to the barracks and modules where ICE detainees are held.  Cal DOJ's
medical and mental health program review included interviews with the health and mental health staff.

Theo Lacy provided access to records including jail policies, training outlines, medical records, disci-
plinary segregation records, grievance logs, and detainee rosters, as well as access to relevant video
footage.

On December 20, 2018, Cal DOJ held a debrief call with the Orange County Sheriff's Department to
provide them with our preliminary findings.

# 3. Summary of Key Findings

From July 2015 to October 2018, Theo Lacy housed a total of 5,837 detainees from 77 countries of origin (Table 25).

**Table 25. Most-Represented Countries of Origin at Theo Lacy**

| Country | Count | Percentage |
|---|---|---|
| Mexico | 3,230 | 55.34% |
| El Salvador | 486 | 8.33% |
| Guatemala | 449 | 7.69% |
| Honduras | 239 | 4.09% |
| Haiti | 217 | 3.72% |
| China | 134 | 2.30% |
| India | 124 | 2.12% |
| Georgia | 115 | 1.97% |
| Nepal | 70 | 1.20% |
| All Other Countries | 773 | 13.24% |
| TOTAL | 5,837 | 100.00% |

Detainees' average length of stay during that time was 107 days.  However, at least one detainee has been housed at Theo Lacy for 1,002 days.  As of the first day of our visit, the facility housed 501 male detainees from over 50 countries of origin.  The average length of stay at the time was 119 days.

Cal DOJ interviewed 91 detainees on a variety of topics, including medical and mental health-focused interviews by our experts in those fields.  Cal DOJ chose detainees to interview from over 150 detainees that volunteered, giving preference to those who had been in the facility the longest and attempting to speak to detainees from a broad range of countries.

Detainees with whom we spoke came from 31 countries of origin (Table 26)[114] and spoke nine different languages (Table 27).

Theo Lacy is a maximum-security jail and immigration detainees assigned to the facility experience it as such.  While most detainees are housed in barracks that offer some freedom of movement, there are over 100 detainees that are confined 20-22 hours a day in a small cell, alone or with a cellmate.

---

[114]  The list of detainees provided by the facility included a designation for "Africa" as a country of origin and also included individual African countries of origin, such as Somalia and Cameroon.

**Table 26. Detainee Interviewees' Countries of Origin at Theo Lacy**

| Country of Origin | Number of Detainees |
|---|---|
| 1. Afghanistan | 2 |
| 2. Africa | 2 |
| 3. All Others | 1 |
| 4. Argentina | 1 |
| 5. Armenia | 2 |
| 6. Azerbaijan | 1 |
| 7. Bangladesh | 1 |
| 8. Belize | 1 |
| 9. Cambodia | 2 |
| 10. Cameroon | 2 |
| 11. Chile | 1 |
| 12. China | 1 |
| 13. Colombia | 1 |
| 14. Cuba | 3 |
| 15. Egypt | 1 |
| 16. El Salvador | 11 |
| 17. Fiji | 2 |
| 18. Guatemala | 3 |
| 19. Haiti | 1 |
| 20. Honduras | 6 |
| 21. India | 6 |
| 22. Jamaica | 1 |
| 23. Korea | 1 |
| 24. Mexico | 29 |
| 25. Nepal | 1 |
| 26. Nicaragua | 3 |
| 27. Nigeria | 1 |
| 28. Peru | 1 |
| 29. Somalia | 1 |
| 30. Ukraine | 1 |
| 31. Venezuela | 1 |

**Table 27. Detainee Interviewees' Languages Spoken at Theo Lacy**

| Language Spoken | Number of Detainees Interviewed |
|---|---|
| Armenian | 1 |
| Cambodian | 1 |
| Haitian Creole | 1 |
| English | 40 |
| Korean | 1 |
| Punjabi | 6 |
| Russian | 1 |
| Somali | 1 |
| Spanish | 39 |

At the time of Cal DOJ's inspection, Theo Lacy imposed disciplinary isolation—up to 30 days in a single cell without access to indoor or outdoor recreation—for conduct that did not pose a threat to operational safety, in violation of applicable immigration detention standards.

Most immigration detainees with which the Cal DOJ team met described their experience with custodial staff as quite negative.  Many reported that deputies yell, use profanity, make fun of detainees, and are physically threatening if not abusive.  However, staff misconduct grievances are rarely, if ever, sustained.  With certain exceptions, it remains unclear how much of the detainees' negative experience of their conditions is attributable to their simply being in a highly restrictive jail setting as opposed to improper conduct by facility staff.  In terms of how confinement impacts access to due process, immigration detainees at Theo Lacy—like those throughout California—struggle to retain counsel, navigate their immigration proceedings, and communicate with individuals and agencies outside the facility.

Cal DOJ's medical expert found that the Orange County Health Agency provides medical care in a manner that is generally safe.  Although many of the immigration detainees interviewed reported being appreciative of counseling they received, mental health resources appear to be inadequate to meet the needs of the immigration detainee population.

Following Cal DOJ's visit, Theo Lacy reported implementation of measures that address some of our findings.  The facility amended its disciplinary segregation policy in two ways.  First, it now prohibits the use of disciplinary segregation for "disrespect to staff," except where the detainee's conduct "creates a disturbance or threatens security."  Second, detainees in disciplinary segregation are now afforded one hour of out-of-cell recreation time five days a week and are permitted one 30-minute social visit per week, absent safety concerns.  Theo Lacy also reported having completed training with health care staff to address Cal DOJ concerns about welfare checks for detainees in disciplinary segregation, reporting missed medication doses, and providing medical services to detainees under quarantine.

# 4. Apprehension and Transfer of Detainees to Theo Lacy

Immigration detainees housed at Theo Lacy came into ICE custody in three main ways.  They may have been: (1) apprehended by or presented themselves to Customs and Border Protection (CBP) at the border, (2) arrested by ICE in the interior of the country after being in the United States with or without permission for some amount of time, or (3) taken into custody by ICE at the time of their release from local, state or federal criminal custody, sometimes without first having been convicted of any offense.  Immigration detainees are sometimes unclear about what law enforcement agency arrested them, but detainees interviewed reported the following:

- Twenty-two detainees had been transferred to ICE custody from CBP when they tried to enter the country.  At least 17 of these detainees requested or plan to seek asylum.

- Seventeen detainees were arrested by immigration authorities in the interior of the country:
  - One young man was at home with his mother.  ICE officers came to their door in uniforms labeled "Police."  They showed her a photo of someone else and asked her who was home.  She said her son was home.  When her son came to the door, ICE arrested him and took him from the house without shoes.
  - A lawful permanent resident was arrested by ICE in a Ventura County courtroom, where he had appeared in a child support matter.
  - A Russian national, who had previously been granted parole and work authorization when he presented himself and his children as asylum seekers, was arrested when he appeared for his regularly scheduled supervision meeting with ICE, although his asylum claim remains pending.
- Twenty-nine detainees were taken into immigration custody from county or state custody after an arrest for or conviction of a criminal offense:
  - Of those, 13 reported that they are lawful permanent residents.
  - ICE took into custody one of the detainees, a 63-year-old green card holder, from Ventura County after he was arrested for an alleged $5.00 drug sale.
  - Another lawful permanent resident was arrested as he was walking out of the Fresno County Jail after having served a criminal sentence.  After he booked out of custody, he was walking out the door when he heard a Fresno County officer tell an ICE officer his name, which led directly to his arrest.

With respect to transfers,

- Fourteen detainees reported they spent less than three weeks in border facilities before being transferred to Theo Lacy directly or by way of Adelanto or James Musick;
- Fifteen had spent time in Adelanto;
- Seven had spent time in James Musick;
- One had been detained in Louisiana and Arizona;
- One had spent over a year at Mesa Verde; and
- One was transferred to Theo Lacy due to the closure of northern California facility Rio Cosumnes.

Most detainees we interviewed who had family in the United States had family in Southern California, including Los Angeles, Orange, Riverside, Ventura, or San Diego County.  There were three exceptions: the detainee who was transferred due to the termination of the Rio Cosumnes ICE contract, whose family lives in Fresno; one detainee whose wife lives in Oakland, and a third detainee who reported that his children live in northern California but when he requested a transfer to Yuba following his wife's death, ICE denied it.



# 5. Conditions of Confinement at Theo Lacy

Immigration detainees at Theo Lacy are housed in four barracks and two modules.  Although there are significant differences between life in the barracks and the modules, some basic components are the same.  All detainees receive two hot meals and one sack lunch, and are entitled to one hour of outdoor recreation each day.  They have access to hygiene items—shampoo, soap, toothpaste, and lotion—
every day and the ability to exchange clothing three times a week.  Detainees can access legal materials through a computer terminal uploaded with LexisNexis databases provided by ICE.  While physical access to telephones is significantly curtailed in the modular housing units, all detainees have access to telephones in the housing unit at least one hour a day.  All detainees are eligible to receive one 30-minute non-contact visit four days a week, for a maximum of four non-legal visits per week.

All individuals detained at Theo Lacy are issued an identification card that they scan when they travel from one place in the facility to another.  This tracking system can alert the facility if a detainee does not arrive at his anticipated destination, especially for barracks detainees who may walk unescorted to medical appointments, visitation, and other areas of the facility if they have an appointment.

## A. Security Classification

Everyone housed at Theo Lacy is first processed through the Orange County Sheriff's Department's Intake Release Center, where they receive a brief medical and mental health screening.  Further intake, including classification assessment, occurs when they arrive at Theo Lacy.

ICE assigns each detainee a security level before they enter Theo Lacy.  Theo Lacy does a further assessment for housing classification purposes, but classification staff indicated that they rarely seek a change from ICE's security classification.  The facility considers additional information in making a housing decision, such as a detainee's disciplinary history while in previous correctional settings and factors that make a detainee vulnerable to attack from others.  Detainees who request protective custody and those who classification staff believes will be unsafe or disruptive in a large group setting are assigned to modular housing.  Detainees with medical needs that require accommodation or supervision are housed in the Medical Module.  Theo Lacy houses the remaining detainees in the barracks, segregating low and medium-low security detainees in different barracks from medium-high and high security detainees.

## B. Layout and Schedule of the Day in the Barracks

The four barracks are adjacent to each other and share a common outdoor area and law library.  Each of the four barracks has 51 double bunk beds and can house up to 102 detainees.  There is one large group bathroom for each barrack, each with an open line of toilets (Fig. 18), a group showers (Fig. 19), and rows of sinks (Fig. 20).  There is no personal privacy for showers or toilet use.

**Figure 18. Photo of Restroom in Barracks**          **Figure 19. Photo of Showers in Barracks**          **Figure 20. Photo of Sinks in Barracks**

  

Deputies are scheduled to conduct a safety check of each barracks every 60 minutes.  There is also a central command station with video feed from the barracks.  There are two 12-hour shifts per barracks per day.  The day shift is staffed with four deputies, one civil employee, and a housing sergeant.  The night shift is similarly staffed, but with only three deputies.

"Lights out" is at 11:00 p.m., and "reveille" (wake-up call) is at 4:45 a.m.  Detainees reported that barracks deputies wake the detainees by hitting the control room microphone on a table, startling some detainees due to the very loud and harsh sound.  Throughout the night, lights are dimmed but are lit enough to keep the barracks illuminated.

"Count" occurs five times a day, in the early morning, mid-morning, midday, evening, and the middle of the night.  During count, movement stops and detainees must return to their bunks unless they are in outdoor recreation.  Two of the counts are "book counts," when a deputy must speak to each detainee and confirm his identity.  The others are "body counts," when deputies count that there is a body on every bunk.  Count takes between 10 to 45 minutes.  Movement during count, such as going to the bathroom, may result in discipline, such as loss of commissary or non-legal visiting privileges for a week.

Detainees in the barracks are not allowed to visit other barracks.  Although the barracks open on to a grassy outdoor area, detainees cannot go outside of their barracks unit unless they have a specific

authorized purpose to do so, such as using the phone, visiting the medical center, getting a haircut, or working on their legal case in the law library. There is one TV in each barracks, but it is difficult to see from bunks that are further away. There is a hot water spigot available, which detainees can use to make coffee or soups they buy through the commissary.

Detainees in the barracks can ask permission to go to the law library (Fig. 22), located in the middle of the barracks area. The law library has six computer terminals for approximately 400 detainees.

**Figure 21. Photo of Barracks Control Booth**    **Figure 22. Photo of Law Library in Barracks**

    

Detainees in the barracks are typically offered one hour of outdoor recreation at a field near the barracks. Cal DOJ staff observed a group of detainees playing soccer during their outdoor recreation time.

## C. Layout and Schedule of the Day in Modular Housing

Immigration detainees are also housed in two modules, referred to here as "ICE Module" and "Medical Module." The Medical Module has five two-story sectors and the ICE Module has six two-story sectors, each with capacity for 32 people in single and double cells. At the time of our visits, there were about 160 immigration detainees in the ICE Module.

In the ICE and Medical Modules, detainees remain in their cells, each of which has a toilet and sink, for approximately 22 hours a day. Detainees are released from their cells into the common area, known as the "day room," for a minimum of one hour a day for access to the phones and showers. Some sectors have detainees in several cells that can have day room time together. Other detainees must take their day room time alone or only with their cellmates because of their classification or because they have been deemed unable to be with other people. The deputies rotate detainees through their day room time, beginning early in the morning, and the schedule varies so detainees do not know in advance when they will have access to telephones. Each day, detainees in the modules are also offered one hour of outdoor recreation on a rotating basis. This usually takes

place in an area adjacent to the housing unit that is a large concrete room and has an opening to the sky with fencing over it (Fig. 26).

There is a medical office in the ICE Module that detainees housed there use for their on-site medical visits.  ICE Module detainees who are taken to different areas of the facility for any reason are transported with ankle shackles and handcuffs attached to a belly chain.  There is one law library computer for the entire ICE Module (Fig. 24).

**Figure 23. ICE Module**                    **Figure 24. Photo of ICE Module Law Library**

        

The Medical Module functions similarly to the ICE Module with respect to day room time and outdoor recreation.  It houses both immigration detainees and individuals in county custody with particular medical needs, such as diabetes or limited mobility.  Two of the sectors have eight four-person cells, with four double bunks.  Two have 16 two-person cells, and one is wheelchair accessible with bunkbeds on the first floor and several three-person cells upstairs.  The Medical

**Figure 25. Photo of Medical Module Housing**           **Figure 26. Photo of Recreation Area in Modular Housing**

        

Module also includes a "negative pressure cell" for detainees with infectious diseases.  According to Theo Lacy facility staff, the county population receives one hour of outdoor recreation three days a week and immigration detainees are offered at least one hour of "outdoor" recreation every day.  At the time of our visit, there were 14 ICE detainees in the Medical Module.

Cal DOJ identified two concerns regarding Theo Lacy's housing of immigration detainees in the ICE Module specifically:

### (i)  Restrictive Conditions in Modular Housing Units

Facility staff contend that Theo Lacy does not use administrative segregation, but admits that many detainees are housed in the ICE Module rather than the barracks because they cannot be housed with other people due to operational concerns.  Examples provided by the facility included detainees who do not get along with others, have a history of fights or disruption, or are likely to be a target of violence because of their criminal histories or sexual orientation.  The rationale for these housing decisions is identical to the bases provided in the 2008 PBNDS for the use of administrative segregation.[115]  By avoiding the label "administrative segregation," Theo Lacy avoids providing the procedural protections required by the PBNDS.[116]

### (ii)  Assignment of all gay men to modular housing

Under the 2008 PBNDS, which are applicable to Theo Lacy, relevant considerations for classification decisions include "current offense(s), past offense(s), escape(s), institutional disciplinary history, documented violent episodes and incidents, medical information, and a history of victimization while in detention.  Personal opinion, including opinions based on profiling . . . may not be considered in detainee classification."[117]  The standards specify appropriate use of "administrative segregation" for "detainees segregated from the general population for administrative reasons," which includes the use of "protective custody . . . only when there is documentation that it is warranted and that no reasonable alternatives are available."[118]  Several facility personnel and detainees indicated that sexual orientation is a basis—on its own—for placement in protective custody.  Given the significantly greater liberty restrictions experienced by detainees in the ICE Module, any blanket policy of housing gay detainees in modular housing—as opposed to barracks housing—without the detainee's consent and without respect to individual circumstances raises concerns under both the 2008 PBNDS and California anti-discrimination law and policy.[119]

---

[115] U.S. Immigration and Customs Enforcement, Dept. of Homeland Security, 2008 Operations Manual ICE Performance-Based National Detention Standards (PBNDS), Part 2 - 15 Special Management Units, Expected Outcomes, § C(1), p. 10.

[116] Id. at § C [requiring administrative segregation order, appeal process for involuntary placement in administrative segregation, regular review schedule and notifications to ICE, among other protections], pp. 10-15.

