# United States District Court
# Central District of California
# Western Division

| | |
|---|---|
| KELVIN HERNANDEZ ROMAN, *et al.*, *etc.*, | EDCV 20-00768 TJH (PVCx) |
| Petitioners-Plaintiffs, | **Findings of Fact** |
| v. | **and** |
| CHAD F. WOLF, *et al.*, | **Conclusions of Law** |
| Respondents-Defendants. | |

On April 13, 2020, Petitioners and Plaintiffs Kelvin Hernandez Roman, Beatriz Andrea Forero Chavez, and Miguel Aguilar Estrada ["Petitioners"], on behalf of themselves and all others similarly situated, initiated this case by filing their Petition for a Writ of *Habeas Corpus* and Complaint for Injunctive and Declaratory Relief. The Petition for a Writ of *Habeas Corpus* was pursuant to 28 U.S.C. § 2241.

Also, on April 13, 2020, Petitioners filed, *inter alia*, three *ex parte* applications for temporary restraining orders, one for each named Petitioner, seeking their immediate release from the Adelanto Immigration and Customs Enforcement Processing Center ["Adelanto"]; and a motion for provisional class certification.

On April 14, 2020, Petitioners filed a motion for a class-wide preliminary

injunction, and an *ex parte* application to shorten time on the motions for provisional class certification and a class-wide preliminary injunction.   Thereafter, the Court approved the parties' stipulated expedited briefing schedule.

On April 16, 2020, the Court issued Temporary Restraining Orders requiring the immediate release of Petitioners from Adelanto, and set a briefing schedule for Orders to Show Cause as to why the Court should not convert the Temporary Restraining Orders into Preliminary Injunctions.   The Temporary Restraining Orders were issued only as to Petitioners because, in the absence of class certification, a temporary restraining order may be issued only for a named plaintiff.   *See Nat'l Ctr. for Immigrants Rights, Inc. v. INS*, 743 F.2d 1365, 1371 (9th Cir.1984).

On April 23, 2020, the Court granted Petitioners' motion to provisionally certify the class.

In lieu of considering the Orders to Show Cause re: Preliminary Injunction, the Court will consider Petitioner's fully briefed motion for a class-wide preliminary injunction.

The Court, having taken Petitioners' motion for a class-wide preliminary injunction under submission, and having considered the evidence and arguments presented by the parties, the Court makes the following Findings of Fact and Conclusions of Law in support of the concurrently filed class-wide Preliminary Injunction:

**FINDINGS OF FACT**

1.   Class members are, or were, in the custody of the United States Department of Homeland Security's ["DHS"] Bureau of Immigration and Customs Enforcement ["BICE"] and detained at the Adelanto Immigration and Customs Enforcement Processing Center ["Adelanto"].

2.   Adelanto is located in the City of Adelanto and the County of San Bernardino, which are within the Central District of California.

3.   Adelanto is a private, for-profit immigration detention facility operated by

Geo Group, Inc. for BICE.

4.      Adelanto's detainee population dropped from 1,650 people on March 15, 2020, to 1,370 people on April 18, 2020.  With 1,370 detainees, Adelanto is at 66% of its maximum capacity of 2,084.  While the Government reported that the current capacity of some Adelanto housing units is as low as 45% of maximum capacity, it, also, reported that other Adelanto housing units, currently, exceed 85% of their maximum capacity.

5.      Over the years, and as recently as 2018, DHS's Office of the Inspector General has, repeatedly, found that significant and various health and safety risks existed at Adelanto.

6.      Class members are at various stages of removal proceedings pursuant to the Immigration and Nationality Act, 8 U.S.C. § 1101, *et seq.*["INA"].

7.      While some class members have prior criminal convictions, they have served their criminal sentences.

8.      Class members are all civil detainees; none are criminal detainees.

9.      On March 4, 2020, the State of California declared a state of emergency in response to the coronavirus and the resulting COVID-19 disease.

10.     On March 10, 2020,  San Bernardino County followed suit and declared a state of emergency.

11.     On March 11, 2020, the World Health Organization ["WHO"] declared COVID-19 to be a global pandemic.

12.     On March 13, 2020, President Donald J. Trump formally acknowledged and declared a national emergency in response to WHO's pandemic declaration.

