# United States District Court
# Central District of California
# Western Division

KELVIN HERNANDEZ ROMAN, et al., etc.,

    Petitioners-Plaintiffs,

v.

CHAD F. WOLF, et al.,

    Respondents-Defendants.

EDCV 20-00768 TJH (PVCx)

**Modified Preliminary Injunction and Additional Findings of Fact**

    The Court has reviewed the Ninth Circuit Court of Appeals' Memorandum Opinion affirming, in part, and vacating, in part, this Court's Preliminary Injunction. The Court, previously, deemed Petitioners'-Plaintiffs' *ex parte* application for reconsideration of the Court's denial of their *ex parte* application for a temporary restraining order to be an *ex parte* application for the Court to issue a Modified Preliminary Injunction, and ordered the parties to file supplemental papers on an expedited basis. The Court has received and considered those supplemental papers. The Court's references herein to the Government are applicable to Respondents, the GEO Group, and their employees, agents, and contractors.

In its Memorandum Opinion, the Ninth Circuit unanimously affirmed that this Court, indeed, had jurisdiction to consider the constitutional challenges raised by Petitioners-Plaintiffs, and that this Court, indeed, possessed the authority to grant the injunctive relief it ordered, including the reduction of the detainee population at the Adelanto Immigration and Customs Enforcement Processing Center ["Adelanto"], to remedy the unconstitutional conditions of confinement that existed at Adelanto at the time the Court issued its Preliminary Injunction on April 23, 2020.

Moreover, the Ninth Circuit "agree[d] with … [this] court that the conditions at Adelanto in April violated detainees' due process right to reasonable safety."  The Circuit's agreement was premised on the following conclusions:

> The Government was aware of the risks the conditions posed, especially in light of high-profile outbreaks at other carceral facilities that had already occurred at the time, yet had not remedied the conditions.  Its inadequate response was objectively unreasonable.  The district court therefore rightly concluded that [Petitioners-Plaintiffs] were likely to prevail on the merits.
>
> … The district court was also correct in its conclusion that [Petitioners-Plaintiffs] were likely to suffer irreparable harm absent relief given COVID-19's high mortality rate.  Finally, the district court rightly concluded that the equities tipped in Plaintiffs favor, particularly in light of the lack of criminal records of many of the detainees and the alternative means available to prevent their absconding if they were released, such as electronic monitoring.

Because the circumstances at Adelanto have changed since April 23, 2020, and the Preliminary Injunction was tailored to the conditions that existed at that time, the Circuit vacated the specific measures ordered in the Preliminary Injunctions, vacated the motions panel's stay of the Preliminary Injunction forthwith, and remanded with instructions to this Court to craft Preliminary Injunction provisions based on the conditions that currently exist at Adelanto.

Back in April, Adelanto held approximately 1,370 detainees, whereas, now, there are approximately 770 detainees. Further, as of April 23, 2020, the Government did not require Adelanto's staff to wear masks while working in detainee housing units or when interacting with detainees, whereas, now, apparently, Adelanto's staff is required to wear masks while working in detainee housing units or interacting with detainees.

Even with the reduced detainee population and the mandatory staff mask rule, we find ourselves in the middle of a COVID-19 outbreak with 81 detainees having confirmed positive cases spread across four of Adelanto's housing units – West 4B, West 5A, West 5C and West 5D. The outbreak likely started between September 5, 2020, and September 10, 2020, and has grown to 81 confirmed positive cases of COVID-19 among the detainees, including 20 *Fraihat* sub-class members, and 9 detainees who required hospitalization. The Government's supplemental papers did not inform the Court of the current number of Adelanto staff who have tested positive, but earlier papers stated that 8 staff members had confirmed positive cases.