[117] Id. at Part 2 – 5 Classification System, Expected Practices § V(E) pp. 4-5.

[118] Id. at Part 2 – 15 Special Management Units, Expected Outcomes §§ II(1) and II(6)); "Detainees in administrative segregation generally receive the same privileges as those available to detainees in the general population…When space and resources are available, detainees in Administrative Segregation may be provided opportunities to spend time outside of their cells (in addition to the required recreation periods), for such activities as socializing, watching TV, and playing board games and may be assigned to work details…" (Id. at Part 2 – 15 Special Management Unit Standard, Expected Practices § B(6)).

[119] See e.g. Gov't Code § 11135 [barring discrimination based on sexual orientation for entities receiving state funding]; Civ. Code § 51 [establishing right to be free from discrimination based on sexual orientation in all business establishments].

## D. Programming and Work Opportunities

Although Theo Lacy offers a general education program and other programs to the county jail population, immigration detainees do not have access to these programs.  In fact, one facility staff member expressed frustration that some advocates complain that ICE detainees do not get equal access to county programming, but other advocates and officials advise the facility that it cannot allow ICE detainees access to state- or county-funded programs.

The only programming offered to immigration detainees is provided by volunteers, namely Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) meetings, and Christian and Catholic bible study. These programs are offered on a rotating basis to different housing units, but detainees reported that participation is on a first-come, first-serve basis and usually only a handful of detainees are permitted to participate when the opportunity is available.

Detainees can request permission to work, and once they are cleared by classification and medical personnel, will be added to a list of workers.  Available jobs include: watering the grass outside the barracks, stenciling uniforms, and handing out sack lunches.  Workers are paid $1.00 per day and may receive perks such as extra food or first pick at clothing items.

## E. Food and Nutrition

The Chief Cook and food supervisors at Theo Lacy are employees of Orange County.  They supervise a kitchen work staff from the county jail population, and immigration detainees are excluded. The kitchen areas were clean, with no standing water or spills on the floor.  Cal DOJ inspected the cold and dry pantries, mindful of the 2017 OIG report findings that criticized Theo Lacy's food handling.  Storage areas were clean, with items on pallets off the floor.  Food packages appeared to be appropriately dated.  According to personnel, the facility keeps 15 days of food on site and provides 2600 calories a day.

A 28-day menu cycle is used for meals served.  The menu is pork-free to allow easier accommodation of Kosher and Halal diets.  In addition to Kosher and Halal meals, vegan and specially ordered medical diets are served.  Breakfast and dinner are hot meals, with a bagged lunch (Fig. 27).

The dining hall accommodates 200 individuals at one time.  Detainees and county inmates in the barracks rotate through the dining hall around 5:00 a.m. for breakfast and 4:00 p.m. for dinner.

Detainees in the ICE and Medical Modules receive their food on trays that are delivered to their sectors on heated carts and served to them in their cells.  If meals arrive during a detainee's day room time, he must return to his cell for the duration of meal service.

Detainees widely complained that the food was unappetizing, especially the processed turkey slices served every day for lunch.  Some detainees reported that they place the turkey slices in hot water to make them edible.  Other detainees reported that they did not eat any of the facility's

**Figure 27. Photo of Daily Bagged Lunch**



*The daily sack lunch consists of four pieces of whole wheat bread,
an individual package of four slices of turkey, a piece of fruit, pack of
cookies, nutrient drink mix, and mayonnaise and mustard packets.*

food, and instead only ate what they purchased through the commissary, if they could afford it.
Detainees who had successfully applied for a religious or medical diet said that they did not have
a problem with the food, but other detainees reported that their requests for a religious diet had
been denied, sometimes without explanation.  Detainees in the ICE Module complained that by the
time meals are delivered, the food is sometimes cold or has spilled over from one compartment to
another on the tray.  A common complaint from detainees in barracks housing is that they are not
given enough time to eat.  Approximately a quarter of recorded transits reviewed by Cal DOJ show
detainees returning to the barracks fewer than 15 minutes after logging their ID cards at the dining
hall, although facility staff reported to Cal DOJ that immigration detainees are provided 20 minutes
to sit down and eat their meals.

On March 2, 2018, 43 detainees filed grievances complaining about the lunch meat served every
day in their sack lunches.  Several of the grievances complained that the lunch meat smells bad or
makes them sick, and several requested more variety in the lunches, specifically requesting peanut
butter or eggs as an alternative.  Records indicate that the grievances were referred to food services.
During Cal DOJ's site visit, we learned that turkey ham continues to be served every day in the sack
lunch.

## F.  Non-Legal Visitation, Telephone Calls, and Mail

Non-attorney visiting takes place Friday, Saturday, Sunday, and Monday.  Detainees can receive one
30-minute visit each day.  Contact visits are not permitted.  Visitation occurs across a Plexiglass bar-
rier, through a phone line (Fig. 28).  Many family members drive long distances to visit their loved
ones in detention, and although facility staff reported that detainees could request additional time
upon proof of significant travel, detainees reported they had not been granted such requests, even
for a family member who drove six hours.

**Figure 28. Photo of Visitation Area in ICE Module**



Stamps and stationery are available through the commissary.  According to the facility handbook, indigent detainees can request materials without charge, including three pieces of non-legal correspondence each week.  Mail delivery is inconsistent and often delayed by several days according to detainees.  Multiple detainees complained that mail is misdelivered—that they had received the mail of other detainees and had been given their mail by other detainees who had mistakenly received it.  One detainee shared his concern that another detainee may have received and kept photos of his children, as he never received them.  We were unable to independently verify these allegations.

In the barracks, telephones are available to detainees all day except during count.  Detainees in the ICE and Medical Modules have telephone access during their day room time, which may not correspond to the times their loved ones are available.  Detainees cannot receive telephone messages except in case of emergency.  Detainees can purchase a calling card from the commissary for $22 or they can make collect or "advance pay" calls to individuals who set up an account with the telephone service provider.  Calls are monitored or recorded and will disconnect if the system perceives the call recipient to be attempting to create a three-way call.  If cell phone service fails and the call is dropped, a new initiation fee must be paid to reconnect the call.

Telephone rates are quite expensive, limiting the calls many detainees can make.  Although the Federal Communications Commission (FCC) has prohibited correctional systems from charging high initiation fees for both interstate and intrastate calls, the FCC rules limiting the costs of intra-state calls have been enjoined in federal court.  As a result, collect calls from Theo Lacy within the State of California are $4.00 for local calls, $3.50 plus $0.10 per minute for intraLATA (within the same phone company area), and $3.00 plus $0.69 per minute for interLATA/intrastate calls.

Cal DOJ tested telephones in the modules and barracks during our tour and they appeared to be in working order.

## G. Sexual Harassment and Abuse Prevention and Investigations

Deputies and other facility staff that work with ICE detainees receive training on PREA requirements annually.  Videos explaining detainees' rights under PREA are shown during intake and sometimes in the housing units.  Detainees can report sexual harassment and assault by filing a grievance or request, telling a deputy, or calling an anonymous tip line.  Deputies are assigned to investigate allegations of detainee harassment or assault.  Sergeants investigate allegations of deputy wrong-doing.  Facility staff consistently reported that the investigation includes a medical exam and interviews with the victim and alleged perpetrator.  According to staff, most of these interviews are videotaped so they can be reviewed by decision-makers.  The investigating deputy files a report, which is sent to a sergeant for approval.  If criminal conduct is alleged, the report is referred to Orange County's special victims' unit for further review.  Detainees who are the subject of a PREA complaint will typically, if not always, be separated by a change in custody, even if the facility deems the complaint unfounded as a result of its investigation.  Several detention staff stated that they believed a high number of PREA complaints against fellow detainees are motivated by a desire for housing changes.  Based on Cal DOJ's review of records, there were nine PREA complaints between January 2017 and the date of our site visit.  The facility found all of them to be unfounded or unsubstantiated.

The inspection team observed PREA information posted in the housing units and that PREA review policies were appropriate.  Cal DOJ did not encounter any detainees who had filed a PREA complaint or complained of sexual assault or harassment.

## H. Staff and Detainee Relations: Rules, Discipline, and Assistance

Theo Lacy staff expressed pride in their facility's management of detainees and believed they were meeting all applicable standards with regard to the care and custody of immigration detainees.  But with the exception of three employees—two deputies and an administrative manager—who had a long tenure working at Theo Lacy on the immigration detention program, most of the custody staff working with the ICE detention program are new to their positions.  The commander, lieutenants, and sergeants working with ICE detainees at the time of our visit only came into their assignments in early 2018.  Many of the housing deputies assigned to immigration detainee areas were relatively new to the Sheriff's Department and had worked with immigration detainees less than a year.

Although a few detainees reported having mutually respectful relationships with deputies and other custody staff, most detainees Cal DOJ interviewed described the deputies as at best, disre-spectful and at worst, abusive.  Both detainees and facility staff described language barriers as one of their greatest challenges.  Many facility staff interviewed were aware of a common complaint by detainees, namely that they are treated like "inmates," even though their detention is not justified as punishment for a criminal conviction or pending trial on criminal charges.  See above, Section II.2.A.

Indeed, staff largely reported that the immigration detention population is more compliant than the county population, and several facility staff stated that the majority of detainees should not be housed in a maximum-security setting.  Nevertheless, detainees are generally subject to the same restrictions as the county population.  Differences in treatment identified by Theo Lacy staff are: (a) detainees are supposed to be permitted 20 minutes instead of 15 minutes to eat their meals; (b) detainees are entitled to more frequent clothing exchanges and have access to free toiletry items; (c) detainees are not subject to strip searches; (d) detainees are offered outdoor recreation every day instead of four days a week; and (e) there is an extra deputy in the ICE Module to facilitate detainees' legal visits.

Despite their different custody status and subject to the exceptions enumerated above, immigration detainees are treated the same as the county population in this maximum-security facility.  This includes random personal and bunk searches, rules against talking while waiting in line to eat, and harsh punishments in response to minor rule violations.  Language and cultural barriers add to the difficulty as immigration detainees may be unaware of rules and unable to follow orders given in English.

### (i) Language and Culture

Several custody staff interviewed identified language barriers as a challenge in working with the detained population at Theo Lacy.  When asked how they worked with non-English-speaking detainees, most staff said they get another detainee to translate.  To determine the language needed to communicate with detainees, the intake and medical areas have an "I Speak" language identification guide that detainees can use to point to one of over 60 languages.  Facility staff were generally aware of the availability of a telephone language interpretation line, known as a "language line," but very few had made use of it or observed other staff using it.  During the intake process, staff rely on other bilingual staff, if available.  Staff also stated they use Google Translate if there are not bilingual staff that can translate, and they believe it works well.  Other than medical staff, which detainees reported to be using the language line to communicate with non-English speakers when there is no staff available to translate, there appears to be no protocol or clear understanding of the preferred practices to bridge language barriers in the facility.  And while Theo Lacy employs a number of bilingual staff in a variety of languages, language ability is not a factor considered in assigning staff to shifts that serve the immigration detainee population.

The inability of detainees to understand facility staff and to communicate their needs significantly impacts their experience in detention.  Many detainees reported that they do not understand the deputies' orders and rely on the help of other detainees to understand the rules of the facility as well as how to fill out medical and other requests.  Many detainees also reported that some of the deputies get angry and yell at non-English speaking detainees for not responding to orders.  One detainee reported that he asked a deputy for an interpreter so that he could complain about the confiscation of his bible.  The deputy did not help him secure an interpreter and the detainee never understood why his bible was confiscated.  He understood the deputy to tell him, *"Go back to your place," "Shut up,"* and *"This isn't a luxury hotel. You're not at home, you're in jail."*  The detainee did not submit a grievance because he did not know how to do so.

While Cal DOJ could not corroborate this incident, it is consistent with similar reports from other detainees.

**(ii)  Training**

All sworn Sheriff's Department staff attend a 28-week academy.  Jail staff also attend a 120-hour jail academy to learn protocols for custodial assignments.  This training includes an eight-hour training specific to immigration detention. In addition, jail staff who are assigned to a position that has contact with or responsibility over immigration detainees participate in a six-week on-the-job training program at one or both of the Department's immigration detention facilities.

Sworn Theo Lacy staff also complete 40 hours of in-service training annually, which includes a four-hour ICE "refresher" course for staff that work with immigration detainees.  Due to the relatively new composition of the current command staff—of which 13 of 18 sergeants in the facility were newly assigned to their positions in early 2018—Cal DOJ is concerned that staff may not be in an optimal position to provide robust on-the-job training and oversight due to the absence of institutional knowledge about the specific needs of immigration detainees.

**(iii) Discipline and Control**

The formal discipline system at Theo Lacy allows deputies to deny privileges such as telephone use, outdoor recreation and/or commissary for up to five days to discipline detainees for a minor rule violation.  Policy prevents deputies from denying day room time in the ICE Module for a minor rule violation.  Discipline for major rule violations can include loss of all privileges—commissary, visiting, recreation, and program classes but not religious services or legal calls and visits—and confinement to disciplinary isolation.  However, such discipline cannot be imposed without a disciplinary hearing.  The policy also allows the restriction of privileges for a group of detainees in response to a group refusal to obey jail rules or where there is a disruption of jail operations.

A partial list of rule violations per Orange County Sheriff's Department policy is provided in Table 28.

**Table 28. Partial List of Rule Violations per Orange County Sheriff's Department Policy**

| Minor Violations | Major Violations |
|---|---|
| • Failure to rise for reveille | • Fighting |
| • Not dressed in full jail-issue clothing | • Creating a disturbance |
| • Failure to have bunk made up properly | • Failure to obey a directive |
| • Failure to clean assigned area | • Insubordination or disrespect |
| • Passing food from table to table in dining hall | • Possession of contraband which would pose a security threat |

According to facility staff, in the event of a major rule violation that impacts facility safety, such as a fight, the detainees involved are taken to a holding cell in the intake loop, where medical

and mental health staff evaluates them, custody staff interviews them, and classification staff considers whether to reassign them to new housing.  Only then are those detainees who appear to be culpable written up.  Thereafter, a hearing is convened within 72 hours before the watch commander.  If detainees are found culpable of a major disciplinary action, they may be sent to the Special Management Unit—disciplinary isolation—for as much as 30 days.  There is a 14-day appeal deadline for all discipline.

In addition to the formal discipline system, detainees reported several informal strategies that facility staff use to control and manage immigration detainees.

Detainees in the modular units reported that deputies turn off the TVs or cancel day room to punish the entire sector or a group within the sector for the actions of one detainee.  We were unable to verify these allegations.

In the barracks, sometimes a detainee representative, known as "the mouse," acts as a liaison between detainees and jail staff.  Reports from facility staff and detainees differ regarding the structure of this informal control system.  Detainees report that the mouse is given duties by deputies, such as mail delivery and distributing shaving razors.  Detainees who ask questions of the facility staff may be directed to "ask the mouse" for answers or pass the questions to staff. Facility staff acknowledge the "mouse" position but deny that the mouse has any formally as-signed duties or authority over other detainees.

There are also three groups within at least one of the barracks that act as self-policing forces within the barrack.  According to detainees, these groups "discipline" their member detainees for bringing attention to the barrack (or "house").  One of the groups is alleged to punish its other detainees by a 16-second beating in the showers, outside of the view of the facility's video cameras.  Cal DOJ staff confirmed that the showers in the detainee barracks—as opposed to similar showers in the county population's barracks—is not captured by video cameras.

Detainees policing each other—including the "mouse," if he has authority or control over other detainees—violates Orange County Sheriff's Department policy, which states:

• No inmate will inflict punishment upon another inmate; and
• No inmate may be given authority over, or permitted to exert control over any other inmate.

As explained below, custody staff demeanor, their implementation of bunk and cell searches, and displays and uses of force also act as significant and problematic methods of controlling be-havior.  In the barracks, another substantial threat is the possibility of being moved to extremely restrictive modular housing.  Many detainees expressed an unwillingness to complain or ask questions for fear of annoying a deputy and being rehoused in a more restrictive environment.

**(iv)  Demeanor of Custodial Staff**

Perhaps the most important factor influencing staff and detainee relations is the demeanor of custodial staff toward immigration detainees.  Although some detainees report they have no problem getting along with deputies, most detainees report that at least some of the deputies inappropriately yell at and make fun of immigration detainees, particularly those that do not speak English.  Detainees who did not have access to religious services in their religion of choice and ran their own prayer groups reported that some deputies seemed to make a point of walking through their prayer groups in a manner detainees believe is disrespectful.