13.     According to the United States Centers for Disease Control and Prevention ["CDC"], the coronavirus is spread mainly through person-to-person contact.  More specifically, the coronavirus is spread between people who are in close contact – within about 6 feet – with one another through respiratory droplets produced when an infected person coughs or sneezes.  The droplets can land in the mouths or noses, or can be

inhaled into the lungs, of people who are within about 6 feet of the infected person. Moreover, studies have established that the coronavirus can survive up to three days on various surfaces.

14.    The CDC's cornerstone of COVID-19 transmission reduction is social distancing – the keeping of a distance of 6 feet between people.

15.    Social distancing is the best preventative measure to prevent the spread of COVID-19.

16.    Despite this Court's issuance, in this and related cases, of dozens of Temporary Restraining Orders releasing dozens of Adelanto detainees because Adelanto did not, *inter alia*, practice social distancing between staff and detainees, and between the detainees, themselves, the Government has yet to impose mandatory social distancing rules at Adelanto, and voluntary social distancing is, still, rarely practiced.

17.    Though the Government failed to explain why it has not imposed mandatory social distancing at Adelanto, it appears to the Court that mandatory social distancing cannot be imposed at Adelanto because, quite simply, there are too many detainees at Adelanto for its size.

18.    The CDC recommends that detainees who are quarantined – because they have had close contact with a person who was suspected or confirmed to have COVID-19 – or in medical isolation – because the detainee is suspected or confirmed to have COVID-19 – should be housed, in order of preference, separately in single cells or as a cohort with 6 feet of personal space assigned each individual in all directions.  One of the least desirable quarantine or isolation methods is to house detainees in a cohort, in multi-person cells without solid walls or a solid door, without excellent ventilation, without social distancing, and without an empty cell between occupied cells.

19.    Coronavirus is highly contagious.

20.    COVID-19 has a mortality rate ten times greater than influenza.

21.    The incubation period for COVID-19 is 2 to 14 days.

22.    During the incubation period, people infected with the COVID-19 can be

asymptomatic.

23.    During that potentially asymptomatic incubation period, infected people are, unknowingly, capable of spreading the coronavirus.

24.    Despite early reports, no age group is safe from COVID-19.  While older people with pre-existing conditions are the most vulnerable to COVID-19-related mortality, younger people without preexisting conditions have, also, succumbed to COVID-19.

25.    There is no approved treatment, vaccine or cure for COVID-19.

26.    While it is not yet clear whether the number of confirmed COVID-19 cases in the United States has hit its pandemic peak or the beginning of a plateau, it is very clear to the Court that, tragically, large numbers of people will continue to get infected with, and too many will, sadly, die from, COVID-19 until there is a cure or a vaccine.

27.    As of the date of these Findings of Fact:

    A.    The United States has had over 850,000 confirmed COVID-19 cases, with COVID-19 related deaths quickly approaching 45,000.

    B.    The State of California has had over 37,780 confirmed  COVID-19 cases, with COVID-19 related deaths exceeding 1,425.

    C.    San Bernardino County has had over 1,575 confirmed COVID-19 cases, with COVID-19 related deaths exceeding 70.

    D.    The City of Adelanto has had 15 confirmed COVID-19 cases, including its mayor *pro tem*, who, sadly, remains on life support, having been placed on a ventilator over a month ago, on March 19, 2020.

28.    The science is well established – infected, asymptomatic carriers of COVID-19 are highly contagious.

29.    Because of the highly contagious nature of the coronavirus and the, relatively high, mortality rate of COVID-19, the disease can spread uncontrollably with

devastating results in a crowded, closed facility, such as a jail or immigration detention center.

30.   For example, Marion Correctional Institution, in Ohio, now has 2,011, and rising daily, confirmed cases among its inmate population, representing an infection rate of approximately 78%, plus more than 115 staff members with confirmed cases. Of the confirmed cases at Marion, 1 corrections officer has died.

31.   As another example, the Pickaway Correctional Institution, also in Ohio, now has 1,536, and rising daily, confirmed cases among its inmate population, representing an infection rate of approximately 74%, plus 67 staff members with confirmed cases. Of the confirmed cases at Pickaway, 6 inmates have died.

32.   As of the date of these Findings of Fact, 287, and rising daily, BICE civil detainees and 35 BICE employees at dozens of BICE facilities have been confirmed infected with the coronavirus.

33.   While there are not, yet, any confirmed COVID-19 cases at Adelanto, it is, merely, fortuitous that an outbreak has not yet occurred, especially given the lax safety standards, now, in place.