Both the Government's expert, Murray Owen, D.O., and the Petitioners'-Plaintiffs' expert, Todd Schneberk, M.D., agree that the outbreak was most likely caused by a staff member who reported to work at Adelanto infected with COVID-19. But, as far as the Court has been informed, contact tracing has not been completed and the source of the outbreak has yet to be identified. Nevertheless, the Government, in its supplemental papers, hypothecated that an attorney representing a detainee in the Immigration Court attached to Adelanto could have, theoretically, been the source of the outbreak, rather than an Adelanto staff member.

Even if the Government's hypothetical scenario were true, the Government is, ultimately, in charge of the facility, which includes the Immigration Court, and responsible the safety of its civil detainees, regardless of where they may be in the facility. Moreover, the Government provided no evidence that it had imposed, or is enforcing, a mandatory mask wearing rule for all people – including judges, attorneys, staff, *etc*. – in common areas inside of the attached Immigration Court. The

Government can easily, and will, impose and enforce such a rule, if one does not currently exist

The clear truth of the matter is that even with a reduced detainee population, and even with staff, supposedly, wearing masks under Adelanto's current staff mask mandate, an outbreak still occurred.  The current outbreak teaches the Court that, *inter alia*, Adelanto's detainee population has not been reduced sufficiently to prevent a COVID-19 outbreak from occurring, and that further reductions in the detainee population are needed to prevent another outbreak from occurring.  While the Court understands that a further reduction will not guarantee that another outbreak will not occur, a further reduction is a reasonable step that must happen to ensure the detainees's reasonable safety guaranteed by the Constitution.

On August 10, 2020, the Petitioners-Plaintiffs filed a motion to enforce the CDC guidelines provision of the Preliminary Injunction that was not stayed by the Circuit.  The Court, ultimately, denied that motion because the Ninth Circuit, in its Memorandum Opinion, vacated the CDC provision.  Nevertheless, in that motion, the Petitioners-Plaintiffs brought to the Court's attention the fact that Adelanto was not testing symptomatic detainees for COVID-19 even though there was on-site testing capacity since May, 2020.  Indeed, Adelanto had received approximately 1,900 swab test kits at one point by overnight delivery.  The Government argued that all detainees who complained of potential COVID-19 symptoms were evaluated by medical personnel and referred for a test only if medical screening determined that testing was medically appropriate.  However, the Court is not concerned that symptomatic detainees must be medically screened to determine whether their symptoms warrant a diagnostic COVID-19 test.

Rather, the Court is concerned because it was informed, in the motion to enforce the Preliminary injunction, that a plan to universally test all Adelanto detainees was quashed for an unjustified and arbitrary reason.  On May 19, 2020, the GEO Group, which operates Adelanto under contract with the Government, advised Gabriel Valdez,

the Assistant Field Office Director of Enforcement and Removal Operations for the Bureau of Immigration and Customs Enforcement, and the Officer in Charge of Adelanto, that it was prepared to start universal COVID-19 testing the next day, May 20, 2020, of all detainees and staff at Adelanto. In response to the advisement, Valdez ordered the GEO Group to not conduct the universal testing of detainees. Valdez's reason for not allowing the GEO Group to conduct universal detainee testing was that the testing was not mandatary for all detainees because detainees could opt to refuse the test. During his deposition, Valdez stated "I had my reservations based on the – the plan as written and the fact that the tests were not mandatory, they were optional, they were voluntary." Thus, Valdez blocked universal COVID-19 testing of detainees at Adelanto.

Valdez's decision was not based on scientific evidence, sound or otherwise; was not based on a lack of detention or medical staff available to administer the tests; and not based on a lack of financial resources.  Nor did Valdez, based on the record before the Court, consider that the Centers for Disease Control, at the time, recommended universal testing for a facility, such as Adelanto, that was in a community, such as San Bernardino County, that had a moderate to substantial community transmission rate of COVID-19.  Rather, Valdez decided that none of the detainees should be tested just because some of the detainees might decline to be tested.  The Court notes that all but 14 detainees voluntarily submitted to Covid-19 testing over the past two weeks.