Cal DOJ was not in a position to corroborate or rule out the underlying facts that detainees reported during our interviews.  Therefore, Cal DOJ makes no findings regarding the following but notes that detainees reported, in a fairly consistent manner, that:

- Few deputies answer questions or assist with detainees' requests, and many deputies instead put detainees' requests off until "later," or tell them to return to the barracks or get away from the glass (in the module);
- Deputies yell at the detainees—sometimes close to detainees' faces—and use profanity, in  response to minor mistakes or to detainees looking at deputies directly in the face or verbally responding to them, and even in response to requests to change the television channel or allow a detainee access to hot water;
- Some deputies mock detainees, including their appearances and problems and some detainees' inability to understand English;
- Deputies are particularly harsh in the line for the dining hall, prohibiting detainees from talking to each other and prohibiting them from going to the dining hall if they speak or laugh;
- Deputies engage in physical roughness, such as unnecessarily rough personal searches, kicking and shaking detainees' bunks to wake them for count, and pushing detainees against the wall; and
- Detainees fear retaliation in the form of bunk or cell searches, yelling, physical roughness, or denial of privileges if they complain about anything.

**(v)  Bunk and Cell Searches**

Pursuant to Orange County Sheriff's Department protocol, deputies conduct two types of searches in detainee housing areas: (1) Facility Assigned Search Team (FAST) searches, and (2) random deputy searches.  FAST searches are planned searches conducted by a team of deputies, and Theo Lacy has an operational goal to conduct two FAST searches each week.  Random deputy searches may be conducted at any time at the discretion of housing unit deputies.  Random deputy searches are not consistently logged unless they reveal a significant find, such as drugs or other contraband.

According to Cal DOJ's correctional expert, random searches are common in a custodial setting, but the manner in which the searches are conducted is critical to evaluating whether they are

**Figure 29. Detainee Reports Regarding Treatment by Deputy**



appropriate.  Many of the detainees our team interviewed reported that certain deputies throw
detainees' belongings on the floor, open and throw commissary items such as coffee grounds
around the housing unit, and confiscate or throw away personal items such as photos without
explanation when they conduct cell and bunk searches.  Cal DOJ's limited review of video from
one bunk search was insufficient to corroborate or rule out the accuracy of detainee complaints.
The video showed deputies sending detainees out of the barrack to search their bunks, confiscating
items, and leaving personal belongings spread out on detainees' bunks.

**(vi)  Use of Force**

According to facility staff, Orange County Sheriff's Department policy allows staff to use force
on detainees only when it is "objectively reasonable."  Through facility staff interviews and
observation of the facility, we learned that deputies have used pepper spray to break up fights
between detainees.  Deputies carry pepper ball guns while supervising immigration detainees
and individuals in county custody in the dining hall line.  We learned from facility staff of one
incident in which a deputy was assigned to escort a detainee from one cell to another.  The de-
tainee refused to comply with orders, claimed to be "feeling suicidal," and broke free from the
deputy's grip.  The deputy took the detainee to the ground and struck the detainee in the face
to overcome his resistance.  The detainee was hospitalized for his injuries.

Nine of the detainees with whom we spoke reported they had experienced or observed physical
assaults by detention staff (Fig. 29).  Several detainees described situations where a group of
deputies "jumped" another detainee, put him in restraints, and then took him away.  However,
the detainees who shared this information were not in a position to know the reason for the
deputies' actions.  Cal DOJ cannot conclude, based on uncorroborated detainee statements
and other information reviewed, that there is a problem with excessive force in the facility.  But
in light of the serious harm that comes from excessive use of force, this is an area Cal DOJ will
continue to explore in subsequent reviews of the facility.

**(vii)  Disciplinary Segregation**

The Special Management Unit (SMU), the unit to which detainees in disciplinary segregation are assigned, has eight cells (Fig. 30).  Each cell has a heavy metal locked door with a window to the hallway.  There is a portable telephone in the hallway that can be wheeled into each cell for legal calls.  Theo Lacy policy allows confinement in disciplinary segregation for a "major" rule violation, and defines such major rule violations to include "disrespect to staff."

During the first part of Cal DOJ's comprehensive site visit, there was one detainee in disciplinary segregation.  He was on a 24-hour lock down for 30 days, with the following privileges suspended: day room and television, outdoor recreation, public visiting, personal telephone calls, commissary, newspapers, magazines, or other publications (except one book from the jail library and one religious text), and cards or games.  Cal DOJ's correctional expert observed security checks marked on the log every 30 minutes.  However, with respect to the two daily required medical checks, Cal DOJ's corrections expert observed that one of the medical checks consisted of a nurse looking in through the window in the door without any communication or questioning of the detainee.  Review of video from another disciplinary segregation case captured another inadequate welfare check, in violation of the Orange County Sheriff's Department policies.

**Figure 30. Photo of Disciplinary Segregation Cell**



The March 2017 OIG report and the February 2017 ODO inspection report both found deficiencies or violations of ICE detention standards for disciplinary segregation.  One of the violations noted was that Theo Lacy does not provide recreation to detainees in disciplinary segregation although the applicable ICE detention standard requires one hour of recreation per day, five

days a week, "unless documented security or safety consideration dictate otherwise."  Cal DOJ found that this is an area where Orange County Sheriff's Department policy conflicts with ICE detention standards.  Under County policy, outdoor recreation is suspended for any individual sentenced to disciplinary segregation, but the 2008 PBNDS require a case-by-case evaluation and specific documented reasons detailing the threat or safety concern justifying denial of recreation.  Cal DOJ's correctional expert raised this issue with facility staff whose position was that Theo Lacy does not place any detainee into disciplinary segregation unless they present the kind of risk contemplated by the standards.  However, Cal DOJ's observations and record review belie that position.

The immigration detainee who was in disciplinary segregation during Cal DOJ's site inspection was being punished for "disrespect to staff."  None of the records related to this infraction, nor any other records in this detainee's file, contained notations of assaultive behavior or risks to officer or operational safety.   Instead, the basis for the discipline was that the detainee had used vulgar language with a staff member during a welfare check while he was in disciplinary segregation on a previous occasion.  Review of additional records related to Theo Lacy's application of disciplinary segregation to immigration detainees shows that 18 of 40 detainees placed in disciplinary segregation from January 1 to October 15, 2018, were denied any outdoor recreation, although the conduct for which they were punished was non-violent and non-threatening behavior.  In 11 cases, the charge was "disrespect to staff."  In one instance, a detainee was assigned to nine days of disciplinary segregation for being "argumentative" with deputies, without even an alleged use of profanity.

Theo Lacy's use of disciplinary segregation for minor offenses is alarming.  Even the American Correctional Association's standards—which are intended for a criminal rather than civil detainee population—recommend that restrictive housing be used "only for behaviors which pose a direct threat to the safety of persons, or a clear threat to the safe and secure operations of the facility."  The detainee Cal DOJ spoke to had been placed in total isolation based on vulgar language and insults three times.  One of the vulgar statements was made when he was in the middle of serving a 30-day sentence, and on one occasion, a nurse ordered him to be released from segregation for a mental health evaluation.  These facts raise concerns about the mental health impact of Theo Lacy's use of disciplinary segregation on immigration detainees, as well as the possibility that isolation is being imposed in part because of mental health problems experienced by the facility's immigration detainee population.

During Cal DOJ's debrief call with County leadership, they reported that they had not used disciplinary segregation for immigration detainees for two months.  Following the call, the Orange County Sheriff's Department provided an updated policy that brings Theo Lacy in line with the 2008 PBNDS recreation requirement for detainees in disciplinary segregation and provides, "Detainees will not be placed in disciplinary segregation for verbal disrespect to staff, unless it creates a disturbance or threatens security, (e.g. detainee is verbally abusive to the staff member in the presence of other detainees)."

**(viii)  Requests and Grievances**

Detainees can make requests verbally to deputies or by filling out a request slip and depositing it into a box in the housing area.  Detainees can submit grievances by placing them into another box which is checked by the housing sergeants (Fig. 31).

**Figure 31. Photo of Grievance Box**



With respect to both grievances and requests, most detainees reported that their requests and grievances went largely unanswered.  Many detainees reported that they did not bother submitting requests or grievances because they believed it was useless and that doing so would create a risk of retaliation.  In one of the disciplinary segregation records provided to Cal DOJ, a detainee was placed in disciplinary segregation for "creating a disturbance," and the detainee's explanation for his behavior was his desire to speak to a sergeant about his concern.

Theo Lacy provided records of detainee grievances, which revealed that some grievances were resolved in a manner that addressed the detainee's concerns and others were not.  For example, one detainee submitted a grievance requesting a telephone call to his family and the call was provided.  Another detainee submitted a grievance stating that he had not received expected books and eyeglasses in the mail.  The only resolution noted in the grievance log is: *"Mailroom staff advised the eye glasses were returned to sender due to being in an eye glass case. They have not received any books for detainee."*

With respect to staff misconduct grievances, all but three of the 27 staff misconduct grievances in the log provided to Cal DOJ showed the allegations were found to be unfounded or the grievance was otherwise resolved in the staff member's favor.  The three remaining grievance outcomes are not detailed on the log, which noted they had been referred to other investigations.

Cal DOJ does not have enough information to make a clear finding regarding Theo Lacy's handling of detainee requests and grievances.  Available records show that in many cases, detainee

grievances are not sustained, which is consistent with detainees' reports that the facility does not consistently provide meaningful assistance in response to detainees' requests and grievances.

# I. Healthcare

Healthcare is provided by Orange County Health Care Agency.  On-site care is included in Orange County's IGSA with ICE.  Off-site specialty care must be approved and paid for by ICE.

Detainees go through an intake screening at Orange County's Intake Release Center (IRC) before arriving at Theo Lacy and receive a more thorough medical screening within 14 days of arrival.

Detainees can request a medical appointment by filling out a request form and placing it in a box in the housing unit.  Medical staff pick up these slips four times a day, review them for urgent needs, and generally schedule an appointment the following day.  In the event of an emergency, detention staff can seek immediate medical response.  Detainees generally reported that they were seen promptly after submitting a request, but some detainees did complain that deputies refused to call for immediate care at a detainee's request.  As a general matter, it appears that medical staff properly protect patient privacy by only using other multilingual medical staff or a language line to communicate with non-English speaking detainees, as opposed to utilizing other detainees or custodial staff, as in other settings.

Dental cleanings are provided after a detainee has been at the facility for six months.  Many detainees reported that they were offered only extractions, and specifically denied tooth saving procedures like fillings and root canals.  However, another detainee reported he had received a filling and in conversation with Cal DOJ's medical expert, the newly appointed dentist described his practice as including these types of procedures.

Many detainees with whom Cal DOJ staff spoke were satisfied with the medical and mental health care provided, though several were unhappy with individual decisions denying requested accommodations and treatment.  Among other issues raised, several detainees complained that the housing units are very cold, which aggravated back pain and other physical conditions and that they had been unable to obtain additional bedding or clothing to address these concerns.  Other detainees complained that medical staff did not approve their request for shoes and are forced to use sandals which reportedly aggravate prior injuries.

Facility staff mentioned healthcare delays and complaints as one of the more common topics for grievances and reported that such grievances are referred to the County Health Care Agency for resolution.

### (i)  Medical Care Concerns

In general, our medical expert found the medical care delivered to detainees at Theo Lacy to be adequate.  The clinical leadership team is well-informed, actively engaged, clinically strong and working hard to keep patients safe.  In addition, Theo Lacy's access to a centralized pharmacy

is a positive feature that allows it to get new medications started quickly.  There are areas for
improvement, and the healthcare leadership team is already aware of some of the following:

### (1)  Disciplinary Segregation Welfare Rounds

Theo Lacy appropriately requires healthcare staff to conduct "welfare checks" on detainees
in disciplinary segregation.  This is a standard of care in detention facilities and important
because the use of isolation cells is associated with a high rate of morbidity due to a number
of vulnerabilities, including injuries that may have been sustained in altercations with other
detainees or through use of force by detention officers, psychological stress from isolation,
and impaired access to healthcare.  The proper way to conduct a welfare check is to ask the
detainee if he is okay and if he has any health needs, while making sure that his appearance
and oral responses do not raise any concerns.  Typically, this can be completed in a few sec-
onds.  However, video replays from Theo Lacy revealed medical staff signing the log without
opening the door or interacting with the detainee in any way.  Ensuring that welfare checks
include verbal interactions with detainees will allow medical staff to identify and flag con-
cerns for further evaluation.

Following Cal DOJ's debrief call with Theo Lacy, the County Health Care Agency reported
that it presented the correct procedure for observation checks at staff meetings and has
plans to conduct additional training to address this concern.

### (2)  Registered Nurse Episodic Care Visits

In performing nursing assessments, RNs sometimes failed to elicit sufficient information
through questions and taking of vital signs to rule out potentially serious medical concerns,
and failed to address all the concerns raised in a single examination.  Although health
managers at the facility are aware of this problem and are addressing it through additional
training, it is likely that training alone is not sufficient to ensure proper diagnoses of all new
problems.  Another solution could include limiting RNs to assessing and managing common
complaints and referring more complex issues to nurse practitioners or physicians.

Following Cal DOJ's debrief call with Theo Lacy, the County Health Care Agency presented
its policy on refused medication and missed doses and informed Cal DOJ of its plans to
conduct additional training to address this concern.

### (3)  Scope of Practice – Detention Officers

Detainees reported and our review suggests that deputies sometimes make judgments
about whether to call a nurse in response to detainee requests.  Although deputies are
trained in first aid and are able to recognize obvious emergencies and provide care while
waiting for emergency medical personnel, they are not trained, educated and licensed to
evaluate and triage requests for medical care.  This concern can be addressed by ensuring
that deputies communicate requests for medical attention to a registered nurse or practi-
tioner immediately, regardless of the custody staff's level of concern.

(4)  Access to Off-Site Care

Review of medical records revealed frequent delays in ordered treatment due to transportation conflicts.  In one example, a patient had a lump in his testicle for which the medical staff ordered an ultrasound, which was scheduled to be completed off site one month later.  On the day of the ultrasound appointment, there was not enough room in the vehicle designated for transport.  The appointment was rescheduled twice due to transportation conflicts, resulting in a nine-week delay from the initial evaluation.  Theo Lacy can address the need for timely compliance with orders for off-site procedures by ensuring there is dedicated medical transportation available.

(5)  Medication Administration

Theo Lacy's electronic system automatically notifies a practitioner if a detainee misses three doses in a row or five in a month, and otherwise relies on a LVN to identify concerns raised by a detainee missing a single dose.  There are many medications for which even a single missed dose confers some risk and LVNs are not trained and licensed to evaluate that risk.  Changes to Theo Lacy's automatic notification system can ensure that practitioners are notified of all critical missed doses.

(6)  Disaster Preparedness

Theo Lacy's recent experience with three separate chicken pox outbreaks revealed a vulnerability in its ability to respond to disasters.  Due to quarantines required by the chicken pox outbreak, some patients experienced delayed access to care.  Medical staff have already identified this problem and have made changes to procedures.  Policy changes and further review of disaster policies and protocols can help healthcare staff ensure detainees safety in the event of future disaster or other emergency.

Following Cal DOJ's debrief call with Theo Lacy, the County Health Care Agency reported that it presented information on continuing sick calls during quarantines at staff meetings.

(7)  Electronic Records System

There are two issues with the electronic health records system at Theo Lacy that can potentially impair patient care.  First, the current system does not allow a practitioner to view the complete chronology of a patient's care in a single place, but requires navigation to two or more screens to see the patient's full history.  Second, a review of electronic records showed that paper copies are sometimes scanned into the system and labeled with the scan date rather than the date of the paper record.  This creates an inaccurate chronology.  These concerns can be addressed by training and supervising staff to enter records in chronological order and by altering the electronic health records systems to allow the full chronology to be viewed on a single screen.

**(ii)  Mental Health Care Concerns**

Mental health services for detainees at Theo Lacy are provided at IRC and by Orange County mental health clinicians assigned to Theo Lacy.  Detainees are screened at IRC for medical and mental health issues.  Detainees who experience acute mental health issues while at Theo Lacy are returned to IRC for stabilization.  If detainees cannot be stabilized within 72 hours at IRC, ICE is called for assistance in securing detention in a more appropriate facility.

Of the 501 immigration detainees at Theo Lacy at the time of Cal DOJ's site visit, 115 were receiving mental health services.  Those detainees present with significant degrees of psychiatric acuity, with 91 detainees on psychotropic drugs, including 37 on anti-psychotic medication.  Mental health care staff informed the Cal DOJ team that there were 15 acutely psychotic detainees on site, despite a structure that should have resulted in acutely psychotic individuals being transferred to IRC for stabilization or transfer to another facility.