34.   On March 23, 2020, the Ninth Circuit Court of Appeals ordered, *sua sponte* and without further explanation, the release of an immigration petitioner "[i]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers." *Xochihua-Jaimes v. Barr*, 2020 WL 1429877, No. 18-71460 (9th Cir. Mar. 23, 2020).

35.   Judge Analisa Torres of the United States District Court for the Southern District of New York issued an order releasing certain immigration detainees, stating:

> The nature of detention facilities makes exposure and spread of the virus particularly harmful. Jaimie Meyer M.D., M.S., who has worked extensively on infectious diseases treatment and prevention in the context of jails and prisons, recently submitted a declaration in this district noting that the risk of COVID-19 to people held in … detention centers … "is

significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected." (citation omitted).

Moreover, medical doctors, including two medical experts for the Department of Homeland Security, have warned of a "tinderbox scenario" as COVID-19 spreads to immigration detention centers and the resulting "imminent risk to the health and safety of immigrant detainees" and the public.  Catherine E. Shoichet, *Doctors Warn of "Tinderbox scenario" if Coronavirus Spreads in ICE Detention*, CNN (Mar. 20, 2020), https://www.cnn.com/2020/03/20/health/doctors-ice-detention-coronavirus/index.html.

*Basank, et al., v. Decker, et al.*, 20 Civ. 2518 (S.D.N.Y., Feb. 28, 2020), ECF No.

36.   New Adelanto detainees are not kept in isolation unless they are symptomatic of a potential COVID-19 infection.

37.   New asymptomatic detainees at Adelanto are either medically screened for 14 days or housed in quarantine with a cohort of other new arrivals.  Regardless of which practice is actually used, it is problematic that asymptomatic new detainees are capable of infecting others, either in the general population while they are being medically monitored or in the new arrival cohort.  Further problematic is that new arrivals are housed in cohorts with detainees who arrived at different times, thereby various members of a single quarantined cohort are released into the general population at various times, rather than each cohort being quarantined for a fixed 14 day period.

38.   Adelanto's staff leave the facility at the end of their shifts.  When staff are off duty and outside of Adelanto, they are subject to community transmission of COVID-19.  Of course, the staff are, also, subject to community transmission inside of Adelanto.

39.   Upon starting a shift, staff members submit to temperature checks and answer questionnaires to determine their COVID-19 risk.

40.     Temperature checks do not identify asymptomatic carriers of COVID-19. Asymptomatic staff could have been unknowingly infected after unknowingly crossing paths with an asymptomatic carrier outside, or inside, the facility.

41.     According to the Government, Adelanto's staff are, now, assigned to the same duty stations, rather than regularly rotating through various duty stations several times a day.  However, declarations from class members contend that staff are still moving between housing and other units, particularly when detainees are being counted.

42.     While Adelanto's staff members, apparently, have access to gloves and masks, they are, merely, encouraged, and not required, to wear them to help prevent the spread of COVID-19.

43.     It is imperative that all Adelanto staff members wear gloves and masks, and practice social distancing, at all times while on duty to prevent the spread of the coronavirus.  Gloves, masks, and social distancing must not be an option for staff.

44.     Each housing unit in Adelanto's West Facility can house a maximum of 80 detainees.

45.     Each day room in each of the West Facility's housing units is furnished with 20 round tables, with each table having four seats.  Those seats provide sufficient seating for everyone in each housing unit, provided that social distancing is not a requirement.  The tables and seats are not moveable as they are permanently affixed to the ground.  The tables are set at 7 feet 6 inches apart, center to center, which does not allow for 6 feet of social distancing.  The seats at each table are set at 5 feet 3 inches from each other, center to center across the table, which, again, does not allow for 6 feet of social distancing.  Even with only two detainees at each of the 20 tables, it does not appear possible for all detainees to maintain a social distance.

46.     While the West Facility day rooms, also, have unencumbered space for use by detainees, and an adjacent space open to the sky with access to fresh air, the Government did not provide the dimensions of those, or any other, Adelanto spaces.

47.     Seven communal showers are accessible from the day rooms in each West

1  Facility housing unit.  However, it is not mandated that the showers be cleaned between
2  each use by professionally trained cleaning staff or, even, by the detainees themselves.

3       48.    While the Government stated that some of the common areas are, now,
4  cleaned and disinfected multiple times per day, it did not state whether those areas are
5  cleaned by professionally trained cleaning staff or by detainees.