Valdez's decision to block universal testing was objectively unreasonable and in callous disregard of the constitutional right of every one of Adelanto's detainees to reasonable safety.  The GEO Group had a plan and the means to conduct universal testing.  If the GEO Group were permitted to start, and continue on a regular cycle, its plan for universal testing, perhaps the current outbreak would have not occurred.  Of this, the Court cannot be sure.  But the failure to universally test – given the existence of the current outbreak and the detainees' current inability to socially distance – is but one means of reasonable mitigation that was available to the Government but not

implemented because of its callous disregard of its detainees' constitutional right to reasonable safety.

Indeed, District Judge Vince Chhabria of the Northern District of California, in *Rivas, et al. V. Jennings, et al.*, 20-CV-02731-VC, (N.D. Cal. August 6, 2020), ECF 500 at 2, recently ordered the Government to provide daily status reports and to conduct weekly universal testing after the occurrence of a COVID-19 outbreak at the Mesa Verde Immigration Detention Center, which is, also, operated by the GEO Group under contract with the Bureau of Customs and Immigration Enforcement. In *Rivas*, Judge Chhabria found that universal testing was not implemented, there, simply because the Government "felt" that the testing was "not worth the trouble." Judge Chhabria went on to state that the Government lost credibility with him. Given the Government's conduct, here, and in the Northern District of California, a picture of widespread callous disregard for the safety of immigration detainees is being painted.

At the time the Court issued its Preliminary injunction, it was evident that Adelanto was so crowded that social distancing to combat the spread of COVID-19 was impossible. The record established that detainees were housed so densely that they could not socially distance while, *inter alia*, sleeping. In support of the Preliminary injunction, the Court made, for example, the following finding regarding social distancing in sleeping quarters:

> 53. The 4-person rooms each have two bunk beds set at 8 feet apart from the center of one lower bunk to the center of the other lower bunk. This does not allow for social distancing of 6 feet. The Government did not indicate the width of the bunk beds. If the beds are twin size, which are, typically, 38 inches wide, there is only 4 feet 10 inches between each bed, edge to edge. If the beds are only 30 inches wide, there would be only 5 feet 6 inches between each bed, edge to edge. Moreover, the Government did not indicate the distance between upper and lower bunks, the dimensions of each 4-

person room, or the location of the toilet and sink in each room.

Indeed, Petitioner Roman declared that in a fully occupied 4-person

room, people are about 3 feet apart from each other.

Based on those findings, it was clear to the Court that only a single person can sleep in a 4-person room to ensure a six-foot social distance at all times.

The record has not yet been supplemented with current information as to the sleeping arrangements for all of the current detainees and all of Adelanto's housing units. However, in its supplemental papers, the Government informed the Court that it continues to house 2 detainees in 4-person rooms.

In support of its position that detainees can, now, maintain a distance of six feet from each other at all times, the Government provided pages 245 to 249 of Valdez's deposition. In those pages, Valdez stated that the number of detainees that could be safely held at Adelanto while maintaining a six-foot social distance from each other at all times is 1,052. Valdez, further, stated that he was the only person involved in determining that capacity limit. In response to a question asking how he reached that capacity limit, Valdez stated that he walked around the facility and imagined in his head that every detainee had a sphere around their body that measured three feet in every direction. Valdez did not measure any common room, did not measure any cell, did not measure any bed, did not measure any table, did not measure any hallway, and did not measure any other area. This evidence is further indication of Valdez's callous disregard for the reasonable safety of the civil detainees who have been placed in his custody.

In its Memorandum Opinion, the Ninth Circuit noted that the Government did not challenge, as being clearly erroneous, any of this Court's factual findings made in support of the Preliminary Injunction. Likewise, Valdez's deposition testimony regarding his imaginary spheres does not rise to the level of being a clearly erroneous challenge to the Court's earlier findings.