Mental health services are provided to ICE detainees by a part-time psychiatrist, a part-time psychologist, two part-time social workers, two full-time psychiatric nurse practitioners, and a part-time psychiatric technician.  Detainees also have access to a tele-psychiatrist from 8:00 p.m. to midnight four days a week.  At the time of our visit, the position of Mental Health Program Manager was vacant and had been since May 2018.  Unlike medical staff, which meets quarterly to discuss both administrative and clinical issues, mental health staff have no formal meetings, either among themselves or with custody staff responsible for on-the-ground oversight of detainees.

Mental health care staff acknowledged that, with a case load of 77 patients per clinician and a lower than average rate of mental health services, they are unable to provide mental health services at an appropriate standard of care.  Orange County's contract with ICE calls for individualized treatment plans for each detainee treated by Theo Lacy's healthcare system, but Cal DOJ saw no indication that this practice is followed.  Mental health staff acknowledged there is a high incidence of trauma among detainees—from both home country experiences and experiences in our country's immigration enforcement system—and that these warrant both more mental health staff and more training for correctional staff on trauma and its manifestations.  Theo Lacy mental health services are largely limited to crisis intervention.

Cal DOJ's mental health expert held 21 interviews with a selection of detainees.  Of these detainees, 11 had spent between five and fifteen days in disciplinary segregation.  Of these eleven, six were on psychiatric medications, including anti-psychotic medications.  Although a small sample, the fact that psychiatrically disordered detainees are being placed in disciplinary isolation is an indication that they may not be receiving the mental health care they need.

# 6. Due Process

## A. Due Process in the Facility: Inadequate Notice of Rules and Opportunities

Facility and ICE handbooks and posted notices are generally available in English and Spanish, with some postings in additional languages.  There is no clear means by which detainees who cannot communicate in English or Spanish can familiarize themselves with the information in the handbooks that ICE and the facility issue.  The failure to provide these rules in a detainee's primary language or otherwise communicate their content to non-English and non-Spanish reading detainees conflicts with Orange County Sheriff's Department Policy 1600.1(d) which states:

> Inmates are required to read, understand and comply with inmate orientation provisions and jail rules. Any violation of law or jail rules may result in jail discipline and/or criminal prosecution. If there are any questions, inmates should ask a member of the jail staff for clarification.

Failure to orient detainees who cannot read the detainee handbooks and posted notices and who cannot understand instructions from facility staff leaves them without notice of the expectations for their behavior.  This in turn can lead to discipline and loss of privileges.

## B. Ability to Access Legal Services and Representation

### (i)  Legal Orientation Opportunities and Legal Counsel

Theo Lacy does not offer a legal orientation program where legal services organizations provide comprehensive explanations about immigration court and basic legal information to large groups of detained individuals.  The facility does allow an immigration legal services organization, Asian Americans Advancing Justice-Los Angeles, to meet with detainees in visitation rooms to provide individual consultations.  However, the availability of this program is not well-known.  Several facility staff were unaware of the opportunity, as were the majority of the detainees we interviewed.  Only two of the detainees interviewed by Cal DOJ had participated in a consultation and one indicated that he had obtained an attorney through this program.

Theo Lacy plays the American Bar Association's (ABA) "Know Your Rights" video in several languages in certain housing units on some mornings.  Many of the detainees we met had seen these videos in the early morning hours, but there were also many detainees who had not seen them.

Over half of the detainees Cal DOJ interviewed—50 of 91—were represented by counsel.  However, given the much lower rates of representation for detained immigrants generally, this high rate of representation is not likely consistent throughout Theo Lacy's immigration detention population and may be more representative of individuals who felt comfortable speaking with our team because they were represented by counsel.[120]  The attorneys that participated in Cal DOJ's survey reported having a more difficult time visiting their clients at Theo Lacy compared to all other detention facilities.

---

[120] See infra n. 134.

**(ii)  Law Library**

Immigration detainees at Theo Lacy can request access to computers containing legal informa-tion provided by ICE—via a LexisNexis disc—to the facility.  Theo Lacy provides each detainee a CD on which he can save legal materials and drafts of documents.  According to facility staff and the detainee handbook, detainees can also request materials from the Orange County law library.  The one detainee with whom Cal DOJ spoke that had attempted to make such a request reported that he did not receive a response.

The LexisNexis materials include immigration statutes and case law, as well as legal orientation materials from the Florence Project, and ABA Know Your Rights materials from 2013 in Arabic, Chinese, English, French, Portuguese, Spanish, and Vietnamese.  Other than the ABA materials, nearly all of the materials are offered only in English, with additional limited materials in Spanish. Cal DOJ attorneys who examined the materials found them difficult to navigate.  To assess detainee reports that the materials are out of date, Cal DOJ attorneys attempted to locate several recent Board of Immigration Appeals and U.S. Supreme Court cases, and were able to locate only three out of four in two separate attempts.

Detainees reported a variety of experiences with the law library.  Several reported being able to use the law library and finding it helpful, and some mentioned the need to plan ahead because of delays in getting access to the law library (particularly in the ICE Module) and in sending and receiving legal mail. A few detainees mentioned being unable to secure assistance from deputies when there were technical problems with the computers or printers, and one detainee reported that the facility lost the disc where he had saved his work and he never recovered it.  Detainees who needed to access material in Punjabi, Russian, and Korean reported being unable to use the law library at all.

**(iii) Mail and Calls**

  **(1) Mail**

  According to policy and the detainee handbook, legal mail is to be opened in front of the detainee to whom it is addressed.  Detainees report that this policy is inconsistently practiced.  In addition, detainees report that delays in the delivery and sending of mail can impact their ability to comply with deadlines in their legal cases.

  According to the detainee handbook, there are limits on how much legal writing material detainees can keep in their cells or bunks.  Stamps are available through the commissary and the detainee handbook provides that indigent detainees will be permitted to mail a reasonable amount of mail each week, including at least five pieces of legal correspon-dence.

(2)  Telephones

Detainees who can afford a calling card can call attorneys, witnesses, and other persons they may need to contact to obtain documents or other support.  The detainee handbook does not describe any options for indigent detainees to make free legal calls, so detainees without money in their account are left to attempt to make collect calls, or are otherwise limited to calling consulates, certain federal agencies, and a small number of legal services organizations that are available through a "pro bono platform" administered by a telephone company that contracts with ICE.

**Figure 32. Photo of Phone and Postings in Barracks**







**Figure 33. Photo of Phone and Postings in Disciplinary Segregation**

The Executive Office of Immigration Review (EOIR), provides a list of pro bono and low cost immigration legal services to detainees when they go to court, and the facility telephones include free speed dial numbers to some of these organizations.  However, very few detainees reported being able to reach those organizations and none of the detainees we spoke to were able to secure representation in their immigration cases by contacting the organizations on the EOIR list.

Phone access is particularly problematic for detainees housed in modular housing.  As described above, phone access is limited to the one hour of day room time detainees have each day in the modules.  This can be a problem when detainees' day room time occurs outside of business hours and because detainees are unable to reliably schedule times to speak to attorneys or others helping them with their cases.  According to facility staff,

detainees can request to use a phone outside the day room time for privacy, but a housing deputy who was present for this conversation reported he had never received such a request. A long-time detainee told us that requests to use the phone outside of normal day room hours are rarely granted.

> *If you are in module housing, the telephones will be available to you during your day room time only.*
>
> *In case of an emergency, such as illness or death in your family, staff can assist you in making telephone calls when access to telephones would not normally be available. Routine telephone calls to attorneys are not considered to be emergencies.*
>
> *Orange County Sheriff's Department*
> *Supplement to ICE Detainee Orientation*
> *Handbook*

In addition, with the exception of the pro bono platform, detainees cannot navigate an automated answering system or leave a voicemail because the telephone system requires the call recipient to actively accept the call before a detainee can even explain the purpose of his call.  In this way, an individual seeking to call his former employer, pastor, a police station, or a hospital for evidence or support may never be able to introduce himself because he would first have to press a certain number to request an operator, or because the call recipient would not know to accept the call.

Even when detainees are able to use the telephone for legal calls, there is no privacy when discussing sensitive matters, such as the detainee's legal claims and defenses.  In addition to being recorded and/or monitored, the telephones available to immigration detainees are located in public areas of the housing unit, within earshot of facility staff and other detainees. This significantly undermines any possibility of confidential attorney-client communications, or a consultation with an immigration expert to discuss a detainee's case.  As with legal visits, attorneys that participated in Cal DOJ's survey reported having more difficulty getting messages to and receiving calls from their clients at Theo Lacy compared to all other detention facilities in California.

# 7. Conclusion

Theo Lacy provides a highly restrictive environment for immigration detainees, including cell confinement for 22 hours a day for a significant portion of its detainee population.  Yet, by providing one hour of outdoor recreation and one hour of out-of-cell time each day, the facility generally complies with ICE's PBNDS recreation standards.  The facility provides medical care that generally ensures the safety of immigration detainees, but mental health resources are stretched thin.  As explained above, barriers to mail and telephone communication at the facility and the limited scope of the legal materials make it difficult for detainees to participate in their immigration cases and other legal matters, even when are represented by counsel.  For those not represented, particularly those who do not have family in the United States, it is extremely difficult to pursue legal rights and remedies from within detention.

Morale seemed high within the custody staff at Theo Lacy.  While difficult to achieve in a jail setting, there are steps that could be taken to improve morale for the immigration detainees housed there as well, and we encourage Orange County to pursue those changes.  In future reviews of Theo Lacy and ongoing conversation with the Orange County Sheriff's Department, Cal DOJ will continue to investigate and evaluate areas of concern such as the use of restricted housing without procedural protections. We will also continue to monitor those areas of concern raised by detainees that Cal DOJ could not independently corroborate such as cell and bunk searches and use of force.

# VIII   Comprehensive Facility Review: West County Detention Facility

## 1. Background

The West County Detention Facility (West County) opened in 1991 and is operated by the Contra Costa County Sheriff's Office.  It has a total bed capacity of 1,096.  Between 1991 and 2009, West County housed male and female county jail populations.  In September 2009, Contra Costa County entered into an IGSA with the U.S. Marshal's Service to house federal detainees, including immigration detainees.  In March 2010, the agreement was amended to add ICE as a contracting party.  On July 9, 2018, the Contra Costa Sheriff ended its IGSA contract with ICE, and by August 21, 2018, ICE had transferred all immigration detainees out of West County.  The 2000 NDS applied to West County, and ICE paid the facility an $82 per diem for each immigration detainee, with a maximum ICE detainee bed capacity of 269.

**Table 29. West County Key Data Points**

| Facility: | West County |
|---|---|
| Operator: | Contra Costa Sheriff's Office |
| Housing Detainees Since: | 2009 |
| Bed Capacity: | 269 |
| Type(s) of Detainees: | Male and Female Adults |
| July 2015 Intake to August 2018 Departure | |
| No. of Countries of Origin: | 94 |
| No. of Detainees: | 5,373 |
| Average Age: | 34 |
| Average Length of Stay: | 35 |
| Longest Detainee Stay: | 749 days |

Prior to West County's announcement that it would terminate its ICE detention contract, Cal DOJ selected the facility for a comprehensive review due to allegations reported in a series of November 2017 *San Francisco Chronicle* news articles that related specifically to female detainees at West County.  The allegations included: (1) excessive lockdowns; (2) denial of access to restrooms; (3) use of biohazard bags to defecate and urinate; (4) cancellation of free time; (5) lack of access to schooling materials; (6) inadequate access to medical care; (7) punishment for not speaking English; and (8) use of profane language by facility personnel.[121]  The Contra Costa Sheriff's Office took some active measures to address the allegations and its Internal Affairs Unit conducted an investigation.  On December 22, 2017, the Sheriff's

---

[121] Taylor, *Deportation chosen over Richmond jail; complaints under investigation*, San Francisco Chronicle (Nov. 2, 2017) <https://www.sfchronicle.com/news/article/Deportation-chosen-over-Richmond-jail-complaints-12324755.php> (as of Jan. 15, 2019)

Office announced that "[th]e investigation found that nearly all of the complaints were unfounded and unsubstantiated," however, "[s]ome issues were identified, such as the use of profanity by a staff member."[122] Having already prepared for a comprehensive review, and given the seriousness of the allegations, Cal DOJ went forward with our review of West County's housing of civil immigration detainees.  The Contra Costa Sheriff's Office was very cooperative with Cal DOJ throughout the review process.

In August 2018, Cal DOJ conducted a multi-day comprehensive visit to West County.  Our review of the facility was severely curtailed because (1) ICE had transferred most detainees out of the facility in the days before our visit, with the last eight detainees being transferred out during the first day of our visit, and (2) sergeants and deputies that the Cal DOJ requested to formally interview declined our requests upon the advice of their union counsel.  Nonetheless, command and administrative staff as well as Internal Affairs investigators agreed to be formally interviewed, and some other deputies engaged in very brief informal discussions with our experts. As a result, we obtained sufficient information to evaluate the *San Francisco Chronicle* allegations, and found evidence at least partially supporting most of the allegations.  We found that a number of factors contributed to the female population's complaints discussed in this report, including a lack of adequate means of communication between them and personnel; a lack of personnel awareness of gender-responsive practices; the failure to hire additional personnel after the County entered into the service agreement to house immigrant detainees and instead rely on overtime to provide adequate personnel coverage for detainees; and a lack of adjustments to accommodate the cultural differences and needs of the detainee population.

This report also includes some data on the impact of West County's ICE contract termination.

## 2. Methodology

Cal DOJ staff first visited West County on November 16, 2017, when the allegations first arose, and then on December 5, 2017, for a one-day follow-up visit during which female detainees we informally spoke with corroborated the allegations reported in the news articles.  Cal DOJ staff, a correctional expert, and a medical expert returned for a comprehensive visit of West County on August 20-21 and 28-29, 2018.  At the time of the visit, one female detainee was being housed at West County and ICE transferred her out during the first day of our visit.  The visit consisted of a facility tour, interviews with command staff, Internal Affairs investigators, medical staff, individuals responsible for programming, training and transportation, 13 female county jail inmates (hereinafter, "county females") housed in the same building as female immigration detainees, and very brief informal discussions between our experts and some deputies who were working at the time of our visit.  We also considered the evidence reviewed by the Internal Affairs investigation team which included interviews with "110 witnesses, with audio recordings and translators where necessary…, log books, computer entries and other evidence."[123]  In addition, Cal DOJ interviewed

---

[122] Contra Costa County Office of the Sheriff, *Contra Costa Sheriff Announces Findings in Investigation into ICE Detention Complaints* (Dec. 22, 2017) <http://www.cocosheriff.org/civicax/filebank/blobdload.aspx?blobid=22868> (as of Jan. 15, 2019).
[123] Id.



three female detainees who were at West County in late 2017 and later transferred to another detention facility in California, as well as attorneys and advocates who worked with West County detainees.

Cal DOJ also obtained and reviewed additional pertinent documents, including policies and procedures; medical files; facility logs; and prior inspection reports prepared by the Board of State and Community Corrections, county health inspectors, and ICE's contractor, the Nakamoto Group.

On September 14, 2018, Cal DOJ held a debrief call with the Contra Costa Sheriff's Office and West County leadership to provide them with our preliminary findings.

# 3. Summary of Key Findings

From July 1, 2015 intake through early August 2018 departure dates, West County housed 5,373 male and female detainees from 94 countries of origin (Table 30).

**Table 30. Most-Represented Countries of Origin at West County**

| Country | Count | Percentage |
|---|---|---|
| Mexico | 3,662 | 68.16% |
| Guatemala | 462 | 8.60% |
| El Salvador | 323 | 6.01% |
| Honduras | 177 | 3.29% |
| India | 84 | 1.56% |
| China | 41 | 0.76% |
| Vietnam | 26 | 0.48% |
| Philippines | 24 | 0.45% |
| Nicaragua | 22 | 0.41% |
| All Other Countries | 552 | 10.27% |
| TOTAL | 5,373 | 100.00% |

Detainees' average length of stay from July 2015 to August 2018 was 35 days.  However, at least one detainee was housed at West County for 749 days.

Thirty-three female detainees housed at West County between November and December 2017, in the timeframe when the allegations first arose and when Cal DOJ completed its two initial facility visits, had an average length of stay at West County of 162 days; however, eight of them arrived at the facility

in 2016, with the longest length of stay being 589 days as of November 15, 2017.  The 33 female detainees' ages ranged from 23 to 63, and they were citizens of the countries listed in Table 31.

**Table 31. West County Detainee Interviewees' Countries of Origin**

| Country of Origin | Number of Detainees |
|---|---|
| 1.   Armenia | 1 |
| 2.   El Salvador | 2 |
| 3.   Guatemala | 2 |
| 4.   Ireland | 1 |
| 5.   Japan | 1 |
| 6.   Mexico | 25 |
| 7.   Russia | 1 |

Like detainees throughout California, detainees at West County were apprehended in three basic ways—at the border, through internal enforcement efforts, or upon release from criminal detention— and struggled to navigate the complex immigration detention system.  During their detention at West County, female detainees faced difficult conditions of confinement, in part because the facility lacked sufficient staffing for the detainee population, did not take active measures to accommodate the cultural and language needs of the detainee population, and did not have gender-responsive practices that recognize the unique needs of women.