6       49.    As the Government is aware, declarations have been filed by class
7  members in this case and in their individual cases.  The Court has considered some of
8  the declarations, here, that were filed in the related individual actions.  From some of
9  those declarations, the Court learned that class members were responsible for cleaning,
10  at least some of, the common areas, that the only available cleaning supplies, at times,
11  were a dirty towel and a bucket of dirty water.

12       50.    As to the communal sinks, toilets and showers, the Government implied
13  that detainees are encouraged to clean those items utilizing available cleaning products
14  and supplies.  Consequently, the Court must assume that those items are not regularly
15  cleaned and disinfected by professionally trained cleaning staff throughout the day.
16  Rather, it appears that the cleaning of communal sinks, toilets and showers is
17  haphazard, at best.  Moreover, the class members challenge the Government's
18  contention that cleaning supplies are readily available for their use.

19       51.    Class members declared that they were instructed to clean their communal
20  toilets once every two days and, at times, they did not have proper cleaning supplies to
21  clean their toilets.  Apparently, out of desperation, some class members resorted to
22  using shampoo to clean their toilets.

23       52.    West Facility housing units each have sixteen 4-person sleeping rooms and
24  two 8-person sleeping rooms, with detainees assigned to particular rooms.  Based on
25  declarations in related cases, each sleeping room has a single communal toilet and sink.

26       53.    The 4-person rooms each have two bunk beds set at 8 feet apart from the
27  center of one lower bunk to the center of the other lower bunk.  This does not allow for
28  social distancing of 6 feet.  The Government did not indicate the width of the bunk

beds.  If the beds are twin size, which are, typically, 38 inches wide, there is only 4 feet 10 inches between each bed, edge to edge.  If the beds are only 30 inches wide, there would be only 5 feet 6 inches between each bed, edge to edge.  Moreover, the Government did not indicate the distance between upper and lower bunks, the dimensions of each 4-person room, or the location of the toilet and sink in each room.  Indeed, Petitioner Roman declared that in a fully occupied 4-person room, people are about 3 feet apart from each other.

54.    The 8-person rooms each have four bunk beds set at 5 feet, 10 inches apart center to center.  To promote social distancing, detainees are, now, assigned to every other bed in the 8-person rooms.  Again, the Government did not indicate the distance between upper and lower bunks, the dimensions of each 8-person room, or the location of the toilet and sink in the each room.

55.    The West Facility has 4 dining halls for detainee meal service.  Each dining hall has a maximum occupancy rating of 133, but only 120 seats.  Again, the tables and seats are not moveable.  According to the Government, a maximum of 30 or 40 detainees are, currently, allowed in each meal hall at one time, with food service staff cleaning each dining hall between each rotation of detainees.  Again, the Government did not provide the Court with the dimensions of each dining hall, the number and dimension of the tables in each dining hall, the distance between the tables, the distance between each seat, the distance between each detainee, the distance between detainees and the food service staff in the food serving lines, or the distance between each detainee as they line up to enter and leave the dining halls.  Nor did the Government state whether the kitchen staff that cleans the dining halls are professionally trained or merely detainees assigned the task with little to no training.  Moreover, the Government failed to dispute the Court's prior finding in related cases that detainees line up, sometimes only inches apart, when they enter and leave the dining halls.

56.    From the dining hall photographs on Adelanto's website, it appears to the Court that with even as few as 40 detainees in a dining hall at a single time, the

detainees are not able to maintain 6 feet of social distance from each other at all times. Indeed, Petitioner Roman declared that to ensure social distancing in the dining halls, the dining halls must be limited to 15 people at one time.  Based on the photographs, Roman's assessment appears to be fairly accurate.

57.   In Adelanto's East Facility, each housing unit has a maximum capacity of 52, 114 or 118 detainees.

58.   Each East Facility housing unit has a large open room divided into four sleeping areas, with a mix of bunk beds and single beds, and a day room stretching the length of the unit.  Detainees housed in the East Facility are not assigned to particular rooms.

59.   Most of the bunk beds in the East Facility are set at parallel and are 9 feet 10 inches apart from center to center, which allows for about 6 and a half feet between the beds.  The single beds are set at parallel and spaced at 9 feet four inches apart center to center, which allows for just over 6 feet between the beds.  If any of the detainees are walking between the beds and a bed is occupied, there is not sufficient space to allow for social distancing.