Also raised in the Petitioners'-Plaintiffs' motion to enforce the CDC guidelines

provision of the Preliminary Injunction were assertions that Adelanto is currently spraying an allegedly noxious disinfectant, HDQ Neutral, several times each day in its housing units, and in a manner inconsistent with the disinfectant's instructions and warnings on its label. For example, the safety data sheet issued by HDQ Neutral's manufacturer states that it should be used only outdoors or in a well ventilated area, and warns that mist, vapors and spray should not be breathed, and that it is harmful if inhaled. Several Adelanto detainees declared that when HDQ Neutral is sprayed in their housing units it causes them to sneeze or cough blood, causes horrific headaches, causes nose bleeds, and causes their eyes to burn. Those same assertions have been made in other *habeas* cases filed with the Court by individual petitioners housed at Adelanto, though the Court is not making any findings, here, based on the declarations and assertions filed in other cases. Finally, Petitioners-Plaintiffs argued that because COVID-19 is spread through respiratory droplets, coughing or sneezing caused by exposure to HDQ Neutral increases their risk of COVID-19 exposure.

In its opposition to the motion, the Government stated that HDQ Neutral is an EPA-registered disinfectant that fights COVID-19, and that "[t]he Court should ignore the petitioner's misleading scaremongering … ." The Government, further, argued that HDQ Neutral is used only in accordance with its label instructions – the disinfectant is sprayed by detainees to surfaces that are allowed to remain wet with the product for 10 minutes and allowed to air dry, and that the detainees who spray HDQ Neutral are provided with gloves to wear while spraying. Finally, the Government argued that the toxic warning on HDQ Neutral's safety data sheet is applicable only to the undiluted version of the product, and that detainees at Adelanto spray only properly diluted HDQ Neutral. The Court takes note of the fact that the Government did not challenge the effects suffered the detainees.

The Court takes, further, note of the deposition excerpts provided by the Government of the testimony provided by James Janecka, a GEO Group employee who is, apparently, the person responsible for the use of HDQ Neutral. In his deposition,

Janecka stated that he is not an engineer but "understood" that air in Adelanto's housing units is exchanged four times per hour, but he failed to indicate whether such air exchange is sufficient to ensure the safe use of HDQ Neutral in Adelanto's housing units. Further, in response to a question as to why he believed that the precautionary statements applicable to the use of the undiluted version of HDQ Neutral did not apply to diluted HDQ Neutral, Janecka stated that "I haven't scrolled down, but there should be two other form [Safety Data] sheets for the user-diluted version that do not have quite the hazard identifications."

In their reply papers, the Petitioners-Plaintiffs provided a copy of the label from a pre-diluted, ready-to-use solution of HDQ Neutral. On the label are "Precautionary Statements," which state as follows:

> HAZARDS TO HUMANS AND DOMESTIC ANIMALS
>
> **DANGER**
>
> KEEP OUT OF REACH OF CHILDREN. Corrosive. Causes irreversible eye damage and skin burns. Harmful if swallowed, inhaled or absorbed through the skin. Avoid breathing spray mist. Do not get in eyes, on skin, or on clothing. Wear goggles or face shield, rubber gloves and protective clothing when handling. Wash thoroughly with soap and water after handling and before eating, drinking or using tobacco. Remove contaminated clothing and wash clothing before reuse.

After receiving what appear to be valid complaints from detainees regarding the toxicity and noxiousness of HDQ Neutral, the Government and its contractor, the GEO Group, did absolutely nothing other than to continue the use of HDQ Neutral. After receiving and reviewing the Petitioners-Plaintiffs' motion to enforce the CDC guidelines provision of the Preliminary Injunction, the Government did nothing towards stopping the use of HDQ Neutral in Adelanto's housing units. There is no evidence that the Government, or the GEO Group, caused any sort of investigation to be initiated.

Janecka did not even attempt to make the effort to simply "scroll down" to determine whether the diluted version of HDQ Neutral had the same, or even similar, safety warnings as the concentrated version. It is clear to the Court that the use of HDQ Neutral in Adelanto's housing units was with a callous disregard for the safety of Adelanto's detainees and in violation of the detainees' constitutional right to reasonable safety.