Unlike the Internal Affairs investigation, Cal DOJ's review found that the allegations in the *San Francisco Chronicle* reports were at least partially substantiated.  Specifically, staffing issues caused women to experience extended lockdowns multiple times a day, when toilet facilities were mostly inaccessible, leading them to, at times, defecate and urinate in biohazard bags when locked in their cells.  Facility restrictions on free time led female detainees who did not attend classes and did not have jobs to spend 20-22 hours in their cells every day.  Further, while female detainees had access to classes, all programming was in English, except for ESL, and information about classes was only disseminated by word of mouth.  Overall access to non-English resources and personnel was limited.  Sworn personnel aggravated these conditions by using profane language towards female detainees.  When women requested medical care, the facility did not provide timely and adequate medical care.  These conditions made it difficult for female detainees, some of whom, upon transfer out of West County to a privately-operated facility, reported that conditions were generally better at the privately-operated facility.

As early as November 2017, the facility took active measures to address some of these issues.  For example, it (1) changed staffing, lockdown and food policies; (2) removed biohazard bags from the housing units; and (3) logged building lockdowns in central control logs.  These measures alleviated some of the conditions of confinement faced by female detainees.

# 4. Apprehension and Transfer of Detainees to West County

## A. Female Detainees' Apprehension

The female detainees were apprehended in a variety of locations.  One woman was apprehended outside of her Arizona home.  Another was apprehended at her California place of work.  A third woman was apprehended outside of a California state courthouse.  ICE apprehended a fourth woman at a U.S. Citizenship and Immigration Services (USCIS) asylum office.  Table 32 summarizes where 32 women housed at West County in summer 2018 were apprehended:

**Table 32. West County Detainee Location of Apprehension**

| Apprehension Location | No. |
|---|---|
| Port of Entry (border or airport) | 6 |
| Work, home, courthouse, asylum office | 4 |
| Upon release from a California state prison | 2 |
| Upon release from a California county jail | 8 |
| Upon release from the Federal Correctional Institution in Dublin, California | 11 |
| Unknown | 1 |
| Total | 32 |

Six of the women were legal permanent residents at the time of apprehension.  Many of them asserted that they feared returning to their countries of origin and ICE referred them for a credible fear interview to determine whether they could pursue a claim for relief.

## B. Female Detainees' Transfer to West County

ICE transferred 31 of the women to West County after apprehension and processing at a local ICE processing office.  It is unclear when ICE transferred the last woman to West County.

# 5. Conditions of Confinement at West County

West County housed low or medium security female detainees with county jail females in a mixed population building.  The female housing unit is self-contained, away from males, with its own medical unit, library, recreation yard, and two classrooms.  Male and female custody deputies on shift are stationed within the unit at a central location.  During our visits, the facility was generally well maintained.

The two-level female housing unit has two sides—A and B—each with 64 double bunk cells (Fig. 34). In November 2017, female detainees were housed in side A.  Most of the cells are "dry," meaning that they do not have a toilet or sink (Fig. 37).  Instead, group toilets and sinks are available to female detainees and county females in common areas.  A few cells on each side are "wet" cells, with toilets and sinks (Fig. 36, 38).  These cells are designed to house women for disciplinary purposes and usually entail cell restriction.  The common areas have couches, TVs, and windows that allow natural light in, but are only accessible during free time for detainees and county females.  The housing units were designed to be part of a "high programming" facility, meaning a facility that has many programs and the freedom to move around the housing unit.



**Figure 34. Photo of Housing Unit**







**Figure 35. Photo of
Shower in Housing Unit**

During count, which occurs seven times a day, women were locked in their cells with limited access to the restroom.  Outside of lockdowns, cells were unlocked, but women were required to remain in their cells unless it was (1) free time, (2) they were attending classes or other programming, (3) had a volunteer job that enabled them to be outside of their cells; or (4) if they had a visitor.  Activities such as tooth brushing, showering (Fig. 35) and making non-legal calls only occurred during free time.

## A. General Conditions

### (i)  Free Time

The *San Francisco Chronicle* article contained allegations that West County staff frequently cancelled free time in the female building.  Our review of the evidence demonstrates that free time was sometimes shortened or cancelled due to staff shortages, emergencies, fights, safety concerns, or as discipline for not following deputy instructions.  Detainees not enrolled in classes

and who did not volunteer to work, however, could end up spending over 22 hours a day in their cells with their out-of-cell access limited to using the toilet to relieve themselves or the sink to wash their hands.

Table 33 shows scheduled class time and free time in the female building:

**Table 33. West County School and Free Time Schedule**

| Monday | Tuesday | Wednesday | Thursday (Cleanup Day) | Friday | Saturday & Sunday |
|---|---|---|---|---|---|
| School 8:00–11:00 am and 12:45-2:30 pm | School 8:00–11:00 am and 12:45-2:30 pm | School 8:00–11:00 am and 12:45-2:30 pm | School 8:00–11:00 am and 12:45-2:30 pm | School 8:00–11:00 am and 12:45-2:30 pm | Free Time 10:30–11:30 am and 1:30-2:50 pm |
| Free Time 3:30–5:00 pm | Free Time 3:30–5:00 pm | Free Time 3:30–5:00 pm | No Free Time | Free Time 3:30–5:00 pm | Free Time 3:30–5:00 pm |
| Free Time 6:45-9:00 pm | Free Time Cancelled for Commissary | Free Time 6:45-9:00 pm | Free Time 6:45-9:00 pm | Free Time 7:45-10:00 pm | Free Time 7:45-10:00 pm |

Pursuant to Contra Costa Sheriff's Office policy, free time could also have been delayed or cancelled for various reasons, including commissary and laundry exchange.  Facility schedules confirmed that commissary occurred at 6:45 pm on Tuesdays in lieu of the Tuesday evening free time.  Our review revealed that, on a particular Tuesday in 2017 women remained in their cells during the evening free time (6:45-9:00 pm) but commissary bags sat on the floor in the main entrance area of the building until 8:38 pm when deputies began distributing commissary, which was completed by 9:30 pm.  On Thursdays, which was cleanup day, females only received the second daily allotment of free time. Prior inspection reports noted the limited time that women spent outside their cells.

Facility staff and county females previously housed at West County noted during interviews with Cal DOJ staff that a prior policy allowed females to exit their cells and spend time in the day room during class time if they were not enrolled in classes.  A few years ago, the facility changed the policy restricting day room time to encourage class enrollment.  County females housed at West County in years past reported that this change resulted in them spending considerably more time in their cells.

Activity logs and video footage support our conclusion.  A review of activity logs demonstrated infrequent logging of free time start and end times.  The few free time log entries that Cal DOJ found for a particular month demonstrated that free time started on time on some occasions but up to 42 minutes late on others.  Our review of video footage similarly showed that while free time began on time or a few minutes early on some occasions, it began late during other occasions.

### (ii)  Excessive Lockdowns

The *San Francisco Chronicle* articles also alleged that female ICE detainees housed at West County were locked in their cells for long periods of time, and up to 23 hours a day.  The Sheriff Office's investigation found that "[c]laims of being 'locked down' for 23 hours a day were false.  The most time any ICE detainee was confined to their dormitory room was 1 hour and 24 minutes.  These 'lock downs' are commonly done for facility counts or for administrative reasons."[124]  We did not find evidence that the facility locked cell doors for 23 hours a day, but, as noted in the above section, on certain days, women were required to stay in their unlocked cells for over 22 hours a day.  In addition, the evidence supported a finding that detainees were regularly subjected to extended count lockdowns, when cells without toilets remained locked for up to one-and-a-half hours at a time, multiple times a day, even after count cleared, largely because of insufficient staff.

**Figure 36. Photo of Wet Cell**      **Figure 37. Photo of Dry Cell**      **Figure 38. Photo of Wet Cell Sink and Toilet**





Cell doors in the female building were locked for a number of reasons including count, emergencies, fights, or staffing shortages.  Emergency cell door lockdowns occurred with frequency, especially for medical reasons.

During our August 2018 visit, staffing in the female building consisted of three deputies—one on the A side, one of the B side, and one floater.  Command staff reported that the staff to detainee/county jail population ratio is 1:64, and if there are 128 detainees, three deputies are required during free time.  Once the group reaches 192, four deputies are required.

---

[124]  Id.

Before November 2017, cell doors were locked whenever a deputy went on break.  Now doors
need to be unlocked when count is cleared and housing units may only be locked for count, emer-
gencies, and for safety reasons.

Count occurred seven times a day, with two of those counts happening during sleeping hours.  The
evidence Cal DOJ reviewed, including interviews during its December 2017 and August 2018 visits,
confirmed the Sheriff Office's finding that during counts, cells without toilets remained locked for
up to one-and-a-half hours at a time, multiple times a day.  The facility has since made changes
and reported that as of the time of our visit, count took no more than 30 minutes.  During our
August 2018 visit, county females confirmed these statements.

### (iii)  Bathroom Use During Lockdowns and Use of Red Biohazard Bags

The news articles alleged that because cells have no toilets, when women needed to use the
restroom they had to wait for personnel "to let them out of their cells."  The article described the
sound of distressed women screaming and pounding on their cell doors, and alleged that ultimately,
women had to decide whether to urinate and defecate "in their clothes or in plastic bags in their
cells, which some [detainees] place[d] into trash cans they squat over."  The Sheriffs Office's investigation
concluded that "there was no evidence that any detainee was forced to use the bags in that manner.  In
very few cases detainees did use the bags for that purpose in violation of policy."[125]  Cal DOJ did
not review any documents or video evidencing female detainees' use of biohazard bags to relieve
themselves during lockdowns, but our overall review found that while staff did not force (or "direct")
detainees to use biohazard bags because personnel denied them restroom access, overall conditions left
no alternative but for women to request and use the biohazard bags to relieve themselves when
cell doors were locked.  Following the allegations in November 2017, the facility removed biohazard
bags from the women's building and limited their use to those women "who are ill or have other
medical needs."[126]

Testimony gathered during Cal DOJ interviews reflected similar stories to those included in the
news articles.  The Sheriff Office's Press Release notes that "detainees have keys to their rooms and
free use of common bathroom facilities," and that "[a]ll inmates are free to use the bathrooms at
any time, and even during 'lock down' periods of approximately one hour, by notifying a Deputy
Sheriff by using the call button in their rooms."[127]  Cal DOJ interviews, however, revealed that not
all personnel opened cell doors during count lockdowns to allow women to use the restroom.
Further, the cell door keys did not work during lockdowns when cell doors had to be manually
opened by personnel.  During our December 2017 visit, one detainee reported that she had to
use a biohazard bag to defecate.  In addition, four of the 13 county females interviewed during
the August 2018 visit reported that they used biohazard bags at least once to relieve themselves.

---

[125] Id. (emphasis added.)

[126] Id.

[127] Id.

Those who worked as module workers reported seeing other women urinate or defecate in a biohazard bags, and that they personally handed out biohazard bags and removed them from cells.

Records do not reflect whether biohazard bags were distributed or whether detainees or county females were allowed to exit their cells when cells were locked.  The women's accounts, however, do show that the inability to access the restrooms when cell doors were locked led some women to relieve themselves in their rooms either on their clothes or in biohazard bags.

After the news article allegations, the facility announced that biohazard bags would no longer be stored in the housing buildings and that now a deputy who requests a red bag must first notify a sergeant.  Further, only medical staff are now allowed to issue biohazard bags for medical reasons.  County females interviewed during the August 2018 visit confirmed that biohazard bags are no longer in the housing unit.  Those who arrived at the facility after November 2017, but who were previously held at West County, expressed surprise when they learned that biohazard bags were no longer used in the housing unit.

### (iv)  Access to School and Programming

A second news article published on November 10, 2017, also alleged that personnel denied detainees "access to classroom learning materials that they readily give nonimmigrant inmates."[128]  Cal DOJ's review found that detainees enrolled in classes offered were generally given access to requested written materials, and did not find express denials of access to school programs.  However, Cal DOJ identified barriers that made it difficult for detainees, especially non-English speakers, to access school programming and written materials.  For example, West County does not provide regular notice of available programming and programming is in English, except for a language learning program.  Failure to provide notice of available programming in languages understood by all detainees created obstacles to their participation.  In addition, some written requests for written materials were denied because the person processing the request did not understand Spanish.

Command staff describe West County as a "program-driven facility."  However, the programming selection is limited for the detainee and women population.  Classes are offered through the County Office of Education but are limited, in part, because only two classrooms are used for women classes.  Between November 2017 and August 2018, West County offered female detainees classes for work readiness, drug education understanding counseling evaluating (DEUCE), adult basic education, GED, computer applications, and parenting.  Except for the language learning program, which was available to detainees on the computer during some of the classes, all classes were in English.  During interviews with Cal DOJ staff, county females reported that English-speaking detainees translated for other detainees during class.

---

[128] Taylor, *Conditions worsen for some ICE detainees at Richmond jail,* San Francisco Chronicle (Nov. 10, 2017)
    < https://www.sfchronicle.com/news/article/Conditions-worsen-for-some-ICE-detainees-at-12346066.php> [as of Jan. 15, 2019].

Other opportunities to spend time out of their cells, such as volunteer work at the facility's frame shop (Fig. 39) and sign shop for manufacturing signs and artwork, were available to detainees.  Immigration detainees were frequently accepted as frame shop and sign shop workers because they had no criminal histories or criminal histories less significant that the county females and cleared through classifications more easily.  Detainees could also volunteer to work as module workers if there was availability and, in exchange, they received some extra food and additional free time, but no other compensation.  Other programming, such as religious services, was offered by outside volunteers.

**Figure 39. Photo of Frame Shop**



To access classes, detainees and county females were required to submit a written request to the housing deputy.  Formal or written information on program offerings and criteria for attendance, however, was almost non-existent.  The detainee handbook contains no mention or description of any programs offered.  While the orientation video provides a brief description about programming, the orientation video was not effective because many women did not watch it.  Women interviewed during our December 2017 visit reported that no one explained the facility procedures to them.  Further, during our December 2017 and August 2018 visits, no program or class information was posted on bulletin boards in the female housing unit.  The facility reported that it relies mostly on "word of mouth" to share information about programming, and county female interviews confirmed this assertion.

Nevertheless, school enrollment records demonstrate that detainees participated in formal class offerings.  Generally, when detainees submitted written requests to attend school, they were scheduled for school orientation within 10 days from the date of the request.

Daily program offerings, beyond regular classes, were announced in English via a public address system in the housing unit.  No advance notice or description of existing programs offered on a particular day was provided, nor were notices or schedules posted within the housing unit—the only flyers posted corresponded to new program offerings.  Deputies themselves did not know daily program offerings until they received a call from the administration building.  Detainees and county females were then told to "line up" for that offering, and deputies allowed the first ten women who lined up to attend the program.  This process was not designed to provide equal access to non-English speaking detainees who may have not understood what was happening.

In addition, detainee requests for written materials, such as bibles, bible study lessons and other religious books, when written in Spanish, were at times returned because the person processing the request did not understand Spanish.  After detainees arrived at the facility, the library acquired some foreign language books, but the selection was limited.  The facility tried to expand ESL classes during the prior school year, but there was insufficient funding.

(v)  Food

The central kitchen is an in-house West County operation.  Meals are served three times a day at 5:00 am, 11:00 am, and 4:00 pm, and are prepared by "quick-chill" method, meaning they are re-heated and served in the housing unit by module workers.  During our visits, the kitchen was clean, and items were shelved off the floor and stacked in the dry storage rooms.  Cold storage was maintained at 37 degrees.  Rotation of foods appeared to be in place and no expired foods were in evidence.

The 2017 annual report from the Contra Costa Environmental Health Department, which evaluates the health and sanitary conditions at West County, found no issues with food handling.  However, it noted that "[p]otentially hazardous food items are stored in county female cells.  These are leftovers from lunch or other meal service."  During our tours, Cal DOJ similarly observed food leftovers in detainee and county female cells, and detainees during our December 2017 visit complained of spoiled milk.  The facility explained that the spoiled milk resulted from detainees bringing the milk into their unrefrigerated cells to consume later in the day.

To address the milk issue, West County updated its food service policy, which now requires random food, safety, and service checks on meals at least twice a week.

## B. Staff and Detainee Relations

The facility reported no significant challenges in working with detainees.  West County noted that, as a group, detainees were "well kept, very clean, and did not engage in many fights."  Personnel further noted that detainees usually came from a different culture, listened to deputies, and were scared or uncertain of what would happen if they did not comply.  Personnel reported that they treated detainees the same as county females.