60.   There was no evidence presented regarding the locations of toilets and sinks in the East Facility housing units.

61.   The East Facility day rooms each have 19 rectangular tables with 6 seats each, 3 on each long side, with enough seats for the entire housing unit population, assuming, again, that social distancing is not a requirement.  Detainees are encouraged, but not required, to sit 6 feet apart.

62.   Again, the Government did not provide any dimensions for any of the spaces in the East Facility.

63.   Communal showers in the East Facility are available in each of the four sleeping areas in each housing unit, with additional showers available on the periphery of the day rooms. Petitioner Chavez declared that her East Facility housing unit housed 118 women and had 6 communal showers.  But, of those 6 showers, only 3 worked –

1   for 118 women.  Thus, there was probably very little opportunity for detainees to clean

2   those 3 showers, if the desire to clean them existed, given their likely constant use.

3         64.   Detainees housed in the East Facility eat their meals in their housing units.

4   The Government stated that there are cleaning products as well as clean cloth and/or

5   paper towels available to clean the day room tables and floors after meal service.  Thus,

6   that implies that the East Facility housing units are not cleaned by a professionally

7   trained cleaning staff.  Additionally, class members declared that they regularly lacked

8   access to paper towels to clean the common areas.

9         65.   While detainees have, according to the Government, been educated as to

10   the best practices for cleaning, there is no evidence that the detainess were mandated

11   to clean any area or item.  Nor is there any evidence that the detainees are supervised

12   while cleaning.

13         66.   Moreover, class members have declared that supplies run out often, and

14   that it can take days, for example, to get more hand soap after they have run out.  They

15   have declared, further, that hand sanitizer dispensers in common areas are often empty.

16   As further corroboration, one class member declared that access to hand soap and hand

17   sanitizer was so limited that if he wanted to wash his hands with soap he had to ration

18   his bar of shower soap.

19         67.   Even if detainees are encouraged to exercise social distancing within each

20   housing unit, they are not required to maintain a social distance at any time.

21         68.   Because of space limitations and current occupancy levels, detainees cannot

22   always maintain a social distance.

23         69.   While the Government stated that occupancy limits have been temporarily

24   reduced in the dining halls, law libraries, intake area, medical area and court hold

25   rooms, there is no evidence as to whether social distancing is required or, even,

26   possible in those spaces.

27         70.   For group movements within Adelanto, detainees are reminded to practice

28   social distancing, but, again, there is no evidence that social distancing is required.

1   And, the Court has read class member declarations to the contrary, with one class
2   member stating that detainees are mere inches apart when lined up for meals.

3       71.     Staff and detainees working in Adelanto's kitchens are required to wear
4   gloves, hair nets and face hair nets, but they are not required to wear masks.  Further,
5   there is no evidence that the kitchen staff is required to maintain a social distance from
6   each other.

7       72.     Adelanto, recently, began issuing each detainee 3 surgical-type masks a
8   week, with each detainee getting a mask on Mondays, Wednesdays and Fridays.
9   However, three disposable masks a week are not enough when the detainees lack
10  sufficient space to contantly maintain a social distance and, therefore, should be wearing
11  masks at all times.

12      73.     The Court takes judicial notice of the following facts presented to,
13  considered by or found by Judge Jesus Bernal in his order granting, *inter alia*, class
14  certification and a preliminary injunction in *Faour Abdullah Fraihat, et al. v. U.S.*
15  *Immigration and Customs Enf't, et al.*, CV19-1546 JGB (SHKx) (C.D. Cal. April 20,
16  2020):

17          A.    New information about COVID-19 suggests that it may be
18                transmitted through shared bathrooms and cell toilets without lids.
19          B.    An immigration facility outbreak would, also, menace the
20                non-detained: a surge in preventable cases would further strain local
21                hospitals and healthcare resources.
22          C.    Detainees are tasked with cleaning most of Adelanto.
23          D.    Social distancing is not possible at Adelanto due to close quarters.
24          E.    Staff circulate between Adelanto's units to conduct counts.
25          E.    Adelanto detainees circulate between units to deliver meals.
26          F.    Adelanto detainees are not spaced 6 feet apart.
27          F.    Some Adelanto staff wear masks and gloves, but others do not.
28      74.     COVID-19 is capable of finding its way into every communal setting, yet

the Government provides no explanation as to why it is acting as though Adelanto is immune, especially without mandating social distancing in place.