The Ninth Circuit reiterated that this Court "possesses broad equitable authority to remedy likely constitutional violations." Further, the Ninth Circuit instructed that "[i]f the [D]istrict [C]ourt determines, based on current facts, that particular measures are necessary to ensure that conditions at Adelanto do not put detainees at unreasonable risk of serious illness and death, it may require such measures." The Ninth Circuit, also, stated that the District Court "should, to the extent possible, avoid imposing provisions that micromanage the Government's administration of conditions at Adelanto."

The Court finds that the use of HDQ Neutral in Adelanto's housing units is objectively unreasonable and in callous disregard for the reasonable safety of the civil detainees who are housed there. Adelanto's use of HDQ Neutral must stop, immediately. By issuing such a mandate, the Court is not unreasonably micromanaging the Government's administration of conditions at Adelanto. *See Spain v. Procunier*, 600 F.2d 189, 196 (9th Cir. 1979). The Court is not telling the Government what cleaning chemicals it must use or what type of staff it must employ to clean. Rather, the Court is telling the Government that it must stop the use of a toxic and noxious chemical that is harming Adelanto's detainees and violating their detainees' constitutional right to reasonable safety. The Government does not have an unfettered right to manage and operate, free of any judicial oversight, a civil detention facility in a way that violates the constitutional rights of its detainees, especially where the constitutional violations affect the health and safety of individuals in the Government's care.

The Government's current response to the COVID-19 – both as to the current outbreak and to the continuing threat the coronavirus poses to the detainees – at Adelanto remains inadequate and objectively unreasonable. As such, the class members' constitutional right to be housed in reasonable safety while in civil detention continues to be violated. Therefore, the class members remain entitled to preliminary injunctive relief.

To ease compliance and enforcement, the Court will limit the provisions of this Modified Preliminary Injunction to significantly fewer provisions than what it ordered in the Preliminary Injunction.

Finally, because the science regarding the coronavirus and COVID-19 is continuously evolving, as are the conditions at Adelanto, the Count will entertain motions by any party to further modify this Modified Preliminary Injunction as the science or conditions evolve.

Accordingly,

𝕴𝖙 𝖎𝖘 𝕺𝖗𝖉𝖊𝖗𝖊𝖉 that, pending a final resolution of this case or further order of the Court:

1. The Government shall file by Noon on October 5, 2020, its Adelanto detainee population reduction plan, which shall include a recommendation as to the maximum number of detainees that can be safely housed at Adelanto during the COVID-19 pandemic such that the detainees will be able to maintain 6 feet of social distance at all times and all places from each other. The plan shall be supported by facts and not imaginary spheres or imprecise estimates. The plan shall include dimensions of all common areas and sleeping rooms/cells, and specific details as to how detainees will be able to sleep, eat, shower, and go about other daily activities while maintaining 6 feet of social distance at all times

and all places from each other. Petitioners-Plaintiffs shall file by October 9, 2020, their response, if any, to the Government's proposed plan. After reviewing the Government's proposed plan and the response filed by Petitioners-Plaintiffs, the Court will issue a further order.

2. Adelanto shall not accept any new or transfer detainees into its facility pending further order of the Court. The Court will permit Adelanto to, again, accept new or transfer detainees only after it has sufficiently reduced its detainee population to such a level that would allow the remaining detainees to maintain a social distance of 6 feet from each other at all times and at all places, including while sleeping, eating, showering, and going about other daily activities.

3. Now that Adelanto has an Abbott ID NOW rapid COVID-19 testing system, starting October 5, 2020, the Government shall test all Adelanto detainees, who agree to be tested, for COVID-19 on a weekly basis.