Still, our review revealed challenges in staff-detainee relations.  While the Contra Costa Sheriff's Office provides an impressive overall level of training to employees, it could have benefitted from more enhanced specialized training in the areas of gender-based management of women; trauma-informed practices; and cultural competence and awareness training for effectively managing and understanding the women population and immigration detainee population.  In addition, the few deputies who informally spoke to our correctional expert reported that the amount of overtime they were required to work was an area of concern.

### (i)  Communication in a Language Other than English

The news articles alleged that female detainees were mistreated for speaking Spanish.  Cal DOJ did not find sufficient evidence to corroborate the allegation because the detainees were no

longer at the facility during our comprehensive review, and we only informally interviewed a few detainees regarding this allegation during our December 2017 visit.  Our review found that there is a strong disconnect between the personnel and the detainees, and that while personnel believe they are treating all detainees equally, detainees perceive that they are discriminated against for speaking Spanish.  In addition, the limited resources available to non-English speaking detainees made it more difficult to navigate the facility.

The information we reviewed shows that West County had limited bilingual resources and few Spanish-speaking personnel—13 out of 85 total custodial personnel—causing communication barriers between personnel and detainees.  A prior inspection report noted that West County's detainee handbook did not describe the availability of a translation service for detainees.  Our review showed that personnel did not use a language line, instead relying on bilingual detainees to translate for Spanish-speaking detainees.  The practice of using other detainees to translate, including during PREA investigations, gave rise to serious privacy concerns.

Our review found that sometimes deputies became frustrated because they could not communicate with detainees and that non-English speakers had a more difficult time communicating with deputies.  Three West County detainees who Cal DOJ interviewed after they were transferred from West County to another California detention facility, said that West County deputies ignored Spanish-speaking detainees unless they found an English-speaking detainee to translate.  In addition to issues faced by monolingual Spanish-speaking detainees, we learned about two Asian detainees who were also frustrated because they could not communicate with personnel.

### (ii)  Personnel Use of Profane Language

The Sheriff Office's investigation found that profanity was used toward detainees.[129]  Our independent review supports the finding that sworn personnel used some form of profane language towards detainees and county females.  During Cal DOJ interviews, women reported that deputies screamed and cursed at them.  For example, language such as, *"Get in your [f\*ing] room"* and *"Shut your [f\*ing] door"* was reported by many of the detainees and county females we informally and formally interviewed during our December 2017 and August 2018 visits.  Our corrections expert concluded that these actions reflect a lack of cultural sensitivity training, to understand that some detainees come from backgrounds where figures of authority abused them, and a lack of gender-responsive training, to understand that women tend to have endured more domestic trauma; therefore, the use of abusive language in a detention setting can re-traumatize women.

### (iii)  Disciplinary Lockdowns

Our review found that when disciplined, women were placed on 23-hour lockdown in "wet" cells (with toilets and sinks).  The Sheriff Office's Press Release indicates that "the person who

---

[129]  See Press Release, at note 122.

complained in the article of being confined to her room for 23 hours was in fact confined for
several days in a room with a full toilet and sink.  She was confined in such a manner for disciplinary
purposes . . . ."[130]  Disciplined detainees only had one hour of free time a day and, per policy,
they were not allowed to participate in any programs.  Unlike count lockdowns, which were not
logged, the facility logs generally reflect when detainees and county females who were on
23-hour lockdown had their free time because it was required by policy.

(iv)  Grievances

Detainees had two options to submit grievances.  First, they could submit written grievances
to ICE by placing them in a locked box located in the housing unit.  West County reported that
only ICE had access to those grievances.  Second, for facility operations grievances, the detainee
had to request the form from and give the completed grievance directly to a deputy.  If the
grievance involved the deputy on duty, then they were instructed to turn in the grievance to
a "non-interested" deputy or staff member.  The problem with this process is ensuring that a
"non-interested" deputy will maintain confidentiality of the complaint and the identity of the
detainee or county female.  County females reported that they are not trustful that another
fellow duty officer will handle confidentially in a totally "non-interested" capacity.

In addition, during our August 2018 visit, there were no Spanish grievance forms available in
the female housing unit, and it took over 24 hours for our team to obtain one after making a
request.  In post-visit communications with the facility, command staff reported that they were
in the process of improving the grievance system to move it to an electronic format through
which county females will be able to submit grievances via kiosks currently used to order commissary.

## C. Healthcare

The Contra Costa County Health Services provides medical care services at West County.  The contract
with ICE required the facility to provide detainees with the same "full range of medical care inside
the detention facility," as that provided to the county jail population.  With the exception of dialysis
services, the facility was financially responsible for all medical, dental, and mental health care provided
to detainees inside the facility.  ICE was financially responsible for all medical care provided outside
the facility and, except for emergencies, all off-site medical care required ICE pre-approval.

To access medical care, female detainees could submit a written medical request form, ask the
housing unit deputy to place her on the phone triage list, which happened twice a day, or request
immediate assistance for emergencies.  The facility reported that female detainees had equal access
to medical care as the county jail population.

The November 2017 news articles alleged that female detainees faced difficulties obtaining adequate
medical care.  Personnel uniformly denied the allegation.  Women interviewed by Cal DOJ stated

---

[130]  Id.

that medical treatment was usually delayed and did not adequately address their medical needs. The Sheriff Office's investigation, however, concluded that "two complaints alleging limited access to healthcare . . . appear to be unfounded based on detainee interviews.  However, Contra Costa Health Services will be reviewing those specific complaints."[131]  Cal DOJ was unable to obtain documentation about the Contra Costa Health Services' independent review and conclusions.

In order to evaluate the medical and dental care at the facility, our medical expert met with the facility Captain and Lieutenant; toured relevant parts of the female housing and medical unit; interviewed facility personnel; interviewed facility and county medical personnel; observed medication administration in the living unit; examined the emergency medical response equipment; observed and listened to phone triage while an RN conducted it; reviewed policies provided to us by West County; and reviewed the medical records of 12 county females housed at West County at the time—seven county females interviewed by our medical expert, plus five additional county females not interviewed but who had visited the emergency room.  If any of these activities generated questions, our medical expert interviewed or re-interviewed the relevant authority.  Cal DOJ staff also inquired about medical care during its interviews with county females.

Our medical expert found that the health care operation at West County benefits from some significant strengths, including its organizational structure and leadership.  Because healthcare is operated under the direct organizational authority of the county public health department, West County benefits from the knowledge, experience, and mission of the department.  The West County healthcare staff currently has many hardworking, dedicated, and capable staff members.  Some highlights of the healthcare operation observed by our medical expert, included:

- A retired nurse specialist who returned to assist the current leadership in making needed changes;
- A pharmaceutical dispensing machine that gives staff access to a wide array of routine, as well as unplanned, medications, reducing delays and lapses in medication administration; and
- A plan to implement a video interpreter service such that when interpretation services are needed in medical examination rooms for sign and foreign languages, interpreters will be able to hear and see patients, augmenting the interpretation with body language clues.

Taking all information into account, our medical expert found that women were not totally denied access to medical care, but, as discussed below, that barriers to access hindered their ability to obtain adequate and timely care.  The facility is aware of some of these barriers and is commendably taking active measures to address them.

### (i)  Provision of Episodic Care by Registered Nurses

Our medical expert found numerous examples of inadequate care delivered by RNs for non-urgent and urgent problems.  Some examples include instances when RNs failed to conduct any assessment for new onset medical complaints or obtain vital signs; delayed medical appointments for complaints

---

[131]  Id.

of shortness of breath and rib pain, and failure to make thorough assessments during medical appointments; and failure to refer a patient to the physician for dangerously low blood pressure.

Based on these and other examples, the care provided by RNs at West County during phone triage as well as in-person encounters is often delayed, incomplete, inappropriate, or devoid of necessary collaboration with or referral to a practitioner, placing patients in danger.  Provision of episodic care provided by RNs is in need of significantly more oversight and monitoring.

### (ii)  Access to Urgent Episodic Care and Deputy Triage

Based on discussions with county females, custody personnel, and medical staff, our medical expert believes that, at times, West County deputies solicit and interpret clinical information from detainees and county females and, based on the information obtained, decide whether to contact a nurse immediately or refer the patient to the phone triage system.  This process is referred to as clinical triage.  West County policy states that "if a deputy *believes* that a non-life threatening emergency exists then he or she *can* call the on-duty nurse to notify them." (emphasis added).  Implicit in this policy statement is that (a) the deputy must make a judgment call as to whether there is a significant problem, and (b) even if there is a significant problem, the policy allows–but does not *require*–the deputy to contact a nurse.  This policy is dangerous because deputies do not have the requisite medical training, education, and licensure to triage medical issues.  Changes in policy and training can prevent deputies from engaging in medical triage.

On the positive side, we found that when female detainees and county females had what deputies assessed as immediate medical concerns, deputies contacted medical staff and called a "Code 2" for medical emergency.

### (iii)  Access to Non-Urgent Episodic Care and Phone Triage

West County uses a telephone triage system whereby during two designated time periods a day, patients can call an RN from their housing unit to seek assistance with healthcare issues.  While such a system has potential for increasing access to care, as practiced at West County, it creates a barrier to care in at least five ways:

- First, because having detainees access an RN by telephone requires so little staff effort, deputies may instruct detainees to wait for the next phone triage session rather than contact a nurse, even in the face of what might be an urgent need.

- Second, phone triage is not confidential.  Patients reported that they hesitated to give RNs full information because other residents could overhear them.  Detainees and county females sitting near the phones confirmed that they could overhear clinical conversations, and RNs confirmed that sometimes they have trouble hearing patients because the patient is trying to keep her voice down.

- Third, some non-native English-speaking RNs have difficulty communicating with patients over the phone, and patients reported that sometimes RNs hang-up on them.

- Fourth, non-English speaking detainees reported having to rely on English-speaking detainees to translate during triage calls.

- Fifth, RNs overuse the system as a mechanism for delivering definitive care, as opposed to determining how quickly a patient needs to be seen and by whom.

West County knew from prior inspections that detainees used English-speaking detainees to interpret for them during the telephone triage process and that telephone triage conversations could be overheard by others.  Addressing the privacy, language, and overreliance on the phone triage issues would aid in resolving the concerns identified by Cal DOJ and other inspectors of West County.

### (iv) Provision of Episodic and Chronic Care by Physician

The primary type of medicine practiced in a jail is adult primary care whereby a single provider or team manage all of the patient's acute and chronic medical problems in a global and coordinated manner.  Our medical expert found a number of examples of patient management that seemed to suffer from a lack of a primary care approach, resulting in discoordination and the potential for patient harm including: (a) failure to thoroughly assess patients with chronic diseases and mere reordering of medication; (b) making medical recommendations based solely on the patient's medical record without conducting an in-person examination; (c) noting that a person's disease was cured when a recurrence had occurred; and (d) an instance of multiple trips to the emergency room due to a lack of medical staff coordination that likely could have avoided most, if not all, of the trips to the emergency room.

These issues could be resolved by training and instructing West County's medical personnel to approach their work as primary care and conduct more face-to-face patient evaluations.

### (v)  Medication Administration

Our medical expert found that, generally, medications are administered as ordered at West County, but he identified some aspects of medication administration that can be improved.  First is West County's medication refusal policy.  Current policy instructs the medication nurse to notify the prescriber after three missed doses of non-essential medications, and after one dose of essential medications.  While a few examples of these essential medications are articulated in West County's policy, the policy relies on nursing judgment to identify other essential medications.  Medications are administered by LVNs, but LVNs are not trained or licensed to assess a patient to determine whether a particular medication is essential based on that patient's condition.  In addition, many non-consecutive missed doses would go unreported under current policy, with potentially serious consequences.

Second, current policy requires LVNs to conduct post-medication administration mouth checks to ensure ingestion of pills.  Our medical expert noted that because of this practice, patients may view LVNs as enforcers able to mete out–or begin the process of meting out–punishment, and will not trust medical staff.  That, in turn, leads to patients withholding critical medical

information that can result in harm or death.  Updates in medication administration policies relating to missed doses and mouth checks could address this issue.

### (vi)  Dental Care

Our medical expert found three problems with dental care at West County.  First, patient complaints are not always evaluated in person prior to referral to the dentist and dental visits are often delayed for several days.  Failure to evaluate in person can lead to the triage RN misunderstanding the nature of the problem or its seriousness.  Delayed referral to a dentist following telephone triage means that serious problems do not receive the urgent attention they require.

Second, there are times when the dentist extracts teeth that could be preserved by an endodontic procedure ("root canal").  The dentist we interviewed was not aware that he could refer a patient for such a procedure.  But the referral would be subject to ICE pre-approval.

Third, access to dental care is greatly delayed at West County.  Our review found that as of August 28, 2018, the dental schedule was backlogged with 67 women waiting to be seen for complaints such as swelling, cracked teeth, and pain.  The backlog ranged from one day to two months but without listing the patient's complaint or problem it is impossible for the dentist to prioritize the backlogged patients.  These issues would be alleviated by reducing the backlog and increasing face-to-face dental evaluations.

### (vii)  Access to Specialty Care

Our review found that there were overdue referrals to a specialist, ranging from one to seven weeks late for issues such as eye or orthopedic care.

### (viii)  Intake

According to several women Cal DOJ interviewed, no facility handbook was issued to them during booking.  Thus, a number of county females were unaware that they could access health services via a written request in addition to a phone triage system, as described in the handbook.  Handbook distribution can help address some of the phone triage issues.

### (ix)  Fall Prevention

The upper bunks in the female housing unit do not have ladders, leading to injuries related to falls while attempting to ascend to, or descend from, an upper bunk.  One such fall-related injury was reported in the November 2017 news articles, another shared during our November 2017 visit, and other instances were identified during our review.  Installation of ladders would aid with such preventable injuries.

### (x)  Electronic Health Records

West County shares an electronic health record system (EPIC) with the county public health system.  EPIC was designed for community hospital care and requires modifications to perform well in a jail environment.  Our medical expert learned that while the version of EPIC in use at West

County has undergone some modifications, it is still difficult to find and use certain information. For example, it is very difficult to use EPIC to review a patient's medical record, in chronological order, in order to create the "story" of a patient's problem leading up to a current visit.  Another example is that EPIC does not contain a failsafe internal monitoring function that alerts supervisors at the end of the day of any medications nurses may have failed to administer that day. Fortunately, the healthcare leaders at West County are aware of these issues, and reported that a consultant has been hired to correct the problems.

### (xi)  Patient Safety, Error Reduction, and Quality Improvement

West County does not have a comprehensive organized system for monitoring patient safety and acting on discovered system problems.  Healthcare leaders recognized the importance of patient safety, and they have implemented some improvements to patient safety, such as "Rapid Response."  However, healthcare leaders noted that change is occurring slowly and that West County lacks resources to implement more widespread changes.

# 6. Due Process

A review of due process issues at West County was limited because we were unable to interview female detainees during our August 2018 visit and facility records provided limited information.

## A. Orientation

Our review found that the facility's orientation program was lacking, in part because women did not receive an orientation.  During booking, detainees housed at West County were supposed to receive an ICE detainee handbook (Fig. 40) and a facility handbook.  They were also supposed to watch the American Bar Association's "Know Your Rights" video and a facility orientation video as part of the booking process.  The handbook discusses detainees' rights and responsibilities, legal and non-legal visits, telephone calls, including unmonitored calls to counsel, group legal rights presentations, mail, law library, classification, discipline, grievances, counts, medical care, and religious services, among other topics.  The orientation video discusses similar topics.  The "Know Your Rights" video discusses

**Figure 40. Photo of ICE Detainee Handbooks in Spanish and English**



immigration court procedures; who is and is not entitled to see an immigration court judge; available forms of relief; and ways to seek relief, bonds, release, and voluntary deportations.

Based upon all evidence reviewed, observations and interviews, Cal DOJ confirmed that handbooks were not consistently provided.  The video orientation was dependent on the deputy working the housing unit and if they had time.  ICE standards on Admission and Release state, in part, that "[i]n-processing includes an orientation of the facility."  The facility's policy for Intake, Transfer, Release and Records, also states: "all incoming inmates shall undergo thorough screening and assessment upon admission, and *shall receive orientation to the facility's procedures, rules, programs and services pursuant to Departmental policy and Procedure"* (emphasis added).  While orientation materials are also available at the self-help kiosk system, West County personnel are supposed to consistently provide orientation.  At the time of our visit, that policy appeared to be inconsistently carried out.