75.     Any member of Adelanto's staff and detention population is capable of being an unknowing, asymptomatic carrier of the coronavirus who could ignite a COVID-19 outbreak.

76.     Class members are not required, or even given an opportunity, to maintain a social distance from others at all times.

77.     Class members must regularly touch surfaces, including communal sinks, toilets and showers, that are regularly touched by other detainees and but are not regularly cleaned by professionally trained cleaning staff or by the detainees, themselves.

78.     The risk of a COVID-19 outbreak at Adelanto, is particularly high if an asymptomatic, but infected, staff member or detainee enters the facility.

79.     Despite the Government's contention that, as of now, there are no confirmed COVID-19 cases at Adelanto, the Government cannot say with any degree of certainty that no one – staff or detainee – at Adelanto is an asymptomatic carrier of COVID-19.  Consequently, the Government must enforce social distancing at Adelanto at all times and all places.

80.     Adelanto's policies and practices subject class members to a substantial and extremely high risk of very serious harm that will occur if the Court does not issue preliminary injunctive relief.

81.     The conditions of confinement at Adelanto are inconsistent with contemporary standards of human decency.

82.     The new policies that the Government has, heretofore, implemented at Adelanto in response to the COVID-19 pandemic are insufficient.

83.     The Government is deliberately indifferent to the potential exposure of the class members to COVID-19, a serious, life-threatening communicable disease.

84.     As civil detainees, the class members are entitled to be protected by the

Government.

85.    The class members have not been protected by the Government.

86.    The Government has acted with a callous disregard for the safety of the class members.

87.    The class has established that the conditions of their confinement are unconstitutional in that those conditions have put them at substantial risk of suffering serious harm.

88.    The Government has breached the duty it owes to the class members to reasonably abate known risks at Adelanto.

89.    Adelanto's detainee population must be immediately and significantly decreased to reduce the risk of serious harm to the class members.

90.    Class members are suffering from a condition of confinement that takes away, *inter alia*, their ability to socially distance and remain safe.

91.    The public has a critical interest in preventing the further spread of the coronavirus.  An outbreak at Adelanto would, further, endanger all of us – Adelanto detainees, Adelanto employees, residents of San Bernardino County, residents of the State of California, and our nation as a whole.

92.    At this time of crisis, our response to those at particularly high risk must be with compassion and not apathy.

93.    To the extent that any of these findings of fact are deemed to be conclusions of law, they are incorporated as conclusions of law.

**CONCLUSIONS OF LAW**

**Jurisdiction**

1.    The Court has jurisdiction over this class *habeas* petition pursuant to 28 U.S.C § 2241, and jurisdiction over the claims for injunctive and declaratory relief pursuant to 28 U.S.C. § 1331.

2.    The INA does not deprive this Court of jurisdiction to grant class-wide injunctive relief for a class of noncitizens where each member of the class is, as here,

an individual and not an organization. *See Padilla v. Immigration and Customs Enf't*, 953 F.3d 1134, 1149-1151 (9th Cir. 2020).

3.      While the INA restricts the jurisdiction of District Courts in some respects, it does not limit a District Court's *habeas* jurisdiction over constitutional claims or questions of law, brought pursuant to 28 U.S.C § 2241, that are independent of the merits of removal orders. *Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011).

4.      Though various class members may be subject to mandatory detention pursuant to INA § 236(c), that does not bar them from proceeding in this case by way of a *habeas* petition. *See Singh*, 638 F.3d at 1202.

5.      Release is an appropriate remedy in a *habeas* petition. *Prieser v. Rodriguez*, 441 U.S. 475, 494 (1973).

**Standing**

6.      The class members have standing to pursue this case. "A remedy for unsafe conditions need not await a tragic event." *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

**Exhaustion of Administrative Remedies**

7.      Because the class members have asserted claims for violations of their Fifth Amendment substantive due process rights, and those claims exceed the jurisdictional limits of the Immigration Court and the Board of Immigration Appeals, class members need not first exhaust their administrative remedies. *Garcia-Ramirez v. Gonzales*, 423 F.3d 935, 938 (9th Cir. 2005).

**Preliminary Injunctive Relief**

8.      Class members are entitled to a preliminary injunction if they show: (1) A likelihood of success on the merits; (2) That they are likely to suffer irreparable harm in the absence of relief; (3) The balance of equities tip in their favor; and (4) An injunction is in the public's interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

9.      "Where the Government is a party to a case in which a preliminary

injunction is sought, the balance of the equities and public interest factors merge." *Padilla v. ICE, et al.*, --- F.3d ---, 2020 WL 1482393, \*5 (9th Cir. Mar. 27, 2020).