4. The Government shall file, under seal, by October 5, 2020, a complete census of all Adelanto detainees. The census shall contain, at a minimum, each class member's:
   A. Registration number;
   B. Name;
   C. Gender;
   D. Age;
   E. Most recent COVID-19 test date and result;
   F. Housing unit and room assignment, if applicable;
   G. Criminal history;
   H. Known medical conditions;
   I. Membership in a *Fraihat* subclass;

J. Location and detention status, specifically whether the class member remains detained at Adelanto, has been or will be released, transferred or deported; if the class member has been transferred, then the transfer location shall be stated;

K. Immigration status;

L. Immigration Court history and orders; and

M. Whether the person has any appeals pending before the Board of Immigration Appeals or the Ninth Circuit Court of Appeals, and the status of those appeals.

5. Starting on October 12, 2020, and every Monday thereafter until further order of the Court, the Government shall file, by Noon, a complete and updated census of all current Adelanto detainees with the above requested information. The Court notes that the Government has been filing weekly census spreadsheets that were incomplete. Henceforth, all weekly census spreadsheets shall include all detainees at Adelanto, and not just those detainees who are new to Adelanto. The weekly census spreadsheets shall, also, note any detainees who have been released, deported or transferred since the prior census.

6. The Government shall immediately stop using HDQ Neutral in all housing units and other indoor spaces at Adelanto that are occupied or used by detainees.

7. All Adelanto staff shall endeavor to keep a 6 foot social distance from each other and from detainees.

8. All Adelanto staff shall wear masks while in housing units and whenever interacting with other staff and/or detainees. Staff in single occupant offices with solid walls and a closed door do not need to wear a mask while in such office.

9. All judges, attorneys, staff and visitors at the Immigration Court attached to Adelanto, unless in a single occupant office with solid walls and a closed door, shall wear masks at all times and shall endeavor to maintain a social distance of six feet from all detainees whenever possible.

10. All Adelanto detainees, shall be **ordered** by the Government to maintain, to the extent possible given the current number of detainees, a social distance of 6 feet from other detainees at all times. When the Adelanto detainee population reaches the target population level that will be established by the Court by separate order, all Adelanto detainees shall be ordered by the Government to maintain a 6 foot social distance from each other at all times and at all places.

11. All Adelanto detainees shall wear masks, provided by the Government at no expense to the detainees, at all times except while sleeping, eating, drinking or showering. If a detainee is the sole occupant of a cell with solid walls and a solid door, s/he need not wear a mask while in that cell with the door closed.

12. The Government shall provide to Adelanto's detainees, at no cost to the detainees, sufficient and appropriate cleaning supplies. If a detainee is unable to clean and disinfect any exclusive use areas or items because of age, a medical or mental health issue, or other infirmity, the Government shall have those areas and/or items cleaned and disinfected on a regular basis.

13. Adelanto shall provide all detainees, at no expense to the detainees, with sufficient quantities of hand soap, paper towels, and hand sanitizer so that the detainees never run out of those supplies.

14. The Government shall create and implement any and all rules at Adelanto

necessary to comply with this Modified Preliminary Injunction.

15. All class members released by the Court pursuant to a Temporary Restraining Order issued in this case or in a separately and previously filed case, or by a Bail Order, shall remain released and subject to the terms and conditions of release as set forth in each respective Temporary Restraining Order or Bail Order.

16. Class counsel shall, with the cooperation of the Government, provide the best notice possible regarding the issuance of this Modified Preliminary Injunction to class members, and their separate counsel, for those class members who may have separate counsel.

𝔍𝔱 𝔦𝔰 𝔣𝔲𝔯𝔱𝔥𝔢𝔯 𝔒𝔯𝔡𝔢𝔯𝔢𝔡 that no bond shall be required for this Modified Preliminary Injunction.

𝔍𝔱 𝔦𝔰 𝔣𝔲𝔯𝔱𝔥𝔢𝔯 𝔒𝔯𝔡𝔢𝔯𝔢𝔡 that the Government's request for a stay pending appeal of this Modified Preliminary Injunction be, and hereby is, 𝔇𝔢𝔫𝔦𝔢𝔡.

Date: September 29, 2020

_____
Terry J. Hatter, Jr.
Senior United States District Judge