## B. Access to Legal Services and Representation

The facility handbook provides that detainees could access the phone for non-legal calls and calls to embassies during free time.  But, as discussed above, free time was sometimes shortened or otherwise limited.  Limited access to calls impacts due process because detainees without counsel, and even those with counsel, tend to rely on family members to help them obtain necessary evidence for their legal cases.  Pursuant to the 2016 *Lyon* settlement, as discussed in Section II.2.A, above, detainees housed at West County should have had access to unmonitored legal calls even during non-free time hours.  The female housing unit had *Lyon* telephones which were in enclosed booths to maintain confidentiality.  The detainee handbook provides that to access the *Lyon* phones, detainees had to complete a phone room request form and submit it to the housing unit deputy.

**Figure 41. Photo of Interview Room in Housing Unit**



Detainees also had access to the law library.  The men's library had a computer with ICE's LexisNexis software, and the computer for female detainees was available in an interview room inside the female housing unit (Fig. 41).

The facilities' detainee handbook provides that detainees may receive unlimited mail, but "the delivery of non-English in-coming mail may be delayed for up to forty-eight hours, until it can be screened by an interpreter."  Our review, however, found instances when it was not obvious that an interpreter was consulted about mail and detainees were not consulted about whether mail depicting violent images was contraband or files in support of their immigration case.

According to the West County handbook, legal visits were available to detainees seven days a week.  Counsel who met with detainees used one of two interview rooms available in the housing unit.

Non-legal visits, sometimes critical for non-represented detainees, were no-contact and limited to 30 minutes every day except on Fridays.  To receive non-legal visits, detainees were required to submit a written request that included the visitor names and the requested visit date and time.  Once approved, detainees had to notify their visitors of the date and time, likely through a phone call (at the detainee's expense) during free time.

# 7. Effect of West County's Termination of the ICE Contract

The Contra Costa Sheriff announced the termination of its contract with ICE on July 9, 2018.  Although ICE had 120 days to transfer all detainees, it transferred all detainees out of West County by August 21, 2018, with approximately 70 of them transferred on or about August 16, 2018.

## A. Impact on West County

The facility reported that ending the contract with ICE was mostly a fiscal issue.  It reportedly required at least 185 detainees to be housed at West County to keep fiscally balanced.  West County also indicated the political climate played some role in ending the contract.  West County encountered community protests as a result of the contract, requiring staffing that created an additional expense.  Given that the detainee population was already staffed on overtime, the Sheriff's Office reported that the contract termination helped with fiscal imbalance because it enabled the facility to close the building that housed male detainees in its entirety.

Detainees worked in the kitchen, laundry, and landscaping jobs.  Once detainees were transferred out, the facility had to rely on the county jail population to fill those positions.

## B. Impact on Detainees and the Community

Detainees were significantly impacted by West County's closure.  The facility reported that it wanted to let detainees finish their immigration cases locally instead of being transferred, but that did not happen

despite ICE's assurances that it would.  Detainees were reportedly transferred to ICE detention facilities in California, Washington, Hawaii, Arizona and Colorado.  Using ICE's online detainee locator, Cal DOJ located female detainees at Mesa Verde in Bakersfield, California, at Adelanto also in California, and the Northwest Detention Center in Tacoma, Washington.  Legal advocates also provided data indicating that a number of detainees were transferred to Yuba, and others to the Denver Contract Detention Facility in Colorado.  Advocates reported that for a number of detainees transferred to Colorado, their immigration proceedings were also transferred to the local immigration court.

Based on the rapid transfer of detainees out of West County, several counsel, including the Alameda County Public Defender's Office, filed habeas petitions challenging the transfer of their clients.  While the legal actions were unsuccessful, these filings demonstrate the implications of detainee transfers to locations far from counsel and their families.  One example is below:

*A female Mexican citizen, arrived in the U.S. when she was 2-years-old, has resided in the San Francisco Bay Area for approximately 30 years, and has a 9-year-old U.S. citizen daughter.  She formerly applied for and received Deferred Action for Childhood Arrivals ("DACA").*

*On or about July 9, 2018, ICE took her into custody after she was arrested for drug possession and possession of paraphernalia. The criminal court found her appropriate for a pre-trial diversion program, but ICE apprehended her in a county jail before she could be released to begin the diversion program. She was detained at West County until August 2018, when ICE transferred her to a detention center in Tacoma, away from her family and counsel.  At the time of her transfer, she was a few days away from a hearing to determine if she could be released on bond.  The transfer meant that her counsel could not meet with her in person to prepare for this hearing.*

Following the transfer of all detainees, legal advocates in Northern California provided data to Cal DOJ indicating that a significant proportion of their clients transferred out of West County had ties to California and had previously resided in northern California counties.

# 8. Conclusion

For almost nine years, West County housed detainees without hiring additional personnel and instead relying on personnel overtime.  The staffing shortages posed problems for the female detainee population who faced extended count lockdowns, limited access to restrooms, and the shortening or cancellation of free time.  The lack of a timely orientation and dissemination of information also created problems for detainees, who had to learn the facility's policies and procedures by word of mouth.  Access to timely and adequate medical care was not always available.  Importantly, language barriers exacerbated some of these problems for non-English speaking detainees.  Fortunately, in the fall of 2017, when allegations about these conditions arose, the Sheriff's Office took immediate measures including changes to staffing, lockdown and food policies, and removed biohazard bags from the housing unit.  The facility is also working to improve the medical health system.  With West County and Rio Cosumnes ending their contracts with ICE, only one ICE adult detention facility remains open in Northern California: Yuba.

# IX  Summary of Key Findings

## 1. Individuals in Immigration Detention: From Asylum Seekers to Long Time Permanent Residents

Individuals in immigration detention are, by definition, civil immigration detainees held in custody while removal proceedings are pending or they are pursuing protections, such as asylum, available under federal law.  In FY 2018, ICE reported that approximately 39 percent of detainees came into ICE custody from ICE enforcement efforts, either through arrest in the community at-large or upon release from criminal detention, and approximately 61 percent from CBP enforcement at the border or other ports of entry.[132]  Some immigration detainees are confined because they pose a risk of danger or flight. However, many may be confined because they cannot afford to pay the bond amount ordered, despite case law requiring courts to consider ability to pay when setting bond amounts,[133] or because they have no right to release pending a decision on their asylum claims.  This results in the confinement of many immigrants in jails or jail-like conditions without any finding that they pose a risk of flight or danger to the community.

Immigration detainees come to detention facilities with different needs than individuals in criminal custody.  Most asylum seekers and other recent arrivals speak a different language, with limited or no English proficiency.  Many come into detention facilities immediately after completing difficult journeys to escape persecution and trauma in their home countries.  With the exception of a small class of detainees who are found to be mentally incompetent, all immigration detainees must navigate extremely complicated immigration law and procedure without appointed counsel.  Each of these challenges is compounded by being detained in often remote facilities that are either jails or jail-like with limited immigrant-specific services and accommodations.  These existing challenges may be further affected by potential unintended consequences that termination of detention contracts or SB 29's prohibitions on new or expanded immigration detention contracts may have on the transfer of immigration detainees who are California residents or whose families are California residents to remote facilities or out of state.

---

[132] U.S. Immigration and Customs Enforcement, Fiscal Year 2018 ICE Enforcement and Removal Operations Report p. 8 <https://www.ice.gov/doclib/about/offices/ero/pdf/eroFY2018Report.pdf> [as of Jan. 23, 2019].

[133] *Hernandez v. Sessions* (9th Cir. 2017) 872 F.3d 976.

# 2. Conditions of Confinement Fail to Address the Unique Characteristics of Immigration Detention Population

Based on Cal DOJ's one-day visits to seven facilities and comprehensive reviews of Yolo, Theo Lacy, and West County, it is apparent that conditions vary significantly between and often within facilities.  Further, while some facilities' detention staff do receive training on trauma-informed practices and cultural competency, most facilities do not offer such training, or the training is insufficient to equip detention staff to appropriately manage the immigration detainee population.  Common themes that impact detainees' experience at the facilities include restrictions on liberty, adversarial interactions with facility staff, lack of language accommodation, limited access to medical and mental health care, and obstacles to communicating with support systems outside of the facility.

## A. Restriction on Liberty

According to federal detention standards, individuals in immigration detention for over 72 hours must be provided at least one hour of outdoor recreation as well as access to telephones and showers outside of their cells, unless they are subject to additional disciplinary restrictions.  For a great number of detainees—including those held in the modular housing at Theo Lacy and those that were held in open bay housing at West County—22 hours of confinement in a small cell, either alone or with one other person, is not uncommon.  In many, if not most, circumstances, these extreme conditions of confinement are due to operational concerns, rather than any particular detainee's propensities for disruption or misbehavior.  At West County, staffing decisions appear to have been the reason for locking down minimum-security immigration detainees in a building that was designed to allow for greater freedom of movement.  At Theo Lacy, not only are many "general population" immigration detainees housed in restricted housing and permitted only 2-3 hours of out-of-cell time a day, but all of those identified by the facility to be LGBT are so restricted.

Dormitory style housing at Adelanto, Imperial, Mesa Verde, and other facilities offers greater freedom of movement, but due to a lack of other furnishings, many detainees spend most of their time on their bunks.

A detention facility's use of force and search policies and practices, as well as staff attitudes, also impact immigration detainees' liberty within the facility.  Nearly all the immigration detainees housed in the barracks at Theo Lacy observed that they were "treated like inmates," rather than immigration detainees, as they were subjected to frequent random searches, not allowed to talk while waiting in line for meals, and would likely be reprimanded if they looked at certain deputies directly, or asked questions.  The use of "take downs" of youth without prior use of de-escalation techniques at the Yolo facility is another example of facility policy that raises concerns about unnecessary use of force.  While some of these may be standard practices in a criminal correctional setting, applying these practices to most immigration detainees is inappropriate in relation to the purpose of their confinement.

There are also multiple facilities that fail to follow national standards that require one hour of recreation five days a week for detainees in disciplinary segregation.

## B. Language Barriers

Language access is a significant barrier for non-English speaking immigration detainees, especially those who speak languages other than Spanish.  Orientation handbooks are usually available in English and Spanish, but not consistently in other languages.  Similarly, while most facilities have at least some Spanish-speaking staff, none of them has staff who are able to communicate in all the languages that immigration detainees require to understand facility rules, communicate with medical and custody staff, and navigate the available legal materials.  For example, at Imperial, despite a reported 40 percent Punjabi-speaking population, the facility employs no Punjabi-speaking staff.  And while most facilities' medical and mental health care staff do use telephonic interpretation services, detention staff use them only infrequently.  Immigration detainees often interpret for other detainees, compromising effective and confidential communication between detention staff and immigration detainees.

Inability to understand facility staff can come at a great price in detention.  As immigration detainees housed at most facilities explained to our team, deputies can get angry and frustrated, or simply mete out immediate punishment to detainees who fail to comply with orders they do not understand.

Inability to read and understand facility rules leads to discipline, including a loss of visitation and outdoor recreation privileges.  For example, not knowing there is a limit on the number of commissary items immigration detainees are allowed to have in their possession can lead to confiscation of commissary items and discipline following a random bunk search.  The uninformed detainee who does not understand the basis for facility action experiences these events as arbitrary, intimidating, and abusive; specially those who have endured abuse at the hands of government agents in other countries.

Most facilities do not keep track of the language that detainees speak, but could easily do so by recording it during the booking process.  This change would aid in determining the language needs of the detainee population.

## C. Daily Life – Food, Hygiene, Programming

The quality of food, sanitary conditions, and programming or work opportunities varies widely by facility, although some daily life factors are fairly consistent.  In all facilities, detainees wear prison-style clothing that is not theirs to keep, and they exchange dirty uniforms for clean ones on a regular basis.  The prison-style clothing generally includes plastic sandals of poor quality and comfort that cannot be used for running or similar exercise.  Detainees are generally provided free shampoo, soap, toothpaste, a toothbrush, and a comb; male detainees are provided access to a razor.

In some facilities, mold, mildew, dust, and other contaminants pose challenges for detainees with allergies and other health problems.  There is generally little privacy for bathing, and privacy for toilet use ranges from none at all to stalls with doors.

Detainees report different levels of satisfaction with food portions and edibility, with Yuba and Imperial receiving relatively positive feedback but many other facilities' food being described as unappetizing at best.

Certain facilities, such as Imperial and West County, allow detainees access to a variety of programming and educational classes.  For example, Imperial offers parenting, Zumba, and ESL classes.  Others provide no non-religious programming opportunities at all.  When detainees are afforded work opportunities, they are often unpaid or compensated $1.00 per day.  There are also reports that work performed by detainees is not always voluntary.

## D. Medical and Mental Health Care

The quality of medical care varies significantly between facilities, but even based on Cal DOJ's preliminary review, there were certain concerns that appeared to be common among multiple, but not necessarily all facilities:

- In many facilities, detention officers, deputies, and LVNs—all of whom are not trained, educated, or licensed to assess medical concerns—play a role in determining whether detainees will have immediate access to a practitioner to address what the detainee considers an urgent medical concern.
- RNs sometimes fail to check vital signs for conditions that present as simple matters, but could have more serious causes that a full evaluation would reveal.
- Safety checks for suicide watch and individuals in disciplinary segregation are insufficiently thorough, often consisting only of a visual check through a window without any verbal interaction.
- Dental services such as fillings and root canals are seldom provided, if at all, and often only extractions are offered for teeth that could be retained with other treatments.
- Mental health staffing is generally inadequate to meet the needs of the immigrant detainee population, which has high incidence of trauma and acute mental illness.
- Information about mental health services offered at facilities, when applicable, is not always provided to the immigrant detainee population.
- ICE does not maintain centralized medical records that all facilities can access to understand detainees' medical history from previous detention placements.

Each facility uses a different medical record system, and some facilities report medical information to ICE only "upon request."  Per the 2011 PBNDS, facilities are only required to forward a medical summary, not a full medical history, upon a detainee's transfer to another ICE facility.  As Cal DOJ's review of immigration detention in California continues, we will explore how the individual facilities'

health systems interact with the ICE Health Services Corps and identify systematic issues that may be impacting detainees' continuity of medical and mental health care.

## E. Contact with Family and Support Systems

Many of the detention facilities in California are in remote locations, and many detainees are housed hours from where their families live and their attorneys practice.  The termination of ICE's contracts with Contra Costa County and Sacramento County highlights this issue, as both West County and Rio Cosumnes were located just 20 miles from the closest major city, with access via public transportation.  Many detainees housed at these facilities were transferred to more distant or remote California facilities or out-of-state—inaccessible locations for their loved ones or counsel.

Contact visits with friends or family members are not permitted at any of the adult county jail facilities.  Instead, visits take place across a Plexiglas barrier, and usually through a phone line.  At Adelanto, Imperial, Mesa Verde, and Otay Mesa, contact social visits are permitted at least once a week.  Visiting hours vary by facility, but many detainees and their visitors must schedule around only two or three visiting periods per week.

Being in contact with family and friends via telephone is also difficult for many detainees.  For detainees in restrictive housing, several detainees may have to share only two or three phones for one hour a day, and if that hour is during working hours, family members may not be able to answer.  Phone rates are also prohibitively expensive in some of the facilities, as most facilities require detainees to have money in their commissary account or purchase a phone card, and calls generally require a costly initiation fee just to connect.  These issues are exacerbated with calls to family in other countries or who are in the United States but do not understand English well enough to respond to the billing and other prompts in automated telephone systems.

## 3. Due Process: The Challenges of Accessing Legal Services, Counsel, and Other Support for Immigration Cases While Detained

Unlike defendants in criminal cases, individuals facing removal proceedings do not have a right to appointed counsel.  A 2016 study found that nationally only 14 percent of detained immigrants are represented, and between 2007 and 2012, detained immigrants with cases pending at the San Francisco and Adelanto immigration courts only had 15 percent and 13 percent rates of legal representation, respectively.[134]  Without

---

[134] Eagly & Shafer, Access to Counsel in Immigration Court pp. 2-9 (Sep. 2016) <https://www.americanimmigrationcouncil.org/sites/default/files/research/access_to_counsel_in_immigration_court.pdf> [as of Jan. 23, 2019]; see also Srikantiah & Weissman, Access to Justice for Immigrant Families and Communities: Study of Legal Representation of Detained Immigrants in Northern California (Oct. 2014) <https://media.law.stanford.edu/organizations/clinics/immigrant-rights-clinic/11-4-14-Access-to-Justice-Report-FINAL.pdf> [as of Jan. 23, 2019] [analyzing rates of representation for detained vs. non-detained immigrants in San Francisco Immigration Court and impact on applications for relief and outcomes in immigration proceedings].

appointed counsel, detained immigrants must either find and retain paid counsel, obtain pro bono counsel, or represent themselves, which requires researching legal doctrine and gathering and presenting relevant evidence in an extremely complex area of the law.  If immigration detainees have financial resources to pay for counsel or are lucky enough to obtain pro bono counsel, they must communicate with counsel to assist in the preparation of applications and declarations, and to prepare for hearings.  If immigration detainees must represent themselves, they need to both understand the law and gather evidence in support of their legal positions.  For most immigrants, the resources available in detention are insufficient to achieve these goals.