10.   Under the Ninth Circuit's sliding scale approach, a stronger showing of one element may offset a weaker showing of another. *See Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012).

11.   Accordingly, class members are entitled to a preliminary injunction if "serious questions going to the merits [are] raised and the balance of hardships tips sharply in [their] favor." *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

12.   A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter* at 22.

13.   It is for the Court to fashion an appropriate preliminary injunction. *See Melendres v. Maricopa Cty.*, 897 F.3d 1217, 1221 (9th Cir. 2018).

14.   The Court's equitable powers are broad, flexible and inherent. *See Hutto v. Finney*, 437 U.S. 678, 687, n. 9 (1978).

15.   Injunctive relief must be tailored to remedy the specific harm alleged. *Melendres v. Maricopa Cty.*, 897 F.3d 1217, 1221 (9th Cir. 2018).   "The Court exceeds [its] discretion only if the injunctive relief is aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation." *Melendres v. Maricopa Cty.*, 897 F.3d 1217, 1221 (9th Cir. 2018).

16.   "A mandatory injunction orders a responsible party to take action," and thus, "goes well beyond simply maintaining the status quo." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal citations and quotation marks omitted).

17.   "[M]andatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases … ." *Marlyn Nutraceuticals* at 879 (quotation marks omitted).

18.   A mandatory preliminary injunction can be issued only when the facts and

1  law clearly favor the moving party.  *Stanley v. Univ. of Southern California*, 13 F.3d
2  1313, 1320 (9th Cir.1994).

3  **Evidence Considered**

4      19.    A preliminary injunction is customarily granted on the basis of evidence
5  that is less complete than what is presented at a trial on the merits.  *University of Texas*
6  *v. Camenisch,* 451 U.S. 390, 395 (1981).

7      20.    The Court may consider hearsay and otherwise inadmissible evidence when
8  considering whether to issue a preliminary injunctive.  *See Republic of the Philippines*
9  *v. Marcos*, 862 F.2d 1355, 1363 (9th Cir.1988).

10     21.    The Court can, *sua sponte*, take judicial notice.  *See Schwab Corp. Sec.*
11  *Litig.*, 257 F.R.D. 534, 561 n. 18 (N.D. Cal.2009).

12     22.    The Court can take judicial notice of records in other cases.  *See United*
13  *States v. Wilson*, 631 F.2d 118, 119 (9th Cir.1980).

14     23.    The Court can take judicial notice of publicly accessible websites.  *See*
15  *King v. Cty. of L.A.*, 885 F.3d 548, 555 (9th Cir. 2018).

16  **Likelihood of Success on the Merits**

17     24.    When the Government takes people into custody and detains them against
18  their will, the Constitution imposes upon the Government a duty to assume
19  responsibility for those detainees' safety and general well being.  *See Helling v.*
20  *McKinney*, 509 U.S. 25, 32 (1993).

21     25.    When the Government detains people for violations of immigration law,
22  those people are civil detainees, even if they have a history of criminal convictions.  *See*
23  *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

24      26.    Civil detainees are entitled to more considerate treatment and conditions
25  of confinement than criminals, whose conditions of confinement are designed to punish.

26     27.    Civil detainees cannot be detained in conditions of confinement that
27  constitute punishment.  *See Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982).

28      28.    The constitutional rights of criminal detainees establish a floor, and not a

ceiling, for the clearly established constitutional rights of civil detainees. *See Smith v. Wash.*, 781 F. App'x. 595, 597 (9th Cir. 2019).

29.   If a condition of confinement would violate the Eighth Amendment pertaining to a criminal detainee, it would, certainly, violate the Fifth Amendment pertaining to a civil detainee. *See Smith,* 781 F. App'x. at 597.

30.   Under the Eighth Amendment, the Government must provide criminal detainees with basic human needs, including reasonable safety. *Helling*, 509 U.S. at 32.

31.   Under the Due Process Clause of the Fifth Amendment, the Government must provide civil detainees with more than minimal human necessities. *See Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir. 2004).

32.   The Government violates the Eighth Amendment when it confines a criminal detainee in unsafe conditions. *See Helling*, 509 U.S. at 33.