Throughout the United States, the Executive Office of Immigration Review (EOIR) manages the Legal Orientation Program (LOP) through a contract with the Vera Institute of Justice.  Through LOP, legal services organizations provide comprehensive explanations about immigration court and basic legal information to large groups of detained individuals.  The program normally includes a group presentation, individual orientations—where unrepresented individuals can briefly discuss their cases with LOP providers, self-help workshops, and referrals to pro bono legal services.  In California, formal LOP is only provided at Adelanto and Otay Mesa, and some of the remaining facilities allow informal legal consultation visits from legal service providers.

Having legal counsel makes a significant difference.  The 2016 study found that "immigrants with legal counsel were more likely to be released from detention," and have a much greater chance of prevailing in their immigration proceedings.  Specifically, between 2007 and 2012, 21 percent of immigration detainees who were represented by counsel had successful case outcomes compared with only two percent of those without counsel.[135]

## A. Retaining and Communicating with Counsel

The options for communicating with counsel from within an immigration detention facility are (1) in-person visits, (2) telephone, and (3) mail.  Many—but not all—detention facilities accommodate attorney visits at a wide range of hours.  At Yuba, immigration attorneys must compete for a small number of attorney visit rooms with criminal defense counsel whose clients are in county custody, and these are only available during business hours.  Attorneys visiting other facilities may be forced to wait if they arrive at a time when attorney visiting spaces are in use.  But because many detention facilities are located far away from urban centers where most attorneys practice, attorney visits can be extremely time consuming and expensive.[136]  Moreover, visiting is only a reasonable option for detainees who have already retained counsel.  Detainees seeking to retain counsel must reach out to potential lawyers through one of the other two means of communication offered: mail and telephonic.

---

[135] Eagly & Shafer, at 16, 19.

[136] Yuba is approximately 120 miles from San Francisco, Mesa Verde is approximately 280 miles from San Francisco, and Imperial is approximately 240 miles from Los Angeles.

All ten detention facilities allow detainees to use mail to communicate with counsel.  Detainees can write letters to potential counsel to explore representation, and attorneys can send documents to detainees to review and sign.  But attorneys generally need to ask questions and engage in a give-and-take of information to evaluate a potential client's case.  This is particularly the case when the lawyer is preparing a declaration or evaluating a client's best legal claims and arguments based on the facts of a client's case.  And in immigration proceedings, facts can be highly determinative of issues such as asylum or entitlement to certain types of visas.  The timing of mail delivery, in-facility processing time, and facilities' inconsistent practices to protect the confidentiality of legal mail all undermine the effectiveness of mail as a method for attorney-client communication.  As email and other more modern modes of communication are not available to detainees at all, telephone access is the final option.

Unfortunately, telephone systems in adult detention facilities in California present significant barriers to attorney-client communications.  With the exception of facilities covered by the *Lyon v. United States Immigration and Customs Enforcement* settlement, immigration detainees in California have little to no access to private areas for legal calls.  Telephones available to detainees are in housing units, where conversations can be overheard by other detainees and facility staff, making sensitive topics such as criminal history and past persecution based on membership in a particular social group difficult to discuss.  With limited exceptions, calls are monitored and recorded and—particularly in county facilities—they can be prohibitively expensive.  Detainees in restricted housing have telephone access only during their one or two hours of "day room time," which is not necessarily a set schedule and may occur outside of business hours.  Moreover, most facilities do not deliver messages from attorneys to clients in detention, making it extremely difficult to schedule calls.

The impact of these barriers is amplified by a general scarcity of free and low cost legal services for detained immigrants, especially away from urban centers.  Many detention facilities, including Imperial, are in such remote locations that legal services organizations are unable to provide consistent legal orientation programs or offer representation to those detained.  And while the immigration courts provide lists of free and low-cost immigration legal services that can be dialed directly from detention facilities, the listed organizations do not have capacity to serve even a small fraction of detained individuals who need low-cost or pro bono legal representation.  Having to contact multiple organizations and search for private attorneys who will offer low cost representation is made even more difficult by limited telephone and mail access.

The isolation and desperation immigration detainees face with respect to retaining counsel also make them vulnerable to exploitation.  Cal DOJ staff spoke to many detainees across California detention facilities who shared stories of having been victims of immigration services fraud, or whose stories raised concerns of malpractice.  Immigration detainees in California are sorely in need of skilled and knowledgeable removal defense lawyers who can represent them for free or at a reduced fee.

## B. Challenges of Self-Representation

Without counsel, many detainees have no choice but to represent themselves.  The obstacles to communication with the outside world detailed above also create barriers for detainees representing themselves.  In addition, the legal materials made available to detainees are extremely difficult to use, particularly for detainees with limited English skills.

Detainees representing themselves in their proceedings cannot rely on an attorney to contact witnesses, track down documentation, or gather information needed for their cases.  Instead, they must attempt to call police departments, hospitals, schools, employers, and other contacts—often in their home countries—to obtain evidence in support of their claims for relief and affirmative applications for immigration benefits.  But the telephone systems in detention facilities have a "positive acceptance" requirement, which means that the first thing a call recipient hears is a recorded message announcing that the call is from a particular jail or detention facility and asking that the call recipient press a number to accept the call.  Callers cannot introduce themselves to explain why they are calling, navigate auto-mated answering systems to dial an extension, or leave voice mail messages.  The positive acceptance feature, added to the other obstacles in terms of timing, cost, and privacy described above, makes it all but impossible for pro se immigration detainees to gather supporting evidence or information to support their claims for relief or claims to be released on bond.

Finally, Cal DOJ found the legal materials provided to detainees to be insufficient to meet their needs as *pro se* immigration court respondents.  Although ICE supplies each of the detention facilities with computer-based LexisNexis legal material, the system is difficult to access, even for experienced attorneys; very few materials were offered in Spanish or any other non-English language; and most facilities did not have the most updated LexisNexis material uploaded to their systems.  Further, most facilities also did not have paper legal materials offered in languages other than English and Spanish.

# X Conclusion and Next Steps

The first step in addressing the treatment of individuals in immigration detention is understanding the conditions they face and sharing this information with the public and policy makers who can address those conditions.  Through reports such as this, Cal DOJ will continue to examine the conditions faced by immigration detainees.  Cal DOJ is diligently working on the facility reviews for its next comprehensive report, which will include a review of at least one privately-operated facility.  In years to come, in addition to the general facility reviews, we also plan to report on changes observed at each facility as a result of our review process, and on demographic changes in the California immigration detainee population.  Finally, as federal policy results in growth or other changes to immigration detention in the United States, Cal DOJ will remain mindful of the importance of providing safe and humane housing for California's residents, including those that may be subject to detention pending federal immigration proceedings.

# Acknowledgments

This Report would not have been possible without the cooperation of youth and adults in detention facilities throughout California.  Detainees housed at eight of the ten facilities Cal DOJ visited[137] shared their experiences directly with our team.  Cal DOJ appreciates the opportunity to have direct access to the detainees and their willingness to cooperate with our review team.

The hard work and dedication of the following individuals in the Cal DOJ was instrumental in bringing this Report to fruition: **Sean McCluskie,** Chief Deputy to the Attorney General; **Antonette Cordero,** Chief of Legal Affairs; **Jonathan Blazer** and **Daniel Costa,** Former Special Assistants to the Attorney General; **Bethany Lesser,** Director of Communications; **Liz Saldivar,** Director of Community and Consumer Affairs; **Monica Anderson,** Senior Assistant Attorney General, Correctional Law Section; **Linda Schneider,** Senior Assistant Attorney General, Licensing Section; **Christina Bull Arndt,** Supervising Deputy Attorney General, Land Law Section; **Shubhra Shivpuri** and **Sergio Perez,** Former Deputy Attorneys General, Civil Rights Enforcement Section; **Sylvie Snyder,** Deputy Attorney General, Correctional Law Section; **Young Eun Choi, Alan Gaines, Asma Fatima Husain, Ektaa Nijjar** and **Elizabeth Urena,** Law Clerks, Civil Rights Enforcement Section; Sanjukta Koppolu, Legal Intern, Civil Rights Enforcement Section; **Gabriel Pond,** Research Assistant, Department of Justice Research Center; and **Janet Mistchenko,** Graphic Designer, Communication and Imaging Resource Center.

The review team is grateful for the expertise and consultation that a range of individuals provided in the research, preparation, writing, and production of this Report.  Our thanks in particular go to **Thomas Faust, Robert Lang, Dr. Emily Ryo, Dr. Dora B. Schriro, Dr. Marc Stern,** and **Dr. Andrea Weisman**.

The review team thanks county counsel and facility staff at the Contra Costa County Sheriff's Office, Orange County Sheriff's Department, Sacramento County Sheriff's Department, Yolo County Juvenile Detention Facility, Yuba County Sheriff's Office, and the cities of Adelanto, Holtville, and McFarland for their cooperation with Cal DOJ during the first year of this initiative.

Finally, the review team acknowledges the former detainees, immigration and criminal defense attorneys, law school professors, and nongovernmental organizations that provided insight during stakeholder meetings and throughout the first year of our AB 103 review, including: the ABA Immigrant Justice Project; ACLU of Northern and Southern California; Asian Americans Advancing Justice; The Bar Association of San Francisco; California Immigrant Youth Justice Alliance; Coalition for Humane Immigrant Rights of Los Angeles (CHIRLA); Casa Cornelia Law Center; Clergy & Laity United for Economic Justice (CLUE);

---

[137]  ICE did not permit Cal DOJ to informally speak with detainees at Adelanto and Mesa Verde during the one-day visits.

Central American Resource Center (CARECEN); Centro Legal de La Raza; Disability Rights California; Esperanza Immigrant Rights Project; Freedom for Immigrants (formerly CIVIC); Human Rights First; Human Rights Watch; Immigrant Defenders Law Center; Immigrant Legal Resource Center (ILRC); Immigration Youth Coalition; Legal Aid Foundation of Los Angeles (LAFLA); Loyola Immigrant Justice Clinic (LIJC); National Day Laborer Organizing Network (NDLON); National Immigration Law Center (NILC); Northern California Collaborative for Immigrant Justice (NCCIJ); Northern California Rapid Response & Immigrant Defense Network (NCRRIDN); Public Counsel; Public Law Center; One Justice; Stanford Law School Immigrants' Rights Clinic; Southwestern Law School Immigration Law Clinic; UC Davis Civil Rights and Immigration Law Clinics; UCI Law Immigrant Rights Clinic; and USC Gould Immigration Clinic.

# List of Figures

Figure 1.   Map of Immigration Detention Facilities in California . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Figure 2.   Length of Stay for All Facilities: Number of Stays at Single Facility. . . . . . . . . . . . . . . . 18
Figure 3.   Length of Stay by Facility: Percentage of Detainees by Length of Stay. . . . . . . . . . . . . 19
Figure 4.   Total Bed Capacity by Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
Figure 5.   Percentage of Immigration Detention Bed Capacity in California by Owner Type . . . . . 20
Figure 6.   Photo of Imperial Regional Detention Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Figure 7.   Photo of Otay Mesa Detention Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Figure 8.   Photo of Housing Pod: Yolo Facility  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
Figure 9.   Photo of Day Room: Yolo Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
Figure 10.  Photo of Housing Cell: Yolo Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
Figure 11.  Photo of Outdoor Recreation Yard: Yolo Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
Figure 12.  Photo of Library: Yolo Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
Figure 13.  Photo of Game Room: Yolo Facility  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
Figure 14.  Photo of Indoor Gym: Yolo Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
Figure 15.  Photo of Classroom: Yolo Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
Figure 16.  Photo of Grievance Drop Boxes: Yolo Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
Figure 17.  Photo of Medical Exam Room: Yolo Facility  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
Figure 18.  Photo of Restroom in Barracks: Theo Lacy Facility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
Figure 19.  Photo of Showers in Barracks: Theo Lacy Facility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
Figure 20.  Photo of Sinks in Barracks: Theo Lacy Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
Figure 21.  Photo of Barracks Control Booth: Theo Lacy Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
Figure 22.  Photo of Law Library in Barracks: Theo Lacy Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
Figure 23.  Photo of ICE Module . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
Figure 24.  Photo of ICE Module Law Library: Theo Lacy Facility. . . . . . . . . . . . . . . . . . . . . . . . . . . 76
Figure 25.  Photo of Medical Module Housing: Theo Lacy Facility. . . . . . . . . . . . . . . . . . . . . . . . . . . 76
Figure 26.  Photo of Recreation Area in Modular Housing: Theo Lacy Facility . . . . . . . . . . . . . . . . 76
Figure 27.  Photo of Daily Bagged Lunch: Theo Lacy Facility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
Figure 28.  Photo of Visitation Area in ICE Module: Theo Lacy Facility . . . . . . . . . . . . . . . . . . . . . . 80
Figure 29.  Detainees Reports Regarding Treatment by Deputies . . . . . . . . . . . . . . . . . . . . . . . . . . 86
Figure 30.  Photo of Disciplinary Segregation Cell: Theo Lacy Facility . . . . . . . . . . . . . . . . . . . . . . . 87
Figure 31.  Photo of Grievance Box: Theo Lacy Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
Figure 32.  Photo of Phone and Posting in Barracks: Theo Lacy Facility. . . . . . . . . . . . . . . . . . . . . . 96
Figure 33.  Photo of Phone and Posting in Disciplinary Segregation: Theo Lacy Facility . . . . . . . . . 96
Figure 34.  Photo of Housing Unit: West County Facility  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104
Figure 35.  Photo of Shower in Housing Unit: West County Facility . . . . . . . . . . . . . . . . . . . . . . . . . 104
Figure 36.  Photo of Wet Cell: West County Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
Figure 37.  Photo of Dry Cell: West County Facility  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
Figure 38.  Photo of Wet Cell Sink and Toilet: West County Facility . . . . . . . . . . . . . . . . . . . . . . . . 106
Figure 39.  Photo of Frame Shop: West County Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
Figure 40.  Photo of ICE Detainee Handbooks in Spanish and English: West County Facility . . . . . 117
Figure 41.  Photo of Interview Room in Housing Unit: West County Facility . . . . . . . . . . . . . . . . . . 118

# List of Tables

Table 1.    Applicable Detention Standards by Immigration Detention Facility . . . . . . . . . . . . . . . . 6
Table 2.    Date Span of Data Provided by Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Table 3.    Immigration Detainees' Regions and Countries of Origin. . . . . . . . . . . . . . . . . . . . . . . . 15
Table 4.    Ten Most-Represented Countries of Origin for All Facilities . . . . . . . . . . . . . . . . . . . . . . 16
Table 5.    Detainees' Gender by Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Table 6.    Detainees' Age in Years by Facility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Table 7.    Length of Stay by Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Table 8.    Adelanto Key Data Points . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Table 9.    Most-Represented Countries of Origin at Adelanto. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Table 10.   Imperial Key Data Points . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Table 11.   Most-Represented Countries of Origin at Imperial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Table 12.   James Musick Key Data Points . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Table 13.   Most-Represented Countries of Origin at James Musick . . . . . . . . . . . . . . . . . . . . . . . . . 27
Table 14.   Mesa Verde Key Data Points . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
Table 15.   Most-Represented Countries of Origin at Mesa Verde . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Table 16.   Otay Mesa Key Data Points. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Table 17.   Most-Represented Countries of Origin at Otay Mesa. . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Table 18.   Rio Cosumnes Key Data Points . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
Table 19.   Yuba Key Data Points . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
Table 20.   Most-Represented Countries of Origin at Yuba . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
Table 21.   Yolo Key Data Points. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Table 22.   Most-Represented Countries of Origin at Yolo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
Table 23.   Detainee Interviewees' Countries of Origin at Yolo . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
Table 24.   Theo Lacy Key Data Points . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
Table 25.   Most-Represented Countries of Origin at Theo Lacy . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
Table 26.   Detainee Interviewees' Countries of Origin at Theo Lacy . . . . . . . . . . . . . . . . . . . . . . . 70
Table 27.   Detainee Interviewees' Languages Spoken at Theo Lacy . . . . . . . . . . . . . . . . . . . . . . . 70
Table 28.   Partial List of Rule Violations per Orange County Sheriff's Department Policy. . . . . . . . . 83
Table 29.   West County Key Data Points . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99
Table 30.   Most-Represented Countries of Origin at West County . . . . . . . . . . . . . . . . . . . . . . . . . 101
Table 31.   West County Detainee Interviewees' Countries of Origin . . . . . . . . . . . . . . . . . . . . . . . 102
Table 32.   West County Detainee Location of Apprehension . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
Table 33.   West County School and Free Time Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

134 ◆