33.   The Government violates the Eighth Amendment when the conditions of a criminal detainee's confinement puts the detainee at substantial risk of suffering serious harm and the conditions cause suffering inconsistent with contemporary standards of human decency. *See Smith,* 781 F. App'x. at 597-598.

34.   The Government holds convicted criminals in unsafe conditions when it "ignore[s] a condition of confinement that is sure or very likely to cause serious illness." *See Helling*, 509 U.S. at 32.

35.   The Government cannot be "deliberately indifferent to the exposure of [prisoners] to a serious, communicable disease on the ground that the complaining [prisoners show] no serious current symptoms." *Helling*, 509 U.S. at 33.

36.   The Government is deliberately indifferent when it fails to take reasonable and available measures to abate a known risk. *See Gordon v. County of Orange*, 888 F.3d 1125, 1124-25 & n. 4 (9th Cir. 2018).

37.   "That the Eighth Amendment protects against future harm to inmates is not a novel proposition." *Helling*, 509 U.S. at 33.

38.    The Supreme Court clearly stated that "… the Eighth Amendment protects [prisoners] against sufficiently imminent dangers as well as current unnecessary and wanton infliction of pain and suffering… ." *Helling*, 509 U.S. at 33.

39.    The Supreme Court has acknowledged that it has "… great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Helling*, 509 U.S. at 33.

40.    In its *amicus* brief filed in *Helling*, the Government stated that it "… recognizes that there may be situations in which exposure to toxic or similar substances would present a risk of sufficient likelihood or magnitude – and in which there is a sufficiently broad consensus that exposure of *anyone* to the substance should therefore be prevented – that the [Eighth] [A]mendment's protection would be available even though the effects of exposure might not be manifested for some time." *Helling*, 509 U.S. at 34.

41.    Indeed, the [Supreme] Court concluded that where prisoners in punitive isolation were crowded into cells and some of them had infectious maladies, "… the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed." *Helling*, 509 U.S. at 33.

42.    The Government violates a civil detainee's constitutional rights if a condition of the detainee's confinement places the detainee at substantial risk of suffering serious harm, such as the harm caused by a pandemic. *See Smith*, 781 F. App'x. at 595.

43.    The Government must not be deliberately indifferent to the potential exposure of civil detainees to a serious, communicable disease on the ground that the complaining detainees show no serious current symptoms, or ignore a condition of confinement that is more than very likely to cause a serious illness. *See Helling*, 509

U.S. at 32.

44.     The Government owes a duty to the class members, as civil immigration detainees, to reasonably abate known risks. *See Castro v. Cty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016).

45.     The class members have established that: (A) The Government made an intentional decision with respect to the conditions under which the class members are confined; (B) Those conditions put the class members at substantial risk of suffering serious harm; (C) The Government did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved — making the consequences of the Government's conduct obvious; and (D) By not taking such measures, the Government is harming the class members. *See Gordon*, 888 F.3d at 1125.

46.     The class members have established that there is significantly more than a mere likelihood of their success on the merits. *See Winter*, 555 U.S. at 20.

47.     Release from custody is a valid remedy, here, for unconstitutional conditions of confinement. *Brown v. Plata*, 563 U.S. 493, 502 (2011).

**Irreparable Harm/Equities/Public Interest**

48.     It is well established that the deprivation of constitutional rights, unquestionably, constitutes irreparable injury. *See Hernanez v. Session*, 872 F.3d 976, 994 (9th Cir. 2017).

49.     Inadequate health and safety measures at a detention center cause cognizable harm to every detainee at that center. *See Parsons v. Ryan*, 754 F.3d 657, 679 (9th Cir. 2014).

50.     The class members have established that they are likely to suffer irreparable harm in the absence of relief from the Court. *See Winter*, 555 U.S. at 20.

51.     The Government has an interest in enforcing immigration laws. *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-558 (1976).

52.     The balance of the equities, here, tip sharply in favor of the class members;

the class members face irreparable harm to their constitutional rights and health.

53.    The Government is not harmed when a court prevents the Government from engaging in unlawful practices.  *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

54.    The injunctive relief sought, here, is absolutely in the public's best interest.

55.    To the extent that any of these conclusions of law are deemed findings of fact, they are incorporated as findings of fact.

For all of the foregoing reasons, the Court issued the preliminary injunction.


Date: April 23, 2020

Terry J. Hatter, Jr.
Senior United States District Judge